# KREBS DECL.
# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
Roy Den Hollander,

                Plaintiff on behalf of himself
                and all others similarly situated,

      -against-

Copacabana Nightclub,
China Club,
A.E.R. Nightclub,
Lotus,
Sol, and
Jane Doe Promoters,

             Defendants.
-----------------------------------------------------------x

Docket No. 07 CV 5873 (MGC)
ECF

**REPLY AFFIRMATION IN
SUPPORT OF MOTION TO
DISQUALIFY
<u>JUDGE CEDARBAUM</u>**

     I, Roy Den Hollander, an attorney admitted to practice in the State of New York and the

U.S. Southern District Court of New York, affirm under the penalty of perjury in accordance

with 28 U.S.C. § 1746 the following:

     1. I am the named plaintiff and attorney who filed this civil rights, 42 U.S.C. § 1983,

class action, Fed. R. Civ. P. 23(b)(2), for the violation of the 14th Amendment equal protection

rights of a class of thousands of men, which includes me. This affirmation is filed in reply to the

attorney for Lotus, Deborah Swindells Donovan, opposition to the motion to disqualify Judge

Cedarbaum for the appearance of sexual bias, sexual prejudice and partiality against the putative

class of men.

     2. Attorney Donovan resorts to a tactic often used by self-righteous feminists[1] and their

sycophants over the past forty years in this country:  attack a man for daring to exercise his

---

[1] Russ Limbaugh is often credited with inventing the term "feminazi" in 1992.  I disagree, since I've been using the
term since 1991, not in court of course.  At the very least, I should be credited as a co-author.  The on-line version of

freedom of speech in an effort to silence what they don't like and win something they don't

deserve—in this case a denial of my motion for recusal. (Donovan Declaration ¶ 11). It doesn't

matter to attorney Donovan and those of like intolerance that "[t]he proponents of the First

Amendment ... were determined that every American should possess an unrestrained freedom to

express his views, however odious they might be to vested interests whose power they might

challenge." Feldman v. United States, 322 U.S. 487, 501, 64 S. Ct. 1082, 1089, 88 L. Ed. 1480,

1419 (Black, J. dissenting)(1944). It also doesn't matter to her how well reasoned and factually

based the essays she published in her Exhibit A are. Clearly attorney Donovan wouldn't object

had the sexes in the essays been trans-gendered, since, as with all conformists, popular

acceptance by others of what they say is most important.

     3. The issue raised by attorney Donovan in the essays in her Exhibit A is not a matter of

popularity over who can genuflect the most before feminist dogma; it's the cornerstone of this

allegedly free nation—the First Amendment right to enter the market place of ideas no matter

what group may be agitated. Attorney Donovan is asking a Federal Court to deny a motion

based on a plaintiff's exercise of this freedom outside the courthouse and having nothing to do

with the legal issues in this case. Attorney Donovan just doesn't appreciate anyone challenging

the power of feminist zealots in this country, especially when the challenge, as in this case, is to

the deprivation of the rights of men. She, therefore, uses essays critical of the feminist special

interest group to stereotype me as biased against all females. (Donovan Declaration ¶ 11,

Donovan Memorandum pp. 8, 9).

---

the Merriam-Webster dictionary defines feminazi as "an extreme or militant feminist." That's probably the
equivalent of feminist zealot or self-righteous feminist.

4. Attorney Donovan does not challenge the accuracy of the essays, only that they offend her personally[2] and the overly subjective sensitivities of self-righteous feminists. The law, theoretically at least, does not make decisions based on the subjective standards of members of powerful special interest groups. Subjective sensitivities that cry offensiveness do not trump the First Amendment right to free speech. Attorney Donovan's, and millions like her, unwillingness to tolerated speech they find offensive is not a compelling interest that allows for the punishment of the exercise of free speech by having a court deny that speaker's motion.

5. Attorney Donovan cites to six essays, all of which except for one, are not available to the public, although I'd be willing to publish them if any publisher makes me an offer.[3] Since the essays are not available to the public, but exist only on a couple of computers, the only way attorney Donovan could have obtained access is by hacking into those computers. That's a violation of 18 U.S.C. § 1030(a)(2)—a federal felony, which is punishable by a fine or imprisonment of not more than ten years. Attorney Donovan indicates that the computer she hacked into, or some third person hacked into on her behalf, was connected to the internet. (Donovan Declaration ¶ 11). She doesn't, however, give the computer's address, perhaps in an effort to disguise her apparent violation of the law.

6. Attorney Donovan argues based on the essays that my motion to have Judge Cedarbaum dismissed for the appearance of sexual bias against the plaintiff class of men should be denied because the plaintiff is a "misogynist." Personally, I disagree with the characterization: one can't hate that which one lusts after. For example, I doubt attorney Donovan hates chocolate, although she might not like what it does to her.

---

[2] And no, the personal is not politically—it's private, but attacking the personal often gets results in America these days.

[3] The only one of the six essays to which the public has access and of which I am particularly proud is attached as Exhibit A.

7. Also based on the illegally obtained essays, attorney Donovan argues that I have an "unrelenting bias against females". (Donovan Declaration ¶ 11). The essays criticize feminist zealots—a sect to which all ladies do not belong, much to the annoyance of the sect. The essays are punchy, hard-hitting, intentionally provocative, well-written, well-reasoned, and factually based. Just because they stroke someone's fur the wrong way is too bad—this isn't Russia[4], and, in fact, they're meant to agitate. Apparently they've been successful even though, until now, not legally available to the public. By putting the essays in her Declaration, attorney Donovan has published them without the author's permission.

8. The *sine qua non* of bias is "unreasoned" of which the essays in Donovan's Exhibit A are not. I'll match their reasoning against any feminist, irrational proselytism that attorney Donovan cares to roll out. More importantly, however, is that the issue in this motion to disqualify a judge is not how bias one of parties may be, but whether the Judge has exhibited an appearance of not acting fairly towards that party. The essays are as irrelevant as attorney Donovan's client, Lulu's LLC or Lotus, repeated failure to pay its New York State taxes. Exhibit B.

9. The above seven paragraphs illustrate the result of the tried and true tactic of self-righteous feminists and their sycophants to distract from the merits of an argument by engaging in *ad hominem* attacks of calling their opponents "biased" or "misogynist" or some other opprobrium. It's always easier to make a dissembling, damaging allegation than to refute it, which is why the political correctionalists in America seem incapable of sticking to the issues when someone dare oppose their world view. Whenever dissent rears up to threaten the

---

[4] Russia hasn't changed as much as the New York Times pretends. Today, vocal opposition to a powerful group no longer ends in the Gulag; it's a straight trip to the grave.

unanimity of belief among the chosen, it is crushed with a choir of vituperation against the person who raises alternative ideas.

10.  Now to the merits of the recusal motion.  Attorney Donovan is correct when she says, "[a]t initial conferences, many judges discuss the merits of a case …." (Donovan Declaration ¶ 2).  But they don't argue on behalf of a defendant's motion to dismiss when that motion isn't scheduled for oral argument until three weeks later.  By the Judge extensively questioning me on the arguments and authorities in A.E.R. Lounge's ("AER") motion to dismiss just five days after the filing of that motion, the Judge violated her own time frame for allowing preparation for oral opposition to a motion.  Attorney Donovan pulls a neat trick in her Declaration at ¶ 7 by claiming I now have more time to "submit written papers."  One of many factors creating an appearance of partiality wasn't the time to submit written papers, but that the Judge, in effect, held oral argument on the dismissal motion just five days after its filing at a conference arranged by the Court for which I had one day's notice.

11.  AER's motion to dismiss left out two key decisions from the Southern District Court of New York that held "state action" did exist for a tavern regulated by the New York State Division of Alcoholic and Beverage Control ("ABC").  During Judge Cedarbaum's antagonistic grilling of me on the "state action" issue, she didn't know about those two decisions until I raised them.  A reasonable inference is that the Judge didn't know about the two decisions because AER's motion left them out.

12.  Attorney Donovan creates a false impression with the best of them in her Declaration at ¶ 3.  She claims Judge Cedarbaum "simply asked questions" of me about "state action".  Not so, the judge consistently interrupted my answers with manifest animosity the likes of which I had never witness in any court before.

Case 1:08-cv-04045-FB-LB   Document 18-2   Filed 04/17/09   Page 7 of 95
Case 1:07-cv-05873-MGC      Document 28      Filed 10/29/2007      Page 6 of 9

6

13.  Attorney Donovan down plays the importance of Judge Cedarbaum's decisions at the

October 3rd Scheduling Conference. (Donovan Declaration ¶¶ 5, 6).  When the Complaint was

filed, the status of the case was a putative class action in which I, as an attorney, could file

motions and take other actions on behalf of the class, which is the law.  Now, however, as the

result of Judge Cedarbaum's refusal to appoint me interim counsel for the class and her refusal to

make a decision on class certification, the case is as the Judge said, *"pro se"*.  The Judge can

later make a decision on class certification, but that's assuming there is a "later".  Judge

Cedarbaum repeatedly questioned the defendants as to why they hadn't moved earlier to dismiss

the action and remarked she couldn't understand their delay.  A clear indication as to where this

case and the rights of thousands of men are going—under the stiletto heel of preferential

treatment for females.

14.  The crucial part of the Judge's decisions is their impact.  Had Judge Cedarbaum

decided to first make a decision on class certification, as I requested, a decision for certification

would have put pressure on the defendants to settle by halting their invidious discrimination

against men.  Any settlement would not have required the defendants to pay money to the class

of men, nor any attorney's fees to me.  A settlement would simply have put a stop to guys

economically subsidizing feminine desires to party at certain night clubs.  The ladies would then

have to pay as much as men do to enter a club—sounds fair to me.  On the other hand, had the

Judge decided against certification, it would not have gone down well with the public because it

would have ruled against thousands of men whose civil rights were being violated.  It would also

have given me a chance, not a certainty, just a chance, to have the U.S. Court of Appeals for the

Second Circuit review her denial of class certification.  By putting off any decision on class

certification, the Judge reduced the case to one lone individual male fighting for his rights.  A

dismissal against one guy is not going to cause any ripples in this society. More importantly, it will send a message, along with Donovan's efforts to chill the free speech of men, that anyone wanting to bring a similar class action should forget it. Even if he has the time and energy, he'll be castigated for exercising his rights under the U.S. Constitution only to end in the street with the courthouse doors slammed in his face.

15. In the majority of civil rights cases, the class certification decision is made before any decision on motions to dismiss. The Second Circuit has urged the district courts to make the class certification "as soon as practicable after the *commencement* of [the] action." Henry v. Gross, 803 F.2d 757, 769 (1986)(Court's emphasis). And the Seventh Circuit discourages pre-certification motions to dismiss. Koch v. Stanard, 962 F.2d 605, 607 (1992).

16. Attorney Donovan keeps raising state action as a jurisdictional requirement that must be decided first—it is not. (Donovan Declaration ¶¶ 3, 6, 8, 10). Personal jurisdiction exists because the parties live or do business in New York State, and subject matter jurisdiction exists because the question to be resolved is a federal question. The Judge's questioning did not focus on these jurisdictional issues but the 14th Amendment's Equal Protection clause, which has two requirements: "state action" and invidious discrimination. Those are substantive questions not jurisdictional. Attorney Donovan initially defends the Judge's grilling me on these issues at the conference on the grounds that they were substantive. She considers the issues substantive in ¶ 2 of her Declaration because it serves the argument she makes there, but in later paragraphs, she claims the "state action" issue is procedural because it serves her arguments in those paragraphs. Apparently attorney Donovan believes she can have her way regardless of the inconsistency of her reasoning. I'll go with the reasoning of the U.S. Supreme Court that the 14th Amendment embodies and extends to all individuals substantive protections from "state action". Jett v.

Dallas Independent School District, 491 U.S. 701, 731, 109 S. Ct. 2702, 2720, 105 L.Ed.2d 598,

624 (1989).

17. Attorney Donovan prevaricates when she claims the conference focused solely on the

"state action" issue. (Donovan Declaration ¶ 10). The judge brought up the invidious

discrimination issue a number of times. The Judge even focused on the details of exactly how

much more guys were charged to enter a club than ladies and raised the unpopularity of the

lawsuit in connection with discrimination.

18. Attorney Donovan makes an intentionally false statement when she says that the

accusation against the Judge is for being "**sexually biased or prejudiced against men ....**"

(Donovan Declaration ¶ 10 (emphasis added)). The allegations in the motion to disqualify are of

the Judge's "**appearance** of sexual bias, sexual prejudice, and partiality against the class of men,

including the named plaintiff," (Den Hollander Law Memorandum p. 1 (emphasis added)) and

that the October 3rd conference "create[d] the **appearance** that Judge Cedarbaum, whether true

or not, is biased and prejudiced against men and creates a perception that she is not impartial in

these proceedings," (Den Hollander Initial Affirmation ¶ 14 (emphasis added)).

19. Defense counsel Donovan claims that the disdainful disregard and animosity

exhibited by the Judge towards me by consistently cutting off my answers, pointing out the

unpopularity of the lawsuit, and at one point mockingly calling into questions my professional

credentials demonstrated no "animus, antagonism or disdain" toward the class of men.

(Donovan Declaration ¶ 8). Attorney Donovan conveniently forgets that I was standing there not

just as a man but as the putative representative of thousands of men. And, let's be frank, does

anyone expect a defense lawyer not to spin what occurs in court or elsewhere.

20.  Attorney Donovan blissfully ignores that this is a suit to vindicate the rights of men, that all the plaintiffs are men, and that I am standing in their stead.  When the Court exhibits palpable antagonism toward me, it is doing the same toward the thousands of guys who continue to be charged more than females at night clubs in violation of the 14th Amendment.  When the antagonism within the courtroom as shown by the Judge's repeated interruptions, the professional insult, the remark about the unpopularity of the case, the arguing on behalf of a defendant's motion that was filed five days earlier, the moving up of the originally scheduled conference to just five days after the filing to that defendant's motion, and the delaying, perhaps forever, a decision on class certification in a civil rights case are all combined with the reality beyond the courthouse walls that (1) this suit would cost females lots of money by ending the male subsidization of ladies to party in nightclubs and (2) the past 40 years of institutions in America giving females preferential treatment at the expense of the rights of men, it adds up to at least an appearance of sexual bias, sexual prejudice and partiality toward the male plaintiffs.

21.  Defendant Sol also filed an answering declaration but it wasn't filed until 5:52 PM on the Wednesday before the return date of Thursday, November 1, 2007.  According to Judge Cedarbaum's rule, 3. Motions C., the declaration should have been filed by 12 noon.  Since the declaration was not timely filed, I have not addressed it in this affirmation.


Dated: New York, NY
      October 28, 2007

/S/

_____
Roy Den Hollander (RDH 1957)
545 East 14 Street, 10D
New York, NY 10009
(917) 687 0652

### A Different Time

A propeller driven plane drones somewhere overhead far out of sight.  Its low monotone humming envelops a warm, spring Sunday afternoon somewhere in the 1950s.  I sit on my 24 inch, black, single-gear Schwinn bicycle, keeping my balance by holding onto the door handle of an old, blue, four-door 1947 Dodge.

My consciousness pauses at the moment, feeling vaguely sad for no discernible reason.  The week's events ended with this gift of nothing to do:  no homework, no television shows, no new housing developments to explore or classmates able to come out and play.

The dead-end street needs a new asphalt topping.  Where I am balance on the side, the asphalt has broken up into small gravel-like stones with an isolated weed sprouting up here and there.  It is still early spring, the lawns are just beginning to turn green and the tulips and dogwood buds remain closed, waiting for a few consecutive days of warm weather.  The air smells fresh, warmed slightly by a gentle breeze.

The droning airplane fills the vacuum of silence on this street with modest middle-class houses in this small suburban town, whose claim to fame will not come until the end of the next decade.  Of all the towns in America, this town will have the second highest number of persons per capita to die in Vietnam—all of them men, of course, and all of them guys I knew.

# New York State Department of State

## State Tax Warrant Notice System

Taxpayer Names

**Please note that this record report has been generated by an independent searcher, using the Department of State's, State Tax Warrant Notice On-Line Database. The information contained in this report is NOT an official record of the Department of State.**

| Taxpayer Name(s) Selected: | City specified in warrant address record of Taxpayer Searched: | County in which warrant is filed of Taxpayer Searched: |
|---|---|---|
| LULU'S, LLC | Not Applicable | Not Applicable |

Your name selection(s) has returned 3 State Tax Lien Notice histories.

Back Button

Back

### Warrant ID# : E-022837098-W001-4

| Recorded Taxpayer Name(s) | Address |
|---|---|
| LULU'S, LLC T/A LOTUS | 409 W 14TH ST NEW YORK, NY 10014-1003 |

| Docket Date | County | Docket Amount | Dos File Date | Satisfied Date | Vacate Date | Amend Date |
|---|---|---|---|---|---|---|
| July 20, 2004 | NEW YORK | $48,613.73 | July 20, 2004 | | | |

| Recorded Taxpayer Name(s) | Address |
|---|---|
| LULU'S, LLC T/A LOTUS | 409 W 14TH ST NEW YORK, NY 10014-1003 |

| Docket Date | County | Docket Amount | Dos File Date | Satisfied Date | Vacate Date | Amend Date |
|---|---|---|---|---|---|---|
| July 20, 2004 | NEW YORK | $48,613.73 | September 19, 2007 | September 10, 2007 | | |

### Warrant ID# : E-010958639-W001-5

| Recorded Taxpayer Name(s) | Address |
|---|---|
| | |

| WILL REGAN INDIVIDUALLY AND AS RESPONSIBLE PERSON OF LULU'S, LLC | | | | 136 W 16TH ST APT 1RW NEW YORK, NY 10011-6200 | | | |
|---|---|---|---|---|---|---|---|
| **Docket Date** | **County** | **Docket Amount** | **Dos File Date** | **Satisfied Date** | **Vacate Date** | **Amend Date** | |
| July 21, 2004 | NEW YORK | $46,590.70 | July 21, 2004 | | | | |

| Recorded Taxpayer Name(s) | | | | Address | | | |
|---|---|---|---|---|---|---|---|
| WILL REGAN INDIVIDUALLY AND AS RESPONSIBLE PERSON OF LULU'S, LLC | | | | 136 W 16TH ST APT 1RW NEW YORK, NY 10011-6200 | | | |
| **Docket Date** | **County** | **Docket Amount** | **Dos File Date** | **Satisfied Date** | **Vacate Date** | **Amend Date** | |
| July 21, 2004 | NEW YORK | $46,590.70 | May 26, 2005 | | May 19, 2005 | | |

| Warrant ID# : E-022837098-W003-3 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Recorded Taxpayer Name(s) | | | | Address | | | |
| LULU'S, LLC T/A LOTUS | | | | 409 W 14TH ST NEW YORK, NY 10014-1003 | | | |
| **Docket Date** | **County** | **Docket Amount** | **Dos File Date** | **Satisfied Date** | **Vacate Date** | **Amend Date** | |
| November 03, 2006 | NEW YORK | $81,817.56 | November 03, 2006 | | | | |

Back Button

* Filed with Department of State on or prior to implementation of electronic filing system, January 8, 2004. Dates for filings made prior to January 8, 2004 must be derived from paper filings and should be obtained from the Department of Taxation and Finance.

Back |

[ Division of Corporations, State Records and UCC Home Page ] [ NYS Department of State Home Page ]

# KREBS DECL.
# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
ROY DEN HOLLANDER, on behalf of
himself and all others similarly
situated,

                    Plaintiff,              OPINION

        -against-                           07 Civ. 5873 (MGC)

COPACABANA NIGHTCLUB, et al.

                    Defendants.

--------------------------------X

APPEARANCES:

        LAW OFFICE OF ROY DEN HOLLANDER, ESQ.
        Plaintiff pro se
        545 East 14th Street, 10D
        New York, New York 10009

        By:  Roy Den Hollander, Esq.

        LAW OFFICE OF CHARLES B. LINN, ESQ.
        Attorney for Defendant Copacabana Nightclub Inc.
        901 North Broadway
        North White Plains, New York 10603

        By:  Charles B. Linn, Esq.

        ADAM B. KAUFMAN & ASSOCIATES, PLLC
        Attorneys for Defendant Sol
        585 Stewart Avenue, Suite 302
        Garden City, New York 11530

        By:  Robert S. Grossman, Esq.

        GORDON & REES, LLP
        Attorneys for Defendant Lotus
        90 Broad Street, 23rd Floor
        New York, New York 10004

        By:  Deborah S. Donovan, Esq.
             Christopher B. Block, Esq.

1

BEATTIE PADOVANO, LLC
Attorneys for Defendant AER Lounge, LLC
50 Chestnut Ridge Road
Montvale, New Jersey 07645

By:  Vanessa R. Elliott, Esq.

**Cedarbaum, J.**

Roy Den Hollander, individually and on behalf of a putative

class of similarly situated men, sues River Watch Restaurant,

Inc. d/b/a the Copacabana Nightclub ("Copacabana"), Nightlife

Enterprises L.P. d/b/a China Club ("China Club"), AER Lounge LLC

d/b/a AER Lounge ("AER"), Lulu's LLC d/b/a Lotus ("Lotus"), Ruby

Falls Partners LLC d/b/a Sol ("Sol"), and "Jane Doe promoters"[1]

pursuant to 42 U.S.C. § 1983 for sex discrimination in violation

of the Equal Protection Clause of the Fourteenth Amendment.  Den

Hollander, an attorney pro se, alleges that defendant nightclubs

regularly hold discriminatory "Ladies' Night" promotions.  On

certain nights, they charge women less for admission than men

and/or give women more time to enter the nightclubs at the

discounted admission price than they give to men.

Defendants AER, Lotus, and Sol move to dismiss the First

Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) on the

ground that they do not act under color of state law in offering

---

[1] "Jane Doe promoters" refers to unnamed individuals who act as
agents for the defendant nightclubs.  Guest House, a defendant
named in the original complaint, was voluntarily dismissed from
the case on October 3, 2007.

2

the Ladies' Night promotion.  Den Hollander moves to strike

defendants' motion papers for various reasons, and moves for an

order directing counsel for Lotus to disclose the source of

certain essays attached as exhibits to her opposition to Den

Hollander's motion for recusal.  For the following reasons,

defendants' motions are granted, and Den Hollander's motions are

denied.


**BACKGROUND**

According to the Amended Complaint, defendants operate

nightclubs in New York and are licensed to sell alcohol on their

premises.  The Amended Complaint describes a number of provisions

of the New York Alcoholic Beverage Control Law (the "ABC Law")

that closely regulate the manufacture, sale, and distribution of

alcoholic beverages in New York.  The New York State Liquor

Authority (the "SLA") issues licenses in accordance with and

oversees the implementation of the ABC Law.  Den Hollander

alleges that defendants engage in state action by selling alcohol

on their premises under that extensive regulatory system.

On various nights, defendants offer Ladies' Night

promotions, under which women receive free or discounted

admission or cover charges and/or are allowed more time than men

to take advantage of reduced cover charges.  Den Hollander claims

that this type of promotional offering is a form of "invidious

3

discrimination against men."  He was the victim of this form of discrimination on at least one occasion at each of the defendant nightclubs in 2007.  Den Hollander sues under 42 U.S.C. § 1983 for deprivation of his right to equal protection of the law.


**DISCUSSION**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008). "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" Id. (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)).


**I. State Action**

Under § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...."  42 U.S.C. § 1983.  Plaintiff must

4

demonstrate that defendants were acting under color of state law at the time of the alleged discrimination. Washington v. County of Rockland, 373 F.3d 310, 315 (2d Cir. 2004). "If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action 'under color of state law' for § 1983 purposes." Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 n.2 (2001).

"[S]tate action may be found ... only if[] there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" Id. at 295 (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974)). "The purpose of this [close nexus] requirement is to assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains." Blum v. Yaretsky, 457 U.S. 991, 1004 (1982) (emphasis in original).

The state-action inquiry has two parts:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible. ... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.

Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982). These two principles are related, but not redundant. Where the defendant's "official character is such as to lend the weight of the State to his decisions," these two principles collapse into a single inquiry. Id. But where, as here, the defendants are "without

5

such apparent authority, <u>i.e.</u>, ... private part[ies]," the
principles diverge.   <u>Id</u>.
     The Supreme Court has identified a number of facts that can
bear on the deprivation aspect of state action:

> a challenged activity may be state action
> when it results from the State's exercise of
> coercive power, ... when the State provides
> significant encouragement, either overt or
> covert, ... or when a private actor operates
> as a willful participant in joint activity
> with the State or its agents....

<u>Brentwood</u>, 531 U.S. at 296 (internal quotation marks and
citations omitted).  As to the state-actor portion of the
inquiry, the Court has:

> treated a nominally private entity as a state
> actor when it is controlled by an agency of
> the State, ... when it has been delegated a
> public function by the State, ... when it is
> entwined with governmental policies or when
> government is entwined in [its] management or
> control....

<u>Id</u>. (internal quotation marks and citations omitted).

## A. Deprivation Through Governmental Decision

     The specific conduct at issue here is the offer of
discounted cover charges to women.  To meet this part of the
<u>Lugar</u> state-action test, the plaintiff must show that defendants'
decisions to discriminate have a close nexus with or can be
fairly ascribed to a governmental decision.  <u>Lugar</u>, 457 U.S. at
937-38.  As noted above, this can be shown when: 1) the
deprivation "results from the State's exercise of coercive
power," 2) "the State provides significant encouragement, either
overt or covert," or 3) "a private actor operates as a willful
participant in joint activity with the State."  <u>Brentwood</u>, 531
U.S. at 296 (internal quotation marks omitted).

### 1. The State's Exercise of Coercive Power

     Den Hollander argues that his deprivation resulted from New
York's regulation of the sale of alcohol because defendants
"could not exercise their admission practices without the direct
and indispensable participation of the SLA."  He speculates that
without alcohol licenses from the SLA, customers would not
patronize nightclubs or invest in their businesses.
     Den Hollander cites <u>Edmonson v. Leesville Concrete Co.</u>, 500
U.S. 614 (1991), to support his state action claim.  In <u>Edmonson</u>,

6

Leesville used peremptory challenges to remove black persons from a prospective jury without having to provide a race-neutral explanation when its conduct was challenged for being racially discriminatory.  500 U.S at 616.  The Court held that Leesville's use of the peremptory challenges constituted state action and that exclusion of a prospective juror on account of race in a civil trial violates that prospective juror's equal protection rights.  Id. at 620-28.  The first part of the Lugar state-action inquiry was met because the peremptory challenges were authorized by federal statute, 28 U.S.C. § 1870.  Id. at 620-21.

Den Hollander argues that the ABC Law and SLA rules form the regulatory framework governing alcohol sale and consumption in New York in the same way that federal statutes and rules govern the jury trial system discussed in Edmonson.  Thus, he asserts that he is deprived of equal protection of the law by defendants' exercise of the privilege of serving alcohol as created and enforced by the laws of New York.  In fact, his deprivation is the reduction to women of the cover charge for admission on some nights.

Defendants' decisions to hold Ladies' Nights are not state action.  The ABC Law establishes an alcohol licensing system administered by the SLA.  When defendants sell alcohol, they are exercising a privilege created by the State.  But when they reduce the cover charge to women on certain nights, they are not acting under any right or privilege created by the State because neither the ABC Law nor the SLA regulates the admission prices set by the defendants.  In other words, Den Hollander's alleged deprivation was not caused by defendants' sale of alcohol but by their pricing of admission to the entertainment provided by their nightclubs.  Thus, it cannot be said that the State is responsible for defendants' Ladies' Nights.

In Edmonson, a federal statute specifically provided for the right to use peremptory challenges to assist the court in selecting a jury, and the exercise of that statutory right constituted state action.  In this case, defendants hold Ladies' Night promotions without any specific approval or endorsement from the State.  The existence of the ABC Law and SLA rules does not transform all conduct by nightclubs into state action any more than the laws regarding jury trials transform every litigant in a jury trial into a state actor.  See, e.g., Polk County v. Dodson, 454 U.S. 312, 325 (1981) ("[A] public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding."); Jackson, 419 U.S. at 350 ("The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment. ... Nor does the fact that the regulation

is extensive and detailed ....") (citation omitted); <u>Cranley v. Nat'l Life Ins. Co.</u>, 318 F.3d 105, 112 (2d Cir. 2003) ("A finding of state action may not be premised solely on the private entity's ... licensing, or regulation by the government.").

The Supreme Court has held that a heavily regulated utility company's decision to terminate services to an individual is not state action because that decision is not "sufficiently connected ... to the State for purposes of the Fourteenth Amendment." <u>Jackson</u>, 419 U.S. at 358–59. It has also held that the acts of physicians and nursing home administrators in discharging or transferring Medicaid patients to lower levels of care is not state action because their decisions were not dictated by the State, despite significant Medicaid regulation. <u>Blum</u>, 457 U.S. at 1008–09.

As in <u>Jackson</u> and <u>Blum</u>, defendants' decisions to hold Ladies' Nights are insufficiently connected to the SLA to constitute state action. The SLA plays no role in establishing or enforcing defendants' Ladies' Night promotions, and defendants do not discriminate against men in their right to purchase and be served liquor. <u>See</u> <u>also</u> <u>Moose Lodge No. 107 v. Irvis</u>, 407 U.S. 163, 175–76 (1972) (private club's discriminatory guest policy not attributable to Pennsylvania or its regulation of alcohol); <u>Hadges v. Yonkers Racing Corp.</u>, 918 F.2d 1079, 1083 (2d Cir. 1990) (heavily regulated, state-licensed racetrack's decision to deny plaintiff's application to work at the racetrack lacked close nexus to the State).

## 2. Encouragement from the State

Den Hollander argues that the SLA encourages defendants' discriminatory practices by renewing their licenses and by benefitting financially from the revenue received from the licenses. Even if the SLA renews defendants' licenses without challenging or questioning their practices, defendants' actions do not amount to state action because the State has not significantly encouraged or endorsed the specific action in question. "State approval of an action by a regulated entity does not constitute state action 'where the initiative comes from [the private entity] and not from the State' and the state 'has not put its own weight on the side of the proposed practice by ordering it.'" <u>Tancredi v. Metro. Life Ins. Co.</u>, 316 F.3d 308, 313 (2d Cir. 2003) (quoting <u>Jackson</u>, 419 U.S. at 357) (brackets in <u>Tancredi</u>). Indeed, "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action." <u>Am. Mfrs. Mutual Ins. Co. v. Sullivan</u>, 526 U.S. 40, 52 (1999).

The SLA collects fees for alcohol licenses, but does not collect any revenue from defendants' cover charges. <u>See</u> ABC Law

§ 17; SLA Schedule of Retail License Fees.  The license fee for
each license category is uniform across all licensees within
those categories, regardless of whether they use the Ladies'
Night promotion.  <u>Id</u>.  Thus, the revenue from the alcohol license
does not encourage or discourage the use by nightclubs of Ladies'
Nights.  <u>See</u> <u>also</u> <u>Yonkers Racing Corp.</u>, 918 F.2d at 1082 (no
state action found even though defendant received a tax credit
from the state and the State benefited from revenue from
defendant).

Den Hollander also asserts that "the special interest group
called 'Feminism' has succeeded in creating a customary practice
in many governmental institutions ... in which the invidious
discrimination of men is the accepted and preferred mode of
behavior."  He lists various examples of such purported
discrimination and asserts that the SLA has engaged in this
customary practice.  These extraneous pronouncements do not
demonstrate that the SLA has any relationship with defendants'
choices to hold Ladies' Nights.

### 3. Joint Activity with the State

Den Hollander argues that the State is engaged in joint
activity with defendants because the alcohol license gives
defendants an economic benefit or franchise.  He compares the
benefits received by defendants to those present in <u>Burton v.
Wilmington Parking Authority</u>, 365 U.S. 715, 724 (1961).  In
<u>Burton</u>, the Court held that defendant restaurant's refusal to
serve plaintiff on account of his race constituted state action
because the restaurant leased its space from the government, was
operating in a public parking lot on land owned by the
government, and benefitted from state funds supporting the
parking lot.  365 U.S. at 724-25.  The Parking Authority's
failure to correct the restaurant's discriminatory policies made
the Parking Authority "a party to the refusal of service,"
thereby placing "its power, property and prestige behind the
admitted discrimination."  <u>Id</u>. at 725.

The State's involvement in defendants' businesses is not
analogous to the facts of <u>Burton</u>.  Defendants do not lease their
property from the government and are not obtaining any unique
benefits from government funds.  <u>See Yonkers Racing Corp.</u>, 918
F.2d at 1082 ("[T]he State in the instant case does not have a
proprietary interest in [defendant's business].").  <u>Burton</u> was
limited to cases where "a State leases public property in the
manner and for the purpose shown to have been the case here."
<u>Id</u>. at 726.  The Supreme Court has distanced itself from the
"vague 'joint participation' test embodied in [<u>Burton</u>]."
<u>Sullivan</u>, 526 U.S. at 57.  "[P]rivately owned enterprises
providing services that the State would not necessarily provide,

9

even though they are extensively regulated, do not fall within the ambit of Burton." Blum, 457 U.S. at 1011.

Furthermore, in Moose Lodge No. 107 v. Irvis, the Supreme Court found that the competitive effect of having a set number of alcohol licenses was "limited" and fell "far short of conferring ... a monopoly in the dispensing of liquor." 407 U.S. at 177. In Yonkers Racing Corporation, the Second Circuit did not find state action even though the Yonkers Racing Corporation ("YRC"), which operates a racetrack pursuant to a State license, receives tax credits from the State and "the State gains greater revenues if YRC prospers." 918 F.2d at 1082. Even if defendants did benefit in some way from a franchise or monopoly, there would still be an "insufficient relationship between the challenged actions of the [defendants] and their monopoly status." Jackson, 419 U.S. at 352. The ABC Law and SLA regulations cannot "be said to make the State in any realistic sense a partner or even a joint venturer in the [defendants'] enterprise[s]." Moose Lodge, 407 U.S. at 177.

Den Hollander also argues that the requirement that defendants display their alcohol licenses in their establishments, ABC Law § 114(6), creates the appearance of state authorization of their practices. That display requirement, which relates to the privilege of selling alcohol, has no bearing on defendants' admission policies, the only issue here.

### B. State Actor

Den Hollander has failed to show that his deprivation was caused by defendants' "exercise of some right or privilege created by the State or by a rule of conduct imposed by the State." Lugar, 457 U.S. at 937. Nevertheless, he argues that New York's regulatory scheme regarding alcohol "dominates the on-premise[s] consumption of alcohol to such a degree" that defendants' "every move evinces State authority and control" and that the State and defendants "have overlapping identities." As noted above, the two-part Lugar state action test collapses into a single inquiry only when the defendant's "official character is such as to lend the weight of the State to his decisions." Id. Defendants lack such an official character.

Den Hollander's argument that defendants possess the official character of the State is taken primarily from his misreading of Seidenberg v. McSorleys' Old Ale House, Inc., 308 F. Supp. 1253 (S.D.N.Y. 1969) ("McSorleys I") and Seidenberg v. McSorleys' Old Ale House, Inc., 317 F. Supp. 593 (S.D.N.Y. 1970) ("McSorleys II"). McSorleys was a public bar which only served men. Two women sought service in the bar and sued for discrimination when they were refused alcohol. A motion to dismiss was denied in McSorleys I, and summary judgment was

10

granted in favor of plaintiffs in McSorleys II.  The court found
state action in both opinions.

Den Hollander argues that McSorleys I & McSorleys II held
that New York's regulatory scheme is so pervasive that any entity
open to the public with an alcohol license is an agent or
instrumentality of the State, such that any and all of its
actions can be fairly treated as state actions.  Such a reading
is erroneous.  McSorleys I focused primarily on the question of
whether McSorleys was a state actor, but it also answered the
first part of the Lugar test by assessing "whether the State has
... significantly involved itself in actions alleged to amount to
invidious discrimination."  308 F. Supp. at 1259.  The state
actor analysis in McSorleys I was undertaken in light of the fact
that the discrimination alleged, refusal to serve alcohol,
resulted from McSorleys' possession of a license to sell alcohol.
The court in McSorleys II understood that the test for state
action requires that there exist "some causal relation ...
between the state activity and the discrimination alleged."  317
F. Supp. at 597.[2]  That causal relation is missing in this case.

Defendants are private entities that set their own policies
for admission.  Their compliance with state regulations for
alcohol does not convert them into all-purpose state actors.  See
Tancredi, 316 F.3d at 313 ("[A] regulatory agency's performance
of routine oversight functions to ensure that a company's conduct
complies with state law does not so entwine the agency in
corporate management as to constitute state action.").
Furthermore, Den Hollander cannot show state action through
entwinement because defendants are not entwined with state
officials or state funds.  Cf. Brentwood, 531 U.S. at 299-300
(entwinement with state officials); Horvath v. Westport Library
Ass'n, 362 F.3d 147, 153 (2d Cir. 2004) (entwinement with state
funds).

Den Hollander also argues that the sale of alcohol is a
public function that has been delegated by the State to entities
possessing alcohol licenses.  State action has been found under
the public function test in cases challenging discrimination in
primary elections, Nixon v. Condon, 286 U.S. 73, 89 (1932), free
speech restrictions in a company town, Marsh v. Alabama, 326 U.S.
501, 509 (1946), and segregation in a municipal park, Evans v.
Newton, 382 U.S. 296, 302 (1966).  The public function relevant
here is the regulation of the alcohol industry.  New York State's

_____

[2] Den Hollander makes much of the Supreme Court's citation of
McSorleys' II in Craig v. Boren, 429 U.S. 190, 208 (1976).  But
the Court cited McSorleys II and other similar cases in Craig
only to show that the Twenty-first Amendment "does not alter the
application of equal protection standards."  429 U.S. at 209.

decision to allow alcohol sales through the provision of licenses is not a delegation of that public function. Defendants do not have the power or authority to alter state regulation in the field, and they must abide by all regulations related to the alcohol license. Accordingly, defendants do not exercise a public function.

### C. Remaining Defendants

The motions to dismiss filed by AER, Lotus, and Sol are granted because Den Hollander cannot show that private nightclubs are state actors in setting cover charges for admission to their facilities. Copacabana and China Club have not moved to dismiss, but the claims against them are similarly defective. There are no separate facts alleged against Copacabana and China Club that would alter the state action inquiry, and plaintiff has had an opportunity to be heard on the issues. Accordingly, in the interest of judicial economy, the claims against Copacabana and China Club will be dismissed sua sponte for failure to state a claim. See Perez v. Ortiz, 849 F.2d 793, 797 (2d Cir. 1988); Leonhard v. United States, 633 F.2d 599, 609 n.11 (2d Cir. 1980) ("The district court has the power to dismiss a complaint sua sponte for failure to state a claim.").

### II. Plaintiff's Motions

Den Hollander moves to strike certain motion papers filed by defendants for being late; to deny the motions to dismiss filed by Sol and AER for failure to file memoranda of law separate from their supplemental affirmations; to strike certain portions of Lotus' memorandum of law for not providing citations; and to compel counsel for Lotus to disclose the source of certain essays attached to her opposition to Den Hollander's motion for recusal. Any technical defects in defendants' motion papers were insubstantial and did not prejudice Den Hollander. The issues relevant to the motions to dismiss were clear to all parties, and the motions were re-filed in light of the filing of the Amended Complaint, giving all litigants more time to respond. The essays submitted by Lotus as exhibits in opposition to Den Hollander's motion for recusal are irrelevant to this case, and any claim that Den Hollander may seek to pursue in relation to the submission of those essays is beyond the scope of this action.

### CONCLUSION

For the foregoing reasons, the motions to dismiss filed by AER, Lotus, and Sol are granted, and the complaint is dismissed as to all defendants. Den Hollander's motions are denied. The Clerk is directed to close this case.

SO ORDERED.

Date:     New York, New York
          September 29, 2008


                                    S/_____
                                        MIRIAM GOLDMAN CEDARBAUM
                                        United States District Judge

# KREBS DECL.
# EXHIBIT 9

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 43127 (S.D.N.Y.), 46 U.S.P.Q.2d 1382
(Cite as: 1998 WL 43127 (S.D.N.Y.))

Page 1

▷
United States District Court, S.D. New York.
Richard NOBLE, Richard Noble, as agent for Wil-
liam J. Cook and Kim L. Waltrip, Jeffrey Robert
Bate, Craig D. Branham, Steve Lyon, Sharon K.
Lloyd-Dunbar, and Christine N Seibert, Plaintiffs,
v.
TOWN SPORTS INTERNATIONAL, INC. and
TSI/NEW YORK SPORTS CLUB, INC., Defend-
ants.
No. 96 CIV. 4257(JFK).

Feb. 2, 1998.

*MEMORANDUM OPINION and ORDER*

KEENAN, District J.

*1 Before the Court is Defendants' motion to dis-
miss this action, pursuant to Fed.R.Civ.P. 12(b)(1),
for lack of federal subject matter jurisdiction or, in
the alternative, dismissing Plaintiffs' claim for stat-
utory damages and attorney's fees under the Copy-
right Act. For the reasons stated below, the Court
grants Defendants' motion to dismiss for lack of
federal subject matter jurisdiction.

BACKGROUND

Plaintiff Richard Noble is a professional photo-
grapher who took photographs of the other
Plaintiffs in this action, who are models. Defend-
ants Town Sports International, Inc. and TSI/New
York Sports Club, Inc. are affiliates that operate
health clubs in New York, Massachusetts, Wash-
ington, D.C. and other places. By a written license
agreement, Defendants allegedly purchased from
Noble a limited right to use his photographs in con-
nection with a specific advertising campaign. The
agreement allegedly provided that Defendants
could use the photographs for one year, in a limited
geographic area, for a specific advertising cam-

paign. Plaintiffs contend that Defendants breached
the terms of the license agreement by using the
photographs for more than one year, without
Plaintiffs' consent, in unauthorized advertisements
and in unauthorized geographic areas. Plaintiffs
filed the instant lawsuit, stating a federal claim for
copyright infringement and state law claims for
breach of contract, unfair competition, unjust en-
richment and invasion of privacy under §§ 50-51 of
the New York Civil Rights Law.

Defendants move to dismiss the federal copyright
infringement claim on the ground that the photo-
graphs at issue are not registered with the U.S.
Copyright Office, which is a prerequisite to institut-
ing a copyright infringement suit. Alternatively,
Defendants move to dismiss the claim for statutory
damages and attorney's fees for failure to comply
with 17 U.S.C. §§ 411(a) and 412 of the Copyright
Act.

DISCUSSION

*A. The Copyright Infringement Claim*

Under the Copyright Act, "[N]o action for infringe-
ment of the copyright of any work shall be insti-
tuted until registration of the copyright claim has
been made in accordance with this title." 17 U.S.C.
§ 411(a). "The registration requirement is a juris-
dictional prerequisite to an infringement suit."
*M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903
F.2d 1486, 1488 & n. (11th Cir.1990); *see Whim-
sicality, Inc. v. Rubie's Costume Co., Inc.,* 891 F.2d
452, 453 (2d Cir.1989) ("proper registration is a
prerequisite to an action for infringement"); *De-
metriades v. Kaufman,* 680 F.Supp. 658, 661
(S.D.N.Y.1988) ("Receipt of an actual certificate of
registration or denial of same is a jurisdictional re-
quirement, and this court cannot prejudge the de-
termination to be made by the Copyright Office.").

Plaintiff Richard Noble has only applied for copy-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 43127 (S.D.N.Y.), 46 U.S.P.Q.2d 1382
(Cite as: 1998 WL 43127 (S.D.N.Y.))

Page 2

right registration of the photographs at issue in this case; a certificate of registration has not yet been issued by the Copyright Office. Nonetheless, Plaintiffs' counsel contends that "[t]he application for registration is sufficient to maintain an infringement action." Pls. Mem. in Opp. at 6. The Court disagrees. The issuance of a registration certificate is a "prerequisite to the commencement of the infringement action" a nd an application for registration does not suffice. *Robinson v. Princeton Review,* No. 96 Civ. 4859(LAK), 1996 WL 663880, at *7-8 (S.D.N.Y. Nov.15, 1996); *see National A ss'n of Freelance Photographers v. Associated Press,* No. 97 Civ. 2267(DLC), 1997 WL 759456, at *12 (S.D.N.Y. Dec.10, 1997) ("an action for copyright infringement cannot be asserted unless a certificate of registration has been issued; the mere filing of an application is simply insufficient to support such a claim"). Because Plaintiff Noble has only filed an application for registration, and no certificate of registration has yet been issued for the photographs underlying the infringement claim, the federal copyright infringement claim cannot stand. Upon dismissal of this federal claim, which is the only basis for original federal jurisdiction, only state law claims remain and the Court declines to exercise supplemental jurisdiction over those claims.

### CONCLUSION

*2 For the reasons discussed above, the Court grants Defendants' motion to dismiss the federal copyright infringement claim for lack of federal subject matter jurisdiction. Absent any other federal claim, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. The Court orders this case closed and directs that it be removed from the Court's docket.

SO ORDERED.

S.D.N.Y.,1998.
Noble v. Town Sports Intern., Inc.
Not Reported in F.Supp., 1998 WL 43127 (S.D.N.Y.), 46 U.S.P.Q.2d 1382

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 10

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 425005 (S.D.N.Y.), 68 Fair Empl.Prac.Cas. (BNA) 1112
**(Cite as: 1995 WL 425005 (S.D.N.Y.))**

Page 1

▷
United States District Court, S.D. New York.
Simone DEWEY, Plaintiff,
v.
PTT TELECOM NETHERLANDS, U.S., INC., De-
fendant.
**Civ. A. No. 94 Civ. 5983 (HB).**

July 19, 1995.

OPINION AND ORDER

BAER, District Judge.

**\*1** Plaintiff Simone Dewey ("Dewey") brings this action against her former employer, defendant PTT Telecom Netherlands, U.S., Inc. ("PTT") for violations of her rights under Title VII of the Civil Rights Act of 1964, *as amended,* 42 U.S.C. § 2000e *et seq.,* and under the Age Discrimination in Employment Act of 1967, *as amended,* 29 U.S.C. 621 *et seq.* ("ADEA"). Dewey, a fifty-four year old African-American woman, alleges that PTT forced her to resign as a result of her age, race and gender.

PTT moved to dismiss the complaint (1) pursuant to Fed.R.Civ.P. 12(b)(1) (lack of subject matter jurisdiction), arguing that it is not an employer as defined in Title VII or ADEA because it does not employ the requisite number of employees; and (2) pursuant to Fed.R.Civ.P. 12(b)(6) (failure to state a claim), arguing that Dewey knowingly and voluntarily signed a valid release waiving her right to sue.

At oral argument, the court reserved decision on PTT's motion to dismiss and directed the parties to take discovery and file supplemental briefs on PTT's status as an "employer" under the definitional scheme of both ADEA and Title VII. After reviewing both parties' supplemental briefs, this Court hereby grants PTT's motion to dismiss as the court lacks jurisdiction over the subject matter of

this case.

## I. FACTS

PTT, a business development, marketing and public relations company, which was designed to facilitate the sale of its Dutch parent company's international telecommunications services in North America, hired Dewey in July 1992 as a Director of Strategic Accounts. On August 17, 1992, PTT and Dewey entered into a three-year employment contract. Although the number of PTT's employees fluctuated, it never exceeded thirteen.

On March 1, 1993, PTT advised Dewey that she had thirty days to improve her job performance or she would be terminated. Dewey claims, conversely, that her performance was satisfactory and that she was fired because of her sex, age and race.

PTT is a wholly owned subsidiary of PTT Netherlands (US) Inc., a Delaware incorporated holding company with two officers. PTT Netherlands (US) Inc. is owned by PTT Telecom B.V., which in turn is owned by Royal PTT Nederland NV ("Royal PTT").

## II. STANDARD FOR MOTION TO DISMISS

A motion to dismiss under Rule 12(b)(1) challenges the court's statutory or constitutional power to adjudicate the case ..." and "[t]ypically ... alleges that the federal court lacks either federal question or diversity jurisdiction over the action." 2A James W. Moore et al.. *Moore's Federal Practice,* ¶ 12.07, at 12-49 (2d ed 1994). In a motion to dismiss for lack of subject matter, the court construes the complaint broadly and liberally in conformity with the principle set out in Rule 8(f), Fed.R.Civ.P., "but argumentative inferences favorable to the pleader will not be drawn." 5A Charles A. Wright et al., *Federal Practice and Procedure* § 1350, at 218-219 (1990 & Supp.1991). The mover and the pleader may use

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 425005 (S.D.N.Y.), 68 Fair Empl.Prac.Cas. (BNA) 1112
(Cite as: 1995 WL 425005 (S.D.N.Y.))

affidavits and other materials beyond the pleadings themselves in support of, or in opposition to, a challenge to subject matter jurisdiction. *See Land v. Dollar,* 330 U.S. 731, 735 n. 4 (1947); *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1130 (2d Cir.1976), *cert. denied sub. nom.,* 469 U.S. 884 (1984). Once challenged, the burden of establishing a federal court's subject matter jurisdiction rests on the party asserting jurisdiction. *See Thomson v. Gaskill,* 315 U.S. 442, 446 (1942); *Gafon Corp. v. Hauserman,* 602 F.2d 781, 783 (7th Cir.1979). Unlike a motion to dismiss under Rule 12(b)(6), however, a dismissal under Rule 12(b)(1) is not based on the claim's merits. *See Exchange Nat'l Bank,* 544 F.2d at 1130-1131.

## III. DISCUSSION

**\*2** Dewey argues that PTT and its parent, Royal PTT, constitute a "single employer" and therefore, when combined, employ the requisite number of people to qualify as "employers" under ADEA and Title VII. ADEA defines employers as those employing twenty or more employees for at least twenty weeks. 29 U.S.C. § 630(b). Title VII's definition of employer requires a minimum of fifteen employees for at least twenty weeks. 42 U.S.C. § 2000e(b). Only potential victims of the alleged discriminatory practice count for the purpose of determining whether the defendant is an employer under Title VII or ADEA. *Goyette v. DCA Advertising,* 830 F.Supp. 737, 745 (S.D.N.Y. 1993). PTT denies that it satisfies the definition of an employer under either statute on the grounds that it never employed more than thirteen people and that it is not sufficiently integrated with its parent corporation for the two entities to constitute a single employer.

The Southern District has enumerated four criteria to determine whether entities are sufficiently related to warrant joint liability for the acts of the immediate employer. Courts should assess the degree of (1) centralized control of labor relations; (2) interrelated operations; (3) common management; and (4) common ownership. *Frischberg v. Esprit de Corp., Inc.,* 778 F.Supp. 793, 800 (S.D.N.Y.1991), *aff'd,* 969 F.2d 1042 (2d Cir.1992); *Kellett v. Glaxo Enterprises, Inc.,* No. 91 Civ. 6237, 1994 WL 669975 at \*2 (S.D.N.Y. Nov. 30, 1994). The *Glaxo* court further stated that "[c]ourts do not readily find that related entities are single employers in discrimination cases." *Glaxo,* 1994 WL 669975 at \*2.

The most important factor in the "single employer analysis" is the degree of centralized control of labor relations and whether it exceeds "the control normally exercised by a parent corporation which is separate and distinct from the subsidiary." *Id.* at \*3 (quoting *Armbruster v. Ouinn,* 711 F.2d 1332, 1337-1338 (6th Cir.1983)). In this case, Dewey fails to demonstrate that PTT Royal exercised any such control over PTT's labor practices. Dewey claims that PTT Telecom B.V., one of PTT's parent companies, stationed three of its employees at PTT's offices and that there were discussions regarding the stationing of another employee there. Pl.'s Suppl.Mem.Opp'n Summ.J. at 5. PTT does not dispute these facts. The employees in question did function as PTT employees during the time period. But there is no evidence, nor does Dewey allege, that Royal PTT dictated the hiring of these individuals or exercised any control over their employment. Def.'s Suppl.Mem.Supp.Mot. to Dismiss at 11; Sander May Aff. ¶ 3. In fact, Dewey states that PTT's President was told not to interfere in PTT's employment agreements without the consent of Jan Volbeda, an employee of Royal PTT who was also on PTT's Board of Directors. Pl.'s.Suppl.Mem.Opp'n Summ.J. at 6. Dewey offers no proof that Volbeda was acting in a manner inconsistent with his position on PTT's Board. As further proof of Royal PTT's control of labor relations, Dewey argues that after both her hiring and termination by PTT, the defendant immediately informed Royal PTT of its decisions. Pl.'s Suppl.Mem.Opp'n Summ.J. at 6-7. These actions do not show that Royal PTT exercised control over PTT's employment practices but rather that PTT kept its parent informed of employment decisions it made. Furthermore, when Dewey appealed by letter to officers of Royal PTT regard-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                         Page 3
Not Reported in F.Supp., 1995 WL 425005 (S.D.N.Y.), 68 Fair Empl.Prac.Cas. (BNA) 1112
**(Cite as: 1995 WL 425005 (S.D.N.Y.))**

ing her termination, her letter went unanswered. Ul-
timately, she dealt exclusively with PTT regarding
her termination. Def.'s Suppl.Mem.Supp.Mot. Dis-
miss at 11, 13-14; Dewey Aff. ¶¶ 2, 7, 8, 22-30,
35-51; Hoover Aff. ¶¶ 4-8. In sum, Dewey fails to
show that Royal PTT participated in PTT's employ-
ment process to any degree inconsistent with that of
a normal parent/subsidiary relationship.

**\*3** In order to prove the second factor, that the de-
fendant and Royal PTT have interrelated opera-
tions, Dewey argues that two out of the three mem-
bers of PTT's Board of Directors are Dutch citizens
and employees of Royal PTT. In assessing the in-
terrelatedness of operations, however, courts look
to factors such as common offices, long-distance
shipping, bank accounts, payroll and shared facilit-
ies rather than to an overlap of personnel as indicia
of integration. *Glaxo,* 1994 WL 669975 at \*3; *see
also Rogers v. Sugar Tree Products, Inc.,* 7 F.3d
577 (7th Cir.1993) (interrelated operations refers to
common offices, common record keeping, shared
bank accounts and equipment). Dewey has not al-
leged, nor can she prove, that PTT and Royal PTT
share any common offices, facilities or have com-
mon record keeping, bank accounts or company
policies. Sander May Aff. ¶ 2.

With regard to the third factor in the "single em-
ployer" analysis, Dewey argues that because nine
out of the ten current and past Board members of
PTT have been Dutch citizens and were employees
of Royal PTT, common management of PTT and
Royal PTT is established. None of the officers of
PTT, however, were simultaneously officers of
Royal PTT or had any responsibility in managing
the operations of Royal PTT. Sander May Aff. ¶¶
6-8. The fact that the directors of the subsidiary are
all employees of the parent does not establish that
the parent controls the subsidiary. *Morgan v. Safe-
way Stores, Inc.,* 884 F.2d 1211 (9th Cir.1989); *see
also Johnson v. Flowers Indus., Inc.,* 814 F.2d 978,
982 (4th Cir.1987) (parent not considered employer
merely because it chose subsidiary's directors as of-
ficers). Dewey would need to prove more than an

overlap in boards or management in order to use the
single employer doctrine. *Rittmeyer v. Advance
Bancorp, Inc.,* 868 F.Supp. 1017, 1023
(N.D.Ill.1994); *Kelber v. Forest Electrical Corp.,*
799 F.Supp. 326, 331 (S.D.N.Y.1992).

Finally, Dewey claims that the fourth factor of the
single employer analysis, common ownership, is
uncontested. Pl's. Suppl.Mem.Opp'n Summ.J. at 7.
The defendant points out that there are two distinct
entities between PTT and Royal PTT but does not
deny that Royal PTT is the ultimate parent. Sander
May Aff. ¶ 3; Hoover Aff. ¶ 2. However, common
ownership alone is insufficient to establish applica-
tion of the single employer doctrine. *Glaxo,* 1994
WL 669975 at \*5; *Frank v. U.S. West, Inc.,* 3 F.3d
1357, 1364 (10th Cir.1993) (common ownership
alone can never establish parent liability).

Dewey fails to demonstrate that PTT and Royal
PTT are sufficiently integrated for the purposes of
Title VII. The defendant and Royal PTT have a nor-
mal parent/subsidiary relationship and such a rela-
tionship does not alone establish a "single employ-
er". *Watson v. Gulf & Western Indus.,* 650 F.2d 990
(9th Cir.1981); *Kelber,* 799 F.Supp. at 331. The
plaintiff has not raised a genuine issue of material
fact as to whether the defendant and its parent
should be considered a "single employer."

### IV. CONCLUSION

**\*4** For the foregoing reasons, defendant's motion
for summary judgment is granted as this court lacks
jurisdiction over the subject matter of this case.

SO ORDERED

S.D.N.Y.,1995.
Dewey v. PTT Telecom Netherlands, U.S., Inc.
Not Reported in F.Supp., 1995 WL 425005
(S.D.N.Y.), 68 Fair Empl.Prac.Cas. (BNA) 1112

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 11

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
**(Cite as: 2001 WL 1518264 (S.D.N.Y.))**

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
VIDEO-CINEMA FILMS, INC., Plaintiff,
v.
CABLE NEWS NETWORK, INC. d/b/a CNN, Defendant.
VIDEO-CINEMA FILMS, INC., Plaintiff,
v.
AMERICAN BROADCASTING COMPANIES, INC., Defendant.
VIDEO-CINEMA FILMS, INC., Plaintiff,
v.
CBS CORPORATION, Defendant.
**No. 98 CIV. 7128IBSJ), 98 CIV. 7129(BSJ), 98 CIV. 7130(BSJ).**

Nov. 28, 2001.

AMENDED OPINION [FN1]

FN1. The only change from the original Opinion appears on page 14, line 8, where the court has substituted the word "copyrighted" for the word "uncopyrighted."
JONES, District J.

INTRODUCTION

*1 Plaintiff, Video-Cinema Films, Inc. ("Video-Cinema") filed these actions against Defendants, Cable News Network, Inc. ("CNN"), American Broadcasting Companies, Inc. ("ABC") and CBS Corporation ("CBS"), alleging copyright infringement in violation of 17 U.S.C. §§ 101 *et seq.,* violation of the Lanham Act, 15 U.S .C. § 1125(a),[FN2] and common-law unfair competition for their nationwide broadcasts of excerpted footage from the motion picture *The Story of G.I. Joe* ("*G.I.Joe*") on their news programs after the death

of actor Robert Mitchum ("Mitchum"). Defendants move for summary judgment. For the reason set forth below, Defendants' motions are granted.

FN2. Plaintiff has withdrawn its Lanham Act claims against Defendants. Accordingly, this Court hereby dismisses Plaintiff's Lanham Act claims.

THE PARTIES

Plaintiff Video-Cinema, a New York Corporation which licenses copyrighted motion pictures and their excerpts, owns the copyright of *G.I. Joe.* Its President and sole shareholder is Larry Stern ("Stern").*See* Plaintiff President's Affidavit in Opposition to [ABC's motion for] Summary Judgment ("Stern Aff.") ¶¶ 1; 4; Deposition of Larry Stern ("Stern Dep.") at 11-13 (attached as Ex. 9 to ABC's Statement of Undisputed Material Facts).

Defendant CNN distributes news and information programming by satellite and cable distribution systems. It is composed of several 24-hour cable news networks, including CNN, CNN Headline News and CNN International. *See* Declaration of Pilar G. Keagy ¶ 6.

Defendant ABC operates the ABC Television Network, which among other things, distributes news programming for the viewing public. ABC distributes programming to its affiliates or approximately 190 independently-owned local television stations around the country and to ten local stations that are indirectly owned by ABC's parent, ABC, Inc.

ABC News is a division of ABC which produces a variety of daily news programming including news programming that principally is dedicated to brief reports of the current news. ABC News' programs include: *World News Tonight with Peter Jennings,* typically broadcast weekdays in the early evening; *World New s Now,* a daily news program for late-night viewers, broadcast weekdays between 2:00

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
(Cite as: 2001 WL 1518264 (S.D.N.Y.))

Page 2

a.m. and 5:00 a.m.; and *World News This Morning,* broadcast weekdays between 5:00 a.m. and 6:00 a.m. In addition, ABC News broadcasts *Good Morning America* every weekday from 7:00 a.m. and 9:00 a.m. *Good Morning America* is a morning news and entertainment show with a variety of programming, including brief reports of the current news of the day, interviews, commentary, and feature programming. *See* Declaration of Griffith Foxley ¶¶ 3-4; Affidavit of Eileen Murphy ¶¶ 3-4.

ABC News also operates NewsOne, a news video wire service. NewsOne distributes television news stories, including some news stories broadcast on ABC News programs, to subscriber news organizations.[FN3]Most NewsOne subscribers are ABC affiliates and the local stations indirectly owned by ABC's parent company. The subscribers may only use the NewsOne provided stories on their local news programs, and only within 40 hours and/or once within a week of its distribution by NewsOne. *See* Declaration of Don Dunphy, Jr. ¶¶ 3-6.

> FN3. NewsOne charges a weekly subscriber fee for all NewsOne news broadcasts distributed that week. The fee is not related to the content of the news stories.

*2 Defendant CBS, a television and radio broadcasting corporation, is the indirect parent of CBS Broadcasting, Inc. which operates the CBS Television Network. The CBS Television Network distributes programming to its affiliates and to 16 local television stations owned and operated by CBS. CBS News is a division of CBS Broadcasting Inc. which produces news programming for the CBS Television Network, including *CBS This Morning* (currently *The Early Show* ) and *Up to the Minute,* its overnight news program show. These shows principally are dedicated to stories that occurred within the previous 24 hours or "day-of-air" stories. CBS also operates *CBS NewsPath,* a satellite television news "wire" service that distributes breaking news programming to subscribers, most of whom are CBS affiliates or the local stations owned and

operated by CBS Broadcasting Inc. *See* Declaration of Helen M. Gold ¶¶ 2-4; Deposition of Andrew M. Sturchio at 16-17; 19; 45-56; 48.

FACTS

The following facts are undisputed or taken in light most favorable to Plaintiff. *G.I. Joe* is a 108 minute long World War II motion picture about American infantry soldiers as seen through the eyes of Ernie Pyle, the famed World War II correspondent.[FN4]It starred Burgess Meredith as Ernie Pyle. Mitchum played a supporting role as Lieutenant Walker for which he received an Academy Award nomination for Best Supporting Actor.[FN5]*G.I. Joe* was released in 1945 in theaters across the United States. Since then, it has been shown in its entirety on television on numerous occasions.[FN6]

> FN4.*G.I. Joe* was produced in 1945 by Lester Cowan. It was originally copyrighted on August 17, 1945 and filed in the Copyright Office at L-13455, with the renewal dated November 20, 1972 and filed with the Copyright Office at R 540453. Cowan passed the copyright by his Last Will and Testament, dated September 28, 1991, to his wife Ann Ronell, who, in turn, bequeathed it to the University of Southern California ("USC") by her Last Will dated September 5, 1991. *See* Stern Aff. ¶¶ 7; 11.

> FN5. This was Mitchum's only Academy Award nomination.

> FN6. Although Stern is "familiar with every aspect of [*G.I. Joe's* ] history since its creation" and was the distributer of the television photoplays, he does not know "with factual certainty" the number of times *G.I. Joe* has been broadcasted on television. *See* Stern Aff. ¶¶ 9-10. Nonetheless, he testified that the movie probably had been shown on television over 50

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
(Cite as: 2001 WL 1518264 (S.D.N.Y.))

Page 3

times. *See* Stern Dep. at 33-34.

*Plaintiff's Purchase of G.I. Joe*

On July 1, 1997, Mitchum passed away. Prior to then, beginning in early 1997, Stern had begun negotiating with USC to purchase *G.I. Joe,* as well as two other films. As of July 1, 1997, the parties had exchanged various proposals, but no agreement had been reached. Nonetheless, Stern, anticipating that news organizations would air Mitchum obituaries containing clips from *G.I. J oe,*[FN7] spent approximately 10 hours in front of two television sets that evening and the next morning, flipping through news broadcasts and the morning shows of seven VHF television stations to determine what stations were showing clips from *G.I. Joe* in their obituaries. While doing so, he measured "the extent of the infringing uses of *G.I. Joe* " with a wrist watch and made notes of each time he saw a clip of *G.I. Joe* in a Mitchum obituary. He saw obituaries containing *G.I. Joe* clips on 6 out of the 7 stations he watched. *See* Stern Aff. ¶¶ 13-14; Stern. Dep. at 53-59; 214-17; 237-41; 263-68; Continued Deposition of Larry Stern ("Stern Dep. II") at 5-9; 21-27 (attached as Ex. 10 to ABC's Statement of Undisputed Material Facts); Declaration of Nathan Seigel Ex. H.

> FN7. Stern believed that news organizations would run clips from *G . I. Joe* because it was the only movie for which Mitchum was nominated for an Academy Award. *See* Stern Dep. 216-17.

Thereafter, in September, 1997, Stern sent a revised draft contract proposal to USC-the first since he saw the obituaries. Apparently, this draft contained two new provisions granting Stern retroactive rights in the film to March, 1997, including the rights to bring any infringement claims available as of that date.[FN8]This Court notes that prior to July, 1997, none of the exchanged draft proposals had contained provisions providing for the purchase of any retroactive rights. *See* Stern Dep. at 50-57; 244-46;

250-52.

> FN8. Stern alleges that he informed USC that infringing clips of *G . I. Joe* had aired on news broadcasts, and "USC gave [his] corporation the express right to pursue these infringements ..."*See* Stern Aff. ¶ 15.

*3 Ultimately, Stern. purchased *G.I. Joe,* with the retroactive rights, as well as the other two movies. According to Defendants, the day Stern received the executed contract from USC, he sent letters to approximately 12 different news organizations requesting payment (of $5,000 or 10,000 each) for use of *G.I. Joe* in their Mitchum obituaries. Some of these organizations had not even aired clips from *G.I. Joe.*All of the news organizations that had aired clips from the movie responded that the use of the clip was fair. *See* Stern Aff. ¶ 18; Stern Dep. at 87-88.

*Defendants' Obituaries*

CNN had prepared an obituary for Mitchum a few months prior to his death. The obituary lasted 2 minutes 50 seconds and detailed Mitchum's acting career as well as other newsworthy aspects from his life, including, among other things, his 57 year marriage to Dorothy Spence. The obituary used film clips from *G.I. Joe* and at least 8 other movies.[FN9]

> FN9. The clip from *G.I. J oe* was obtained from a Mitchum documentary entitled *Robert Mitchum: The Reluctant Star,* which the CNN journalist who prepared the obituary received from another reporter, who had purchased it from a video store.

During the middle of the obituary, a 17-second clip from *G.I. Joe* airs, without sound, as the correspondent states that "[i]n 1945 Mitchum earned an Academy Award nomination-his only one-for Best Supporting Actor in [*G.I. Joe* ]." The clip then shows Mitchum speaking one line from *G.I.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                          Page 4
Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
(Cite as: 2001 WL 1518264 (S.D.N.Y.))

CNN aired its Mitchum obituary approximately 10 times on its 3 networks between the afternoon of July 1, 1997 and the morning of July 2, 1997.

Upon learning of the news of Mitchum's death, ABC News prepared three obituaries for its daily news broadcasts-all of which were aired within 24 hours of Mitchum's death. Each obituary contained clips from 7-10 Mitchum films, including *G.I. Joe.*[FN10]The *G .I. Joe* clips ranged from 9 to 20 seconds in length. The first obituary aired on *World News Tonight With Peter Jennings* at 6:30 p.m. EDT. It was 55 seconds long and contained a 9 second clip from one scene of *G.I. Joe* in which the camera focused exclusively on Mitchum. During the 9 second clip the movie's original sound was replaced by the anchor stating that "Mitchum was nominated for an Academy Award for his role in 'The Story of G.I. Joe,' which launched him into stardom in 1945."

> FN10. ABC's clip from *G.I. Joe* likewise was obtained from *Robert Mitchum: The Reluctant Star,* which ABC News had rented from a local video store. *See* Affidavit of Elizabeth Tribolet ¶ 8; Deposition of Kate O'Brian at 13-14.

ABC broadcast its second Mitchum obituary on July 2, 1997 at about 3:00 a.m. EDT on *World News Now,* and again at around 5:00 a.m. EDT. It lasted 1 minute 53 seconds and included an 18 second clip of Mitchum from *G.I. Joe.*The original sound was eliminated from 9 seconds of the clip while the correspondent explained that Mitchum "reached stardom in 1945 with *G.I. Joe* " for which "he was nominated for an Oscar as best supporting actor, but did not win ."The other 9 seconds of the clip had Mitchum speaking one line from the film.

ABC's last Mitchum obituary aired on *Good Morning America* shortly after 8:00 a.m. on July 2, 1997. It was 1 minute and 44 seconds in length including a 20 second clip from *G.I. Joe.*Ten of the 20 seconds of the original sound were inaudible as the correspondent explained that "[Mitchum] found the

most success when cast as a rugged military man. His 1945 portrayal of an Army captain in 'The Story of GI Joe' earned him his only Oscar nomination."[FN11]

> FN11. Adding the length of the clips from the 3 different shows, Plaintiff states that the overall use of *G.I. Joe* by ABC was 47 seconds. Stern Aff. ¶ 12.

*4 On July 12, 1997, NewsOne distributed the ABC News Mitchum obituaries to its subscribers. It also distributed a Mitchum obituary that aired on KABC-TV, a NewsOne subscriber.[FN12]That obituary lasted 1 minute 40 seconds, including a 22 second clip of *G.I. Joe,* of which 11 seconds of the original sound was inaudible.

> FN12. KABC-TV is not a Defendant to this lawsuit.

CBS prepared separate Mitchum obituaries containing clips of *G.I. Joe* for *CBS This Morning* and for *Up To The Minute.*[FN13]CBS aired one of the Mitchum obituaries on *Up To The Minute* at 4:38 a.m. EDT on July 2, 1997. The obituary, which was 1 minute 59 seconds long, contained a 6 second clip of Mitchum's performance in *G.I. Joe.*During these 6 seconds, the sound from the original movie was replaced by the correspondent describing the significance of the film to Mitchum's career. Specifically, the clip airs in the middle of the obituary while the correspondent explained: "It was *G.I. Joe* that made him a star. His portrayal of Lieutenant Walker in the film earned him an Oscar nomination for best supporting actor."The obituary also explained other newsworthy aspects of Mitchum's life. It was rebroadcast at 7:38 a.m. EDT on July 2, 1997, for the benefit of CBS's West Coast affiliates, and was retransmitted on *CBS NewsPath.*

> FN13. In doing so, the news producers obtained footage from Mitchum's films from the CBS News archives. Included in the archives was a tape of the *49th Annual Golden Globe Awards* show, which con-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
(Cite as: 2001 WL 1518264 (S.D.N.Y.))

Page 5

tained a tribute to Mitchum for receiving the Cecil B. DeMille Award for outstanding contribution to the entertainment field. The Mitchum tribute contained an excerpt from *G.I. Joe,* among other films. CBS incorporated a portion of this excerpt into its Mitchum obituaries.

On July 2, 1997 at 7:48 a.m. EDT, *CBS This Morning* broadcast its Mitchum obituary. The obituary lasted for 1 minute 53 seconds and included a 14 second clip from *G.I. Joe.* During the first 9.5 seconds of the clip, the original sound was muted while the correspondent noted that: "Mitchum's powerful performance as a rough but weary lieutenant in [*G.I. Joe* ] earned him his only academy award nomination." The rest of the clip has Mitchum speaking one line from the movie.

Two shorter versions of the *CBS This Morning* obituary ran on the show at 7:01 a.m. and 7:11 a.m EDT. These obituaries, which were 16 seconds and 26 seconds long respectively, each contained an identical clip of less than 6 seconds from *G.I. Joe,* and did not use the audio from the original movie. The *CBS This Morning* obituaries were not rebroadcast by CBS or retransmitted by *CBS NewsPath.*

*The Instant Motion*

As previously noted, Stern sent letters to different news organizations, including Defendants, requesting payment for the use of *G.I. Joe* in their Mitchum obituaries.[FN14] All of the news organizations that actually had used clips of *G.I. Joe* in their obituaries responded that their use was fair. Thereafter, Plaintiff commenced this action for copyright infringement and unfair competition. Defendants now move for summary judgment on the grounds that the use of the clips from *G.I. Joe* was a fair use under 17 U.S.C. § 107.

FN14. This Court notes that no one who owned any copyright interests in any of the Mitchum clips from other films used in

any of Defendants' obituaries ever objected to their use. The only complaint that Defendants ever received about the Mitchum obituaries came approximately 9 months later, in March, 1998, when Stern wrote letters to Defendants requesting a fee.

DISCUSSION [FN15]

FN15. Plaintiff asserts that Defendants' arguments for their motions are based on unsworn documents containing allegations by counsel. Since under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment motions must be supported by the personal knowledge of a declarant or affiant, and not by statements from counsel, Plaintiff argues that Defendants motion should be denied. Plaintiff's argument is without merit. It is clear from reading the declarations and affidavits that they are made from the personal knowledge of the declarant or affiant. Indeed, all of these sworn statements state that the undersigned is familiar with the facts of this action. To the extent that Plaintiff's argument is that Defendants' sworn documents must contain the words "personal knowledge," it is unavailing. *See Texaco A/S, S.A. v. Commercial Ins. Co, of Newark,* 1995 WL 628997 at *2 (S.D.N.Y.1995), *rev'd on other grounds,* 160 F.3d 124 (2d Cir.1998). Furthermore, this Court notes that Defendants' attorneys' declarations do not contain allegations in support of their motions, but simply attach exhibits in support of their statements of facts and memoranda of law.

*The Copyright Claims*

For purposes of this motion alone, Defendants do not contest the validity of Plaintiff's copyright in *G.I. Joe.* Accordingly, this Court will assume that Plaintiff's copyright is valid.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
(Cite as: 2001 WL 1518264 (S.D.N.Y.))

Page 6

**\*5** The Copyright Act grants copyright owners certain exclusive rights, including the right "to reproduce the copyrighted work in copies."17 U.S.C. § 106. Notwithstanding this, "the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."17 U.S.C. § 107. Thus, the fair use doctrine permits the reasonable use of copyrighted materials, without the permission of the copyright owner, as long as it is for one of the purposes enumerated in § 107. *Maxtone-Graham v. Burthchell,* 803 F.2d 1253, 1255 (2d Cir.1986); *see Leibovitz v. Paramount Pictures,* 137 F.3d 109, 112 (2d Cir.1998).

"Fair use is a mixed question of law and fact." *Wright v. Warner Books, Inc.,* 953 F.2d 731, 735 (2d Cir.1991) (citing *Harper & Row, Pub., Inc. v. Nation Enterprises Inc.,* 471 U.S. 539, 560 (1985)). Nonetheless, courts can resolve fair use determinations on summary judgment motions. *Id.*" '[T]he mere fact that a determination of the fair use question requires an examination of the specific facts of each case does not necessarily mean that in each case involving fair use there are factual issues *to be tried.*" ' *Id.* (citations omitted).

Whether use of the copyrighted material is fair requires a case-by-case determination "within the context of the four non-exclusive factors enumerated in section 107." *Wright,* 953 F .2d at 735 (citing *Harper & Row,* 471 U.S. at 549). These factors are:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. While, Defendants have the burden of proving that their potentially infringing use

was fair, *see Infinity Broadcast Corp. v. Kirkwood,* 150 F.3d 104, 107 (2d Cir.1998), Defendants need not establish that all of the factors favor them. *See Wright,* 935 F.2d at 740. In addition, no one of the above factors is dispositive to this Court's analysis.

Before analyzing the fair use factors, however, this Court first addresses Plaintiff's assertion that, under *Roy Export* and *Harper & Row,* any use of copyrighted material must be essential or an actual necessity to qualify as fair use. Specifically, Plaintiff argues that because Defendants could have obtained still photos of Mitchum from the public domain and used them for their obituaries, Defendants' fair use defense must fail. This Court disagrees. As correctly noted by Defendants, neither *Roy Export* nor *Harper & Row* stand for that proposition. *See Roy Export Company Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting System, Inc.,* 672 F.2d 1095, 1099-1100 (2d Cir.1982); *Harper & Row,* 471 U.S. at 555-560. In fact, the portion of the opinions on which Plaintiff relies do not address the fair use doctrine. *See id.*Instead, they are concerned with whether there exists a First Amendment privilege to use copyrighted material beyond what is permitted by the fair use doctrine, which for the purpose of this Court's analysis is irrelevant. *See Roy Export,* 672 F.2d at 1099-1100; *Harper & Row,* 471 U.S. at 555-560.

*Purpose and Character of Use*

**\*6** The first fair use factor is the purpose and character of Defendants allegedly infringing use. To determine the purpose and character of the use, this Court must consider whether the material was used for one of the purposes set forth in § 107, and whether it was used for a meaningfully different or "transformative" purpose than the original. *Campbell v. Acuff-Rose Music,* 510 U.S. 569, 579 (1994). In addition, although far from dispositive, this Court should consider whether Defendants are for-profit or not-for-profit entities. *Id.*

First, Defendants clips of *G.I. Joe* were used in

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
(Cite as: 2001 WL 1518264 (S.D.N.Y.))

Page 7

connection with news reports of the death of Mitchum. Thus, they were used for one of the purposes set forth in § 107. It is well settled that where the Defendants' use is for one of the purposes set forth in the statute, there is a strong presumption this factor favors the alleged infringer. *Arica Institute, Inc. v. Palmer,* 970 F.2d 1067, 1077 (2d Cir.1992) (citing *Wright,* 953 F.2d at 737). Indeed, the Second Circuit has stated that " '[i]f a [work] falls into one of these categories ... assessment of the first fair use factor should be at an end." ' *Wright,* 953 F.2d at 736 (citations omitted).

Second, in order to determine whether a work is transformative, this Court looks to whether the new work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell,* 510 U.S. at 579 (citations omitted). This Court finds that the obituaries are transformative works as they do not intend to supersede *G.I. Joe,* but rather to create a new work. *See Hofheinz v. AMC Productions* 2001 LEXIS 1591 at *25 (E.D.N.Y.2001). Simply stated, Defendants' use of the clips from *G.I. Joe* serve an entirely new purpose and character than the original film. While Plaintiff's copyrighted work intended to entertain its audience, as well as to inform them of the reality that American infantrymen faced in World War II, Defendants' obituaries aimed to inform the viewing public of Mitchum's death and educate them regarding his impact on the arts. *See id.; Hofheinz v. A & E Television Networks,* 146 F.Supp.2d 442, 446-47 (S.D.N.Y.2001). Moreover, defendants' clips were used because of their relevance to Mitchum and not to convey a synopsis of the original film.[FN16] J ust as parody must mimic the original work to make its point, and biographers are permitted to quote their subjects, so too should obituaries about actors be allowed to show reasonable clips of their work. *Hofheinz,* 2001 LEXIS 1591 at *26 (citing *Campbell,* 510 U.S. at 580-81; *New Era Publications, Int'l v. Carol Pub. Group,* 904 F.2d 152, 156 (2d Cir.1990) (*"New Era II "*)).

FN16. For Instance, CNN's clip of *G.I. Joe* has Mitchum telling a soldier to dig a latrine.

Finally, this Court should consider the fact that Defendants are for-profit entities. Plaintiff argues that this fact weighs against a finding of fair use. This Court disagrees. As previously noted, the commercial nature of Defendants is not dispositive for finding against fair use. *See Campbell,* 510 U.S. at 584. Courts should look to see whether the new work will be used for a purpose favored by the statute rather than Defendants' status as a for-profit entity.*Id.* (if "commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107 ... since these activities 'are generally conducted for profit' "). This is true especially where, as here, the new work is transformative in nature. *Id.* at 579 (noting that the more transformative a new work, the less significant will be the other factors, such as commercialism, that may weigh against a finding of fair use); *see also Arica* 970 F.2d at 1078; *Infinity Broadcast Corp.,* 150 F.3d at 108. Otherwise, as correctly noted by Defendants, the fair use doctrine would be limited to not-for-profit entities. *Arica* 970 F.2d at 1078.

*7 In sum, based upon the above, this Court finds that the purpose and character of the obituaries favors a finding of fair use.

*Nature of Copyrighted Work*

When analyzing the second factor, courts look to whether the original work previously had been published and whether it is fictional. Creative works are entitled to greater copyright protection than factual works. Here, it is undisputed that *G.I. Joe* is a fictional work. Although this weighs against a finding of fair use, it is not dispositive. *See e.g. Leibovitz,* 137 F.3d at 115 (finding fair use although the original work was creative).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
**(Cite as: 2001 WL 1518264 (S.D.N.Y.))**

*G.I. Joe* was published through both the release of the film to the public and its appearance on television numerous times.[FN17]*See Shoptalk, Ltd. v. Concorde-New Horizons Corp.,* 168 F.3d 586, 591 (2d Cir.1999); *Hofheinz,* 2001 LEXIS 1591 at *27. Since Defendants did not usurp the first publication rights in *G.I. Joe,* they enjoy a slightly wider degree of latitude in making their fair use claim. *See Hofheinz,* 2001 LEXIS 1591 at *27 (citing *Campbell,* 510 U.S. at 586);*see also Harper & Row,* 471 U.S. at 564 (noting that unpublished works are entitled to greater protection than published works); *New Era Publications Int'l v. Henry Holt & Co.,* 873 F.2d 576, 583 (2d Cir.1989). Indeed, the Second Circuit has found that where the plaintiff's work has already been published, this fact alone supports a finding of fair use under the second statutory factor. *See Arica,* 970 F.2d at 1078. Based upon the above reasoning, this court finds that the second factor is neutral or, at best, slightly favors a finding against fair use.

> FN17. Plaintiff argues that under the 1909 Copyright Act (which, according to Plaintiff, governs), *G.I. Joe* was not "generally published," but rather only had a "limited publication." That distinction is irrelevant to the fair use doctrine, which is concerned only with whether the work has been published at all. *See Harper & Row,* 471 U.S. at 555. By contrast, the distinction between "general" and "limited" publication concerns whether a work that existed prior to the 1976 Act was published in a manner which divested it of any form of copyright protection, or published in a manner whereby it still enjoyed common law copyright protection. *See Estate of Martin Luther King v. CBS Inc.,* 194 F.3d 1211, 1214 (11th Cir.1999).

*Amount and Substantiality of Portion Used*

The third factor looks to "the amount and substantiality of the portion used in relation to the copy-

righted work as a whole."17 U.S.C. § 107(3). This factor has both a "quantitative and a qualitative" aspect to it. *Wright,* 953 F.2d at 738 (internal citations omitted). Thus, this Court must consider whether the clips formed a significant percentage of the original film, as well as whether the clips were essentially the heart of the film. *See id.* at 738; *New Era II,* 904 F.2d at 158. Courts also have considered "whether the quantity of the material used was 'reasonable in relation to the purpose of the copying." ' *American Geophysical Union v. Texaco, Inc.,* 60 F.3d 913, 926 (2d Cir.1994) (citing *Campbell,* 510 U.S. at 586).

The length of the clips used by Defendants were far from substantial, especially in comparison to the overall length of the film.[FN18]Indeed, the clips ranged from 6 to 22 seconds, or less than 1 percent, of the 108 minute long film. Such *de minimus* amounts of a full-length feature film favor a finding of fair use.[FN19]*See Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.,* 166 F.3d 65, 71 (2d Cir.1999) (stating that a "[d]e minimis infringement of a copyrighted work is not actionable"); *Hofheinz v. A & E Television Networks,* 146 F.Supp.2d at 448.

> FN18. As previously noted, Plaintiff states that this court should consider the aggregate length of the clips used by the individual Defendants. *See supra* at 9 n. 9. For instance, according to Plaintiff, ABC's total use was 47 seconds. This Court has considered the total use of the clips and finds that it does not change the result.

> FN19. The Second Circuit consistently has found fair use in cases where only a small portion of the original work was used. *See Leibovitz,* 137 F.3d 109; *Arica,* 970 F.2d at 1079; *Wright,* 953 F.2d at 740;*New Era II,* 904 F.2d at 59; *Maxtone-Graham,* 803 F.2d at 1263.

*8 Nor do the clips constitute the "heart" of the film. Taking the heart of a work means taking the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 9
Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
**(Cite as: 2001 WL 1518264 (S.D.N.Y.))**

key informational or creative component that serves as a substitute for the original. *See Harper & Row,* 471 U.S. at 564-65. This is not the case here. Plaintiff argues that the scene from which ABC and CBS took their clips was the essence of *G.I. Joe* because it was an important scene in which Mitchum's character is in a dugout talking to Burgess Meredith's character, Ernie Pyle about sending death notices to soldier's mothers. However, the information that Plaintiff claims makes this scene important was not conveyed by the small fraction of the scene used by ABC and CBS. The clips gave no indication that Mitchum was discussing writing letters to dead soldiers' mothers, or even that the film had anything to do with Ernie Pyle. Nor can CNN's clip-a scene in which Mitchum tells a soldier to dig a latrine-be described as the heart of *G.I. Joe.*

Finally, Defendants' use was reasonable in relation to the purpose of the copying. Defendants' obituaries sought to effectively detail Mitchum's career-a task which required some exhibition of actual movie clips. *See Hofheinz,* 2001 LEXIS 1591 at *31. The clips used by Defendants related solely to Mitchum's performance and did not distill or reflect the entire movie. In addition, the original sound was completely inaudible for some of the clips and partly eliminated in the others. Based on the above, this Court finds that Defendants' use was reasonable to produce their obituaries. Accordingly, the amount and substantiality of clips in the obituaries favors a finding of fair use. [FN20]

> FN20. Plaintiff contends that "the overall aggregate broadcasts must be considered" when analyzing this factor. This Court disagrees. This factor measures the extent of Defendants' use "in relation to the copyright work,"17 U.S.C. § 107(3), not whether it was widely distributed. *See Wright,* 953 F.2d 731; *Mathieson v. Associated Press,* 1992 WL 164447 (S.D.N.Y.1992).

*Effect of Use upon Potential Market*

The fourth factor focuses on the effect Defendants' use will have upon the potential market for or value of the copyrighted work. 17 U .S.C. § 107(4). This factor asks whether the challenged use competes with, by providing a substitute for, either the original copyrighted work, or derivative works that a copyright owner would traditionally expect to create or commission. *New Era II,* 904 F.2d at 159-60. In analyzing this factor, this Court must consider whether "widespread conduct of this sort would have a substantial impact on the market for the original." *Campbell,* 510 U.S. at 590;*see also Harper & Row,* 471 U.S. at 566-67 (" 'Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." ') (citations omitted); *Infinity Broadcast Corp.,* 150 F.3d at 110 (noting that this factor is concerned with the possible usurpation of a "market that properly belongs to the copyrightholder"). If the allegedly infringing use "is not in competition with the copyrighted use," the fair use defense is ordinarily sustained. *Italian Books Corp. v. American Broadcasting Cos., Inc.,* 458 F.Supp. 65, 70 (S.D.N.Y.1978).

Here, there is nothing before this Court that suggests that Defendants' obituaries competed with or reduced the market for Plaintiff's film. In fact, Stern himself acknowledged that the obituaries did not have an impact on the market for the entire original film. *See Stern Dep. II* at 40; 47-49; 63. This Court therefore finds that the alleged infringing clips "are too few, too short, and too small in relation to the whole" to undercut the market for the film.[FN21] *Monster Communications, Inc. v. Turner Broadcasting Systems, Inc.,* 935 F.Supp. 490, 495 (S.D.N.Y.1996). Where, as here, Defendants have produced a transformative work that would otherwise qualify for fair use, and Defendant's work does not interfere with the market for the original, the fourth factor favors the defendant as a matter of law. *See Leibovitz,* 137 F.3d at 116-17.

> FN21. Indeed, it is possible that the obituaries could have increased market demand

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
(Cite as: 2001 WL 1518264 (S.D.N.Y.))

Page 10

for the film.

**\*9** Plaintiff claims that it will be deprived of a licensing fee for the use of its film if Defendants' use is deemed fair. This argument, however, fails to establish market impairment under this factor. A copyright plaintiff "is not entitled to a licensing fee for a[use] that otherwise qualifies for the fair use defense." *Leibovitz*, 137 F.3d at 117;*see Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 81 (2d Cir.1997). In addition, since every copyright infringer who seeks to avail herself of the fair use doctrine potentially could have sought a license from the owner of the infringed work, Plaintiff's argument, if taken to its logical conclusion, would render this factor obsolete because it would favor the copyright owner in every case. *See Ringgold*, 126 F.3d at 81. The point of the fair use doctrine is that, in certain circumstance, such as the one before this Court, the law will not require an infringer of a copyrighted work to obtain such a license. *See Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 306 (2d Cir.1966).

Moreover, even for non-transformative uses of entire works, consideration of licensing revenues is not permitted absent evidence that a regular traditional market exists for the specific use at issue. *See Ringgold*, 126 F.3d at 79. This Court finds that there is not a regular traditional market for obituaries. According to Defendants, between the three of them, only once in the last five years have they paid for a licensing fee for use of a film clip in obituaries. In addition, Defendants note that in Stern's 38 years in the industry, he has received only 3 other small settlement payments from other stations (to avoid litigation) for use of his clips in obituaries.

In sum, this court finds that the public would be hindered by denying Defendants' fair use defense. Defendants created obituaries that detail Mitchum's life and his impact on the arts. The obituaries contain information which, if the general public does not find interesting, at the very least, movie aficionados across the country will find informative. *See Campbell*, 510 U.S. at 578 n. 10. Accordingly, the

fourth factor also favors a finding of fair use.

Having considered the four factors set forth in the 17 U.S.C. § 107, this Court holds that the balance of factors favors a finding of fair use. *See Wright*, 953 F.2d at 740 (district court correctly granted defendants summary judgment where three of the four factors clearly favored the defendants); *Leibovitz*, 137 F.3d 109; *Arica* 970 F.2d 1067. Accordingly, Defendants' motions for summary judgment on Plaintiff's copyright claims are granted.

*The Unfair Competition Claims*

Defendants' summary judgment motions for Plaintiff's unfair competition claims are granted as well. Plaintiff's unfair competition claims are based on the same conduct as its copyright claims, and thus are preempted by federal law. *See Oboler v. Goldin*, 714 F.2d 211, 213 (2d Cir.1983); *see also Richard Feiner & Co.*, 10 F.Supp.2d 310, 316 (S.D.N.Y.1998) ("Section 301 of the Copyright Act provides for preemption of all state claims that are tantamount to those falling within the scope and subject matter of copyright").

CONCLUSION

**\*10** For the reasons set forth above, Plaintiff's Lanham Act claims are DISMISSED. Defendants' motions for summary judgment are GRANTED. The Clerk of the Court is ORDERED to close these cases.

SO ORDERED.

S.D.N.Y.,2001.
Video-Cinema Films, Inc. v. Cable News Network, Inc.
Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 12

Westlaw.

Not Reported in F.Supp.                                                                         Page 1
Not Reported in F.Supp., 1991 WL 64453 (S.D.N.Y.)
**(Cite as: 1991 WL 64453 (S.D.N.Y.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Greg E. MATHIESON, Plaintiff,
v.
ASSOCIATED PRESS, Defendants.
**No. 90 Civ. 6945 (LMM).**

April 16, 1991.

*MEMORANDUM AND ORDER*

McKENNA, District Judge.

*1 Defendant moves, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the complaint, which alleges that defendant's distribution to its subscribers of the first page of an advertising brochure of Guardian Technologies International, on which page appear a photograph of Oliver L. North, Chairman of Guardian, and a composite photograph of a police officer, one half of his chest protected by a Guardian product, the other not, constitutes an infringement of plaintiff's copyright in the photographs. Defendant asserts that its distribution of the copies, in connection with a news release, summarized "North Now Selling Bullet-Proof Vests", is a "fair use" within the meaning of 17 U.S.C. § 107, and, hence not an infringement.

Plaintiff, a professional photographer, claims that, on an assignment for Guardian, he created photographs of Mr. North and Guardian products for use in the brochure and registered his claim to copyright in the photographs. The last page of the brochure bears a notice "Photos © 1990, by Greg Mathieson." Defendant, he continues, obtained a copy of the brochure for the purpose of writing an article on Guardian, its products and North, and has used the photographs "for its own benefit and gain by distributing them to its clients worldwide" without plaintiff's notice; some customers of defendant have printed the photographs without

plaintiff's notice.

Defendant argues that it distributed copies of the brochure with a news story about North's entry into the bullet proof vest business, and that the copy of the cover "was an integral part of AP's news reporting of Oliver North's unusual new business venture"-that, in other words, "AP's limited use of plaintiff's copyrighted work was for purposes of news reporting."

Plaintiff responds that he has cultivated a relationship with North which permits him to obtain and sell photographs of him and that newspapers have, in fact, used-and may in the future use-the photographs distributed by defendant.[FN1] Plaintiff argues that defendant's real purpose in distributing copies of the first page of the brochure was to give its customers file photographs of North, for use as such.

In *New Era Publications v. Carol Pub. Group,* 904 F.2d 152, 160 (2d Cir.)*cert. denied* 111 S.Ct. 297 (1990), the court, quoting *Maxtone-Graham v. Burtchaell,* 803 F.2d 1253, 1264 (2d Cir.1986), *cert. denied,* 481 U.S. 1059 (1987), pointed out that, in addition to the four non-exclusive factors listed in 17 U.S.C. § 107, ' "bad faith by the user of copyrighted material [that] suggests unfairness" ' is among the other factors to be considered.

The House Report on the 1976 Copyright Act referred to the "fair use" defense as an "equitable rule of reason" and said that "each case raising the question must be decided on its own facts." H.R.Rep. No. 94-1476 at 65, quoted in *Sony Corp v. Universal City Studios,* 464 U.S. 417, 448 n. 31 (1984).

The arguments of the parties and the incomplete facts available to the Court require that the motion be denied, without prejudice, however, to a motion for summary judgment once adequate discovery has been conducted. *Cf. New York Tribune v. Otis & Co.,* 36 F.Supp. 67 (S.D.N.Y.1941). Too many po-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 64453 (S.D.N.Y.)
**(Cite as: 1991 WL 64453 (S.D.N.Y.))**

tentially relevant facts are absent from the record
made on the present motion for the Court to under-
take the balancing process called for by the fair use
defense. Among other things, the nature of the uses
actually made of the photographs by defendant's
subscribers and the nature of defendant's under-
standing with its subscribers as to the permissible
uses to which the photographs might be put, and
also the nature of plaintiff's arrangement with
Guardian, may well bear on that process.

**\*2** The parties will appear for a pretrial conference
on May 14, 1991, at 4:30 p.m.

SO ORDERED.

> FN1. The precise use made of the photo-
> graphs by newspapers is not clear,
> however, examples not having been sub-
> mitted.

S.D.N.Y.,1991.
Mathieson v. Associated Press
Not Reported in F.Supp., 1991 WL 64453 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 13

Westlaw.

Slip Copy
Slip Copy, 2008 WL 516676 (E.D.N.Y.)
(Cite as: 2008 WL 516676 (E.D.N.Y.))

Page 1

C
Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
WORLD WIDE TOURS OF GREATER NY,
LTD., individually, World Wide Travel of Greater
New York, Ltd., individually, and Westport Insur-
ance Company A/S/O World Wide Travel of Great-
er New York Ltd., Plaintiffs,
v.
PARKER HANNIFIN CUSTOMER SUPPORT,
INC. and Prevost Car (US) Inc., Defendants.
No. CV-07-1007 (FB).

Feb. 25, 2008.

Carletha S. Parkinson, Esq., Mintzer, Sarowitz,
Zeris Ledva & Meyers, New York, NY, for the
Plaintiffs.

William Thymius, Esq., Christopher P. Digiulio,
Esq., New York, NY, for the Defendant Parker
Hannifin Customer Support, Inc.

Victor L. Prial, Esq., Hunton & Williams LLP,
New York, NY, for the Defendant Prevost Car (US)
Inc.

### MEMORANDUM AND ORDER

BLOCK, Senior District Judge.

*1 Plaintiffs World Wide Tours of Greater NY, Ltd.
("World Wide Tours"), World Wide Travel of
Greater New York Ltd. ("World Wide Travel"), and
Westport Insurance Company A/S/O World Wide
Travel of Greater New York Ltd. ("Westport")
brought this action in the Supreme Court of the
State of New York, Kings County, against defend-
ant Prevost Car (US) Inc. for breach of contract,
and against both Prevost and Parker Hannifin Cus-
tomer Support, Inc. ("Parker Hannifin") for negli-

gence, strict liability, and breach of warranty. On
March 9, 2007, the action was removed to this
Court pursuant to 28 U.S.C. §§ 1441 and 1446. Pre-
vost moves to dismiss the complaint pursuant to
Federal Rule of Civil Procedure 12(b)(6).

I

The following facts are drawn from the complaint
and the purchase agreement and warranty for a bus
sold to World Wide Travel by Prevost; the latter
two documents were presented to the Court for the
first time as exhibits annexed to Prevost's motion.
In ruling on a 12(b)(6) motion, the Court "is to ac-
cept as true all facts alleged in the complaint..[and]
is to draw all reasonable inferences in favor of the
plaintiff," *Kassner v. 2nd Avenue Delicatessen.* 496
F.3d 229, 237 (2d Cir.2007); it is to limit its consid-
eration "to facts stated on the face of the complaint
and in documents appended to the complaint or in-
corporated in the complaint by reference, as well as
to matters of which judicial notice may be taken."
*Automated Salvage Transp. v. Wheelabrator Envtl.
Sys.,* 155 F.3d 59, 67 (2d Cir.1998).

Where "matters outside the pleading are presented
to and not excluded by the court,"Rule 12(b)
provides that "the motion shall be treated as one for
summary judgment and disposed of as provided in
Rule 56."Fed.R.Civ.P. 12(b). The Second Circuit
has noted, however, that consideration of materials
outside the complaint need not trigger conversion
of a Rule 12(b)(6) motion to a Rule 56 motion
where " 'plaintiff has actual notice of all the in-
formation in movant's papers and has relied upon
these documents in framing the complaint.' "
*Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153
(2d Cir.2002) (quoting *Cortec Indus., Inc. v. Sum
Holding L.P .,* 949 F.2d 42, 48 (2d Cir.1991)). As
the plaintiffs have relied on the purchase contract
and the warranty in their complaint, the Court con-
siders these documents in the face of Prevost's
12(b)(6) motion. *See id.*("[A] plaintiff's *reliance* on

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 516676 (E.D.N.Y.)
(Cite as: 2008 WL 516676 (E.D.N.Y.))

the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion." (emphasis in original)).

World Wide Travel purchased a Model H3-45 bus from Prevost, Compl. at ¶ 3; the purchase contract shows that World Wide Travel paid $384,570 for the bus on June 10, 1999, with delivery to occur on or about July 2, 1999. *See* Motion to Dismiss for Failure to State a Claim for Relief at Ex. A. Prevost warranted general repairs for 24 months and warranted "repair or replacement at no charge of any hidden structural member found to have developed perforation (rust-through) due to corrosion in normal use."*See id.,* Ex. C. The warranties began to run on the date the bus was delivered to the purchaser-here, on or about July 2, 1999. *Id.* Prevost limited the warranties as follows:

*2 EXCEPT FOR THE WRITTEN WARRANTY STATED ABOVE, THERE ARE NO OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF PERFORMANCE OR FITNESS FOR A PARTICULAR PURPOSE, WHICH SHALL APPLY TO THE COACH. PREVOST HEREBY DISCLAIMS ANY AND ALL SUCH WARRANTIES. THE PERFORMANCE OF REPAIRS IS THE EXCLUSIVE REMEDY UNDER THIS WARRANTY. NO PERSON IS AUTHORIZED TO MODIFY THIS WARRANTY OR TO ASSUME ANY OTHER LIABILITY ON BEHALF OF PREVOST CAR INC. UNLESS THIS MODIFICATION IS MADE IN WRITING AND SIGNED BY AN AUTHORIZED OFFICER OF PREVOST CAR INC.

THE OBLIGATIONS OF PREVOST CAR INC. SHALL NOT EXTEND BEYOND THE OBLIGATION EXPRESSLY UNDERTAKEN HERETO AND PREVOST CAR INC. SHALL HAVE NO LIABILITY OR RESPONSIBILITY OR OTHERWISE TO THE PURCHASER OF THE COACH OR ANY THIRD PARTY FOR

ANY LOSS OR DAMAGE, WHETHER DIRECT OR INDIRECT, OR FOR INCIDENTAL OR CONSEQUENTIAL DAMAGE.

*Id.*FN1

> FN1. The plaintiffs do not dispute that the purchase contract and warranty presented by Prevost are applicable to the bus here at issue.

The bus was operated by World Wide Tours and insured by Westport. Compl. at ¶¶ 2, 4. Plaintiffs allege that on November 14, 2004, a World Wide employee was driving the bus, which also contained passengers, in New Jersey when a fire "erupted from the power steering hose in the engine compartment, spread rapidly to, and was fed by, the surrounding combustible materials, and resulted in a conflagration of the bus." Compl. at ¶ 25. Westport indemnified and paid World Wide Travel and World Wide Tours $273,243 .53 for property loss sustained due to the fire. Compl. at ¶ 47. World Wide Tours and World Wide Travel claim that they also sustained uninsured financial losses "caused by business interruption, loss of charter work, loss of revenue and equity for which they were not reimbursed by Westport" in the amount of $400,000. Compl. at ¶ 48.

In seeking to dismiss plaintiffs' action for failure to state a claim, Prevost argues that (1) the strict product liability and negligence claims are barred by the economic loss doctrine, which limits recovery in tort for contractually-based economic loss, and (2) the breach of contract and breach of warranty claims are barred by the terms of the Prevost warranty.

## II

### 1. Negligence and Strict Liability Claims

As an initial matter, plaintiffs argue that the Court should apply the substantive law of New Jersey be-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                  Page 3
Slip Copy, 2008 WL 516676 (E.D.N.Y.)
**(Cite as: 2008 WL 516676 (E.D.N.Y.))**

cause the bus fire occurred there. New York does not apply the *lex loci delicti* rule when determining choice of law for tort claims; rather, it applies the "greater interest test," pursuant to which "controlling effect is given to the law of the jurisdiction which ... has the greatest concern with the specific issue raised in the litigation." *Universal Marine Medical Supply, Inc. v. Lovecchio,* 8 F.Supp.2d 214, 221 (E.D.N.Y.1998) (quotation marks omitted). In any event, the issue is irrelevant because there is no conflict between the laws of New Jersey and New York, since both recognize the economic loss doctrine as applied to tort recovery between a seller and purchaser. *See Bocre Leasing Co. v. General Motors Corp.,* 84 N.Y.2d 685,(N.Y.1995) ("[C]ogent policy considerations militate against allowing tort recovery for contractually based economic loss in ... [a] commercial dispute."); *compare Alloway v. General Marine Industries, L.P.,* 695 A.2d 264, 270 (N.J.1997) ("When the harm suffered is to the product itself, unaccompanied by personal injury or property damage, [the court has] concluded that principles of contract, rather than of tort law, were better suited to resolve the purchaser's claim. Consequently, [the court has] held that the U.C.C. provided the appropriate period of limitations.") (citing *Spring Motor Distributors, Inc. v. Ford Motor Co.,* 489 A.2d 660 (N.J.1985)).

**\*3** The economic loss doctrine provides that "[t]ort recovery in strict products liability and negligence against a manufacturer [is] not ... available to a ... purchaser where the claimed losses flow from damage to the property that is the subject of the contract." *Bocre* at 694.Tort recovery is limited as between a seller and a purchaser because the "particular seller and purchaser are in the best position to allocate risk at the time of their sale and purchase, and this risk allocation is usually manifested in the selling price. Allowing the purchaser to recover in tort for what is, in sum and substance, a commercial contract claim ... would grant the purchaser more than the 'benefit of [the] bargain' to which the purchaser agreed." *Bocre* at 688-89.

In the complaint, plaintiffs do not allege any personal injury related to the bus fire, nor do they allege any property damage other than to damage to the bus itself. Instead, they allege that they suffered losses "caused by business interruption, loss of charter work, loss of revenue and equity for which they were not reimbursed by Westport."Compl. at ¶ 48. These damages are purely economic in nature, as they solely "resul[t] from injury to the contracted-for property [and] the consequential losses flowing from that injury."*Bocre* at 691.Because the economic loss doctrine bars recovery in tort for such damages, the plaintiffs' negligence and strict liability claims cannot succeed.

**2. Contract and Warranty Claims**

Section 2-316 of the Uniform Commercial Code addresses the exclusion or modification of warranties in contracts for the sales of goods.[FN2]That section provides that, to exclude or limit an implied warranty of merchantability, "the language [of the exclusion or limitation] must mention merchantability and in case of a writing must be conspicuous."U.C.C. 2-316(2). This requirement, however, is "subject to subsection (3)," which in turn provides that, "[n]otwithstanding subsection (2)," "unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is', 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty."U.C.C. Section 2-316(3).

> FN2. As with the tort claims, there is no conflict between the laws of New York and New Jersey in regard to the contract claims because both states adhere to the Uniform Commercial Code. *See*N.Y. UCC LAW § 1-101 (2001) ("This Act shall be known and may be cited as Uniform Commercial Code."); *compare*N.J. STAT. ANN.. § 12A:1-101 (2004) ("This Act shall be known and may be cited as Uniform Com-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                         Page 4
Slip Copy, 2008 WL 516676 (E.D.N.Y.)
**(Cite as: 2008 WL 516676 (E.D.N.Y.))**

mercial Code.").

The Prevost warranty associated with the bus expressly and conspicuously excluded implied warranties, prominently stating that, "EXCEPT FOR THE WRITTEN WARRANTY STATED ABOVE, THERE ARE NO OTHER WARRANTIES, EXPRESSED OR IMPLIED .... " Motion to Dismiss for Failure to State a Claim for Relief at Ex. C. The exclusion stood out, as it was in all capital letters; a "reasonable person would notice the provision 'when it is juxtaposed against the rest of the agreement.' " *Travelers Ins. Cos. v. Howard E. Conrad, Inc.,* 233 A.D.2d 890 (4th Dep't 1996). Thus, though the warranty exclusion did not use the word "merchantability," it certainly met the requirements of U.C.C. 2-316(3) by "call[ing the exclusion] to the buyer's attention" and "mak[ing] plain that there is no implied warranty." U.C.C. 2-316(3).

*4 Because both the implied warranty of merchantability and the implied warranty of fitness for a particular purpose were properly excluded by Prevost, the Court turns to the question of whether any of the express warranties were still in effect at the time of the bus fire. The bus was delivered on or about July 2, 1999; the fire occurred on November 14, 2004, some five years and four months after the bus was delivered. As the 24-month general repair warranty and the 60-month corrosion warranty began to run on the date of delivery, they were expired as of the date of the fire, and cannot support a cause of action.

### III

Prevost's motion is granted and the plaintiffs' complaint is dismissed as to Prevost in its entirety.

**SO ORDERED.**

E.D.N.Y.,2008.
World Wide Tours of Greater NY, Ltd. v. Parker Hannifin Customer Support, Inc.
Slip Copy, 2008 WL 516676 (E.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 14

  **Get. Enjoy. Shar**
Fun Stuff Category

MySpace.com | rss | sign in

**Roy Den Hollander**



**Last Updated:** 12/2/2008

Send Message
Instant Message
Email to a Friend
Subscribe

**Gender:** Male
**Status:** Divorced
**Age:** 101
**Sign:** Libra

**City:** NEW YORK
**State:** New York
**Country:** US
**Signup Date:** 7/16/2006

**Blog Archive**
[Older]   [Newer]
Mar ▼ | 9 ▼ | 2009 ▼ | Go

Sponsored Links

# Pimp My Profile (Free)

Layouts,

Backgrounds, &

Graphics:

Download Them All

Now - (100% Free)

Webfetti.com

**Wednesday, August 30, 2006**

**A Different Time**

A propeller driven plane drones somewhere overhead far out of sight. Its low monotone humming envelops a warm, spring Sunday afternoon somewhere in the 1950s. I sit on my 24 inch, black, single-gear Schwinn bicycle, keeping my balance by holding onto the door handle of an old, blue, four-door 1947 Dodge.

My consciousness pauses at the moment, feeling vaguely sad for no discernible reason. The weeks events ended with this gift of nothing to do: no homework, no television shows, no new housing developments to explore or classmates able to come out and play.

The dead-end street needs a new asphalt topping. Where I am balance on the side, the asphalt has broken up into small gravel-like stones with an isolated weed sprouting up here and there. It is still early spring, the lawns are just beginning to turn green and the tulips and dogwood buds remain closed, waiting for a few consecutive days of warm weather. The air smells fresh, warmed slightly by a gentle breeze.

The droning airplane fills the vacuum of silence on this street with modest middle-class houses in this small suburban town, whose claim to fame will not come until the end of the next decade. Of all the towns in America, this town will have the second highest number of persons per capita to die in Vietnam: all of them men, of course, and all of them guys I knew.

**5:30 PM   1 Comments  (Add Comment) |  1 Kudos**

About | FAQ | Terms | Privacy Policy | Safety Tips | Contact MySpace | Report Abuse | Advertise New! | My!

Music | Video | Jobs | Games | Weather | Sitemap

Web▾   Search

©2003-2009 MySpace.com. All Rights Reserved.

# KREBS DECL.
# EXHIBIT 15

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 324592 (D.Colo.)
(Cite as: 2007 WL 324592 (D.Colo.))

Page 1

**H**

Only the Westlaw citation is currently available.

United States District Court,
D. Colorado.
Suzanne SHELL, Plaintiff,
v.
Jolene DEVRIES, Anna Hall Owen, and Unknown
Defendant Doe, Defendants.
No. Civ. 06-CV-00318-REB.

Jan. 31, 2007.

Suzanne Shell, Elbert, CO, pro se.

Daniel Bernard Slater, Law Offices of Dan Slater,
Canon City, CO, for Defendants.

ORDER ADOPTING RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

BLACKBURN, J.

*1 This matter is before me on: 1) the defendants'
Motion to Dismiss Pursuant to F.R.C.P. Rule
12(b)(6) and for Attorneys' Fees and Costs Pursuant
to 17 U.S.C. § 505; and 2) the Recommendation of
the United States Magistrate Judge [# 19], filed
December 15, 2006. The Magistrate Judge recom-
mends that the motion to dismiss be granted. The
plaintiff filed an objection to the recommendation
[# 21] on December 28, 2006, and the defendants
filed a response to the plaintiff's objection [# 22] on
January 8, 2006. I have reviewed each of these fil-
ings, as well as the balance of the record in this case.

As required by 28 U.S.C. § 636(b), I have reviewed
*de novo* all portions of the recommendation to
which objections have been filed, and have con-
sidered carefully the recommendation, the objec-
tion, and the applicable case law. In addition, be-
cause the plaintiff is proceeding *pro se,* I have con-

strued her pleadings more liberally and held them
to a less stringent standard than formal pleadings
drafted by lawyers. *See Hall v. Belmon,* 935 F.2d
1106, 1110 (10th Cir.1991). Plaintiff's objection is
without merit. The recommendation is detailed and
well-reasoned. Therefore, I find and conclude that
the arguments advanced, the authorities cited, and
the findings of fact, conclusions of law and recom-
mendation proposed by the Magistrate Judge should
be approved and adopted.

THEREFORE, IT IS ORDERED as follows:

1. That the recommendation of Magistrate Judge
Boland [# 19], filed December 15, 2006, is AP-
PROVED AND ADOPTED as an order of this court;

2. That the defendants Motion to Dismiss Pursuant
to F.R.C.P. Rule 12(b)(6) and for Attorneys' Fees
and Costs Pursuant to 17 U.S.C. § 505; is GRAN-
TED;

3. That the plaintiff's first claim for relief is DIS-
MISSED under FED. R. CIV. P. 12(b)(6) for failure
to state a claim on which relief can be granted;

4. That under 28 U.S.C. § 1367(c)(3), the court DE-
CLINES to exercise supplemental jurisdiction over
the plaintiff's second and third claims for relief,
both of which are claims under state law; and

5. That this case is DISMISSED.

Dated January 30, 2007, at Denver, Colorado.

RECOMMENDATION OF UNITED STATES
MAGISTRATE JUDGE

BOLAND, Magistrate J.

This matter is before me on the Motion to Dismiss
Pursuant to F.R .C.P. Rule 12(B)(6) and for Attor-
neys' Fees and Costs Pursuant to 17 U.S.C. § 505
[Doc. # 5, filed 3/17/06] (the "Motion"). I respect-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 324592 (D.Colo.)
**(Cite as: 2007 WL 324592 (D.Colo.))**

Page 2

fully RECOMMEND that the Motion be GRAN-TED insofar as its seeks dismissal of this case and DENIED to the extent it seeks an award of attorneys' fees.

## I. STANDARD OF REVIEW

The plaintiff is proceeding *pro se.*1 must liberally construe the pleadings of a *pro se* plaintiff. *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Nevertheless, I cannot act as advocate for a *pro se* litigant, who must comply with the fundamental requirements of the Federal Rules of Civil Procedure. *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991).

*2 In ruling on a motion to dismiss, the court must accept the plaintiff's well-pleaded allegations as true, and must construe all reasonable inferences in favor of the plaintiff. *City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 493, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986); *Mitchell v. King,* 537 F.2d 385, 386 (10th Cir.1976)."The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), overruled on other grounds by *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). A claim should be dismissed only where, without a doubt, the plaintiff could prove no set of facts in support of his claims that would entitle him to relief. *Id.*

## II. BACKGROUND

The plaintiff filed her First Amended Complaint (the "Complaint") on March 6, 2006 [Doc. # 4]. The Complaint contains the following allegations:

1. The plaintiff is the author and copyright owner of an internet website entitled *www.profane-justice.org.Complaint,* ¶ 1, 31.

2. On or about February 24, 2004, the defendants

obtained a copy of ten pages of the plaintiff's website, and "transmitted that copy to their computer or computers, without seeking or obtaining [the plaintiff's] permission and without paying license fees and without negotiating a license fee reduction or waiver."*Id.* at ¶¶ 23, 31-32.

3. "The purpose and character of the defendants' use was to seek an order from the court against Shell in the form of an award of Owen's attorney fees and costs."*Id.* at ¶ 36e-f. The defendants attached the material as an exhibit to a motion for attorney fees and costs in Case No. 03-cv-00743-REB-MJW [Doc. # 95, filed February 26, 2004], filed by the plaintiff in this Court on April 25, 2003. *Id.* at ¶¶ 2-4, 36e-f.

The Complaint alleges three causes of action: (1) copyright infringement in violation of 17 U.S.C. §§ 101 et seq.; (2) "civil theft"; and (3) breach of contract. *Id.* at pp. 8-18.The plaintiff seeks monetary and injunctive relief. *Id.* at pp. 18-20.

## III. ANALYSIS

### A. Claim One: Copyright Act

The defendants assert that the use of copyrighted material in judicial proceedings is inherently "fair use" as a matter of law and, therefore, Claim One does not state a claim for infringement of the Copyright Act. *Motion,* pp. 4-6.

The Copyright Act grants a copyright owner exclusive rights in the copyrighted works. 17 U.S.C. § 106. However, the Act contains a "fair use" privilege which allows others to use the copyrighted material in a reasonable manner despite the lack of the owners' consent:

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 324592 (D.Colo.)
(Cite as: 2007 WL 324592 (D.Colo.))

that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include-

*3 (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. Fair use is a statutory defense to copyright liability.*Id.*

The defendants assert that "[t]he use of copywritten [sic] material in judicial proceedings is inherently 'fair use' as a matter of law" based on "the plain language of the legislative history surrounding the adoption of the Fair Use' provision." While it is true that both the United States Senate and the United States House of Representatives have recognized that judicial use of copyrighted materials may constitute fair use, S.Rep.No. 94-473, pp. 61-62 (1975); H.R.Rep. No. 94-1476, p. 65 (1976), the United States Supreme Court has clearly stated that fair use must be determined on a case-by-case basis.*Campbell,* 510 U.S. at 577. Thus, the use of copyrighted material in judicial proceedings is not *inherently* fair use. Indeed, the use of copyrighted material in judicial proceedings has been found in some cases *not* to constitute fair use.

In *Images Audio Visual Productions v. Perini Bldg. Co.,* 91 F.Supp.2d 1075 (E.D.Mich.2000), the plaintiff held copyrights for photographs of a construction site. The photographs were intended to serve, among other purposes, as an evidentiary record of progress in the event a dispute occurred during or after construction. When a dispute arose and the parties entered into arbitration proceedings, the construction company made photocopies of the plaintiff's photographs instead of paying the plaintiff for the copies. When sued by the plaintiff for copyright infringement, the construction company argued that its reproduction of the photographs for use in the arbitration proceedings constituted fair use. In determining that the construction company did not make fair use of the photographs, the court distinguished "between copyrighted works that happen to capture information that proves relevant to subsequent litigation, and works that are intended to capture such information, specifically for the purpose of litigation." *Id.* at 1086.The court held that where judicial proceedings are one of the intended markets of the copyrighted work, "the copyright holder is entitled to exercise control over the use of his works within this market; the fair use doctrine does not require the wholesale abandonment of copyright protection at the courthouse door."*Id.*

In contrast, where use of the copyrighted material as evidence in a judicial proceeding does not put the material to its intrinsic use, courts have found fair use of the material. *Religious Technology Center v. Wollersheim,* 971 F.2d 364, 367 (9th Cir.1992) (finding fair use where defendants copied and distributed religious scriptures from former members of the Scientology Church and gave them to expert witnesses for the purpose of preparing testimony in a state tort litigation); *Jartech v. Clancy,* 666 F.2d 403, 406-07 (9th Cir.1982) (finding fair use where defendants made abbreviated copies of adult movies for use as evidence in a nuisance abatement proceeding).

### 1. Purpose and Character of the Use

*4 The first factor 1 must examine is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."17 U.S.C. § 107(1).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                        Page 4
Not Reported in F.Supp.2d, 2007 WL 324592 (D.Colo.)
**(Cite as: 2007 WL 324592 (D.Colo.))**

The central purpose of this investigation is to see ... whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative." Although such transformative use is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.

*Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 579, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (internal quotations and citations omitted). Use of the material for the intrinsic purpose for which it was prepared balances the weight of the first factor against fair use.

The Complaint alleges that the content of the website "is intended to generate income" and that "the nature of the infringed work was an exclusive publication containing creative analysis and commentary about events occurring related to the lawsuit."*Complaint,* ¶¶ 21, 36i. The Complaint does not contain any allegations to support a reasonable inference that the defendants used the material for the intrinsic purpose for which it was prepared, *i.e.* that they used the "creative analysis and commentary about events" to generate income. Nor are there any allegations to support a reasonable inference that the defendants' use of the material was commercial in nature. To the contrary, the Complaint alleges that the defendants used the copyrighted portion of the plaintiff's website as an exhibit to a motion for attorneys' fees. There are no allegations that the defendants used the materials for any other purpose. Thus, the first factor weighs heavily in favor of fair use.

### 2. The Nature of the Copyrighted Work

The second factor to consider is the "nature of the copyrighted work." 17 U.S.C. § 107(2)."In general, fair use is more likely to be found in factual works than in fictional works." *Stewart v. Abend,* 495 U.S. 207, 237, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990)."The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 563, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

The materials are entitled "Lawsuit in United States District Court for the District of Colorado Civil Action No. 03-RB-1743(MJW)."*Complaint,* second consecutive attachment, p. 1. The materials provide a time-line of events leading up to the lawsuit as well as a time-line of events that occurred during the lawsuit. Because the materials are primarily a chronology of events, the materials are more factual in nature than creative.[FN1] Thus, the second factor also weighs in favor of fair use.

> FN1. The plaintiff alleges in the Complaint that the materials are "singularly creative, containing insightfully unique results of her research which is not available from any other source, as well as containing editorial commentary, discussion, analysis, and legal documents which are not generally available anywhere else."*Complaint,* ¶ 36h. The plaintiff attaches the materials to the Complaint. The materials are simply a chronology of the plaintiff's version of the events surrounding her lawsuit.

### 3. Amount and Substantiality of the Portion Used

**\*5** The third factor I must examine is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."17 U.S.C. § 107(3). The Complaint alleges that the defendants

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 324592 (D.Colo.)
**(Cite as: 2007 WL 324592 (D.Colo.))**

Page 5

"obtained a copy of a significant chapter of Shell's website, specifically 10 pages dealing with Shell's civil rights lawsuit against Owen...."*Complaint,* ¶ 23. The Complaint further alleges that "[t]he amount and substantiality of the work infringed consisted of the entire content involving Fremont County and Shell's competitors in Fremont County. This content was meant to stand alone as a complete representation of the concept explored."*Id.* at ¶ 36j.It is unclear from the allegations of the Complaint exactly how much of the website was used, and how substantial the used portion is in relation to the entire website.

Even if I assume that the entire website was used, "the fact that an entire work was copied does not ... preclude a finding of fair use." *Sega Enterprises Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1526 (9th Cir.1992). Where the use of the work was limited, as it was here, the third factor carries very little weight. *See id.* at 526-27.

### 4. Effect on the Market

The fourth factor focuses on "the effect of the use upon the potential market for or value of the copyrighted work.""This last factor is undoubtedly the single most important element of fair use." *Harper & Row,* 471 U.S. at 566."Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Id.* at 566-67.

The Complaint alleges only that the defendant's use of the materials deprived the plaintiff of the income from defendants for the license fees. *Complaint,* ¶ 36k. The Complaint does not allege that the marketability of her work is impaired. Indeed, it is impossible to imagine how the defendants' use of the materials as an exhibit to a motion for attorneys' fees could in any way impact the marketability of the materials.

My analysis of the fair use factors weighs heavily in favor of the defendants. Accepting all well-

pleaded allegations as true and construing all reasonable inferences in favor of the plaintiff, the Complaint alleges a fair use of the copyrighted materials. Therefore, the Complaint fails to state a claim for copyright infringement. I RECOMMEND that Claim One be dismissed for failure to state a claim upon which relief can be granted.

### B. State Law Claims

Claims Two and Three assert causes of action for civil theft and breach of contract, respectively. I construe these claims solely as state-law-based claims. This Court may decline to exercise supplemental jurisdiction over the plaintiff's state law claims when it has "dismissed all claims over which it has original jurisdiction."28 U.S.C. § 1367(c)(3). Because I have recommended dismissal of the plaintiff's copyright claim for failure to state a claim upon which relief can be granted, I respectfully RECOMMEND that the Court decline to exercise supplemental jurisdiction over the remaining state law claims.

### C. Attorneys' Fees

*6 The defendants seek attorneys' fees pursuant to the Copyright Act, 17 U.S.C. § 505. Section 505 provides:

In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

The Supreme Court has stated that, in determining whether attorneys' fees should be awarded, courts may consider "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence ... as long as such

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 324592 (D.Colo.)
**(Cite as: 2007 WL 324592 (D.Colo.))**

factors are faithful to the purposes of the Copyright Act...." *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 535 n. 19, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).

The plaintiff's claims required an analysis and an application of the facts to the law. Although I have recommended that the claims be dismissed, I find that the action was not wholly frivolous. I respectfully RECOMMEND that the Motion be DENIED insofar as it seeks attorneys' fees.

### IV. CONCLUSION

I respectfully RECOMMEND that the Motion be GRANTED to the extent it seeks dismissal of this case.

I further RECOMMEND that the Motion be DENIED insofar as it seeks an award of attorneys' fees to the defendants.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have 10 days after service of this recommendation to serve and file specific, written objections. A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed.R.Civ.P. 72(b); *Thomas v. Arn,* 474 U.S. 140, 147-48, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), and also waives appellate review of both factual and legal questions. *In re Key Energy Resources Inc.,* 230 F.3d 1197, 1199-1200 (10th Cir.2000). A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review. *United States v. One Parcel of Real Property,* 73 F.3d 1057, 1060 (10th Cir.1996).

D.Colo.,2007.
Shell v. Devries
Not Reported in F.Supp.2d, 2007 WL 324592 (D.Colo.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 16

Westlaw.

Slip Copy
Slip Copy, 2007 WL 4269047 (C.A.10 (Colo.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2007 WL 4269047 (C.A.10 (Colo.)))

**H**
Only the Westlaw citation is currently available. This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Tenth Circuit Rule 32.1. (Find CTA10 Rule 32.1)

United States Court of Appeals,
Tenth Circuit.
Suzanne SHELL, Plaintiff-Appellant,
v.
Jolene DEVRIES, Anna Hall Owen and Unknown Defendant Doe, Defendants-Appellees.
**No. 07-1086.**

Dec. 6, 2007.

Suzanne Shell, Elbert, CO, pro se.

Daniel B. Slater, Canon City, CO, for Defendants-Appellees.

Before BRISCOE, EBEL, and McCONNELL, Circuit Judges.

### ORDER AND JUDGMENT[FN*]

FN* After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R.App. P. 34(a)(2); 10th Cir. R. 34.1(G). This case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R.App. P. 32.1 and 10th Cir. R. 32.1.

MICHAEL W. McCONNELL, Circuit Judge.

*1 Suzanne Shell appeals from the district court's dismissal of her claim of copyright infringement. The case arose when the defendants printed ten pages from Ms. Shell's website to use as evidence in unrelated litigation. Ms. Shell's website forbids any reproduction without prior permission, which may be purchased for $5,000 per page per copy. The defendants did not obtain Ms. Shell's permission to print the materials. Ms. Shell filed suit for copyright violation. The defendants moved for judgment on the pleadings under Fed.R.Civ.P. 12(b)(6), on the ground that, based on the allegations in Ms. Shell's complaint, their reproduction of the pages from the website constituted fair use. The district court agreed, and dismissed Ms. Shell's action.

We review de novo the district court's grant of a motion for judgment on the pleadings. *Park Univ. Enters., Inc. v. American Cas. Co.,* 442 F.3d 1239, 1244 (10th Cir.2006)."Judgment on the pleadings should not be granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law."*Id.* (internal quotation marks omitted)."[W]e accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same."*Id.*

Section 107 of the Copyright Act lists the factors to consider in determining "fair use":

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 4269047 (C.A.10 (Colo.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2007 WL 4269047 (C.A.10 (Colo.)))**

whole; and

(4) the effect of the use upon the potential market value for or value of the copyrighted work.

17 U.S.C. § 107. This Court has not yet decided whether use of copyrighted material as evidence in a judicial proceeding constitutes fair use. The Ninth Circuit has found that use of copyrighted material as evidence in judicial proceedings is fair use, so long as the users do not reproduce the work for its "intrinsic purpose." *Jartech, Inc. v. Clancy,* 666 F.2d 403, 406-07 (9th Cir.1982).*See also Religious Tech. Ctr. v. Wollersheim,* 971 F.2d 364, 367 (9th Cir.1992)."[W]orks are customarily reproduced in various types of judicial proceedings ... and it seems inconceivable that any court would hold such reproduction to constitute infringement either by the government or by the individual parties responsible for offering the work in evidence." 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.05[D] at 13-91 (1991).

We need not decide in this case whether the reproduction of copyrighted materials for use in judicial proceedings is *per se* fair use. Here, the district court thoroughly examined each of the statutory factors, studied the specific circumstances of the case, and found that they weigh in favor of fair use. The court explained its conclusions in detail. We have carefully examined the record, the district court's analysis, and the arguments in Ms. Shell's briefs in this Court, and for substantially the reasons stated by the district court, conclude that the defendants' reproduction of pages from her website constituted fair use.

**\*2** The judgment of the United States District Court for the District of Colorado is **AFFIRMED.**

C.A.10 (Colo.),2007.
Shell v. DeVries
Slip Copy, 2007 WL 4269047 (C.A.10 (Colo.))

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 17

Westlaw.

Slip Copy
Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
(Cite as: 2008 WL 4185737 (S.D.N.Y.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
CREDITSIGHTS, INC., Plaintiff-Counterclaim Defendant,
v.
Paul CIASULLO, Defendant-Counterclaim Plaintiff,
v.
Glenn Reynolds and Peter Petas, Additional Counterclaim-Defendants.
No. 05 CV 9345(DAB).

Sept. 5, 2008.

MEMORANDUM & ORDER

DEBORAH A. BATTS, District Judge.

*1 Defendant-Counterclaim Plaintiff Paul Ciasullo (hereinafter Counterclaim Plaintiff) brings counterclaims against Plaintiff CreditSights, Inc., as well as additional Counterclaim Defendants Reynolds and Peta (hereinafter collectively referred to as "Counterclaim Defendants"). Counterclaim Plaintiff alleges that Counterclaim Defendants conspired to divest him of his shares and control within the company.

Now before the Court are four different motions. The first is Plaintiff's Motion for Default Judgment against Counterclaim Plaintiff. The second is Counterclaim Defendants' Motion to Dismiss Counterclaim Plaintiff's counterclaims under Federal Rule of Civil Procedure 12(b)(6). The third is Counterclaim Defendants' Motion for Sanctions under Fed.R.Civ.P. 11. The fourth motion pending before the Court is Counterclaim Defendants' Motion to Strike certain allegations made by the Defendant. Also before the Court are Counterclaim Plaintiff's requests to re-plead and for sanctions against Counterclaim Defendants.

Counterclaim Plaintiff brings ten counter causes of action: (1) breach of contract; (2) unjust enrichment; (3) fraud; (4) declaratory judgment stating that Counterclaim Defendants have no continuing right, title, or interest to any of shares of CreditSIghts and such shares rightfully belong to Defendant; (5) breach of fiduciary duties; (6) tortious interference with business relations; (7) prima facie tort; (8) civil conspiracy to commit prima facie tort; (9) civil conspiracy to tortiously interfere with business relations; and (10) damage to business reputation. Counterclaim Plaintiff seeks damages based on his first, second, third, fifth, sixth, seventh, eight, ninth, and tenth causes of action.

For the reasons contained herein, Counterclaim Defendants' Motion for Default Judgment is DENIED. Counterclaim Defendants' Motion to Dismiss Counterclaim Plaintiff's first, second, third, fourth, fifth, sixth, seventh, eight, ninth, and tenth causes of action is GRANTED in part and DENIED in part. Counterclaim Defendants' Motion for Rule 11 Sanctions is DENIED. Counterclaim Defendants' Motion to Strike certain allegations is GRANTED. Counterclaim Plaintiff's request to re-plead is DENIED. Counterclaim Plaintiff's request for sanctions is DENIED.

I. MOTION FOR DEFAULT JUDGMENT

A. *BACKGROUND*

This action originally commenced on November 3, 2005, and was duly served upon the Defendant, Paul Clasullo. On December 1, 2005, Counterclaim Plaintiff Clasullo submitted a request for an extension of time to Answer or respond to the Complaint, which was due merely one day later on December 2, 2005. That request was granted and Counterclaim Plaintiff's deadline was extended to December 23, 2005. On December 27, 2005, four days after Counterclaim Plaintiff's Answer or response was due, the Court received Counterclaim

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

Plaintiff's second request for an extension of time to file a Motion to Dismiss. This second request was granted, and a December 30, 2005 deadline was set. On December 30, 2005, Counterclaim Plaintiff filed his Motion to Dismiss. On March 1, 2006, after the filing of an Amended Complaint and the institution of a new briefing schedule for Motion to Dismiss submissions, the Court granted a Plaintiff's first request for an extension, extending by one week the deadlines for the Parties' respective submissions. On March 27, 2006, the due date for Counterclaim Plaintiff's reply submission in further support of his Motion to Dismiss, the Court received Counterclaim Plaintiff's third request for an extension; this request was granted and Counterclaim Plaintiff's time to file reply papers was set for April 10, 2006. These papers were filed timely.

*2 On May 10, 2006, this Court stayed discovery in this action pending resolution of Counterclaim Plaintiff's Motion to Dismiss. On March 26, 2007, Counterclaim Plaintiff's Motion to Dismiss was denied and Counterclaim Plaintiff was ordered to Answer Plaintiff's Amended Complaint within 30 days. On May 2, 2007, the Court granted Plaintiff's request to file a Second Amended Complaint, in order to add claims against Counterclaim Plaintiff based on newly discovered conduct. Plaintiffs were given 60 days to file the Second Amended Complaint. Plaintiffs filed the Second Amended Complaint on May 18, 2007.

On June 13, 2007, the Court received Counterclaim Plaintiff's request for yet another extension of time; the request proposed extending Counterclaim Plaintiff's time to Answer Plaintiff's Second Amended Complaint until June 25, 2007. Plaintiff consented to this request upon the express condition that Counterclaim Plaintiff make no further extension requests, and Counterclaim Plaintiff consented to this condition. The Court granted this extension request on June 13, 2007. The next day, on June 14, 2007, the Court received a letter from counsel for Defendant, requesting to be relieved as counsel. On June 21, 2007, the Court ordered that defense coun-

sel be relieved. This Order gave Counterclaim Plaintiff Ciasullo a deadline of June 25, 2007 to have new counsel file an appearance, and an extended deadline of July 31, 2007 to move against or Answer Plaintiff's Second Amended Complaint.

On June 25, 2007, the deadline date for having new counsel file a Notice of Appearance, the Court received a telephone call from Mr. Ciasullo. He indicated that the new counsel he planned to retain was on trial and would be unable to finalize paperwork with counsel until the end of the week. The Court directed Mr. Ciasullo to communicate through the Pro Se Office. On June 28, 2007, the Court received a written request for an extension of time for new counsel to file a Notice of Appearance. The Court granted this request and extended the deadline for the filing of a Notice of Appearance to July 13, 2007.

On July 16, 2007, three days after the Court Ordered deadline for filing a Notice of Appearance, Counterclaim Plaintiff Ciasullo filed a Notice of Pro Se appearance in this action. On August 1, 2007, one day after the response to Plaintiff's Second Amended Complaint was due, the Court received a letter request from Plaintiff for an extension of time until September 28, 2007 to file that response. The Court denied that request.

On September 6, 2007, Plaintiff moved for default judgment against Defendant. The very next day, on September 7, 2008, Ms. Marianne Murray, Esq. filed a Notice of Appearance on Counterclaim Plaintiff's behalf. On September 11, 2007 Counsel for Counterclaim Plaintiff filed submissions in opposition to the Motion for Default Judgment. Plaintiff replied to the opposing papers on September 17, 2007. Finally, on September 21, 2007, Counsel for Counterclaim Plaintiff also filed an Answer, Third Party Complaint and Counterclaims in response to Plaintiff's Second Amended Complaint.

B. *THE DEFAULT JUDGEMENT LEGAL STANDARD*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

Page 3

**\*3** "The dispositions of motions or entries of defaults and default judgments ... are left to the sound discretion of a district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties." *Shah v. New York State Dept. of Civil Serv.,* 168 F.3d 610, 615 (2d Cir.1999) (*quoting Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 95 (2d Cir.1993)). District courts generally consider three factors when deciding whether to vacate a default judgment motion: (1) the willfulness of the default; (2) whether defendant has demonstrated a meritorious defense and (3) whether, and to what extent, granting default will cause prejudice to the non-defaulting party. *Gonzalez v. City of New York,* 104 F.Supp.2d 193, 195 (S.D.N.Y.2000); *Nationsbank of Florida v. Banco Exterior de España,* 867 P. Supp. 167, 175 (S.D.N.Y.1994). The Second Circuit has held that, where default judgment is entered, " 'excusable neglect' is to be construed generously in the context of an attempt to vacate a default judgment." *American Alliance Ins. Co., Ltd. v. Eagle Ins. Co.,* 92 F.3d 57, 58 (2d Cir.1996)

*C. DISCUSSION*

In this case, the Court finds that Counterclaim Plaintiff's default was willful and intentional. Counterclaim Plaintiff repeatedly flouted this Court's Orders and deadlines and proceeded on his own schedule; Counterclaim Plaintiff acted in bad faith and in blatant disregard for the Court's generosity and leniency. However, while the Court finds most of Counterclaim Plaintiff's Answer, Third party Complaint and Counterclaims frivolous (see Motion to Dismiss discussion, *infra* ), at this stage of the litigation, the Court cannot find with certainty that Counterclaim Plaintiff has no meritorious defense to any of the claims that have been levied against him. Most significantly, Counterclaim Plaintiff filed a response to Plaintiff's Second Amended Complaint within a month after Plaintiff moved for default judgment; in this case, the Court cannot find that Plaintiff would be unduly prejudiced by having to prosecute its claim after a delay

of such a relatively short period. In light of the fact that a Motion to Vacate a default judgment here would, accordingly, be successful, the Court declines to exercise its discretion to grant Plaintiff's Motion in the first place. In the interests of judicial economy, Plaintiff's Motion for Default Judgment is hereby DENIED.

II. COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS COUNTERCLAIM PLAINTIFF'S COUNTERCLAIMS

*A. BACKGROUND*

The Court presumes the Parties' familiarity with the facts set forth in the March 26, 2007 Memorandum & Order, which addressed Counterclaim Plaintiff Ciasullo's Motion to Dismiss the Complaint.[FN1]

> FN1. In its Complaint, Plaintiff alleges that Counterclaim Plaintiff pledged his Credit-Sights stock in violation of various Stockholder and Stock Grant Agreements, that Counterclaim Plaintiff resigned after he sexually harassed a colleague and signed an agreement giving that resignation all effects of a termination for cause, and that Counterclaim Plaintiff's pledges created a basis to divest him of his shares, and that Counterclaim Plaintiff improperly disclosed confidential information to certain persons.

In his counterclaims, Counterclaim Plaintiff claims that Counterclaim Defendants Reynolds and Petas engaged in a plan and scheme to use Counterclaim Plaintiff's expertise in the financial industry to create and build CreditSights, all the while concealing their intent to divest Counterclaim Plaintiff of any control or decision making in the operation of CreditSights, and ultimately to divest him of ownership. (Counterclaim Plaintiff's Answer to Second Amended Complaint and Counterclaims "CCP. Ans. & Count." ¶ 64).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
(Cite as: 2008 WL 4185737 (S.D.N.Y.))

Page 4

**\*4** In December 1999, Counterclaim Defendant Petas approached Counterclaim Plaintiff about starting an online financial research firm focused on the debt market. (*Id.* ¶ 66). At that time, Counterclaim Defendant Petas allegedly did not mention that he wanted Counterclaim Defendant Reynolds to be a participant in the business plan. (*Id.* ¶ 66). In January 2000, Counterclaim Plaintiff alone wrote a business plan that ultimately became a model for CreditSights; the plan was sent to various potential investors. (*Id.* ¶ 67). Over the next two months, Counterclaim Plaintiff became aware of Counterclaim Defendant Reynolds' intention to participate in the planned business. Counterclaim Plaintiff assented, based on representations that the founding three would each support one another and each act as a team. (*Id.* ¶ 68). At this point, "it was agreed that Ciasullo, Petas and Reynolds would together start an online independent financial research business focused on debt research ..."(*Id.*)

From January through March 2000, Counterclaim Plaintiff built the CreditSights business, engaging in massive efforts to obtain financing for the Company.(*Id.* ¶ 69). Ultimately, according to Defendant, CreditSights was formed in or about November 2000.[FN2](*Id.* ¶ 71.)Counterclaim Defendants Reynolds and Petas both made personal capital contributions to facilitate the formation of CreditSights; Counterclaim Plaintiff raised contributions from two business acquaintances. (*Id.*)

> FN2. The Court notes that this date differs from the date provided in Plaintiffs Complaint.

At the inception of CreditSights, Counterclaim Plaintiff and Counterclaim Defendants Reynolds and Petas were each issued 2000 shares of stock. (*Id.* ¶ 72.)The Board of Directors included Counterclaim Defendants Reynolds and Petas, as well as Defendant. (*Id.*) Counterclaim Defendant Reynolds was named CEO and Counterclaim Plaintiff was named President. (*Id.*) Counterclaim Petas did not wish to be an officer (*Id.* ¶ 68.)

Approximately two years after the Company was formed, Counterclaim Plaintiff came to learn that Counterclaim Defendants Petas and Reynolds were actually both initially involved with the idea to create a company. (*Id.* ¶ 73.)Counterclaim Plaintiff had been led to believe by Counterclaim Defendant Petas that only Counterclaim Defendant Petas and Counterclaim Plaintiff would be founders.[FN3](*Id.* ¶ 73.)This information was withheld from Counterclaim Plaintiff in order to induce him to provide his expertise, without which the Company could not be formed. (*Id.*) Counterclaim Plaintiff would not have provided his expertise had he known that Counterclaim Defendants Reynolds and Petas were planning to deny him an equal partnership. (*Id.*)

> FN3. The Court notes that this allegation is directly contradictory to Counterclaim Plaintiffs previous allegations that, prior to the formation of the Company, "it was agreed that Ciasullo, Petas and Reynolds would together start an online independent financial research business focused on debt research ...," and that each were issued equal portions of founding shares in the Company. (CCP.Ans. & Count.¶¶ 68, 72.)

Based on the promises of an equitable team environment, Counterclaim Plaintiff devoted all of his time to building the necessary components of the CreditSights business. (*Id.* ¶ 74.)

In the beginning of 2001, Counterclaim Defendants Reynolds and Petas recapitalized the Company with additional funds of their own, funds of their friends and family, but not funds of Defendant, who did not at that time have sufficient resources. (*Id.* ¶ 77.)Counterclaim Plaintiff later learned that Counterclaim Defendants Petas and Reynolds intentionally exploited the facts that, as alleged by Defendant, the Company needed a cash infusion at that time, and the fact that Counterclaim Plaintiff lacked resources to contribute personally to the recapitalization of the Company, to try to dilute his stake in the Company and reduce his control. (*Id.*) However, Counterclaim Plaintiff raised $1 million in capital

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
(Cite as: 2008 WL 4185737 (S.D.N.Y.))

to help keep the Company afloat, thereby thwarting the efforts of Counterclaim Defendants Petas and Reynolds to dilute his stake and reduce his control. (*Id.* ¶ 78).

*5 In August 2001, Counterclaim Defendants Reynolds and Petas, among others, voted in favor of removing Counterclaim Plaintiff as President of CreditSights. (*Id.* ¶ 79). At that point, Counterclaim Defendant Reynolds told Counterclaim Plaintiff he was removed because Counterclaim Defendant Reynolds did not want to leave his wife's and children's fortunes in Counterclaim Plaintiff's hands, as certain succession rules governing the officers of the Company would otherwise require. (*Id.* ¶ 7 9). Counterclaim Plaintiff alleges that this reason was merely pretextual, provided to conceal Counterclaim Defendants Reynolds and Petas' true intent to divest him of his control and ultimately ownership in the Company. (*Id.*)

In April 2004, another financing effort was undertaken; new outside investors infused the Company with an additional $7 million dollars of capital. (*Id.* ¶ 81.)As part of the 2004 financing, lead investors were given the right to appoint a member to the Board of Directors, increasing the size of the Board from four to five, and creating the possibility that it could grow to a size of six or seven. (*Id.*) The new outside investors required that additional financial controls be implemented, including set caps on compensation levels and bonus pools. (*Id.* ¶ 82.)

Given these caps, Counterclaim Defendant Reynolds requested that Counterclaim Plaintiff sell shares to generate cash in lieu of taking a bonus at the level they determined they should be able to take, stating he would do the same.(*Id.*) Counterclaim Plaintiff did so, even though he preferred to be paid a bonus and not dilute his equity. (*Id.*) Unbeknownst to Defendant, the shares sold by Counterclaim Defendant Reynolds did not belong to him but were in his wife's name. (*Id.*) As a result, Counterclaim Plaintiff was left with fewer shares than either Counterclaim Defendants Petas or Reynolds. (*Id.*)

In August of 2004, Counterclaim Plaintiff developed a life threatening condition, requiring surgery and "some weeks of absence" from the CreditSights offices. (*Id.* ¶ 83.)During this absence, Counterclaim Defendants Reynolds and Petas hired new salesmen without formal approval, without justification and without consulting Defendant, who was Head of Sales and Counterclaim Defendants Reynolds' equal. (*Id.*) Two days after Counterclaim Plaintiff's surgery, Counterclaim Defendant Reynolds held meetings with each sales person, falsely telling them he was doing so at the behest of Defendant. (*Id.* ¶ 84.)As a result of these meetings, there was a referendum on Counterclaim Plaintiff's management of the sales force; several sales staff members notified him of Counterclaim Defendant Petas' conduct and expressed their view that his authority was being undermined. (*Id.*)

On November 29, 2004, without warning or provocation, Counterclaim Defendant Reynolds requested that Counterclaim Plaintiff immediately meet with him and David Good, who was then the Company's General Counsel.[FN4](*Id.* ¶ 86.)Prior to the meeting Counterclaim Plaintiff was planning to resign because he desired to pursue other expected professional opportunities. (*Id.* ¶ 89.)Counterclaim Plaintiff entered the meeting with a mindset to resign. (*Id.*)

> FN4. The Court notes that this allegation directly contradicts Counterclaim Plaintiff's claim that, just prior to the meeting, Counterclaim Plaintiff suspected that Counterclaim Defendants may have become aware of the fact that Counterclaim Plaintiff was involved in a relationship with a CreditSights employee, Ms. Tara Pierce. (*Id.* ¶ 88.)

*6 At the meeting, Counterclaim Defendant Reynolds told Defendant, " 'we believe that we could fire you for cause, but we're offering you the opportunity to resign according to the letter I'm placing in front of you."(*Id.* ¶ 87.)Counterclaim Plaintiff was also told he had been voted off the Board of Direct-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
(Cite as: 2008 WL 4185737 (S.D.N.Y.))

ors. (*Id.* ¶ 87.)Counterclaim Plaintiff was not given notice or the opportunity to participate in the Board meeting. (*Id.*) The allegedly pretextual basis for Counterclaim Defendant Reynolds' request for his resignation was the relationship with Ms. Pierce. (*Id.* ¶ 90.)Counterclaim Plaintiff claims that, in deciding whether to resign under the stated conditions of the prepared letter, or face being fired for cause, he was "well aware of the specious and disingenuous pretext upon which Reynolds sought to use to cloak his real motives."(*Id.* ¶ 91.)

While the prepared resignation letter states quite plainly that, "For purposes of my employment agreement, this resignation will be deemed to have the same economic consequence to me as a termination for cause under the employment agreement," (Second Am. Compl. Exh. G), at the meeting, Counterclaim Plaintiff understood the only "economic consequence" of signing the letter was a waiver of the right to six-month severance. (*Id.* ¶ 92.)Provisions of the employment agreement and the agreements incorporated therein notwithstanding, Counterclaim Plaintiff further understood that by resigning under the terms of the prepared letter, his founder's share of CreditSights stock would be preserved. (*Id.*) On November 29, 2004, the same day as the meeting, Counterclaim Plaintiff tendered his resignation. (*Id.*)

In 2005, Counterclaim Plaintiff began working at Soleil Securities Group, Inc. ("Soleil") which provides independent equities research services. (*Id.* ¶ 94.)It does not provide the same financial research services as Plaintiff CreditSights. (*Id.*) Counterclaim Plaintiff attempted to assure Counterclaim Defendant Reynolds that his new employment would not violate the non-compete clause in his employment agreement, but Counterclaim Defendant Reynolds refused to meet with him. (*Id.* ¶ 95.)

In March 2006, CreditSights employee Tara Pierce informed Counterclaim Plaintiff that Counterclaim Defendants were paying her to file a sexual harassment criminal complaint. (*Id.* ¶ 104.)

After learning about Counterclaim Plaintiff's employment at Soleil, Counterclaim Defendants Reynolds and Petas baselessly accused Counterclaim Plaintiff of violating his non-compete agreement. (*Id.* ¶ 96.)Subsequently, Counterclaim Defendants went to the authorities around or before June, 2006 accusing Counterclaim Plaintiff of stealing confidential and proprietary information from CreditSights, though in an email exchange between the parties a year earlier, Counterclaim Defendants assented to this activity. (*Id.* ¶ 97.)A criminal investigation was conducted at the location of Counterclaim Plaintiff's Soleil employment on June 6, 2006. (*Id.* ¶ 98.)No criminal charges were ever filed. (*Id.* ¶ 99.)

*7 Allegedly because of this criminal investigation, Soleil placed Counterclaim Plaintiff on leave and launched its own independent investigation of him. (*Id.*) Upon Counterclaim Plaintiff's return to Soleil, he was stripped of his management responsibilities and closely monitored. (*Id.*) Although the Counterclaim Defendants allegedly went to the authorities around or before June 2006, Counterclaim Plaintiff alleges that their accusation, and the attendant investigation, caused Soleil, in April of 2007, to ask him to leave his position with them. (*Id.* ¶ 99.)

Counterclaim Plaintiff filed these counterclaims on September 2007, after the Court's March 26, 2007 Order denying Counterclaim Plaintiff's Motion to Dismiss, and in response to Counterclaim Defendants' Hay 2007 Second Amended Complaint.

## B. *DISCUSSION*

### 1. *Legal Standard*

For a complaint to survive dismissal under Rule 12(b)(6), the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1974 (2007). In other words, a plaintiff must satisfy "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allega-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
(Cite as: 2008 WL 4185737 (S.D.N.Y.))

tions in those contexts where such amplification is needed to render the claim plausible." *Igbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007)."[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 127 S.Ct. at 1964-65 (internal quotation marks omitted). Further, in deciding a motion to dismiss, the court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v. Jennings,* 489 F.3d 499, 510 (2d Cir.2007) (citation omitted). However, "general, conclusory allegations need not be credited ... when they are belied by more specific allegations of the complaint." *Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany,* No. 05 Civ. 10669, 2007 WL 2822214, at *7 (S.D.N.Y. Sept. 27, 2007).

In ruling on a 12(b)(6) motion, a court may consider the complaint as well as any additional documents incorporated into or appended to the complaint. *See Tarshis v. Riese Org.,* 211 F.3d 30, 39 (2d. Cir.2000). It is also well-established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes." *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d. Cir.1988). *See also Dayton Monetary Associates v. Donaldson, Lufkin, & Jenrette Securities,* 1992 WL 204374, at *3 (S.D.N.Y.2002) (public court filings considered on 12(b)(6) motion to dismiss).

### 2. *Counterclaim Plaintiff's Release of Claims*

Counterclaim Defendants argue that all counterclaims based on Counterclaim Plaintiff's employment and resignation with CreditSights are subject of a valid release and waiver executed by Counterclaim Plaintiff on December 17, 2004. (Plaintiff and Counterclaim Defendants' Memorandum of Law in Support of Motion to Dismiss Counterclaims, "Count. Defs.' Mem. Law," at 1.) Counter-

claim Defendants assert that, given this release, Count Three, (a Fraud claim), is barred entirely; and Counts One (Breach of Contract), Five (Breach of Fiduciary Duties), Seven (Prima Facie Tort), Eight and Nine (Civil Conspiracy claims) are each barred to the extent they rely on conduct relating to and predating his termination from the Company. (*Id.* at 8.)

*8 Counterclaim Plaintiff counters that the release and waiver he signed is subject to interpretation. (Counterclaim Plaintiff's Memorandum of Law in Opposition of Motion to Dismiss Counterclaims, "CCP Opp. Mem. Law," at 4.) He also argues that the release is unenforceable because he was fraudulently induced into signing the Separation Agreement, and/or unenforceable under affirmative defenses in equity. (*Id.* at 6.) Counterclaim Plaintiff further asserts that the language of the executed release does not discharge Counterclaim Defendants as Directors. (*Id.* at 7.) Finally, Counterclaim Plaintiff argues rescission of the contract for Counterclaim Defendant's failure to provide consideration for Counterclaim Plaintiff's assent to the release. (*Id.* at 9.)

Generally, a release is governed by the principles of contract law. *Golden Pacific Bancorp v. Fed. Deposit Ins. Corp.,* 273 F.3d 509, 515 (2d Cir.2001). It is well settled that "the threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous." *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59, 66 (2d Cir.2000). A contract is unambiguous when it has a "definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Hunt Ltd. v. Lifschultz Fast Freight,* 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Breed v. Insurance Co. of North America,* 413 N.Y.S.2d 352, 385 (1978)). When interpreting an unambiguous contract, "words and phrases are given their plain meaning." *Painewebber v. Bybyk,* 81 F.3d 1193, 1199 (2d Cir.1996). Under New York law, a court must enforce that plain meaning,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

"rather than rewrite an unambiguous agreement." *American Express Bank Ltd. v. Uniroyal,* 164 A.D.2d 275, 277, 562 N.Y.S.2d 631 (1st Dept.1990). A release may be invalidated if it is a "product of fraud, duress or undue influence." *Skluth v. United Merchants and Mfrs.,* 599 N.Y.S.2d 280, 282 (1st Dept.1990). However, it is well-settled that, in New York, a written release cannot be invalidated for lack of consideration.N.Y. GEN. OBLIG. § 15-303 (McKinney 2005).

In this case, Counterclaim Plaintiff's arguments in support of his contention that the release is unenforceable are unavailing. The release provision in Section 8 of the Separation Agreement reads unambiguously:

'[Y]ou release CreditSights, Inc. and its shareholders, officers, employees, agents, and affiliates from any and all causes of action, claims, rights of recovery or setoff, demands, damages, costs, losses and expenses of any kind or nature whatsoever, at law or in equity, which you may have had, now have, claim to have, or may claim to have in the future, whether known or unknown/ including but not limited to all claims on account of, or in any way arising or alleged to arise out of, your employment by or other association or other relationship with CreditSights, Inc., or your termination and resignation from such employment ... You represent that you have withdrawn any charges or complaints that you may have filed against the Company or its affiliates, or its or their officers, directors, shareholders, employees and agents, and you further agree not to file any charges or complaints arising out of or relating to your employment with the Company or termination thereof, against the Company, its affiliates or its or their officers, directors, shareholders, employees, and agents."

*9 (Second Amend. Compl., Exh. H § 8.)

The release provision does in fact bar claims against Counterclaim Defendants Petas and Reynolds as Directors. Clear on its face, this provision

provides no ambiguity and no other reasonable interpretation exists.

In this case, Counterclaim Plaintiff fails to allege any specific statements made by either Counterclaim Defendant when soliciting the Separation and Proxy Agreements that were fraudulent. In his Memorandum of Law in Opposition to Motion to Dismiss Counterclaims, Counterclaim Plaintiff explicitly cites paragraphs 114(c) and 116 in support of his argument that his Counterclaim properly alleges fraudulent inducement. (CCP. Opp. Mem. Law at 6.) These paragraphs merely allege that Counterclaim Defendants' failed to disclose that they never intended to honor their obligations under those Agreements. (CCP. Ans. & Count. ¶¶ 114(c), 116). Counterclaim Plaintiff erroneously conflates a breach of contract claim with a claim for fraudulent inducement. "[A]s a general matter, a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract. Thus, general allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support [a fraud] claim." *Fierro v. Gallucci,* No. 06-CV-5189, 2008 WL 2039545, *4 (E.D.N.Y. May 12, 2008) (citing, *Wall v. CSX Transp., Inc.,* 471 F.3d 410, 416 (2d Cir.2006), and *N.Y. Univ. v. Cont'l Ins. Co.,* 87 N.Y.2d 308, 318 (1995), internal quotations omitted.) Accordingly, these allegations cannot support Counterclaim Plaintiff's claim that the release is invalid on grounds of fraudulent inducement.

Nor does a more searching review of Counterclaim Plaintiff's allegations reveal any other specific misrepresentations made by Counterclaim Defendants which fraudulently induced him to enter the Separation Agreement. Rule 9(b) requires that in all allegations of fraud, the circumstances constituting the fraud must be stated with particularity. *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127-28 (2d Cir.1994). The pleading must be particular enough to satisfy the three goals of Rule 9(b): (1) to provide a defendant with fair notice of the claims against it; (2) to protect a defendant from harm to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

its reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987)."[C]onclusory allegations that defendant's conduct was fraudulent or deceptive are not enough." *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 114 (2d Cir.1982)."Despite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge," however, "[w]here pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990) (citations omitted). In this case, Counterclaim Plaintiff has not identified a single misrepresentation which fraudulently induced him into entering the Separation Agreement. Nor do any of Counterclaim Plaintiff's allegations give rise to a "strong inference of fraud."

**\*10** Counterclaim Plaintiff's argument for rescission of contract due to failure of consideration likewise fails. In this case, not only was consideration provided to Defendant, specifically the consulting fee of $75,000 (Second Amend. Coxnpl., Exh. H.), but the provision in question is a release term in the Separation Agreement. Under New York Gen. Oblig. § 15-303 (McKinney 2005), there is no question that consideration is not required to support a term of release; any purported lack or insufficiency of consideration in this case does not render Counterclaim Plaintiff's release invalid.

Counterclaim Plaintiff's arguments that he was fraudulently induced to enter into the release fail. Accordingly, the executed release is valid. It bars Count Three, Counterclaim Plaintiff's claim for fraud, as well as those portions of Count One (Breach of Contract), Count Five (Breach of Fiduciary Duties), Count Seven (Prima Facie Tort), Counts Eight and Nine (Conspiracy) and Count Ten

(Damage to Business Reputation) which relate to Counterclaim Plaintiff's employment with, and termination from, the Company, and any conduct occurring prior to the date when the release was entered into, December 17, 2004.[FN5]

> FN5. This conduct includes any breach of contract claim with respect to the Proxy and Voting Agreement; although the Proxy and Voting Agreement was entered into subsequent to the Separation Agreement, it was clearly contemplated by the Separation Agreement. (Second Amend. Compl.,, Exh. H, § 4.) Thus any such claim arises out of Counterclaim Plaintiff's termination and resignation from his employment with the Company. "It is well settled that releases are contracts that, unless their language is ambiguous, must be interpreted to give effect to the intent of the parties as indicated by the language employed [and] ... that releases bar suits on causes of action arising on or prior to the date of their execution but will not bar subsequent claims *unless they are specifically embraced within the release or fall within the fair import of its terms." Murray-Gardner Mgt. v. Iroquois Gas Transmission Sys.,* 646 N.Y.S.2d 418, 419 (3rd Dept.1996) (citation omitted; emphasis added).

**3.** *Count One: The Breach of Contract Counterclaim*

Counterclaim Defendants argue that, to the extent that portions of Counterclaim Plaintiff's Breach of Contract Counterclaim are not barred by the release provision of the Separation Agreement, Counterclaim Plaintiff still fails to state adequately a claim for relief. Counterclaim Defendants maintain that Counterclaim Plaintiff's allegations regarding his breach of contract counterclaim are insufficient because he fails to identify which specific contractual provisions Counterclaim Defendants breached. (CCDs.' Mem. Law at 8-9.) Counterclaim Defend-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy

Slip Copy, 2008 WL 4185737 (S.D.N.Y.)

**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

ants further argue that this Count is contradicted by the agreements themselves, and that Counterclaim Plaintiff's allegations fall to satisfy the elements of a claim for breach of contract. (*Id.*)

In New York, a claim for breach of contract must allege: (1) existence of a contract; (2) the claimant has performed his or her obligations under the contract; (3) the defendant failed to perform his or her obligations there under; and (4) damages resulted to the plaintiff. *W.B. David & Co., Inc. v. DWA Communications, Inc.,* 2004 WL 369147 at *2 (S.D.N.Y.2004); *Global Intellicom, Inc. v. Thomson Kernaghan & Co.,* 1999 WL 544708, at *18 (S.D.N.Y.1999)."In pleading these elements, a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.,* 171 F.Supp.2d 354, 358 (citing *Levy v. Bessemer Trust Co., N.A.,* 1997 WL 431079, at *5 (S.D.N.Y.1997)).

Counterclaim Defendants assert that Counterclaim Plaintiff's Breach of Contract claim must be dismissed because Counterclaim Plaintiff failed to set forth the specific contractual provisions that Counterclaim Defendants allegedly breached. (CCDs.' Mem. Law at 8-9.) Counterclaim Plaintiff counters that he has identified the breach of specific agreements and that he provided Counterclaim Defendants with adequate notice of the claimed breaches by incorporating various contractual provisions in the pleading, specifically provisions regarding the wrongful divesting of Counterclaim Plaintiff's shares. (CCP. Opp. Mem. Law at 10.)

*11 The Court finds Counterclaim Defendants' argument compelling. New York law is eminently clear that a proper breach of contract claim must identify specifically breached contract terms. None are so alleged in the counterclaims.

Moreover, in this case, amendment would be futile. Counterclaim Plaintiff failed to allege facts which satisfy sufficiently all the elements required for a breach of contract claim. Specifically, he fails to allege sufficiently that he adequately performed his

own obligations under the relevant agreements. Counterclaim Plaintiff admits the existence of certain executed documents, including the 2001 Convertible Loan Agreement with third party Klausner and the 2005 Stock Pledge Agreement with Klausner. (Opposition to Counterclaim Defendant's Motion for Rule 11 Sanctions, "CCP. Opp. To Rule 11 Mot.," ¶¶ 29-34.) [FN6]The existence of these documents is in violation of the unambiguously stated terms of the 2000 Restricted Stock Grant Agreement, which prohibit the offering, transfer, pledge, or encumbrance of any unvested stock without written consent, and of any vested stock without the Company exercising the right of first refusal.[FN7]This conduct was engaged in prior to any divestment of Counterclaim Plaintiff's CreditSights shares by the Counterclaim Defendants.

> FN6. These documents are considered by this Court even on a Rule 12(b)(6) motion since they are documents integral to the complaint. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808-09 (2d Cir.1996); *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773-74 (2d Cir.1991).

> FN7. Counterclaim Plaintiff does not argue that these documents are fabricated, or that they have been erroneously attributed to him; instead, he relies on the specious argument that they do not constitute "pledges" within the meaning of an "enforceable security interest" as defined by the Uniform Commercial Code, Articles 8 and 9. (CCP. Opp. Mem. Law Rule 11 Mot. at 7.) It is a basic principle of contract law that, where the language of an agreement is clear and unambiguous, the intent of the parties lies therein and the agreement must be enforced by the plain meaning of its terms. *Klos v. Lotnicze,* 133 F.3d 164, 168 (1997) (noting that where the contractual terms are clear, "[t]he secret or subjective intent of the parties is

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
(Cite as: 2008 WL 4185737 (S.D.N.Y.))

irrelevant.") Since the plain language of the Restricted Stock Agreement prohibits even the offering of shares, not to mention any encumbrance of shares, Counterclaim Plaintiff's sophistry fails. (Second Amend. Compl. Exh. B ¶ 5.)

Counterclaim Plaintiff argues that when he agreed in his resignation letter to have the same economic consequences as a termination for cause under the 2004 Employment Agreement, it was understood that this only meant the Counterclaim Plaintiff giving up his six-month severance, not his rights to CreditSights shares. (CCP. Ans. & Count. ¶ 92).

This alleged "understanding" is nowhere reflected in any of the relevant contractual terms, which are facially clear. Counterclaim Plaintiff fails to allege he had the written consent of the Counterclaim Defendants to disclose proprietary business information to third parties such as Klausner, as required in the 2000 Restricted Stock Grant Agreement, Section 6(a).

Therefore, even accepting all the factual allegations in the counterclaim as true and making all reasonable inferences in the claimant's favor, Counterclaim Plaintiff cannot make out a claim for breach of contract because Counterclaim Plaintiff does not allege adequately that he performed his obligations under the referenced contracts, particularly the 2000 Restricted Stock Grant Agreement. Because Counterclaim Plaintiff cannot allege that he had prior written consent to release proprietary information as required under Section 6(a) of the 2000 Restricted Stock Grant Agreement, the second element of his breach of contract counterclaim requiring the claimant to have performed his obligations under the contract is not satisfied. The counterclaim for breach of contract is therefore DISMISSED.

4. *Count Two: The Unjust Enrichment Counterclaim*

Counterclaim Defendants maintain that Counter-

claim Plaintiff's unjust enrichment counterclaim must be dismissed because it is duplicative of the breach of contract counterclaim. (CCDs.' Mem. Law at 10-11.) Counterclaim Plaintiff asserts the unjust enrichment counterclaim is properly alleged because he was wrongfully deprived of the value to which he is entitled, the full market value, of his CreditSights shares. (CCP. Ans. & Count. ¶ 111.)

*12 "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000) (internal quotation marks and citation omitted). However, before inquiring into these elements, a court must make the threshold consideration of whether or not the matter is controlled by a valid contract. "The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." *Goldman v. Metropolitan Life Ins. Co.,* 807 N.Y.S.2d 583, 588 (2005) (citation omitted). As the New York Court of Appeals has explained:

A 'quasi contract' only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment.... Briefly stated, a quasi-contractual obligation is one imposed by law *where there has been no agreement or e xpression of a ssent, b y word o r act, on th e part of either party involved.*

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 NY.2d 382, 388-389 (1987) (citations and internal quotations omitted) (emphasis in original).

Here, Counterclaim Plaintiff conclusorily argues that, "the pleading alleges that CreditSights was unjustly enriched by the true value of Ciasullo's CreditSights stock based on conduct that goes beyond and is separate from that which is the subject of any of the agreements between CreditSights and Ciasullo."(CCP. Opp. Mem. Law Mot. to Dismiss at 16.) However, Counterclaim Plaintiff fails to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

point out exactly, or even suggest, what conduct was "beyond and separate from" the scope of matters controlled by contract in this case.

Moreover, the Court sees no grounds for allowing the counterclaim to proceed as a pleading in the alternative. "[C]ourts generally dismiss claims for quantum meruit on the pleadings only when it is clear from the face of the complaint that there exists an express contract that clearly controls." *Knudsen v. Quebecor Printing (U .S.A.), Inc.,* 792 F.Supp. 234, 237 (S.D.N.Y.1992). In this case, Counterclaim Plaintiff has made no factual allegations which make plausible a claim that the relevant contracts are either invalid or unenforceable. The deprivation of the value of Counterclaim Plaintiff's CreditSights shares is an issue clearly controlled by valid and enforceable contracts between the Counterclaim Defendants and Defendant, including the Separation Agreement, the 2004 Executive Employment Agreement, and the 2000 Restricted Stock Grant Agreement.

Because the Counterclaim Defendants' and Counterclaim Plaintiff's rights and obligations with respect to Counterclaim Plaintiff's shares is a matter controlled by valid and enforceable agreements, the counterclaim for unjust enrichment is hereby DISMISSED.

### 5. *Count Three: The Fraud Counterclaim*

*13 As discussed supra, the Court holds that Counterclaim Plaintiff's counterclaim for Fraud is barred by the release provisions of the Separation Agreement, Section 8. Even if that release was not valid, not enforceable, or did not contemplate all of the fraudulent misconduct alleged by Defendant, this counterclaim would still fail, as a matter of law.

Counterclaim Defendants contend that Counterclaim Plaintiff's Count for Fraud is impermissibly duplicative of his Breach of Contract counterclaim. (CCDs.' Mem. Law at 12.) Counterclaim Defendants further contend that the fraud claim must fail

because Counterclaim Plaintiff does not identify specific representation upon which he relies, as required under Fed.R.Civ.P. 9(b).(*Id .* at 13, FN 4.)

Counterclaim Plaintiff alleges that his relationship with Counterclaim Defendants exceeded that of a mere contractual relationship, suggesting that, though CreditSights was in fact a corporation, because his relationship with Counterclaim Defendants was "mora akin to a partnership," distinct duties were owed to him. (CCP. Mem. Law at 14.) Counterclaim Plaintiff further alleges that the misrepresentations made by Reynolds and Fetas go beyond intent to perform and that, because the alleged misrepresentations and omissions concern "the very heart of the issue of trust among Petas, Reynolds and Ciasullo," they are beyond the scope of his counterclaim for breach of contract. (*Id.* at 14.)

In New York, the elements of common law fraud are "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970-71 (2d Cir.1987). The elements of actual fraud in New York are false representation, scienter, materiality, expectation of reliance, justifiable reliance, and damage." *Congress Fin. Corp. v. John Morrell & Co.,* 790 F.Supp. 459, 469 (S.D.N.Y.1992) (citation omitted). A successfully pleaded count for fraud that is independent of a breach of contract count must either (1) demonstrate a legal duty that is distinct from a legal duty to perform under the contract; or, (2) allege a misrepresentation that is collateral or extraneous from the contract; or, (3) seek special damages caused by a misrepresentation and unrecoverable as contract damages. *Bridgeston/Firestone Inc. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir.1996). As "an essential element of a cause of action for fraud ... justifiable reliance must be pleaded with particularity pursuant to Fed.R.Civ.P 9(b)." *Lutin v. New Jersey Steel Corp.,* 1996 WL 636037, at *7 (S.D.N.Y.1996) (citation omitted); *see also Man-*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

*ning v. Utilities Mutual Ins. Co.,* 254 F.3d 387, 400-01 (2d Cir.2001) (affirming District Court's dismissal of New York fraud claim for failure to plead reasonable reliance with sufficient particularity as required by Rule 9(b)).

In this case, Counterclaim Plaintiff tries to support his fraud counterclaim on four factual bases. (CCP. Ans. & Count. ¶ 114(a)-(d).) Three of these allegations concern an allegedly fraudulent scheme to usurp Counterclaim Plaintiff's control in, and ultimately oust him from, the Company; the last concerns Counterclaim Defendants' intent to perform under the agreements.

*1. The Scheme to Oust Counterclaim Plaintiff From the Company*

**\*14** Counterclaim Plaintiff alleges the Counterclaim Defendants intended to induce his reliance and subsequent actions in helping to create and build the Company, specifically misrepresenting that Counterclaim Plaintiff and Counterclaim Defendants would always be equal in the Company, failing to disclose their real motive in removing Counterclaim Plaintiff as President of the Company was to divest Counterclaim Plaintiff of his control and ownership of CreditSights, and representing to Counterclaim Plaintiff that he should continue to work at CreditSights without disclosing their plan to oust Counterclaim Plaintiff from the company and divest Counterclaim Plaintiff of his shares. (CCP. Ans. & Count. ¶¶ 82, 114, 116.) Counterclaim Plaintiff alleges that Counterclaim Defendant Reynolds induced Counterclaim Plaintiff to sell his shares to generate cash for the company by falsely representing to Counterclaim Plaintiff that Reynolds sold his own shares when, in actuality, he sold shares under his wife's name, with the intent of diluting Counterclaim Plaintiff's equity. (CCP. Ans. & Count. ¶ 82.) Counterclaim Plaintiff asserts that these allegations demonstrate fraudulent misrepresentations collateral to the contracts and are not duplicative of the breach of contract counterclaim. (CCP. Opp. Mem. Law at 14.)

The Court finds Counterclaim Plaintiff's efforts to create a fraud counterclaim predicated on such allegations unavailing. First, Counterclaim Plaintiff fails to demonstrate how these allegations, which fundamentally concern his capacity and control as an employee of CreditSights, are outside the scope of the agreements relevant in this case, including valid and enforceable employment contracts. Second, Counterclaim Plaintiff has not pleaded any legal duty, nor can the Court ascertain one, outside a duty to perform under the contract, upon which he justifiably relied. While Counterclaim Plaintiff claims Counterclaim Defendants breached fiduciary duties he was owed as a partner, the structure of the Company was a corporation, not a partnership. Finally, even assuming the misrepresentations to be collateral to the contracts and/or that there exists a separate fiduciary duty upon which Counterclaim Plaintiff could justifiably rely, these allegations are merely conclusory. Counterclaim Plaintiff has not pleaded justifiable reliance with the requisite particularity. Moreover, the Counterclaim Plaintiff has failed to "allege facts that give rise to a strong inference of fraudulent intent." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 812 (2d Cir.1996).

On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286 (1986)."Factual allegations must be enough to raise a right to relief above a speculative level." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1965 (2007).[FN8]

> FN8. Counterclaim Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss Counterclaims erroneously relies on the pre-*Twombly* standard of pleading on a motion to dismiss.

In short, Counterclaim Plaintiff has offered up no facts which would raise his conclusory allegations to a level of plausibility, and a fraud counterclaim based on an alleged scheme to oust him from the Company fails.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*2. Counterclaim Defendants Never Intended to Honor their Obligations Under Specific Agree- ments*

**\*15** Second, Counterclaim Plaintiff tries to base his fraud counterclaim on the allegation that Counterclaim Defendants failed to disclose to Counterclaim Plaintiff when soliciting the Separation and Proxy Agreements that they never intended to have CreditSights honor its obligations under these agreements. (CCP. Ans. & Count. ¶ 114.) Essentially Counterclaim Plaintiff's allegation challenges the Counterclaim Defendants' intent to perform under the multiple contracts. It is hornbook law that such allegations cannot support a claim of fraud in New York. *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13, 19 (2d Cir.1996) (citing *McKernin v. Fanny Farmer Candy Shops, Inc.,* 574 N.Y.S.2d 58, 59 (2d Dept 1991) (where a fraud claim "is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie"); *Metropolitan Transp. Auth. v. Triumph Advertising Productions,* 497 N.Y.S.2d 673, 675 (1st Dept 1986) (dismissing fraud claim where claim "allege[d] only a breach of the representation of performance implicit in making the bid and a subsequent assurance of performance" by the defendant)).*See a lso Papa's-June Music, Inc. v. McLean,* 921 F.Supp. 1154, 1162 (S.D.N.Y.1996) (dismissing fraud claim where "[t]he complaint does not allege a fraud claim that is sufficiently distinct from the breach of contract claim" but "merely appends allegations about [defendant's] state of mind to the claim for breach of contract").

Counterclaim Plaintiff's counterclaim for fraud is not adequately alleged. Accordingly, the Counterclaim Plaintiff's counterclaim for fraud is hereby DISMISSED.

*6. Count Four: The Declaratory Relief Counterclaim*

Counterclaim Defendants move to dismiss Counterclaim Plaintiff's counterclaim for declaratory relief on the grounds that it is duplicative of his breach of contract claim. (CCDs.' Mem. Law at 14 .) Counterclaim Plaintiff seeks a declaratory judgment that "CreditSights has no continuing right, title or interest to any of Ciasullo's shares of CreditSights and such shares rightfully belong to Ciasullo."(CCP. Ans. & Count. ¶ 120.)

In this case, none of Counterclaim Plaintiff's allegations adequately support a claim under which the declaratory relief he seeks could be granted. Accordingly, the counterclaim for Declaratory relief is hereby DISMISSED.

*7. Count Five; The Breach of Fiduciary Duty Counterclaim*

Counterclaim Defendants ask the Court to dismiss Counterclaim Plaintiff's breach of fiduciary duty counterclaim against Counterclaim Defendants Fetas and Reynolds, arguing that Counterclaim Plaintiff can not allege facts which satisfy the elements of a breach of fiduciary duty claim. (CCDs.' Mem. Law at 12 .)

Counterclaim Plaintiff alleges that, as officers and directors of CreditSights, Counterclaim Defendants violated fiduciary duties owed to fellow directors and shareholders, including Defendant. (CCP. Ans. & Count. ¶¶ 1 23-124.) Counterclaim Plaintiff further alleges that Counterclaim Defendants' morally reprehensible and reckless conduct warrants punitive damages. (*Id.* at ¶ 125.)Counterclaim Plaintiff seeks to recover damages, including the restoration of his CreditSights shares, loss of earnings from future employment at CreditSights, and loss of earnings from employment subsequent to his tenure at CreditSights, based on the alleged violation of fiduciary duties. (*Id.* at ¶ 125-126.)

**\*16** In New York, a claim for breach of fiduciary duty must allege: (1) breach by a fiduciary of a duty owed to the plaintiff; (2) defendant's knowing parti-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                    Page 15
Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

cipation in the breach; and (3) damages. *SCS Communications, Inc. v. Herrick Co., Inc.,* 360 F.3d 329, 342 (2d Cir.2004). Generally under New York law, there is no fiduciary relationship between employers and employees. *Ellis v. Provident Life & Accident Ins. Co.,* 3 P.Supp.2d 399, 411 (S.D.N.Y.1998) (citation omitted).

At the outset, the Court notes that, in this case, the loss of earnings damages sought by Counterclaim Plaintiff arises from his status as an employee, not as a shareholder. Because no duty is owed to the Counterclaim Plaintiff as an employee, Counterclaim Plaintiff can neither make out a claim for damages arising from loss of earnings from future employment at CreditSights, nor from future employment subsequent to his employment at CreditSights, based on any alleged violation of fiduciary duties.

In stating his counterclaim for breach of fiduciary duties, Counterclaim Plaintiff seeks to rely on the duties Counterclaim Defendants Reynolds and Petas owed as officers and directors of the Company. However, as discussed infra, pages 18-24, the executed release in the Separation Agreement bars any and all causes of action against Counterclaim Defendants Petas and Reynolds as officers and directors. Moreover, even if the release did not bar this claim, it would still fail. The facts as alleged by Counterclaim Plaintiff do not support a counterclaim that Counterclaim Defendants Reynolds and Petas cancelled his shares. In fact, Counterclaim Plaintiff alleges that the Company divested him of his shares. (CCP. Ans. & Count. ¶¶ 102-103.)

Accordingly, the Counterclaim Plaintiff's Count for Breach of Fiduciary Duty is hereby DISMISSED.

*8. Count Six: The Tortious Interference with Business Relations Counterclaim*

Counterclaim Defendants argue that Counterclaim Plaintiff has not alleged facts sufficient to satisfy the elements of a tortious interference with business

relations claim. (Pl. Mem. Law at 15-16.)

Counterclaim Plaintiff alleges two distinct grounds for his tortious interference with business relations Count. First, Counterclaim Plaintiff contends that Counterclaim Defendants were aware of Counterclaim Plaintiff's employment with Soleil and contacted Soleil regarding his non-compete obligations to CreditSights with either the sole purpose of harming Counterclaim Plaintiff and/or through means that were unlawful and improper. (CCP. Ans. & Count. ¶¶ 95-99, 128.) Second, Counterclaim Plaintiff alleges that Counterclaim Defendants conspired to make a baseless criminal complaint to the New York City Police Department, falsely accusing Counterclaim Plaintiff of stealing confidential and proprietary information from CreditSights. (*Id.* ¶ 97.)

In New York, a claim for tortious interference with business relations must allege: (1) business relations between the plaintiff and third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship. *Nadel v. Play-by-Play Toys & Novelties, Inc.,* 208 F.3d 368, 382 (2d Cir.2000).

*a. The Non-Compete Clause*

**\*17** Counterclaim Plaintiff alleges that Counterclaim Defendants' sole purpose in contacting Soleil about the non-compete clause in Counterclaim Plaintiff's Employment Agreement was to cause him harm. (CCP. Ans. & Count. ¶ 128.) Counterclaim Plaintiff also alleges that within days of rebuffing Counterclaim Plaintiff's efforts to discuss his employment with Soleil, Counterclaim Defendants wrote to Soleil accusing Counterclaim Plaintiff of violating the non-compete clause. (*Id.* ¶¶ 95, 96.)

With respect to CreditSights' conduct in contacting Soleil to discuss his non-compete clause, Counterclaim Plaintiff's counterclaim fails. Counterclaim

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
(Cite as: 2008 WL 4185737 (S.D.N.Y.))

Plaintiff's allegation that Counterclaim Defendants' sole purpose in contacting Soleil was to cause harm to the Counterclaim Plaintiff is not only conclusory, it is also belied by many of the Counterclaim Plaintiff's other factual allegations. Counterclaim Plaintiff concedes that his 2004 Executive Employment Agreement includes a one year non-compete clause; Section 9(b) of this Agreement makes untenable Counterclaim Plaintiff's conclusion that Counterclaim Defendants' only motivation was to bring him harm. Indeed, Section 9(b) makes it clear that the facts, as pleaded by Defendant, show that Counterclaim Defendants had an alternative purpose for contacting Soleil: the enforcement of the non-compete clause and protection of their business interests.

b. *The Criminal Investigation*

Additionally, Counterclaim Plaintiff alleges that Counterclaim Defendants' complaint to authorities and the criminal investigation which followed were a tortious interference with his business relations with Soleil. (CCP. Opp. Mem. Law at 18-19.) Counterclaim Plaintiff alleges an email exchange indicating Counterclaim Defendants' assent to the investigated activity make it improper for Counterclaim Defendants to bring a complaint to the authorities. (CCP. Ans. & Count. ¶ 97.)

Here, the Counterclaim Plaintiff has alleged at least one fact which, if true, makes plausible a claim for tortious interference with business relations. Namely, Counterclaim Defendants' complaint to the authorities may amount to tortious interference with Counterclaim Plaintiff's Soleil business relationship, assuming the truthfulness of his claim that in an email exchange, Counterclaim Defendants assented to Counterclaim Plaintiff's activity. This counterclaim is not precluded by the contractual release between the parties, as the Counterclaim Defendants' allegedly went to the police after the execution of the contractual release.

Accordingly Counterclaim Defendants' Motion to

Dismiss Count Six, for tortious interference with business relations is GRANTED in part, on the non-compete clause claim, and DENIED in part, on the tortuous interference claim.

9. *Count Seven: The Prima Facie Tort Counterclaim*

Counterclaim Defendants challenge Counterclaim Plaintiff's prima facie tort counterclaim because, in violation of the law in this Circuit, it does not allege facts that are unique from those alleged in other tort claims. (CCDs.' Mem. Law at 18.)

*18 Counterclaim Plaintiff argues that Counterclaim Defendants, separately and conspiring with each other, intended to cause and did cause Counterclaim Plaintiff to suffer the intentional infliction of economic damages without excuse or justification for their actions, solely motivated by greed and/or malevolent reasons. (CCP. Ans. & Count. ¶ 131.)

A prima facie tort includes four elements: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, and (4) by an act or series of acts that would otherwise be lawful. *Curiano v. Suozzi,* 63 N.Y.2d 113, 117 (1984). However, "[a] set of facts giving rise to a common-law tort is fatal to a prima facie tort claim". *Chen v. United States,* 854 F.2d 622, 628 (2d Cir.1988)."[T]here is no recovery in prima facie tort unless malevolence is the sole motive for defendant's otherwise lawful act." *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 333 (1983); *see also, Fallon v. McKeon,* 230 A.D.2d 629, 630 (1st Dep't 1996).

Here, Counterclaim Plaintiff alleges that Counterclaim Defendants' conduct was motivated solely by greed and/or malevolent reasons. (CCP. Ans. & Count. ¶ 131). Notwithstanding Counterclaim Plaintiff's conclusory language, Counterclaim Plaintiff fails to support adequately his claim that Counterclaim Defendants' actions were motivated

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                    Page 17
Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

solely by the intent to injure him. Indeed, Counterclaim Plaintiff's own allegations identify several other legitimate motives for Counterclaim Defendants' conduct, including the enforcement of legal, binding contractual agreements. Counterclaim Plaintiff, for example, states that Counterclaim Defendants sought to take advantage of his absence for the purpose of economic gain. (CCP. Ans. & Count. ¶¶ 79, 85.) *See e.g., Discover Group, Inc. v. Lexmark Int'l., Inc.,* 333 F.Supp.2d 78, 87 (E.D.N.Y.2004) (dismissing a prima facie tort claim where the complaint alleged that defendant "was acting, at least in part, to further its own economic interests.").

Clearly, as acknowledged by Counterclaim Plaintiff, Counterclaim Defendants alleged conduct was not motivated solely by disinterested malevolence. Accordingly, Counterclaim Plaintiff's counterclaim for prima facie tort is DISMISSED.

*10. Counts Eight and Nine: The Civil Conspiracy to Commit a Prima Facie Tort, and Civil Conspiracy to Interfere Tortiously with Business Relations, Counterclaims*

Counterclaim Defendants move to dismiss Counterclaim Plaintiff's Civil Conspiracy to commit a prima facie tort and civil conspiracy to tortiously interfere with business relations counterclaims because independent claims for civil conspiracy are barred under New York law. (CCDs.' Mem. Law at 20-21.)

New York does not recognize an independent tort of conspiracy. *See, Alexander & Alexander of New York, Inc. v. Fritzen,* 68 N.Y .2d 968, 969, 503 N.E.2d 102, 102, 510 N.Y.S.2d 546, 547 (1986) ("[A]s we long held, a mere conspiracy to commit a tort is never of itself a cause of action.") Therefore, if the claimant fails to state a cause of action for either of the torts underlying the alleged conspiracy, it necessarily fails to state an actionable claim for civil conspiracy. *Kirch v. Liberty Media Corp.,* 449 F .3d 388, 401 (2d Cir.2006).

*19 Here, Counterclaim Plaintiff fails to state a counterclaim for prima facie tort. Consequently, the counterclaim of civil conspiracy to commit a prima facie tort must be dismissed. However, because Counterclaim Plaintiff provides sufficient facts to state a claim for tortious interference with business relations with respect to the Counterclaim Defendants' complaint to the authorities, his civil conspiracy to interfere tortiously with business relations counterclaim cannot be dismissed.

Consequently, Counterclaim Defendants' Motion to Dismiss Count Eight is GRANTED, however Counterclaim Defendants' Motion to Dismiss Count Nine is DENIED.

*11. Count Ten: The Damage to Business Reputation Counterclaim*

Counterclaim Defendants move to dismiss Counterclaim Plaintiff's damage to business reputation counterclaim on two grounds. First, to the extent that the counterclaim is based on statements allegedly made one year prior to the filing of Counterclaim Plaintiff's Answer to Amended Complaint and Counterclaims, Counterclaim Defendants contend it is barred by the statute of limitations. (CCDs.' Mem. Law at 22-23.) Second, Counterclaim Defendants maintain that, to the extent that the counterclaim is based on statements made in litigation, the alleged statements are protected by absolute privilege. (*Id.* at 21-23.)

Counterclaim Plaintiff argues that Counterclaim Defendants falsely and publicly accused Counterclaim Plaintiff of; (1) sexual harassment; (2) purportedly breaching the non-compete clause in the 2004 Executive Employment Agreement; and, (3) disclosing confidential and proprietary business information with knowledge or reckless disregard as to the inaccuracy of the statements. In Counterclaim Plaintiff's view, these statements caused damage to Counterclaim Plaintiff's business reputation. (CCP. Ans. & Count. ¶¶ 140-141.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
(Cite as: 2008 WL 4185737 (S.D.N.Y.))

### a. *Public Actions Not Identified and the One Year Statute of Limitations*

Counterclaim Plaintiff's counterclaim for damage to business reputation is, in New York, a defamation claim. *See Pasqualini v. MortgageIT, Inc.,* 498 F.Supp.2d 659, 670 (S.D.N.Y.2007) (Where the plaintiff's claim is based entirely on defendant's dissemination of negative statements about her, the resulting harm to plaintiff's professional reputation, "is thus, in essence, a defamation claim, and is subject to the applicable one year statute of limitations.") Defamation claims are subject to a one year statute of limitations under New York C.P.L.R. § 215(3) (McKinney 2007).

In this case, outside of the instant litigation, Counterclaim Plaintiff's defamation claim is based on statements made prior to June 2006 (CCP. Ans. & Count. ¶ 140.) Consequently, these statements are barred by the one-year statute of limitations, as they were made more than one year before the September 2007 filing of this counterclaim.

Counterclaim Plaintiff fails to allege that any of the allegedly harmful accusations, including the alleged public accusations of sexual harassment, accusations that he violated the non-complete clause in his employment agreement, or accusations that he wrongfully disseminated confidential and proprietary business information occurred within one year prior to the filing of his Answer and Counterclaims.[FN9] Accordingly, Counterclaim Plaintiff's counterclaim for damage to business reputation is DISMISSED because of the one-year statute of limitations.

> FN9. Regarding Counterclaim Plaintiff's allegation that, after he began employment at Soleil, Counterclaim Defendants baselessly made public accusations mat Counterclaim Plaintiff violated the Section 9(b) non-compete clause in the 2004 Executive Employment Agreement, the Court notes that Counterclaim Plaintiff cannot rely on statements made during the instant litiga-

tion proceedings. Public statements made in connection with court proceedings are absolutely privileged and not actionable. *See Levy v. State,* 58 N.Y.2d 733 (1982) (holding that there is absolute immunity from civil suits on statements and affirmations made in the course of a judicial proceeding).

### III. COUNTERCLAIM DEFENDANTS' MOTION FOR RULE 11 SANCTIONS

#### A. *BACKGROUND*

**\*20** Counterclaim Defendants move pursuant to Federal Rule of Civil Procedure 11, on the grounds that Defendants asserted blatant factual errors and statements not relevant to their counterclaims solely for the purpose of smearing the Counterclaim Defendants. (Counterclaim Defendant's Memorandum of Law in Support of Motion for Sanctions for Rule 11 of the FRCP, "CCDs.' Mem. Law Rule 11 Mot .," at 2.) Counterclaim Defendants allege that Counterclaim Plaintiff's Answer to Amended Complaint and Counterclaims contains erroneous information which should be stricken and merit sanctions. (*Id.*) According to Counterclaim Defendants, the blatant factual inaccuracies alleged by Counterclaim Plaintiff include: (1) Counterclaim Plaintiff's denial that he pledged his CreditSights stock; and (2), Counterclaim Plaintiff's awareness that Counterclaim Defendant Reynolds would be involved with running the Company from the start. (*Id.*) Counterclaim Defendants argue that sanctions should be imposed to deter Counterclaim Plaintiff from engaging in similarly frivolous litigation tactics in the future. (*Id.*)

#### B. *THE FED. R. CIV. P. 11 LEGAL STANDARD*

Rule 11 states in part: "The signature of an attorney or party constitutes a certificate by the signer that ... to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

grounded in fact.... If a pleading, motion, or other paper is signed in violation of this rule, the court ... shall impose upon the person who signed it ... an appropriate sanction."The purpose of Rule 11 is to afford a trial court judge a mechanism "to enforce ethical standards upon attorneys appearing before them, while being careful not to rein in zealous advocacy." *Pannonia Farms, Inc. v. USA Cable,* 426 F.3d 650, 652 (2d Cir.2005). Federal Rules of Civil Procedure are to be given their plain meaning. *Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 123 (1989). The plain meaning of Rule 11 is well-settled: any signatory of a document submitted to the court must conduct a "reasonable inquiry" or face sanctions. *Business Guides, Inc. v. Chromatic Commc'ns Enter., Inc.,* 498 U.S. 533, 541 (1991). Though decision of whether or not to impose sanctions is completely within the discretion of the district court, "any such decision [must be] made with restraint and discretion." *Schlaifer Nance & Co., Inc. v. Estate of Warhol,* 194 F.3d 323, 334 (2d Cir.1999) (citation omitted)."[T]he standard for triggering the award of fees under Rule 11 is objective unreasonableness." *Margo v. Weiss,* 213 F.3d 55, 65 (2d Cir.2000).

*C. DISCUSSION*

Counsel for Counterclaim Plaintiff argues that sanctions are inappropriate in this case. Defense Counsel represents that Counterclaim Plaintiff was extensively interviewed regarding the pledges of his CreditSights stock to third parties, and that Counsel assured themselves of the truthfulness of Counterclaim Plaintiff's denial of stock pledges by contacting the third parties and confirming that those third parties would sign affidavits attesting to this assertion. (Joint Declaration of Murray, Esq. and O'Rourke, Esq. In Opposition to Counterclaim Defendant's Motion for Rule 11, "CCP. Joint Decl. Opp. Rule 11 Mot." ¶¶ 18-19.) Counterclaim Plaintiff and his Counsel jointly and separately reviewed the Counterclaim Plaintiff's Answer/ Counterclaims several times for factual accuracy. (*Id.* ¶ 17.)Counsel repeatedly asked Counterclaim

Plaintiff whether they had all relevant documentation and requested that Counterclaim Plaintiff search his files for supporting documentation. (*Id.* ¶ 28.)Counterclaim Plaintiff continuously assured Counsel that he provided them all the requisite information. (*Id.* ¶¶ 23, 28-30.)

*21 When Counterclaim Plaintiff finally disclosed the existence of a 2005 Stock Pledge Agreement with third party Klausner, Counsel conducted extensive research, questioning Counterclaim Plaintiff about why he had not come forth with this information earlier. (*Id.* ¶ 34.)They also called Klausner to verify the existence of any agreement. (*Id.*) In the course of this inquiry into the 2005 Stock Pledge Agreement, Counsel became aware of an executed 2001 Convertible Loan Agreement with Klausner. (*Id.* ¶¶ 29-31.)Upon discovering this, Counsel immediately advised Counterclaim Defendants that the Answer and Counterclaims would be withdrawn and revised. (*Id.* ¶ 33.)

Counterclaim Defendants' maintain Counterclaim Plaintiff's allegation that he was unaware of the extent of Counterclaim Defendant Reynolds involvement with the Company was also a blatant factual inaccuracy. Defense Counsel argues it cannot be known whether this is a blatant inaccuracy until further discovery is conducted, and therefore not a basis for Rule 11 sanctions.

Counterclaim Defendants have raised a compelling claim that at least with respect to Counterclaim Plaintiff's denial that he pledged CreditSights stock, Rule 11 sanctions may be warranted in this case. This is particularly true given that Counsel for Counterclaim Plaintiff has yet to withdraw and revise the Answer and Counterclaims in this case, which clearly contain erroneous representations. However, the Court, in an exercise of leniency and restraint, exercises its discretion and hereby declines to impose monetary sanctions at this time on Counterclaim Plaintiff's counsel. The Court expects, however, that Counterclaim Plaintiff's counsel, now with knowledge of their client's unreliability, will require more information and corroboration

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

Page 20

from their client and/or others before filing sanctionable papers with the Court. Counterclaim Plaintiff shall withdraw and revise the Answer and Counterclaims within 30 days of the date of this Order.

D. *CONCLUSION*

In accordance with the foregoing, Counterclaim Defendants' motion for Rule 11 sanctions against the Counterclaim Plaintiff is DENIED at this time.

IV. COUNTERCLAIM DEFENDANTS' MOTION TO STRIKE CERTAIN ALLEGATIONS IN THE COUNTERCLAIM

A. *BACKGROUND*

Counterclaim Defendants move to strike certain allegations in the Counterclaim Plaintiff's Answer to Second Amended Complaint and Counterclaims pursuant to Fed.R.Civ.P. 12(f). In particular, Counterclaim Defendants assert that allegations made pertaining to (1) adulterous relationships between members of the Company's Board of Directors and employees at prior places of employment; and, (2) Counterclaim Defendant Reynolds' mental health and alcohol use, are unsupported by evidence, unsupportable and irrelevant to any claim or defense which may be raised by Defendant. (CCDs.' Mem. Law Rule 11 Mot. at 12.)

B. *MOTION TO STRIKE LEGAL STANDARD*

Fed.R.Civ.P. states in pertinent part: "[T]he court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."It is well settled that a Rule 12(f) motion will be denied, "unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United Corp.* 551 F.2d 887, 893 (2d Cir.1976).

C. DISCUSSION and CONCLUSION

**\*22** In this case, evidence regarding the adulterous relationships that members of the Company's Board of Directors engaged in prior to working at the Company would be inadmissible. As Counterclaim Defendants explain, "what allegedly occurred at previous places of employment by Board Members has no bearing on, and is no defense to, Ciasullo's own non-compliance with CreditSights' policies against sexual harassment or the unanimous decision of the Board of Directors to remove him from the Board for harassing a subordinate."(CCDs.' Mem. Law Rule 11 Mot. at 12.)

Likewise, the Court cannot find that there are any circumstances under which evidence pertaining to Counterclaim Defendant Reynolds' mental health and alcohol use would be admissible in this case. Counterclaim Plaintiff has alleged no causal relation between such facts and his claims.

Accordingly, Counterclaim Defendants' Motion to Strike is GRANTED.

V. COUNTERCLAIM PLAINTIFF'S REQUESTS TO REPLEAD AND FOR SANCTIONS

Counterclaim Plaintiff requests leave to replead. (CCP. Opp. Mem. Law at 24.) Federal Rule of Civil Procedure 15 states, in relevant part: "A party may amend its pleading by leave of the court ... and leave shall be freely given when justice requires."If amendment to the complaint would not be futile, requests for leave to re-plead should be granted. *Nemo Tile Company v. Shamut Nat'l. Corp.,* 1995 WL 1682315 (E.D.N.Y.1995).

Here, amendments to the counterclaims would be futile. Thus, Counterclaim Plaintiff's request for leave to re-plead counterclaims is DENIED. All counterclaims dismissed herein are accordingly DISMISSED, WITH PREJUDICE.

Counterclaim Plaintiff also requests that the Court impose sanctions on Plaintiff and its Counsel for

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

filing their Motion for Sanctions. (CCP. Mem. Law Opp. Rule 11 Mot. at 11.) This request is patently frivolous, in that Counterclaim Plaintiff barely escaped monetary sanctions at this stage of the proceedings. Moreover, the request is made in obvious contravention of Rule 11, which requires that a motion for sanctions be made separately from any other motion, describe the alleged conduct which violates Rule 11(b) and be served in accordance with Rule 5 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 11(c)(2). Counterclaim Plaintiff's request is accordingly DENIED.

## VI. CONCLUSION

For the foregoing reasons, Counterclaim Defendants' Motion for Default Judgment against Counterclaim Plaintiff is DENIED. Counterclaim Defendants' Motion to Dismiss Counterclaim Plaintiff's First, Second, Third, Fourth, Fifth, Seventh, Eighth, and Tenth causes of action is GRANTED. Counterclaim Defendants' Motion to Dismiss Counterclaim Plaintiff's Sixth and Ninth Cause of Action is GRANTED in part, and DENIED in part. Counterclaim Defendants' Motion for Rule 11 Sanctions against Counterclaim Plaintiff is DENIED, at this time, and Counterclaim Defendants' Motion to Strike certain allegations is GRANTED. Counterclaim Plaintiff's request to re-plead is DENIED. Counterclaim Plaintiff's request for sanctions is DENIED.

**\*23** SO ORDERED.

S.D.N.Y.,2008.
CreditSights, Inc. v. Ciasullo
Slip Copy, 2008 WL 4185737 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 18

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 4292030 (S.D.N.Y.)
(Cite as: 2007 WL 4292030 (S.D.N.Y.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Charlene MORISSEAU, Plaintiff,
v.
DLA PIPER, et al., Defendants.
**No. 06 Civ. 13255(LAK).**

Dec. 3, 2007.

**MEMORANDUM AND ORDER**

LEWIS A. KAPLAN, District Judge.

*1 Plaintiff, an African-American graduate of the Harvard Law School and, in her student days, an editor of the *Harvard Law Review,* here sues DLA Piper, a former employer, and a host of its personnel principally for employment discrimination. She alleges that (a) her work conditions and termination were discriminatory on the basis of her race, (b) her termination constituted retaliation for protected activity, (c) the firm engaged in post-termination retaliation in connection with her application for admission to the New York Bar, (d) she was subjected to a hostile work environment, and (e) the firm breached a contract by allegedly terminating her for complaining about what she asserted was an ethical violation. The matter is before the Court on defendants' motion for summary judgment.

*Prior Proceedings*

This controversy has had a long and turbulent history.

Plaintiff initially filed a complaint with the Equal Employment Opportunity Commission ("EEOC") which, on August 14, 2006, determined upon its investigation that it was unable to conclude that any violation of the civil rights laws had occurred and

notified plaintiffFof her right to sue. On November 16, 2006, plaintiff, then represented by the firm of Ballon Stoll Bader & Nadler, PC (the "Ballon Firm"), filed this action.

On February 16, 2007, the Court entered a Consent Scheduling Order (DI 17) which called for the completion of discovery by May 25, 2007 and the filing of a joint pretrial order by May 31, 2007.

Discovery did not proceed smoothly, to say the least. Some of the difficulties are captured by this excerpt from the Court's order of March 29, 2007:

"Defendants served their document requests on January 12, 2007. On February 16, 2007, the Court ordered plaintiff to respond to all outstanding document requests by March 8, 2007. Plaintiff then sought an extension of, among other things, the time for document production. By order endorsed on the application and dated March 15,2007, the Court directed that '[t]he documents shall be produced by plaintiff no later than March 20, 2007.'

"On March 20, 2007, plaintiff produced 340 pages of documents and a formal response to the document request that was filled with boilerplate objections. She furnished also a privilege log, as required by S.D.N. Y. Civ. R. 26.2., which asserted privileged as to only 7 documents.

"Upon review of the documents produced by plaintiff, defendants' counsel concluded that there were numerous categories of requested documents in which no responsive documents were furnished and in which it was most unlikely that plaintiff did not possession [*sic* ] responsive materials. Accordingly, they wrote to plaintiff's counsel making these points. Plaintiffs counsel did not respond.

"On March 26, 2007, plaintiff appeared for her deposition. At the outset, she admitted that she had numerous responsive documents that had not

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 4292030 (S.D.N.Y.)
(Cite as: 2007 WL 4292030 (S.D.N.Y.))

Page 2

been produced including documents relating to her employment after leaving defendant DLA Piper, her litigation against a former employer, and her application to the New York Bar. She admitted also that she had two e-mail accounts that she had not reviewed for responsive documents.

*2 "When confronted with this testimony, plaintiff's counsel first sought to excused [*sic* ] the failure to produce these documents on the ground that a Confidentiality Stipulation only recently had been signed. This excuse, however, was undercut by the fact that defendants sent the confidentiality stipulation to plaintiff's counsel on March 14 and followed up on March 21 after failing to hear from plaintiffs counsel. In any case, the Confidentiality Stipulation was so-ordered on March 23, in advance of plaintiff's deposition. Plaintiff's counsel then changed course. Following a break at the deposition, he told defendants' counsel that the reason the documents had not been produced is that many were privileged. They did not, however, appear on the privilege log served on March 20, 2007."DI 28.

Accordingly, the Court held that all privilege claims with respect to documents that did not appear on the March 20, 2007 privilege log had been waived. It granted defendants' motion for sanctions to the extent that plaintiff was ordered to "pay defendants $5,000 to compensate them for part of the attorneys' fees incurred by defendants in making this application and in conducting the March 26 session of plaintiff's deposition without the benefit of the documents that the Court had ordered produced by March 20, in advance of the deposition."In addition, in light of the fact that "the documents withheld include materials going directly to plaintiff's economic damages as a result of her departure from DLA Piper," it precluded plaintiff "from offering evidence of economic damages as a result of that departure unless all documents sought by defendants' request are produced on or before April 2, 2007."[FN1]*Id.* This dispute was only a harbinger of things to come.

FN1. Plaintiff ultimately did not comply. The economic damages aspect of her claim therefore was dismissed. DI 102.

Plaintiff's deposition was scheduled to resume on April 9, 2007. On that morning, however, plaintiff purportedly fired the Ballon Firm. Defendants by letter sought an order that the case proceed notwithstanding the purported termination of plaintiff's counsel. Moreover, on April 10, 2007, defendants moved for a Rule 35 examination of plaintiff by mental health professionals.

On April 10, 2007, the Court held a conference in consequence of defendants' request. At that time, it stayed the action, with certain exceptions, to and including May 10, 2007 to permit plaintiff to seek other counsel. Tr., Apr. 10, 2007, at 12. It extended plaintiffs time to respond to the Rule 35 motion until May 24. *Id.* at 13.In addition, it permitted defendants to make any motion they saw fit with respect to events that already had occurred, with opposing papers on any such motion to be due on the later of May 24 or the fourteenth day after the date the motion was made. *See also* DI 37.

Two motions were filed while the case was stayed: (1) defendants' motion to compel and for sanctions (DI 40), and (2) the Ballon Firm's motion for leave to withdraw and to fix charging and retaining liens (DI 42).

*3 The stay expired on May 10, 2007. No counsel appeared on plaintiff s behalf. In addition, defendants noticed the continuation of her deposition for May 22. Plaintiff, however, simply failed to show up. DI 102, at 4.

May 24, 2007 came and went without any response by plaintiff to the pending motions. Accordingly, on May 29, 2007, the Court granted all three motions. DI 47.

The strife, if anything, subsequently increased. Plaintiff subsequently has engaged in repeated baseless efforts to relitigate the question whether

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 4292030 (S.D.N.Y.)
**(Cite as: 2007 WL 4292030 (S.D.N.Y.))**

she should be compelled to submit to a Rule 35 examination and, if so, on what terms as well as the privilege objections that were waived long ago. *See, e.g.,* DI 102, at 4-5. It would burden this memorandum unduly to recapitulate the details. They are apparent from the docket sheet as well as a number of orders of the Court. *E.g.,* DI 95, 97, 98, 102, 106, 111.

In short, plaintiff repeatedly has obstructed the progress of this action and has ignored deadlines and other obligations.

*The Pending Motion*

Defendants' motion for summary judgment dismissing the complaint was filed on October 22, 2007. Answering papers initially were due on or about November 5, 2007.

Plaintiff filed no answering papers on that date. She did, however, file an affirmation in opposition to another motion by defendants.[FN2] The last paragraph of her affirmation asked that the motion for summary judgment be held in abeyance pending the disposition of the other motion. DI 117 ¶ 12(d). While the Court saw no reason to hold the summary judgment motion in abeyance, it *sua sponte* extended plaintiffs time in which to respond to the summary judgment motion to and including November 14, 2007. DI 120.

> FN2. That motion seeks dismissal for violation of several Court orders. DI 115.

On November 11, 2007, plaintiff moved for an extension of time until November 27, 2007 to respond to the motion for summary judgment. DI 121. That motion was granted. DI 124. Nonetheless, plaintiff filed no answering papers by the due date.

On November 28, 2007, after the due date already had passed, plaintiff filed a request to submit her responsive papers by mail, stating that she could not bring them to the Courthouse during business hours. DI 125. On the following day, me Court

granted permission but with the proviso that it did not thereby extend the time within which papers had to be filed, DI 127, which already had expired.

On December 3, 2007, the Court received in chambers a package from plaintiff delivered by Federal Express. The package contained three volumes of purported exhibits to plaintiffs declaration authenticating documents in opposition to defendant's motion for summary judgment.[FN3] No such declaration was filed. Nor has plaintiff filed a Rule 56.1 statement, a memorandum of law, or any properly authenticated, admissible evidence in opposition to the motion.

> FN3. The three volumes together are roughly 3 inches thick. The contents are not authenticated. There are no exhibit tabs or other labels, and there is no table of contents. Even if there were a basis for concluding that these materials are admissible, as there must be in order to be considered here, *e.g., Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997), "( [j]udges are not like pigs, hunting for truffles buried' in the record." *Albrechtsen v. Bd. of Regents of the Univ. of Wisconsin Sys.,* 309 F.3d 433, 436 (7th Cir.2002), *cert. denied,* 539 U.S. 941 (2003) (*quoting United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) (per curiam)). The Court therefore would decline to review them in any event.

The consequences of plaintiff's failure to respond are clear. Under S.D.N.Y. CIV. R. 56.1, all well supported averments in defendants' Rule 56.1 Statement are deemed admitted. Moreover, as the Notice to Pro Se Litigants attached to the motion make clear, plaintiff:

*4 "may NOT oppose summary judgment simply by relying upon the allegations in [her] complaint. Rather, [she] must submit evidence, such as witness statements or documents, countering the facts asserted by the defendant and raising material issues of fact for trial ....

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 4292030 (S.D.N.Y.)
(Cite as: 2007 WL 4292030 (S.D.N.Y.))

Page 4

"If [she] do[es] not respond to the motion for summary judgment on time with affidavits or documentary evidence contradicting the material facts asserted by the defendant, the court may accept defendant's factual assertions as true. Judgment may then be entered in defendant's favor without a trial."

As plaintiff has not controverted defendants' Rule 56.1 Statement, all of the well supported averments it contains are deemed admitted.

*Discussion*

In view of the procedural posture of the case, it is unnecessary to say a great deal about the evidence and the law. But the Court has reviewed defendants' submissions-which include voluminous excerpts from plaintiffs deposition-with care. A few brief words are in order.

Plaintiff applied for a job at Piper in early spring 2003. She was offered a job in its New York litigation department by Heidi Levine, now one of the defendants. Plaintiff was actively recruited for the position after the offer was made by Peter Bynoe, an African American partner in the firm's Chicago office. Def. 56.1 St. ¶¶ 4-5.

Plaintiff had serious difficulties with several people in the New York office. It would serve little purpose to recount the details here; they are spelled out in defendants' Rule 56.1 Statement and the papers there cited. *Id.* ¶¶ 5-146.

All of this led to Ms. Levine expressing the view, in late March 2004, that plaintiff's conduct needed to be addressed. *Id.* ¶ 147.After a careful review, Piper partners Finnerty IE, Finnerty, Jr., and Inskeep concluded that plaintiff's behavior was unacceptable and that she would have to acknowledge the problems and correct her behavior or be terminated. *Id.* ¶¶ 164-65.They delivered this message to her at a meeting on April 8, 2004, saying in substance that there were two options-Option A being to acknowledge the problems and correct her behavior and

Option B being to discuss severance alternatives. *Id.* ¶ 172-75.

Finnerty III, another partner named Kaback, and plaintiff met again on April 13, 2004. Plaintiff claimed that she lacked sufficient information to choose either Option A or Option B and declined to pick one. *Id.* ¶¶ 179-80.Finnerty III informed plaintiff on the following day that her employment was terminated. *Id.* ¶¶ 183-86.Finnerty III has sworn that the termination was based on plaintiff's insubordinate and inappropriate conduct and had nothing to do with race or retaliation. Finnerty III Decl. ¶¶ 41-42.

In order to withstand a motion for summary judgment, an employment discrimination plaintiff first must adduce evidence that would permit a reasonable trier of fact to find that (1) she was a member of a protected class, (2) her job performance was satisfactory, (3) an adverse employment action occurred, and (4) the action occurred in circumstances giving rise to an inference of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000). If such evidence is adduced, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for their actions. *See id.* at 142.Assuming that burden is carried, the evidence as a whole must be such as to justify a trier of fact's finding that "the defendant intentionally discriminated against the plaintiff." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993).

*5 In this case, plaintiff concededly was a member of a protected class. Her termination was an adverse employment action. The critical questions are whether her job performance was sufficiently satisfactory to make out a *prima facie* case and, if it was, whether a trier of fact on this record reasonably could find discrimination on the basis of race. It quite plainly could not.

Historically there has been some tension in the Second Circuit authorities as to how demanding is the required showing of qualification of employment or continued employment at the *prima facie*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 4292030 (S.D.N.Y.)
(Cite as: 2007 WL 4292030 (S.D.N.Y.))

Page 5

case stage. On occasion, concern has been expressed lest the requirement of proof of a *prima facie* case fold into the ultimate determination on the merits. *See, e.g., Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 91 (2d Cir.2001); *Tavoloni v. Mount Sinai Med. Ctr.,* 26 F.Supp.2d 678, 681 (S.D.N .Y.1998) (citing cases); *Naftchi v. New York University,* 14 F.Supp.2d 473,480-81 (S.D.N.Y.1998) (same). But this uncertainty does not affect the analysis of this case.

Here, the uncontradicted evidence demonstrates that plaintiff did not perform in a manner satisfactory to Piper notwithstanding her academic credentials. She was a confrontational, stubborn, and insubordinate employee in an environment in which professional personal relations, flexibility and a willingness to accept supervision were essential. For that reason alone, she arguably cannot establish a *prima facie* case. But she would fail even if the Court were to assume the existence of a *prima facie* case. Defendants have articulated a legitimate, nondiscriminatory reason for plaintiffs termination. There is no basis from which any reasonable jury could find that race played a factor in the decision to terminate plaintiff, as there is no evidence to support the notion that plaintiff's difficulties were race-related. Indeed, plaintiff had difficulties with more than one senior lawyer who was involved in hiring her not many months before. *Cf. Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997) (difficult to impute invidious motive inconsistent with decision to hire to person involved in hiring decision).

The Court has considered also plaintiff's hostile work environment and other claims. There is no evidence from which a reasonable trier of fact could find that plaintiff's workplace was "permeated with 'discriminatory intimidation, ridicule, and insult' " that was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment," *Harris v. Forklift Sys.,* 510 U.S. 17, 21 (1993) (citation omitted), let alone that any problems in the

workplace were race related.

The retaliation claims also fail. While plaintiff engaged in protected activity and suffered an adverse employment action when she was terminated, there is no evidence of any causal connection between the two. Nor is there any evidence either of any adverse post-termination action by defendants or, even if there were, of any causal connection between any such action and any protected activity.

*6 Finally, plaintiff's breach of contract claim fails. First, the Court already has dismissed her claim for economic damages (DI 50, 102), the sole relief available even if there were a breach of contract. In any case, the conduct alleged here does not come within the narrow exception articulated in *Wieder v. Skala,* 80 N .Y.2d 628 (1992), because the Piper firm never impeded or discouraged plaintiff from filing a complaint with the Disciplinary Committee.

*Conclusion*

The Court understands that plaintiffs belated submission of the three volumes of purported exhibits may evidence a desire to oppose this motion and that she is proceeding *pro se,* however, it has elected not to delay decision further against the possibility that further papers will arrive. Plaintiff is a member of the Bar, a graduate of the Harvard Law School, and a former editor of its law review. She is fully able to conduct this litigation properly. She repeatedly has failed to do so. Indeed, she has defied court orders, ignored schedules, failed to show up for or obstructed her deposition, and filed frivolous applications. She has no claim to any further indulgence.

Defendants' motion for summary judgment dismissing the complaint (DI 114) is granted in all re- spects.

SO ORDERED.

S.D.N.Y.,2007.
Morisseau v. DLA Piper

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 4292030 (S.D.N.Y.)
**(Cite as: 2007 WL 4292030 (S.D.N.Y.))**

Not Reported in F.Supp.2d, 2007 WL 4292030 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.