# KREBS DECL.
# EXHIBIT 1

MySpace.com Blogs - Roy Den Hollander MySpace Blog                                   Page 1 of 2

 

MySpace.com | rss | sign in



**Roy Den Hollander**

**Last Updated:** 12/2/2008

Send Message
Instant Message
Email to a Friend
Subscribe

**Gender:** Male
**Status:** Divorced
**Age:** 101
**Sign:** Libra

**City:** NEW YORK
**State:** New York
**Country:** US
**Signup Date:** 7/16/2006

**Blog Archive**
[Older   Newer]
Mar ▾ 9 ▾ 2009 ▾ Go

Sponsored Links

# Pimp My Profile (Free)

Layouts,

Backgrounds, &

Graphics:

Download Them All

Now - (100% Free)

Webfetti.com

**Wednesday, August 30, 2006**

**A Different Time**

A propeller driven plane drones somewhere overhead far out of slight. Its low monotone humming envelops a warm, spring Sunday afternoon somewhere in the 1950s. I sit on my 24 inch, black, single-gear Schwinn bicycle, keeping my balance by holding onto the door handle of an old, blue, four-door 1947 Dodge.

My consciousness pauses at the moment, feeling vaguely sad for no discernible reason. The weeks events ended with this gift of nothing to do: no homework, no television shows, no new housing developments to explore or classmates able to come out and play.

The dead-end street needs a new asphalt topping. Where I am balance on the side, the asphalt has broken up into small gravel-like stones with an isolated weed sprouting up here and there. It is still early spring, the lawns are just beginning to turn green and the tulips and dogwood buds remain closed, waiting for a few consecutive days of warm weather. The air smells fresh, warmed slightly by a gentle breeze.

The droning airplane fills the vacuum of silence on this street with modest middle-class houses in this small suburban town, whose claim to fame will not come until the end of the next decade. Of all the towns in America, this town will have the second highest number of persons per capita to die in Vietnam: all of them men, of course, and all of them guys I knew.

**5:30 PM   1 Comments   (Add Comment) | 1 Kudos**

About | FAQ | Terms | Privacy Policy | Safety Tips | Contact MySpace | Report Abuse | Advertise New! | My:

Music | Video | Jobs | Games | Weather | Sitemap

Web▾    Search

©2003-2009 MySpace.com. All Rights Reserved.

# KREBS DECL.
# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROY DEN HOLLANDER, et ano.,

          Plaintiffs,

      -against-                                                                      08 Civ. 7286 (LAK)

INSTITUTE FOR RESEARCH ON WOMEN &
GENDER AT COLUMBIA UNIVERSITY, et al.,

          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED #: 4/24/07

## ORDER

LEWIS A. KAPLAN, *District Judge.*

      Plaintiffs object to the report and recommendation of Magistrate Judge Kevin Nathaniel Fox, which recommended the dismissal of this action for lack of standing. Having reviewed the amended complaint, the report and recommendation, and plaintiffs' objections, I have concluded that there was no error and that the action should be and hereby is dismissed for lack of standing. I write only to address a few points raised by the objections.

      First, plaintiffs contend that the Magistrate Judge should have recused himself because he is an alumnus of Columbia University. As an initial matter, plaintiffs were obliged to raise any such objection at the earliest possible moment,[1] but there has been no showing that they did so, as they have not disclosed when they learned the fact upon which they rely. The point therefore has been waived. Even if that were not the case, however, recusal would have been warranted only if "an objective, disinterested observer fully informed of the underlying facts [would] entertain significant doubt that justice would be done absent recusal."[2] I am satisfied that a

---

[1]      *See, e.g., Apple v. Jewish Hosp. and Medical Center,* 829 F.2d 326, 333 (2d Cir.1987) ("It is well-settled that a party must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim.").

[2]      *In re Aguinda,* 241 F.3d 194, 201 (2d Cir.2001) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992) (internal quotation marks omitted)).

2

disinterested observer fully informed of the fact that the Magistrate Judge once attended Columbia University would not entertain significant doubt that justice would be done here. In any case, as it is my obligation to review the decision on this motion *de novo,* any failure to recuse by the Magistrate Judge would have been harmless.

Second, plaintiffs argue that the Magistrate Judge erred in believing that the action is brought *pro se.* In fact, Roy Den Hollander is both the attorney of record for the plaintiffs and a plaintiff himself. Thus, as a purely technical matter, it might be said that the action is not brought *pro se* insofar as it is brought on the second plaintiff although it undeniably is brought *pro se* to the extent that Mr. Hollander represents himself as a party plaintiff. But plaintiffs' argument betrays a remarkable instinct for the capillaries. By characterizing the case as having been brought *pro se,* the Magistrate Judge gave the plaintiffs the benefit of the greater liberality afforded to *pro se* litigants and thus afforded them a benefit to which at least the second plaintiff and possibly also Mr. Hollander, who is a member of the Bar, were not entitled. Certainly neither plaintiff was prejudiced by any error that might have been committed in their favor. At the end of the day, moreover, the result here would be the same regardless of whether the plaintiffs or either of them is proceeding *pro se.*

Finally, although the Magistrate Judge did not reach the merits, it bears noting that plaintiffs' central claim is that feminism is a religion and that alleged federal and state approval of or aid to Columbia's Institute for Research on Women & Gender therefore constitute a violation of the Establishment Clause of the First Amendment. Feminism is no more a religion than physics, and at least the core of the complaint therefore is frivolous.

I have considered plaintiffs' other objections and concluded that they lack merit.

Accordingly, the motions to dismiss all are granted and the case dismissed for lack of standing. The Establishment Clause claims are dismissed also on the alternative ground that they are absurd and utterly without merit. The Clerk shall enter final judgment of dismissal and terminate all open motions.

SO ORDERED.

Dated:       April 23, 2009

Lewis A. Kaplan
United States District Judge

# KREBS DECL.
# EXHIBIT 3

Westlaw

Not Reported in F.Supp., 1997 WL 759456 (S.D.N.Y.), 45 U.S.P.Q.2d 1321, 26 Media L. Rep. 1481
**(Cite as: 1997 WL 759456 (S.D.N.Y.))**

**c**

United States District Court, S.D. New York.
NATIONAL ASSOCIATION OF FREELANCE
PHOTOGRAPHERS, Kevin J. Larkin, Joseph M.
Tabacca, and Paul Hurschmann, Plaintiffs,
v.
ASSOCIATED PRESS, Defendant.
**No. 97 Civ. 2267(DLC).**

Dec. 10, 1997.

Joel L. Hecker, Laurence Desind, Charles D.
Donohue, Russo & Burke, New York City, for plain-
tiffs.

Robert Penchina, Margaret B. Soyster, Hilary Lane,
Rogers & Wells, New York City, for defendant.

OPINION and ORDER

COTE, J.

*1 This action was commenced in March 1997 by
three professional freelance photographers, Kevin J.
Larkin, Joseph M. Tabacca, and Paul Hurschmann
(collectively "the individual plaintiffs"), and the non-
profit association with which they are affiliated,[FN1]
the National Association of Freelance Photographers
("NAFP"), against the Associated Press ("AP"), a
non-profit corporation that gathers and disseminates
news and information, and, according to the plain-
tiffs, also engages in the sale of photographs of
newsworthy events. The plaintiffs filed an Amended
Complaint on May 7, 1997, in response to a motion
for sanctions that AP had served on the plaintiffs on
April 24, 1997, but not filed, in compliance with Rule
11(c)(1)(A), Fed.R.Civ.P. That motion, and an ac-
companying cover letter, notified the plaintiffs that
their original complaint contained some false state-
ments (regarding procurement of copyright registra-
tions), and advised that if the plaintiffs did not with-
draw three of the complaints' six counts, which were
asserted to have no legal basis, then AP would file
the sanctions motion. In filing their mended Com-
plaint, the plaintiffs removed the allegedly false
statements, but made no other curative changes in
their pleadings. The Amended Complaint asserts anti-

trust and copyright infringement claims and seeks
declaratory and injunctive relief largely on the basis
of AP's practice of requiring photographers who are
on assignment for AP, and from whom it buys photo-
graphs, to assign their copyrights in those photo-
graphs to AP as a condition of sale.

> FN1. The Amended Complaint states that
> Larkin is NAFP's president, Hurschmann is
> NAFP's executive vice president, and Ta-
> bacca is a member of the organization.

On May 29, 1997, AP filed an answer with counter-
claims and also noticed the two motions that are the
subject of this opinion. First, AP has moved pursuant
to Rule 12(c), Fed.R.Civ.P., for a judgment on the
pleadings as to all but one of the counts of the
Amended Complaint (hereinafter "Complaint"), argu-
ing that both NAFP and the individual plaintiffs lack
standing to assert their claims and that, in any event,
none of the claims states a viable cause of action.
Second, as forewarned, AP has filed a motion for
sanctions under Rule 11, Fed.R.Civ.P., asserting that
the plaintiffs and their counsel filed the Complaint
for improper motive and without a reasonable basis
in law. As to the latter, the plaintiffs have cross-
moved pursuant to Rule 11(c)(1), Fed.R.Civ.P., for
expenses and attorney's fees incurred in opposing
AP's motion for sanctions. For the reasons set forth
below, the motion under Rule 12(c) is granted and
the Complaint is dismissed with prejudice as to all
the counts at issue; the cross-motions for sanctions
are denied.

**STANDARD OF REVIEW**

In deciding a motion under Rule 12(c), this Court
"appl[ies] the same standard as that applicable to a
motion under Rule 12(b)(6)," that is, the Court "must
accept the allegations contained in the complaint as
true, and draw all reasonable inferences in favor of
the nonmovant." Sheppard v. Beerman, 18 F.3d 147,
150 (2d Cir.1994). Moreover, the Court may dismiss
an action pursuant to a motion under either Rule only
if "it appears beyond doubt that the plaintiff can
prove no set of facts in support of his claim which
would entitle him to relief." Cohen v. Koenig, 25
F.3d 1168, 1172 (2d Cir.1994) (quoting Conley v.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 759456 (S.D.N.Y.), 45 U.S.P.Q.2d 1321, 26 Media L. Rep. 1481
**(Cite as: 1997 WL 759456 (S.D.N.Y.))**

*Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *accord Sheppard,* 18 F.3d at 150. In other words, the Court can dismiss the plaintiffs' complaint here only if, assuming all facts as true, they still have failed to plead the basic elements of their causes of action.

## BACKGROUND

**\*2** The Complaint alleges that AP is a cooperative association of publications and other communications related entities referenced as "Members") whose business, at least in part, is he collection, assembly, and distribution of information to the public. This information is acquired by AP from its own employees, from the employees of Members, and from other "independent originators of such materials," including the photographers who make up NAFP. In regard to the latter point, although the Complaint speaks in terms of "Freelance Photographers," the practice of AP that is attacked in the Complaint pertains to AP's purchase of photographs from photographers who attend and photograph events at AP's request, and on its behalf, and not to AP's purchase of photographs from those who are called freelance photographers in the conventional sense.

According to the plaintiffs, AP is "the chief single source of information for the American press," such that the "inability to sell photographs to AP or any of its multitude of Members could have a decimating effect upon the business of any Freelance Photographer." The Complaint purports to document the "power and domination of AP" through allegations of specific instances in which AP improperly demanded, disseminated, retained, or otherwise used without furnishing satisfactory compensation (if any), certain photographs taken by the three individual plaintiffs.

Count One of the Complaint seeks declaratory relief. It alleges that Freelance Photographers routinely "cover" events for AP by providing what is labeled as "Professional Services," which involves "the presence of the Freelance Photographer at an event with the intent, but not the absolute requirement, of creating photographic images of the event for submission to the AP or a Member." AP pays Freelance Photographers for Professional Services at a rate that is unrelated to the subject matter or content of the images, or whether any images are in fact created or submitted to AP, or accepted, used, or returned by AP.

Payment for such services is accomplished by check, and each check that AP issues for such services bears on its face a legend stating:

In consideration of the transfer of any and all copyrighted ownership in the news materials described above. Endorsement signifies consent.[FN2]

> [FN2.] AP indicates that it began printing the legend on its checks after the decision in *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). The plaintiffs assert that the reference in the legend to "news materials described above" is to "a payment stub which does not describe the photographs submitted."

The central focus of this action concerns the parties' differing interpretations of this legend, that is, AP's position that it owns the copyright in all images for which a check bearing this legend was endorsed by a freelance photographer, and he plaintiffs' contention that the legend is ineffective to transfer copyright to AP. In support of the latter view, the complaint alleges that checks bearing the legend were:

Endorsed by Freelance Photographers on the back without noticing and therefore not reading, the Legend on the front; ... Endorsed by Freelance Photographers on the back not understanding the significance or intended meaning of the Legend on the front, or ... Endorsed by Freelance Photographers after crossing out or altering the language of the Legend.

**\*3** On the basis of these allegations Count One seeks a declaration that
each Freelance Photographer is the copyright owner of the Photographs created by such Freelance Photographer and submitted to AP; and that endorsement of Payment Checks issued as compensation for Professional Services and bearing the Legend on their face did not and/or do [sic] not transfer copyright ownership in the Contested Images from Freelance Photographers to AP.

In Count Two the Complaint requests injunctive relief to prevent AP's continued misuse of photographs, taken by Freelance photographers, that AP maintains in a "photo library." The plaintiffs allege that AP

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 759456 (S.D.N.Y.), 45 U.S.P.Q.2d 1321, 26 Media L. Rep. 1481
**(Cite as: 1997 WL 759456 (S.D.N.Y.))**

uses these photographs without the authorization or consent of the Freelance Photographers who created them, without attributing copyright credit to them, and without payment for each use. The specific relief requested includes an injunction against future unauthorized "commercial exploitation" of the photos by AP, and an order directing that AP: (i) give full copyright credit "to each Freelance Photographer owning a photographic image used by AP" for any unauthorized purpose; (ii) account to "each Freelance photographer" for "each use made by AP" of his or her images and the revenues received therefrom, and pay over "to each Freelance photographer owning photographic images used by AP" any revenue derived by any unauthorized use thereof; and (iii) return "to each Freelance Photographer all images presently held by AP without the express authorization of each such Freelance photographer."

Counts Three and Four assert claims for restraint of trade, monopoly, and unfair trade practices under (respectively) federal and state antitrust laws. The Complaint alleges that "AP dominates and controls the market for gathering and disseminating information through print media in the form of photographic images," and that due to this "dominant position in the marketplace, Freelance Photographers are compelled to submit images of noteworthy events to AP if such Photographers desire to remain active in such marketplace ." More particularly, the complaint asserts that AP, "directly and through and/or in combination with its constituent Members": (i) uses its dominance to require as a condition of payment for Professional Services that Freelance Photographers "transfer to AP all copyright ownership and interest in images used by AP," and allow AP to make continued use of the images without credit and/or additional compensation; and (ii) "refuse[s] to do business with and/or threaten[s] not to do business with those Freelance Photographers who object to the conduct of AP."

According to the plaintiffs, AP's conduct "restrain[s] trade and commerce by interfering with the ability of Freelance Photographers to compete in the commercial exploitation of images concerning events and people," in violation of Sections 1 and/or 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, which causes Freelance Photographers to "lose substantial revenue and threaten[s] their economic survival." The plaintiffs demand treble damages for these infractions, as well

as an injunction (i) barring AP from requiring as a condition of payment that Freelance Photographers transfer copyrights to AP, (ii) halting AP's use of photos without permission of the copyright owners, and (iii) precluding AP from refusing to do business, threatening not to do business, or taking other reprisals in retaliation for objections by Freelance Photographers to AP's actions or their refusal to comply with AP's demands.

**\*4** Count Five asserts a copyright infringement claim on behalf of plaintiff Larkin only. The Complaint alleges that he created certain images and then, prior to the commencement of this action, "complied in all respects" with governing federal copyright laws by

> filing a Registration Application together with deposit copies of the [subject images] with the United States Copyright Office, along with payment of the requisite fees, which submission and payment were received by the Copyright Office prior to the commencement of this action.

AP's use of Larkin's images is thus alleged to have infringed on his "exclusive rights in the copyright" of the images, in violation of Sections 106(2) and 106(5) of the Copyright Act of 1976, 17 U.S.C. §§ 106(2), (5). [FN3]

> FN3. Count Six asserts a nearly identical infringement claim on behalf of plaintiff Hurschmann, but as noted, AP has not made a motion as to that claim. Although AP speaks of moving to dismiss "Counts One through Four, and part of Count Five," Count Five is not readily divisible. The Court therefore construes AP's motion to be directed at all of the first five counts of the Complaint and not at Count Six.

## DISCUSSION

AP raises numerous grounds for dismissal as to each of the plaintiffs' claims, including one ground that applies equally to all, standing. Because standing is a prerequisite to maintaining suit, the Court will address that issue first.

A. *Standing*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 759456 (S.D.N.Y.), 45 U.S.P.Q.2d 1321, 26 Media L. Rep. 1481
(Cite as: 1997 WL 759456 (S.D.N.Y.))

AP argues that both NAFP and the individual plaintiffs lack standing here because the Complaint purports to assert claims generally on behalf of "professional Freelance Photographers" who "have been 'covering' events pursuant to a specific assignment or some other agreement with the AP or a Member." As for the individual plaintiffs, they plainly lack standing to assert the present claims on behalf of any persons other than themselves. *See, e.g., Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 955, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) ("plaintiff generally must assert its own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties") quoting *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). The Court finds that the individual plaintiffs do have standing to assert the claims in the Complaint as to themselves; AP's arguments to the contrary go more toward the sufficiency of the individual plaintiffs' pleadings (or lack thereof) than to their capacity constitutionally to assert the present claims.

With respect to NAFP, AP contends that this organization-which seeks redress in the present action only for injuries allegedly suffered by its members, and not for any injury to itself-fails to satisfy the test for "associational" standing set forth in *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and reiterated in *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977):

an association has standing to bring suit on behalf of its members when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt,* 432 U.S. at 343. It is undisputed that NAFP satisfies the first two elements of this test; the only question is whether it satisfies the third element as well, that is, whether the claims asserted in the Complaint *or* the relief requested therein require the participation of individual members of NAFP.

**\*5** The Court essentially agrees with AP that NAFP lacks standing here under the *Warth/Hunt* standard. Any judicial determination on the claims in this lawsuit requires proof regarding individual claimants, for example, whether given payment checks were effective to transfer copyright to AP in light of all the circumstances under which the checks were endorsed by Freelance Photographers. Because this conclusion rests on slightly different considerations as to each of the plaintiffs' claims, the Court will further address the issue of NAFP's standing in the sections below that correspond to those claims.

Generally speaking, however, the plaintiffs are not challenging the enforceability of the check legend on its face or standing alone. Rather, they are challenging AP's business practice concerning the endorsement of checks and the transfer of copyright in purchased photographs, a practice that (at least potentially) affects each plaintiff endorser/seller differently, depending on their prior understandings or course of dealing with AP, specific side-agreements that may govern a given transaction, or particular instances of misperception, miscommunication, or fraud by either party. In this situation, the merits of the plaintiffs' claims simply cannot be determined without the participation of individual claimants and the presentation of evidence as to the discrete circumstances substantiating their claims.[FN4] *See, e.g., Rent Stabilization Ass'n v. Dinkins,* 5 F.3d 591, 596-97 (2d Cir.1993) (denying standing to association challenging city rent schemes as a "taking" because "it is impossible to discern the identity of the aggrieved parties without delving into individual circumstances" and "whether a taking has occurred depends ... on a variety of financial and other information unique to each landlord"); *C.A.U.T.I.O.N., Ltd. v. City of New York,* 893 F.Supp. 1065, 1069-70 (S.D.N.Y.1995) (denying associational standing where plaintiffs alleged that city officials had policy or practice that violated Fourteenth Amendment and "[p]roof of the existence of a policy or practice require[d] ... individual members of CAUTION ... to show individual instances of misconduct"). For this reason, NAFP has no standing to assert most of the claims in the Complaint.

FN4. The plaintiffs do not-and in any event could not-dispute that it is appropriate to deny associational standing where the *claims* at issue require individual participation, even if the relief requested, as is often the case with declaratory or injunctive relief, does not so require. *See Rent Stabilization*

Not Reported in F.Supp., 1997 WL 759456 (S.D.N.Y.), 45 U.S.P.Q.2d 1321, 26 Media L. Rep. 1481
**(Cite as: 1997 WL 759456 (S.D.N.Y.))**

*Ass'n v. Dinkins,* 5 F.3d 591, 596 (2d Cir.1993) ( "[T]he relief requested is only half of the story. The *Hunt* test is not satisfied unless '*neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.*' ") (quoting *Hunt,* 432 U.S. at 343) (emphasis in *Dinkins* ).

B. *Declaratory Judgment*

As noted, the plaintiffs seek a declaration that each freelance photographer owns the copyright in his or her photographs, and that AP's policy of requiring the transfer of copyright through "endorsement of Payment Checks issued as compensation for Professional Services" was not effective to "transfer copyright ownership in the Contested Images from Freelance Photographers to AP ." Initially, the plaintiffs concede, as they must, that the use of "a legend on a check" and the required endorsement thereof-as was AP's practice here-"*may* be effective to transfer copyright under the proper circumstances." (Emphasis in original.)

*6 Section 204(a) of the Copyright Act of 1976 provides:

A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

17 U.S.C. § 204(a). The Second Circuit in *Playboy Enters., Inc. v. Dumas,* 53 F.3d 549, 564 (2d Cir.1995), indicated that the use of a legend on a check may satisfy the writing requirement of Section 204(a), at least in certain circumstances. The district court in *Playboy* had found the legend in that case [FN5] ineffective to transfer copyright, given the ambiguity of the legend and the absence of evidence of the parties' intent. The legend was ambiguous because, *inter alia,* it made no mention of "copyright"; the assignment of "all right, title, and interest" was in the "items" as opposed to rights; the language described not a present transfer of rights but confirmation of one past; and thus there was "no clear way to tell what the parties intended by their agreement." *Playboy Enters., Inc. v. Dumas,* 831 F.Supp. 295,

308-309 (S.D.N.Y.1993).[FN6] The Second Circuit affirmed the finding that the legend was ambiguous, and thus ineffective to transfer copyright in the circumstances of that case. *See Playboy,* 53 F.3d at 564 (emphasizing that the legend at issue "does not expressly mention copyright" and that "the evidence is conflicting as to whether the parties intended a one-time transfer of reproduction rights or a transfer that included copyright").

FN5. The legend at issue read in pertinent part:

By endorsement of this check, payee acknowledges payment in full for the assignment to Playboy Enterprises, Inc. of all right, title, and interest in and to the following items: [a description followed]

*Playboy Enters., Inc. v. Dumas,* 831 F.Supp. 295, 300 n. 1 (S.D.N.Y.1993) (alteration in original).

FN6. The district court repeatedly stressed this theme of clarity, concluding, for example, that the Ninth Circuit's view that "a one-line pro forma statement will do" to transfer copyright had to be "predicated on the fact that the terms of the to forma statement are clear," *Playboy,* 831 F.Supp. at 308 citing *Effects Assocs. ., Inc. v. Cohen,* 908 F.2d 555 (9th Cir.1990)), and that the import of two Southern District cases was that "unless there is evidence of an intention to transfer copyright, a writing merely reciting transfer of an object will not transfer copyright," *id.* at 309 (citing *Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc.,* 690 F.Supp. 298 (S.D.N.Y.1988); and *Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc.,* 13 U.S.P.Q.2d 1472 (S.D.N.Y.1989)).

The plaintiffs argue in opposing this motion that "*this Legend* under *these* circumstances, does not transfer copyright to AP." (Emphasis in original.) To begin with, that very statement of the issue demonstrates again why NAFP has no standing here; there is no way to determine whether "*this Legend* under *these* circumstances" was effective to transfer copyright without examining "*these* circumstances," that is, the particular circumstances in which individual Free-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 759456 (S.D.N.Y.), 45 U.S.P.Q.2d 1321, 26 Media L. Rep. 1481
  (Cite as: 1997 WL 759456 (S.D.N.Y.))

lance Photographers endorsed their checks. That conclusion is reaffirmed by the Complaint's allegations as to why the endorsements were ineffective in this regard, *i.e.,* because Freelance Photographers endorsed the checks "without noticing and therefore not reading, the Legend[,] ... [while] not understanding the significance or intended meaning of the Legend[,] ... [or] after crossing out or altering the language of the Legend." Such fact-intensive inquiries plainly require the participation of the individual photographers offering the specific explanations.

Although the individual plaintiffs have standing to seek a declaration as to the effect of AP's check endorsement procedure on them, the Court finds that this claim, as pleaded in the Complaint, fails as a matter of law to state a viable cause of action. Specifically, the Complaint alleges no facts on behalf of the individual plaintiffs that would permit this Court to find that the legend at issue did *not,* in the particular circumstances of this case, transfer *their* copyright interests to AP. Instead, in apparent recognition of the clarity of the language in the legend, the Complaint attacks the legend by identifying circumstances in which it might *not* be effective, *e.g.,* where individual endorsers failed to see it or understand it, crossed it out, or had prior understandings or dealings with AP that would unambiguously render the legend moot. The critical fact, however, is that no such alternative circumstances are adduced in the Complaint *as to the individual plaintiffs.* To the contrary, the Complaint contains potentially mitigating allegations only as to "Freelance Photographers" generally, which, for the reasons stated above, are wholly ineffectual in this action given NAFP's lack of standing. Notwithstanding the plaintiffs' misplaced protestations (in opposing this motion) about what "[t]he evidence in this case *will show,*" (emphasis added), the Complaint contains no allegations particular to any of the three individual plaintiffs that would render the legend ineffective as to them and thereby entitle them to relief. The claim for a declaratory judgment must therefore be dismissed.

C. *Injunction*

*7 The plaintiffs' claim for injunctive relief is deficient largely for the reasons set forth above. First, NAFP lacks standing to seek an injunction on behalf of Freelance Photographers in general. The grounds proffered for the injunction, essentially that AP engaged in unauthorized use of Freelance Photographers' copyrighted materials and failed to compensate or credit Freelance Photographers for those uses, all depend at root on proof of copyright ownership in the subject materials-especially in light of the plaintiffs' concession that "AP has the right to *use* the photographs" themselves "in connection with the story for which such photograph[s] w[ere] created" by the plaintiffs. (Emphasis added.) As noted above, proof of copyright ownership cannot be adduced without the participation of individual photographers, who would have to establish that their endorsement of payment checks from AP was ineffective to transfer copyright, or that they had other individual arrangements or dealings with AP that negated the effect of the transfer. Once again, NAFP cannot satisfy the test for associational standing.

The individual plaintiffs do have standing to assert their own claims for unauthorized use and failure to provide compensation or credit for copyrighted materials. But these plaintiffs nevertheless still cannot maintain their claim for injunctive relief because the Complaint fails to allege facts that would permit the finding of liability requisite to such relief. Although the Complaint describes a photograph taken by each of the individual plaintiffs and used by AP, the Complaint does not, as explained above, identify the theory by which the transfer of copyrights in these three photographs might be deemed ineffective. That is, when read as a whole, the Complaint appears to allege that these three photographs were taken while the individual plaintiffs worked on behalf of AP as "Freelance Photographers," as that term is used in the Complaint,[FN7] and that each plaintiff thereafter received payment through endorsement of a check bearing the legend described above. What the Complaint quite clearly fails to allege, however, is that the circumstances claimed to have rendered ineffective the copyright transfers of Freelance Photographers *generally -i.e.,* that checks were endorsed without the photographers noticing or understanding the legend, or after crossing it out-apply to any of the three individual plaintiffs, or occurred with respect to any of the three specifically referenced photographs.

> FN7. The Complaint explicitly states that two of the three individual plaintiffs were working as Freelance Photographers for AP when they took the photographs at issue, but does not make such an allegation as to plain-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 759456 (S.D.N.Y.), 45 U.S.P.Q.2d 1321, 26 Media L. Rep. 1481
 **(Cite as: 1997 WL 759456 (S.D.N.Y.))**

tiff Tabacca.

In short, the Complaint alleges no facts that would permit a finding that the individual plaintiffs retained ownership of copyrights in the subject photographs (or that would permit a finding of copyright infringement, as explained below); and therefore those plaintiffs cannot maintain a claim for unauthorized use or failure to compensate or credit for copyrighted materials. Accordingly, the plaintiffs have no entitlement to injunctive relief with respect to these issues, and their claim to that effect must be dismissed.

D. *Antitrust*

**\*8** The Complaint asserts antitrust claims under both Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2,[FN8] and seeks both treble damages and an injunction against (i) AP's policy of requiring Freelance Photographers to transfer their copyright ownership in photographs to AP as a condition of sale, (ii) AP's unauthorized use of Freelance Photographers' photographs, and (iii) AP's "refusing to do business" with, or taking other retaliatory actions against, Freelance Photographers who object to AP's policies. As above, the individual plaintiffs have standing to assert these claims in regard to themselves, but unlike the prior claims, whether NAFP also has standing is a closer question.

> FN8. AP correctly notes that, because the provisions of New York's antitrust laws are to be construed in keeping with federal antitrust law, the plaintiffs' antitrust and unfair business claims under state law will rise or fall along with their federal antitrust claims. Because the Court concludes that the federal claims are deficient as a matter of law, the state claims will not be discussed.

The plaintiffs concede that NAFP, as an association, cannot pursue a claim for money damages on behalf of its members under the antitrust statutes, but they maintain that it may seek injunctive relief for such individuals under those laws. In support of this argument the plaintiffs rely on *Barr v. Dramatist's Guild, Inc.,* 573 F.Supp. 555, 561-62 (S.D.N.Y.1983), where the court held that an association was not precluded *by any principle of antitrust law*[FN9] from obtaining injunctive relief for its members, and therefore analyzed the standing of the association in that case un-

der the familiar *Warth/Hunt* standard. Although this Court has concluded that NAFP cannot satisfy the third element of that test with respect to the claims for declaratory or injunctive relief-because those claims necessitated the participation of individual plaintiffs-the antitrust injunction claim presents different considerations. In its most important aspect, the claim seeks to bar AP from requiring as a condition of purchasing photographs from Freelance Photographers that those Freelance Photographers transfer their copyrights in the subject photographs to AP. Giving the plaintiffs the benefit of the doubt on this motion to dismiss, the Court concludes that substantiation of this claim (at least) will not necessarily require the participation of individual claimants.[FN10] The Court therefore finds that NAFP as well as the individual plaintiffs have standing to assert the antitrust claims in the Complaint.

> FN9. The *Barr* court based this conclusion on the difference between Section 4 of the Clayton Act, 15 U.S.C. § 15, which prohibits associations from suing for treble damages where the only injury alleged is to its members, *see Hawaii v. Standard Oil Co.,* 405 U.S. 251, 262-65, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), and Section 16 of the Clayton Act, 15 U.S.C. § 26, which permits "[a]ny person, firm, corporation, or association ... to sue for and have injunctive relief." *See Barr,* 573 F.Supp. at 561-62.

> FN10. Unlike the declaratory judgment claim, for example, the claim here does not require proof that transfers of copyright were or were not effective in individual cases; rather, the claim seeks to bar the practice in the first instance on the ground that it restrains trade. Proving an adverse effect on competition in the marketplace as a result of that practice (regardless of its effectiveness to transfer copyright) would not necessarily require the participation of each individual photographer.

Although the plaintiffs have standing, the Court concludes that the Complaint contains insufficient factual allegations to permit a finding that AP has violated either Section 1 or 2 of the Sherman Act. At the very least, the plaintiffs have failed adequately to allege the following essential elements of such

Not Reported in F.Supp., 1997 WL 759456 (S.D.N.Y.), 45 U.S.P.Q.2d 1321, 26 Media L. Rep. 1481
(Cite as: 1997 WL 759456 (S.D.N.Y.))

claims: that they were the victims of "antitrust injury" or "concerted action," or that AP exercised "monopoly power" in the relevant market. For these reasons, Counts Three and Four of the Complaint must be dismissed.

*1. Restraint of Trade*

Section 1 of the Sherman Act provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

*9 15 U.S.C. § 1. In order to state a claim under Section 1, plaintiffs must allege "(1) a contract, combination, or conspiracy; (2) in restraint of trade; (3) affecting interstate commerce." *Maric v. Saint Agnes Hosp. Corp.*, 65 F.3d 310, 313 (2d Cir.1995) (citing *Capital Imaging Assocs. v. Mohawk Valley Medical Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir.1993), *cert. denied*, 116 S.Ct. 917 (1996)). In addition, plaintiffs must demonstrate that they have "antitrust standing" and have suffered "antitrust injury." The former requirement involves a showing that the antitrust claimant is a "proper plaintiff," *i.e.*, that based on factors such as the directness and identifiability of his injuries, the plaintiff will be "an efficient enforcer of the antitrust laws." *Balaklaw v. Lovell*, 14 F.3d 793, 798 n. 9 (2d Cir.1994). The latter requirement demands inquiry into "whether the plaintiff suffered antitrust injury," *id.*, that is,

injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Id.* at 797 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). This definition underscores the fundamental tenet that '[t]he antitrust laws ... were enacted for "the protection of *competition*, not *competitors*." " ' " *Id.* quoting *Brunswick*, 429 U.S. at 488 (quoting *Brown Shoe v. United States*, 870 U.S. 294, 320 (1962))). In light of these standards, the plaintiffs' claims are deficient in numerous respects.

First, the plaintiffs have failed to allege sufficient facts to satisfy the first fundamental element of a Section 1 claim, the existence of "a combination or some form of concerted action between at least two legally distinct economic entities." *Capital Imaging*, 996 F.2d at 542. The Complaint states that AP acted improperly "directly and through and/or in combination with its constituent Members," and "directly and by way of and/or in combination with its constituent Members." This bare assertion is an inadequate allegation of concerted action because, for one, it fails to make clear whether AP is legally distinct from its "Members," *both* of which are included within a single cryptic definition in the Complaint as "a cooperative association of publications and other communications related entities." *See id.* (agreement between parent corporation and wholly owned subsidiary agents is not concerted action for purposes of Sherman Act).

In any event, the plaintiffs have apparently abandoned this theory of concerted action in opposing the present motion. They now allege instead that it is "the presence of 'agreements' here between AP and Freelance Photographers ... that bring AP's practices within the each of the [concerted action] requirement of Section 1." Under the facts as alleged by the plaintiffs, however, the photographers are not willing participants in these agreements and can hardly be said to have engaged in the kind of joint action forbidden by Section 1. Indeed, the only case cited in support of the plaintiffs' revised theory is *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665 (7th Cir.1985), a case that describes the narrow exception whereby *franchisees* alleging an illegal "tying" arrangement can satisfy the joint action requirement by charging a "conspiracy"-really "unwilling compliance"-between themselves and a franchisor. *Id.* at 669-70 (citing *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968)). Because this case does not (and could not) involve allegations of a franchisor-franchisee situation, and because, as explained below, the plaintiffs cannot establish a "tying" arrangement, this theory of concerted action fails as a matter of law. On the basis of this conclusion alone, the plaintiffs cannot maintain a Section 1 claim.

*10 In addition, however, the plaintiffs also have failed to allege "antitrust injury." Even assuming that they are the "proper plaintiffs" here-such that they satisfy the "antitrust standing" requirement-the plain-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 759456 (S.D.N.Y.), 45 U.S.P.Q.2d 1321, 26 Media L. Rep. 1481
 **(Cite as: 1997 WL 759456 (S.D.N.Y.))**

tiffs have set forth insufficient facts to enable them to show, as they must, "that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market." *Capital Imaging,* 996 F.2d at 543 (emphasis in original). *See also Clorox v. Sterling Winthrop, Inc.,* 117 F.3d 50, 56 (2d Cir.1997) (discussing actual adverse effects requirement). To the contrary, the only allusions to anticompetitive effect in the Complaint are the allegations that AP's copyright transfer policy and "refusal to deal" with Freelance Photographers who object to that policy: (i) has "restrain[ed] trade and commerce by interfering with the ability of Freelance Photographers to compete in the commercial exploitation of images concerning events and people," and (ii) "is causing and will continue to cause Freelance Photographers to lose substantial revenue and threaten their economic survival." These allegations not only are wholly conclusory, but more importantly fail to demonstrate he requisite effect on "*competition,* not *competitors.*" *Balaklaw,* 14 F.3d at 797; accord *Clorox,* 117 F.3d at 57.

To begin with, the plaintiffs simply make *no* factual allegations that would permit a finding that either of the proffered effects has actually occurred, is occurring, or is threatened to occur. Absent allegations suggesting how Freelance Photographers' "ability to compete" has been hampered, or facts documenting such hindrances and the revenue photographers have lost or will continue to lose thereby, the plaintiffs' antitrust claims resemble only a rote inventory of key words and phrases from an antitrust hornbook. *See Sage Realty Corp. v. ISS Cleaning Servs. Group, Inc.,* 936 F.Supp. 130, 135 (S.D.N.Y.1996) ("[A]n antitrust Complaint is insufficient if it simply contains conclusory allegations which merely recite the litany of antitrust.") (internal quotations and citations omitted). Such terminology may be necessary to state an antitrust claim, but it is not alone sufficient.

Moreover, the Complaint sets forth no factual connection between the alleged market effects and the substantive allegations concerning, for example, AP's check endorsement policies with respect to Freelance Photographers generally. Similarly, the allegations regarding the individual plaintiffs show at most that they personally were harmed by AP's actions toward them, and *not* that others in the market were thereby harmed, thus rendering those allegations deficient as well. *See Capital Imaging,* 996 F.2d at 543 ("to prove

[plaintiff] has been harmed as an individual competitor will not suffice"). In short, at no point does the Complaint adduce facts to show that *competition in the market* -even as generously defined by the plaintiffs in their brief opposing this motion as the "commercial" market for photographs by Freelance Photographers-was harmed by AP's copyright transfer policies or its "refusal to deal with Freelance Photographers." To the contrary, the Complaint merely sets forth a situation in which a purchaser of goods dictates the terms of its purchases. There is no allegation, however, that the copyright transfer requirement prevents those Freelance Photographers who do *not* "object to AP's conduct" from competing in the market, and there are no facts alleged-including those concerning the individual plaintiffs-to support the claim that Freelance Photographers are compelled to submit images to *AP* and no other entity to remain competitive. Without any of these sorts of allegations, the plaintiffs' claim simply cannot survive.

\*11 Finally, the plaintiffs' substantive theory of antitrust violation under Section 1 is flawed as well. Although nowhere asserted in the Complaint, the plaintiffs contend in opposing this motion that their pleadings adequately allege restraint of trade in the form of either a "reciprocal dealing" arrangement or a "tying" arrangement. The former claim fails because, as the plaintiffs concede, the "essence" of a reciprocal dealing arrangement is "the willingness of each [of two companies] to buy from the other, conditioned upon the expectation that the other company will make reciprocal purchases," (quoting *United States v.. General Dynamics Corp.,* 258 F.Supp. 36, 58 (S.D.N.Y.1966)); in this case, however, there has never been the slightest suggestion (either in the Complaint or in the papers addressed to this motion) that the plaintiffs have made any relevant purchases from AP.

The tying claim is equally invalid. A tying arrangement is defined as:

an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.

*Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 461, 112 S.Ct. 2072, 119 L.Ed.2d 265

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 759456 (S.D.N.Y.), 45 U.S.P.Q.2d 1321, 26 Media L. Rep. 1481
(Cite as: 1997 WL 759456 (S.D.N.Y.))

(1992) (quoting *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5-6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)). Implicit in this definition is the "fundamental principle of antitrust law that an illegal tying arrangement requires that *at least two products* and/or services be purchased by the same individual." *DeJesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 71 (2d Cir.) (citation omitted) (emphasis added), *cert. denied,* 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996). There simply is no way that the plaintiffs can make out a tying claim in this case as presently configured, given that the only purchaser at issue is AP, the alleged antitrust violator, and that AP is purchasing only *one product,* the photographs that are the subject of the plaintiffs' present copyright claims. The plaintiffs' dubious attempt to distinguish different *markets* for the subject photographs-one ostensibly involving news agencies such as AP and the other involving the "commercial" photograph-buying public-cannot circumvent the determinative circumstance in their pleadings, *i.e.,* that only a *single* product is being bought.

In sum, the plaintiffs have pleaded insufficient facts to establish that they suffered antitrust injury under the *per se* "tying" theory, and they likewise have stated no claim for the requisite injury under the "rule of reason" because, as noted above, they have plead no facts that, if proven, would show that AP's actions "had an *actual* adverse effect on competition as a whole in the relevant market." *Capital Imaging,* 996 F.2d at 543 (emphasis in original). Their Section 1 claim must therefore be dismissed.

2. *Monopolization*

Although the plaintiffs failed to plead a separate claim for monopoly, the Court will consider the viability of such a claim because the Complaint, by citing Section 2 of the Sherman Act, seems at least to attempt to make allegations thereunder. Section 2 penalizes "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire ... to monopolize ... trade or commerce." 15 U.S.C. § 2. Under that statute, "[t]he offense of monopoly ... has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power...." *Eastman Kodak,* 504 U.S. at 481 (citation omitted); *accord Clorox,* 117 F.3d at 61. A claim of attempted monopoly requires the plaintiff to prove: "(1) that the defendant

has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). The allegations here are insufficient to sustain either variation of the claim.

*12 First and foremost, while the Complaint makes the flatly conclusory assertion that "AP dominates and controls the market for gathering and disseminating information through print media in the form of photographic images," the plaintiffs' pleadings fail altogether to allege facts that would substantiate such a claim. Specifically, the Complaint contains not a single factual allegation demonstrating that AP has *any* market power, or the extent thereof, let alone that AP's market share makes it dominant. Absent any description of the relevant market structure, or any statement concerning the percentage of the market that is controlled by AP, the plaintiffs cannot establish that AP either possesses monopoly power or has a "dangerous probability" of achieving it. The plaintiffs' mere assertion of AP's dominance is insufficient make it so.

In addition, as indicated above, the Complaint contains no facts to support that AP's policies have had any adverse effect on *competition,* as opposed to individual Freelance Photographers. And finally, there is no allegation from which it could be found that AP wilfully acquired monopoly power or intends to acquire it in the future. For these reasons, the plaintiffs have failed to state a claim under Section 2.

E. *Copyright Infringement*

The claim for copyright infringement is easily dismissed. he allegation in the Complaint that plaintiff Larkin "fil[ed] a Registration Application" as well as other materials and fees with the United States Copyright Office ... prior to the commencement of this action," bares the fatal defect. As AP correctly notes, an action for copyright infringement cannot be asserted unless a certificate of registration has been *issued;* the mere filing of an application is simply insufficient to support such a claim. *See, e.g., Fonar Corp. v. Domenick,* 105 F.3d 99, 103 (2d Cir.) ("There are only two elements of an infringement claim: ownership of a valid copyright and the copying of constituent elements of the work that are origi-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 759456 (S.D.N.Y.), 45 U.S.P.Q.2d 1321, 26 Media L. Rep. 1481
  (Cite as: 1997 WL 759456 (S.D.N.Y.))

nal."), *cert. denied,* 522 U.S. 908, 118 S.Ct. 265, 139 L.Ed.2d 191 (1997); *Whimsicality, Inc. v. Rubie's Costume Co.,* 891 F.2d 452, 455 (2d Cir.1989) (same); *Robinson v. The Princeton Review Inc.,* 41 U.S.P.Q.2d 1008, 1015 (S.D.N.Y.1996) ("[A]s most of the cases in this Circuit to have considered the issue have held, registration is a prerequisite to commencement of an action for copyright infringement.") (citing cases). Because it is undisputed that neither Larkin nor any of the other plaintiffs has received a certificate of registration in any of the subject photographs from the Copyright Office, this claim must be dismissed.[FN11]

> FN11. The plaintiffs' sole citation from this Circuit in support of their claim is to a single footnote in *Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* 886 F.Supp. 1120 (S.D.N.Y.1995), which in turn cited a Fifth Circuit opinion in dicta for the proposition that receipt by the Copyright Office of a registration application (along with the required materials and fees) is sufficient to assert an infringement claim. *Id.* at 1125 n. 7 (citing *Apple Barrel Prods., Inc. v. Beard,* 730 F.2d 384, 386-87 (5th Cir.1984)). Even aside from the limited persuasiveness in any event of so attenuated a reference, the Fifth Circuit opinion appears to offer minimal precedential value, especially today. First, it is evident that the court in *Itar-Tass* found the registration requirement unnecessary only because the works for which the plaintiffs sought copyright protection in that case were "Berne Convention works under 17 U.S.C. § 101," 886 F.Supp. at 1126, works that are expressly exempted from the registration prerequisite under Section 411 of the Copyright Act, 17 U.S.C. § 411. Moreover, as Judge Kaplan of this Court has pointed out, the statement in *Apple Barrel* regarding the necessity of actual registration was based solely on "the then-current edition of *Nimmer* [,] ... yet that authoritative text now quite clearly indicates that registration is a precondition to the commencement of an infringement action except in limited circumstances that do not pertain to this case." *Robinson v. The Princeton Review Inc.,* 41 U.S.P.Q.2d 1008, 1015 (S.D.N.Y.1996) (citing 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 7.16[B] (1996)). In

short, the plaintiffs have offered no persuasive authority to sustain their claim.

*F. Sanctions*

AP's motion for sanctions under Rule 11, Fed.R.Civ.P., is based on the following conduct of the plaintiffs: (i) their erroneous assertion in the original complaint that the individual plaintiffs had obtained actual registration with the Copyright Office for the photographs that they are the subject of their infringement claims against AP; and (ii) their contention that the legend on the checks at issue cannot transfer a copyright. On the latter point, AP argues that the law is settled that a copyright may be transferred by such a legend unless factual circumstances surrounding the transfer indicate otherwise.

*13 As noted, the plaintiffs amended their pleadings to remove any assertion of actual copyright registration, and they have made clear in opposing AP's motion for judgment on the pleadings that their legal theory regarding the check legends is that the legend in this case was ineffective to create a transfer of copyright because of the circumstances attendant to individual transfers. Indeed, in light of the amendment of their pleadings and subsequent arguments, the plaintiffs now contend that AP's Rule 11 motion was filed in bad faith, and they have accordingly cross-moved for Rule 11 sanctions against AP. Applying the safe harbor provision of Rule 11, I decline to impose sanctions pursuant to either motion.

CONCLUSION

For the reasons set for above, AP's motion for judgment on the pleadings is granted and Counts One through Five of the Complaint are dismissed in their entirety. The cross-motions for sanctions are denied.

SO ORDERED.

S.D.N.Y.,1997.
National Assoc. of Freelance Photographers v. Associated Press
Not Reported in F.Supp., 1997 WL 759456 (S.D.N.Y.), 45 U.S.P.Q.2d 1321, 26 Media L. Rep. 1481

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 759456 (S.D.N.Y.), 45 U.S.P.Q.2d 1321, 26 Media L. Rep. 1481
**(Cite as: 1997 WL 759456 (S.D.N.Y.))**

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 4

Westlaw.

322 F.Supp.2d 520, 2004 Copr.L.Dec. P 28,836
**(Cite as: 322 F.Supp.2d 520)**

C

United States District Court,
S.D. New York.
CORBIS CORPORATION, Plaintiff,
v.
UGO NETWORKS, INC., et al., Defendants.
**No. 04 Civ. 2480(JSR).**

June 28, 2004.

**Background:** Purported copyright holder brought action against alleged infringer.

**Holding:** The District Court, Rakoff, J., held that it lacked subject matter jurisdiction, since images embraced in holder's complaint had not been either approved or refused for registration by the Copyright Office.

Ordered accordingly.

West Headnotes

**[1] Copyrights and Intellectual Property 99**
⊜75.5

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                    99k75.5 k. Conditions Precedent; Registration. Most Cited Cases
Federal district courts do not have jurisdiction over a claim for federal copyright infringement until the Copyright Office has either approved or refused the pending application for registration. 17 U.S.C.A. §§ 410, 411(a).

**[2] Copyrights and Intellectual Property 99**
⊜50.20

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(H) Registration
            99k50.15 Registration

99k50.20 k. Application. Most Cited Cases
Copyright registration is not obtained simply by filing the deposit, application, and fee; rather, the deposit, application, and fee are preliminary to another step, i.e., the Copyright Office's approval or refusal of the application. 17 U.S.C.A. §§ 408, 410.

**[3] Copyrights and Intellectual Property 99**
⊜75.5

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                    99k75.5 k. Conditions Precedent; Registration. Most Cited Cases
District Court lacked subject matter jurisdiction over any images embraced in purported copyright holder's complaint alleging infringement, although holder's registration applications were pending, where they had not been either approved or refused for registration by the Copyright Office. 17 U.S.C.A. §§ 408, 410, 411(a).
**\*521** Andrew Baum, Darby & Darby, P.C., Eric A. Prager, New York City, John W. Branch, Darby & Darby P.C., Seattle, WA, for Plaintiff.

Kenneth L. Bressler, Nixon Peabody, L.L.P., Kenneth L. Bressler, Nixon Peabody LLP, Jason David Sanders, Cowan, Liebowitz & Latman, P.C., Patrick Thierry Perkins, Fross Zelnick Lehrman & Zissu, P.C., New York City, for Defendants.

*MEMORANDUM*

RAKOFF, District Judge.

By Order dated June 23, 2004 ("June 23 Order"), the Court, *inter alia*, granted the defendants' motion to dismiss those federal copyright claims in the Complaint that alleged infringement of visual images as to which plaintiff's applications for copyright registration were pending but not yet approved or disapproved by the Copyright Office. This Memorandum briefly elaborates the reasons for that portion of the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

322 F.Supp.2d 520, 2004 Copr.L.Dec. P 28,836
(Cite as: 322 F.Supp.2d 520)

Court's June 23 Order.

Section 410 of the Copyright Act gives the Copyright Office the power to examine a depositor's application for copyright registration and then either to register the copyright (and issue a certificate to confirm same) or to refuse to do so. Specifically, section 410 provides that:

When, after examination, the Register of Copyrights determines that, in accordance with the provisions of this title, the material deposited constitutes copyrightable subject matter and that the other legal and formal requirements of this title have been met, the Register shall register the claim and issue to the applicant a certificate of registration under the seal of the Copyright Office. The Certificate shall contain the information given in the application, together with the number and effective date of the registration.

17 U.S.C. § 410.

The next section of the Copyright Act, section 411(a), sets forth the jurisdictional pre-requisites to a federal action for copyright infringement as follows:

[N]o action for infringement of the copyright in any United States work shall be instituted *until registration of the copyright claim has been made in accordance with this title.* In any case, however, where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form *and registration has been refused,* the applicant is entitled to institute an action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights.

17 U.S.C. § 411(a) (emphasis supplied).

[1] The combination of sections 410 and 411 thus make plain that the federal district courts do not have jurisdiction over a claim for federal copyright infringement until the Copyright Office has either approved or refused the pending application for registration. Numerous courts in this District (as elsewhere) have so held. *See, e.g.,* *522*City Merchandise, Inc. v. Kings Overseas Corp., 2001 WL 286724 (S.D.N.Y.2001); U-Neek, Inc. v. Wal-Mart Stores,

Inc., 147 F.Supp.2d 158, 169 (S.D.N.Y.2001); Tuff-N-Rumble Mgmt., Inc. v. Sugarhill Music Publ'g Inc., 49 F.Supp.2d 673 (S.D.N.Y.1999); Noble v. Town Sports Int'l, Inc., 1998 WL 43127 (S.D.N.Y.1998); National Ass'n of Freelance Photographers v. Associated Press, 1997 WL 759456 (S.D.N.Y.1997); Robinson v. Princeton Review, 1996 WL 663880, at *7 (S.D.N.Y.1996); Demetriades v. Kaufmann, 680 F.Supp. 658 (S.D.N.Y.1988).[FN1]

> FN1. While a few courts in this District have held to the contrary, *see, e.g.,* EPM Communications Inc. v. Notara, Inc., 2000 WL 1154315 (S.D.N.Y.2000); Lennon v. Seaman, 63 F.Supp.2d 428, 432 (S.D.N.Y.1999); Havens v. Time Warner Inc., 896 F.Supp. 141 (S.D.N.Y.1995), their holdings to this effect are entirely conclusory and thus fail to provide any reason for ignoring the plain language of sections 410 and 411.

[2] Plaintiff's principal response, *see* transcript, 6/22/04, is to argue that the aforementioned construction of sections 410 and 411 is contradicted, or at least rendered problematic, by the language of a still earlier section of the Copyright Act, section 408(a), which provides that "the owner of copyright or of any exclusive right in the work may obtain registration of the copyright claim by delivering to the Copyright Office the deposit specified by this section, together with the application and fee specified by [other sections.]" 17 U.S.C. § 408. Contrary to plaintiff's argument, however, nothing in this language suggests that registration is obtained simply by filing the deposit, application, and fee, for if that were the case the verb would be "shall obtain." Instead, the actual verb-"may obtain"-shows that the deposit, application and fee are simply preliminary to another step, *i.e.,* the approval or refusal described in section 410.[FN2]

> FN2. Still other objections based on other provisions of section 408 have similarly been rejected. *See, e.g.,* Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc., 29 F.3d 1529, 1531 (11th Cir.1994).

[3] Accordingly, this Court lacks subject matter jurisdiction over any images embraced in plaintiff's Complaint that, even though the subject of pending applications for registration, have not been either

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

322 F.Supp.2d 520, 2004 Copr.L.Dec. P 28,836
 **(Cite as: 322 F.Supp.2d 520)**

approved or refused for registration by the Copyright
Office.

SO ORDERED.

S.D.N.Y.,2004.
Corbis Corp. v. UGO Networks, Inc.
322 F.Supp.2d 520, 2004 Copr.L.Dec. P 28,836

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 5

Not Reported in F.Supp., 1998 WL 43127 (S.D.N.Y.), 46 U.S.P.Q.2d 1382
**(Cite as: 1998 WL 43127 (S.D.N.Y.))**

☞

United States District Court, S.D. New York.
Richard NOBLE, Richard Noble, as agent for William J. Cook and Kim L. Waltrip, Jeffrey Robert Bate, Craig D. Branham, Steve Lyon, Sharon K. Lloyd-Dunbar, and Christine N Seibert, Plaintiffs,
v.
TOWN SPORTS INTERNATIONAL, INC. and TSI/NEW YORK SPORTS CLUB, INC., Defendants.
**No. 96 CIV. 4257(JFK).**

Feb. 2, 1998.

*MEMORANDUM OPINION and ORDER*

<u>KEENAN</u>, District J.

*1 Before the Court is Defendants' motion to dismiss this action, pursuant to <u>Fed.R.Civ.P. 12(b)(1)</u>, for lack of federal subject matter jurisdiction or, in the alternative, dismissing Plaintiffs' claim for statutory damages and attorney's fees under the Copyright Act. For the reasons stated below, the Court grants Defendants' motion to dismiss for lack of federal subject matter jurisdiction.

## BACKGROUND

Plaintiff Richard Noble is a professional photographer who took photographs of the other Plaintiffs in this action, who are models. Defendants Town Sports International, Inc. and TSI/New York Sports Club, Inc. are affiliates that operate health clubs in New York, Massachusetts, Washington, D.C. and other places. By a written license agreement, Defendants allegedly purchased from Noble a limited right to use his photographs in connection with a specific advertising campaign. The agreement allegedly provided that Defendants could use the photographs for one year, in a limited geographic area, for a specific advertising campaign. Plaintiffs contend that Defendants breached the terms of the license agreement by using the photographs for more than one year, without Plaintiffs' consent, in unauthorized advertisements and in unauthorized geographic areas. Plaintiffs filed the instant lawsuit, stating a federal claim for copyright infringement and state law claims for breach of contract, unfair competition, unjust enrichment and invasion of privacy under <u>§§ 50-51 of the New York Civil Rights Law.</u>

Defendants move to dismiss the federal copyright infringement claim on the ground that the photographs at issue are not registered with the U.S. Copyright Office, which is a prerequisite to instituting a copyright infringement suit. Alternatively, Defendants move to dismiss the claim for statutory damages and attorney's fees for failure to comply with <u>17 U.S.C. §§ 411(a)</u> and <u>412</u> of the Copyright Act.

## DISCUSSION

*A. The Copyright Infringement Claim*

Under the Copyright Act, "[N]o action for infringement of the copyright of any work shall be instituted until registration of the copyright claim has been made in accordance with this title." <u>17 U.S.C. § 411(a)</u>. "The registration requirement is a jurisdictional prerequisite to an infringement suit." <u>M.G.B. Homes, Inc. v. Ameron Homes, Inc.,</u> 903 F.2d 1486, 1488 & n. 4 (11th Cir.1990); *see* <u>Whimsicality, Inc. v. Rubie's Costume Co., Inc.,</u> 891 F.2d 452, 453 (2d Cir.1989) ("proper registration is a prerequisite to an action for infringement"); <u>Demetriades v. Kaufman,</u> 680 F.Supp. 658, 661 (S.D.N.Y.1988) ("Receipt of an actual certificate of registration or denial of same is a jurisdictional requirement, and this court cannot prejudge the determination to be made by the Copyright Office.").

Plaintiff Richard Noble has only applied for copyright registration of the photographs at issue in this case; a certificate of registration has not yet been issued by the Copyright Office. Nonetheless, Plaintiffs' counsel contends that "[t]he application for registration is sufficient to maintain an infringement action." Pls. Mem. in Opp. at 6. The Court disagrees. The issuance of a registration certificate is a "prerequisite to the commencement of the infringement action" and an application for registration does not suffice. *Robinson v. Princeton Review,* No. 96 Civ. 4859(LAK), <u>1996 WL 663880, at *7-8</u> (S.D.N.Y.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 43127 (S.D.N.Y.), 46 U.S.P.Q.2d 1382
**(Cite as: 1998 WL 43127 (S.D.N.Y.))**

Nov.15, 1996); *see National Ass'n of Freelance Photographers v. Associated Press,* No. 97 Civ. 2267(DLC), 1997 WL 759456, at *12 (S.D.N.Y. Dec.10, 1997) ("an action for copyright infringement cannot be asserted unless a certificate of registration has been issued; the mere filing of an application is simply insufficient to support such a claim"). Because Plaintiff Noble has only filed an application for registration, and no certificate of registration has yet been issued for the photographs underlying the infringement claim, the federal copyright infringement claim cannot stand. Upon dismissal of this federal claim, which is the only basis for original federal jurisdiction, only state law claims remain and the Court declines to exercise supplemental jurisdiction over those claims.

### CONCLUSION

**\*2** For the reasons discussed above, the Court grants Defendants' motion to dismiss the federal copyright infringement claim for lack of federal subject matter jurisdiction. Absent any other federal claim, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. The Court orders this case closed and directs that it be removed from the Court's docket.

SO ORDERED.

S.D.N.Y.,1998.
Noble v. Town Sports Intern., Inc.
Not Reported in F.Supp., 1998 WL 43127 (S.D.N.Y.), 46 U.S.P.Q.2d 1382

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 6

Westlaw

Not Reported in F.Supp.2d, 2005 WL 1668542 (S.D.N.Y.)
**(Cite as: 2005 WL 1668542 (S.D.N.Y.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Leonard TABACHNIK, Ph.D, Plaintiff,
v.
Professor Bruce DORSEY, and the President's Office of
Swarthmore College; Cornell University Press; and President Jeffrey S. Lehman, Cornell University, Defendants.
**No. 04 Civ. 9865(SAS).**

July 15, 2005.

Leonard Tabachnick, Ph.D, Knickerbocker Station, New
York, New York, Plaintiff, pro se.

Nelson E. Roth, Garden Avenue, Ithaca, New York, for
Cornell Defendants.

*OPINION & ORDER*

SCHEINDLIN, J.

**\*1** Dr. Leonard Tabachnik, proceeding pro se, has sued a
number of defendants alleging copyright infringement,
monopolization of trade and commerce and academic
conspiracy. Cornell University Press and President Jeffrey
S. Lehman (the "Cornell defendants") move to dismiss
plaintiff's Amended Motion and Complaint <sup>FN1</sup> ("Cmpl.")
for lack of subject matter jurisdiction and for failure to
state a legally cognizable cause of action. *See*
Fed.R.Civ.P. 12(b)(1) & 12(b)(6). For the following reasons, defendants' motion is granted and this case is dismissed as to all defendants.

> FN1. Construing plaintiff's Amended Complaint
> liberally, his reference to a motion can be interpreted as a request to preliminarily enjoin Cornell University Press from publishing additional
> copies of the alleged infringing work. This request will be moot if the case is dismissed. *Cf.*
> *Ruby v. Pan American World Airways, Inc.,* 360
> F.2d 691 (2d Cir.1966) (dismissing appeal from
> order denying motion for preliminary injunction
> on ground that it had become moot where complaint in case had been dismissed).

**I. FACTS**

In his pleading, Dr. Tabachnik alleges that his doctoral
dissertation, entitled *Origins of the Know-Nothing Party:
A Study of the Native American Party in Philadelphia,
1844-1852,* is the subject of copyright protection. <sup>FN2</sup> *See*
Cmpl. ¶ 1. Dr. Tabachnik further alleges that parts of Professor Bruce Dorsey's book entitled *Reforming Men and
Women* violate the copyright laws "by describing important events us[ing] virtually identical language as is found
in the text of Dr. Tabachnik's dissertation." *Id.* ¶ 14. Professor Dorsey's book was published by Cornell University
Press. *See id.* Dr. Tabachnik further claims that the academic community "successfully subverted" him so that
others could present, and get credit for, his research. *See
id.* ¶ 18 ("Had Dr. Tabachnik been allowed to publish his
research years ago, those who have subsequently published on the subject could have made their citations accordingly. Since that is not the case, the press, the authors,
and the universities are all committing illegal acts against
Dr. Tabachnik."). Dr. Tabachnik is claiming damages in
the amount of $2,0000,000,000 (two trillion dollars). *See
id.* ¶ 3.

> FN2. The statute cited by plaintiff provides that
> "the owner of copyright under this title has the
> exclusive rights to do and to authorize any of the
> following: (1) to reproduce the copyrighted work
> in copies or phonorecords...." 17 U.S.C. § 106.

**II. LEGAL STANDARDS**

**A. Lack of Subject Matter Jurisdiction Under Rule
12(b)(1)**

A district court may exercise subject matter jurisdiction if
the action "arises under" federal law. *Bracey v. Board of
Educ. of City of Bridgeport,* 368 F.3d 108, 113 (2d
Cir.2004) (citing 28 U.S.C. § 1331). An action "arises
under" federal law if " 'in order for the plaintiff to secure
the relief sought he will be obliged to establish both the
correctness and the applicability to his case of a proposition of federal law.' " *Id.* at 114 (quoting *Franchise Tax
Bd. v. Construction Laborers Vacation Trust,* 463 U .S. 1,
9 (1993)). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the
court lacks the statutory or constitutional power to adjudi-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1668542 (S.D.N.Y.)
(Cite as: 2005 WL 1668542 (S.D.N.Y.))

cate the case." *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1187 (2d Cir.1996). *See also Carlson v. Principal Fin. Group,* 320 F.3d 301, 306 (2d Cir.2003) ("[I]n order to sustain federal jurisdiction, the complaint must allege a claim that arises under the Constitution or laws of the United States and that is neither made solely for the purpose of obtaining jurisdiction nor wholly insubstantial and frivolous.").

*2 A plaintiff bears the burden of proving the existence of subject matter jurisdiction by a preponderance of the evidence. *See Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). *See also Linardos v. Fortuna,* 157 F.3d 945, 947 (2d Cir.1998) ("[T]he party invoking federal jurisdiction bears the burden of proving facts to establish that jurisdiction."). "When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Raila v. United States,* 355 F.3d 118, 119 (2d Cir.2004). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Id.* In resolving a motion to dismiss under Rule 12(b)(1), a court may consider evidence outside the pleadings, including affidavits submitted by the parties, and is not limited to the face of the complaint. *See Robinson v. Government of Malaysia,* 269 F.3d 133, 140-41 (2d Cir.2001).

B. Failure to State a Claim Under Rule 12(b)(6)

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Curto v. Edmundson,* 392 F.3d 502, 503 (2d Cir.2004) (internal quotation marks and citation omitted). The task of the court in ruling on a motion to dismiss is "merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 176 (2d Cir.2004) (internal quotation marks and citation omitted).When deciding a motion to dismiss, courts must accept all factual allegations as true and draw all reasonable inferences in the non-moving party's favor. *See Chambers v. Time Warner Inc.,* 282 F.3d 147, 152 (2d Cir.2002).

Furthermore, a complaint need not state the legal theory, facts, or elements underlying the claim in most instances.

*See Phillips v.. Girdich,* No. 04-0347, 2005 WL 1154194, at *2-3 (2d Cir. May 17, 2005). Pursuant to the simplified pleading standard of Rule 8(a) of the Federal Rules of Civil Procedure, a complaint must include only " 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002) (quoting Fed.R.Civ.P. 8(a)(2)). And when a plaintiff is proceeding pro se, courts are instructed to construe the complaint liberally. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972); *see also Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997).

Finally, while courts generally may not consider matters outside the pleadings in determining if a complaint should survive a Rule 12(b)(6) motion, documents attached to the pleadings, documents referenced in the pleadings, and documents integral to the pleadings may be considered. *See Chambers,* 282 F.3d at 152-53; Fed.R.Civ.P. 10(c). Courts may also take judicial notice of facts within the public domain and public records if such facts and records are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)(2). *See also Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773-74 (2d Cir.1991) ("[A] district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' ") (quoting Fed.R.Evid. 201(b)(2)).

III. DISCUSSION

A. Plaintiff's Copyright Claim

*3 "The Copyright Act requires that 'no action for infringement of the copyright in any United States work shall be instituted until registration of the copyright claim has been made in accordance with this title.' " *Morris v. Business Concepts, Inc.,* 259 F.3d 65, 68 (2d Cir.2001) (quoting 17 U.S.C. § 411(a)). *See also Whimsicality, Inc. v. Rubie's Costume Co., Inc.,* 891 F.2d 452, 453 (2d Cir.1989) ("[P]roper registration is a prerequisite to an action for infringement."). Thus, "federal district courts do not have jurisdiction over a claim for federal copyright infringement until the Copyright Office has either approved or refused the pending application for registration." *Corbis Corp. v. UGO Networks, Inc.,* 322 F.Supp.2d 520, 521 (S.D.N.Y.2004). The interplay of the relevant statutory provisions has been explained as follows:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1668542 (S.D.N.Y.)
(Cite as: 2005 WL 1668542 (S.D.N.Y.))

Section 411(a) provides that jurisdiction is not conveyed "until registration of the copyright claim has been made in accordance with [the Copyright Act]." 17 U.S.C. § 411(a). Additionally, Section 410(a) indicates that a claim must be examined and approved by the Register of Copyrights before it is registered. 17 U.S.C. § 410(a). Only after the Register of Copyrights examines the material deposited and determines that the legal and formal requirements of the statute have been met does it register the claim and issue a certificate of registration. *Id.* Thus, the plain language of the statute confirms that although submission of a claim begins the registration process, a claim is not deemed registered until the Register of Copyrights approves it.

> *Green v. Columbia Records/Sony Music Entm't Inc.,* No. 03 Civ. 4333, 2004 WL 3211771, at *3 (S.D.N.Y. Mar. 1, 2004) (footnote omitted).

In sum, "an action for copyright infringement cannot be asserted unless a certificate of registration has been *issued;* the mere filing of an application is simply insufficient to support such a claim." *National Assoc. of Freelance Photographers v. Associated Press,* No. 97 Civ. 2267, 1997 WL 759456, at *12 (S.D.N.Y. Dec. 10, 1997) (emphasis in original) (citing *Fonar Corp. v. Domenick,* 105 F.3d 99, 103 (2d Cir.1997), for the proposition that "[t]here are only two elements of an infringement claim: ownership of a valid copyright and the copying of constituent elements of the work that are original"). *See also Noble v. Town Sports Int'l, Inc.,* No. 96 Civ. 4257, 1998 WL 43127, at *1 (S.D.N.Y. Feb. 2, 1998) ("The issuance of a registration statement certificate is a prerequisite to the commencement of the infringement action and an application for registration does not suffice.").

Here, Dr. Tabachnik appended his Application for Registration of a Claim to Copyright, dated December 27, 1973, as an exhibit to his Amended Complaint. *See* Cmpl., Document 2. In his Reply papers, dated June 21, 2005, Dr. Tabachnik belatedly submitted an Additional Certificate of Registration of a Claim to Copyright, dated April 22, 2005, and signed by the Register of Copyrights. In *M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d

1486 (11th Cir.1990), the appellate court reviewed a lower court decision dismissing the case because plaintiff failed to register its copyright before initiating the infringement action, but allowing plaintiff to amend its complaint based on subsequently obtaining a certificate of registration. *See id.* at 1489.

*4 The appellate court excused this procedural irregularity but stated that "the filing of a new lawsuit would ordinarily have been the proper way for [plaintiff] to proceed once it received the registration certificate." *Id.* Here, plaintiff has not moved to amend, instead, plaintiff has belatedly submitted a certificate of registration obtained some four months after the filing of the instant Complaint. This Court lacked jurisdiction over plaintiff's Complaint at the time of filing because there was no registration certificate. Therefore, the proper course is to dismiss the case without prejudice. *See id.* at 1488 ("The registration requirement is a jurisdictional prerequisite to an infringement suit ."). Accordingly, this case is dismissed for lack of subject matter jurisdiction.

The next question is whether the dismissal should be with or without prejudice. To subject another court to plaintiff's claims would be a waste of judicial resources if the facts alleged by plaintiff cannot support any claim which would entitle him to relief. "To allege a claim of copyright infringement, [plaintiff] must claim that a substantial similarity exists between the defendant's work and the protectible elements of its work. To be 'protectible,' these elements must be original." *County of Suffolk v. First Am. Real Estate Solutions,* 261 F.3d 179, 187-88 (2d Cir.2001) (citing *Feist Publ'ng, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 345-349 (1991)). In *Feist,* the Supreme Court explained that copyright protection extends only to original authorship and that the publication of facts, regardless of how much effort was expended in discovering them, is not original authorship. *See Feist,* 499 U.S. at 347-48; *see also id.* at 350 ("Facts, whether alone or as part of a compilation, are not original and therefore may not be copyrighted ... In no event may copyright extend to the facts themselves."). Here, plaintiff has provided the following table comparing his text with the allegedly infringing Dorsey text.

| Tabachnik Text | Dorsey Text |
|---|---|
| Chapter 1-The Birth of the Naive | Paragraph 1 |
| [sic] American Party. | |

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1668542 (S.D.N.Y.)
**(Cite as: 2005 WL 1668542 (S.D.N.Y.))**

| | |
|---|---|
| "In 1844, two related events-a controversy over Bible reading in the public schools and a series of riots between Irish Catholics and those who later call themselves Native Americans -led to a dramatic change in the political life of Philadelphia.["] | "Between May and July 1844, one of the worst incidents of ethnic and religious violence in the history of the US erupted in the outlying districts of Philadelphia." |
| | Paragraph I |
| p. 36. "The danger to individual life was so great that the Irish Catholic residents in the district fled into the nearby woods located between Kensington and Richmond. They camped there, women and children, in the most pitiable conditions with scarcely anything to eat, and exposed to the rain." | "Frightened Irish families fled the city and camped in nearby woods to escape the wrath of the nativists." |
| pp. 36-37. "During the course of the riot, city officials were helpless. Volunteer fireman either refused to respond to alarms for fear of their lives, or were prevented by the mob from extinguishing fires on Catholic property." | "Local authorities were powerless to stop the rioting, and, when the state militia tired to quell the disturbances, their presence merely escalated the violence." |
| pp. 33-33. "These riots were symptomatic of a deeper malady: the discontent caused by the depression of Kensington's hand-loom economy. Since one-third of the third world's gainfully employed males earned their livelihood from handloom weaving the conditions in that industry greatly affected the general economic state of the district ... From 1835 to 1845 wages declined by 100%." | p. 200. Handloom weaversweavers riots. "The weavers' riots exposed the complexity of ethnic conflict and the changing dynamic produced by new immigrants. Kensington's weaving population was overwhelmingly Irish-born. The majority were Catholics....["]. |
| p. 20. "In November of 1842, when | p. 201. "In Philadelphia nearly one |

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1668542 (S.D.N.Y.)
**(Cite as: 2005 WL 1668542 (S.D.N.Y.))**

| | |
|---|---|
| Archbishop Kendrick made his | hundred Protestant clergymen joined |
| demands to the Board of Controllers, a | together in November 1842 to create |
| group of sixty-one local Protestant | the American Protestant Association, |
| clergymen formed a body known as | whose principle objective was to |
| the American Protestant Association. | encourage and equip ministers to |
| By the time the new association had | preach regularly against Catholicism." |
| drawn up its charter in December of | |
| 1842 it had added another twenty-eighty | |
| clergymen to its list of charter | |
| members, giving the organization | |
| thirty-seven percent of the city's | |
| clergy." | |

*5 Amended Motion and Complaint ¶ 14.

The above excerpts reveal that Tabachnik is seeking to protect the kind of historical facts that fall within the public domain and, as such, are not copyrightable. *See Sparaco v. Lawler, Matusky, Skelly, Engineers LLP,* 303 F.3d 460, 466 (2d Cir.2002) ("The view developed that historical, scientific, or factual information belongs in the public domain, and that allowing the first publisher to prevent others from copying such information would defeat the objectives of copyright by impeding rather than advancing the progress of knowledge."); *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 979 (2d Cir.1980) (a pre-*Feist* case holding that historical facts are not protected by copyright).

Not only are the historical facts themselves not subject to copyright protection, but it is apparent from the above that Dorsey did not copy Tabachnik's presentation of those facts, which may be protected by copyright. *See Feist,* 499 U.S. at 349 ("Notwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement."). *See also Churchill Livingstone, Inc. v. Williams & Wilkins,* 949 F.Supp. 1045, 1050 (S.D.N.Y.1996) ("[T]he facts in a medical textbook nevertheless are not copyrightable; the over-all selection and arrangement of these facts, if original, may be copyrightable."). Although Dorsey does state some of the same facts as Tabachnik, he does so in his own distinct style and wording. It cannot be said that Dorsey's presentation is substantially similar to that of Dr. Tabachnik. Accordingly, plaintiff has not stated a valid claim of copyright infringement. Having failed to state a claim upon which relief can be granted, plaintiff's infringement claim is dismissed with prejudice. *See Buckman v. Citicorp,* No. 95 Civ. 773, 1996 WL 34158, at *3 (S.D.N.Y. Jan. 30, 1996), *aff'd,* 101 F.3d 1393 (2d Cir.1996) ("A court may dismiss a copyright claim if it concludes that no reasonable jury could find that the two works are substantially similar, or if it concludes that the similarities between the two works pertain only to unprotected elements of the plaintiff's work.") (citing *Warner Bros., Inc. v. American Broad. Cos.,* 720 F.2d 231, 240 (2d Cir.1983)).

B. Plaintiff's Remaining Claims

Plaintiff's remaining claims, brought under Sections 1 and 2 of the Sherman Act, can be summarily dismissed as there are no allegations in his Amended Complaint to support such claims. Section 1 of the Sherman Act provides as follows:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the Several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. In order to state a claim under Section 1, a plaintiff must allege: "(1) a contract, combination, or conspiracy; (2) in restraint of trade; (3) affecting interstate commerce." *Maric v. Saint Agnes Hosp. Corp.,* 65 F.3d 310, 313 (2d Cir.1995). Section 2 of the Sherman Act penalizes "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States...." 15 U.S.C.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1668542 (S.D.N.Y.)
**(Cite as: 2005 WL 1668542 (S.D.N.Y.))**

§ 2. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451 (1992) (internal quotation marks and citation omitted). The question, then, is whether plaintiff's Amended Complaint sufficiently alleges the required elements of either Sherman Act claim.

*6 Plaintiff's claim under Section 1 of the Sherman Act, entitled "Academic Conspiracy," and his claim under Section 2, entitled "Monopolization of Trade and Commerce," lack any connection to trade or commerce. There are no allegations of an antitrust conspiracy and no allegations of economic monopoly power in any relevant market. The sole question presented here is whether plaintiff's scholarly dissertation is entitled to copyright protection. The kinds of economic activity covered by the Sherman Act are simply not at issue in this case. Plaintiff's reliance on the Sherman Act is therefore misplaced. Accordingly, plaintiff's remaining claims, brought under Sections 1 and 2 of the Sherman Act, must also be dismissed.

V. CONCLUSION

For the foregoing reasons, the Cornell defendants' motion is granted and this case is dismissed in its entirety, with prejudice, as to all defendants. Counsel for the Cornell defendants is directed to provide a copy of this Opinion and Order to his co-counsel. The Clerk of the Court is directed to close this case.

SO ORDERED:

S.D.N.Y.,2005.
Tabachnik v. Dorsey
Not Reported in F.Supp.2d, 2005 WL 1668542 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 7

Westlaw.

257 Fed.Appx. 409, 2007 WL 4386196 (C.A.2 (N.Y.)), 2007 Copr.L.Dec. P 29,488
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 257 Fed.Appx. 409, 2007 WL 4386196 (C.A.2 (N.Y.)))**

**H**This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,
Second Circuit.
Leonard TABACHNIK, Plaintiff-Appellant,
v.
Bruce DORSEY, Cornell University Press, Jeffrey S. Lehman, Defendants-Appellees.
**No. 05-6246-cv.**

Dec. 13, 2007.

Appeal from the United States District Court for the Southern District of New York (Scheindlin, J.).
**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the judgment of the district court dismissing the complaint be **AFFIRMED,** on the ground that the complaint fails to state a cause of action.
Leonard Tabachnik, pro se, New York, NY, for Appellant.

Nelson E. Roth (Valerie L. Cross and Wendy E. Tarlow, on the brief), Ithaca, NY, for Appellee.

*410 PRESENT: Hon. DENNIS JACOBS, Chief Judge, Hon. BARRINGTON D. PARKER, Circuit Judge.[FN1]

> FN1. Judge Richard C. Wesley, originally a member of this panel, recused himself from this case. The remaining two members of the Panel, who are in agreement, decide this case in accordance with Second Circuit Local Rule 0.14(b).

### SUMMARY ORDER

**\*\*1** Plaintiff-Appellant Leonard Tabachnik appeals from the July 22, 2005 order of the United States District Court for the Southern District of New York (Scheindlin, J.), dismissing the complaint for lack of subject matter jurisdiction (pursuant to Federal Rule of Civil Procedure 12(b)(1)) and failure to state a claim (pursuant to Federal Rule of Civil Procedure 12(b)(6)).

We assume the parties' familiarity with the underlying facts, the procedural history, and the issues presented for review. In the main, Tabachnick claims that a book written by Bruce Dorsey and published by Cornell University Press infringed on Tabachnik's copyright in his 1973 doctoral dissertation, that the Copyright Act, 17 U.S.C. § 106, unconstitutionally prevents Tabachnik from copyrighting facts contained in the dissertation, and that the defendants (along with the national academic community) are part of a racketeering organization engaged in an antitrust conspiracy to prevent the dissertation from being published, in violation of the Sherman Act, 15 U.S.C. §§ 1 and 2.

"We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002).

The copyright infringement claim alleges that Dorsey appropriated the historical facts discussed in Tabachnik's doctoral dissertation. However, "[f]acts, whether alone or as part of a compilation, are not original and therefore may not be copyrighted." *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 350, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Tabachnik also excerpts Dorsey's work that allegedly plagiarized the phrasing of the dissertation. Having reviewed those excerpts, we cannot conclude that "a substantial similarity exists between [Dorsey's] work and the protectible elements of [Tabachnik's]," a requirement for any copyright infringement claim. *County of Suffolk v. First Am. Real Estate Solutions,* 261 F.3d 179, 187 (2d Cir.2001).

Tabachnik's antitrust arguments likewise fail to state a claim. A threshold requirement for a private plaintiff under §§ 1 or 2 of the Sherman Act is an allegation of antitrust injury, which entails showing "that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

257 Fed.Appx. 409, 2007 WL 4386196 (C.A.2 (N.Y.)), 2007 Copr.L.Dec. P 29,488
**(Not Selected for publication in the Federal Reporter)**
 **(Cite as: 257 Fed.Appx. 409, 2007 WL 4386196 (C.A.2 (N.Y.)))**

will not suffice." *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (internal citation omitted). Tabachnik's allegations of antitrust injury focus exclusively on the academy's failure to publish his own dissertation.

**\*\*2** Finally, Tabachnik's constitutional challenge to the Copyright Act is without merit.

For failure to state a claim, as set forth above, the judgment of the district court is hereby **AFFIRMED** with prejudice.

C.A.2 (N.Y.),2007.
Tabachnik v. Dorsey
257 Fed.Appx. 409, 2007 WL 4386196 (C.A.2 (N.Y.)), 2007 Copr.L.Dec. P 29,488

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 8

Westlaw.

Not Reported in F.Supp.2d, 2006 WL 2109454 (S.D.N.Y.)
**(Cite as: 2006 WL 2109454 (S.D.N.Y.))**

ⒸOnly the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Benjamin K. CALDWELL, Hazim Tawfiq, Plaintiffs,
v.
Billy RUDNICK, Mike Serrano, Theodore Heath,
Sunil Thadani, Defendants.
**No. 05 Civ. 7382(NRB).**

July 26, 2006.

Benjamin K. Caldwell, Hazim Tawfiq, Spojax, Inc.,
New York, NY, for Plaintiffs.

Joseph Sutton, Ezra Sutton, Ezra Sutton, P.A.,
Woodbridge, NJ, for Defendants Serrano and Rud-
nick.

Vivek S. Suri, Middle Village, NY, for Defendants
Thadani and Heath.

MEMORANDUM AND ORDER

BUCHWALD, J.

*1 On August 25, 2005, *pro se* plaintiffs Benjamin K.
Caldwell ("Caldwell") and Hazim Tawfiq ("Tawfiq")
filed this copyright infringement action. Plaintiffs are
both affiliated with a company called Spojax, Inc.
("Spojax"), which sells a clothing line marketed un-
der the name of Department of Hood Affairs (or
"DOHA"). *See* Compl. at ¶¶ 1-2, 11. The DOHA
clothing line includes T-shirts featuring three differ-
ent graphics and a text logo. *Id.* at ¶ 11. Defendants
Billy Rudnick ("Rudnick") and Mike Serrano
("Serrano") are employed by a clothing retailer, Dr.
Jay's, and purchase apparel sold in the company's
stores. *Id.* at ¶ 5. Defendant Theodore Heath
("Heath") is the owner of a company called BALLA
Clothing and defendant Sunil Thadani ("Thadani") is
the owner of a company called Dagia's, Inc. *See*
Compl. at ¶¶ 5, 32-33. Plaintiffs allege that Dr. Jay's
sold T-shirts that infringed their copyright and that
defendants Heath and Thadani supplied the infringing
T-shirts to Dr. Jay's. Rudnick and Serrano have
jointly submitted a motion to dismiss pursuant to

Fed.R.Civ.P. 12(b)(1) and 12(b)(6) which is currently
pending before this Court. For the reasons that fol-
low, we conclude that the complaint must be dis-
missed.

BACKGROUND [FN1]

> FN1. The facts set forth in this section are
> taken from the original complaint and at-
> tached exhibits. For purposes of resolving
> the pending motion, we assume that the facts
> set forth in the complaint and attached ex-
> hibits are true.

The graphic at issue in this case features an octagonal
stop sign with the word "SNITCHING" inserted be-
low the word "STOP." (Hereafter, the "Stop Snitch-
ing Graphic"). *Id.,* Ex. A.[FN2] Plaintiffs claim that they
started selling T-shirts with the Stop Snitching
Graphic on or about May 7, 2005. Compl. at ¶ 13.
Shortly thereafter, plaintiffs learned that others were
producing and selling similar T-shirts. *See id.* at ¶ 13.
This apparently prompted Tawfiq to submit a copy-
right application for the Stop Snitching Graphic, as
well as for two other graphics and a text "logo" for
the Department of Hood Affairs to the Copyright
Office on June 7, 2005.[FN3] *See id.* at ¶¶ 11, 13. In the
complaint, plaintiffs allege that the registration appli-
cation was received by the Copyright Office on June
20, 2005, but concede that the application was still
pending on the date the complaint was filed. *See id.*
at ¶¶ 14-15.

> FN2. Based on the allegations in the com-
> plaint, plaintiffs' claim appears to be limited
> to the assertion that defendants unlawfully
> copied and sold T-shirts with the Stop
> Snitching Graphic rather than other DOHA
> T-shirt designs. *See* Compl. at ¶¶ 17, 18.
> Exhibits attached to the complaint also sup-
> port this construction of plaintiffs' claim. *See*
> *id.,* Ex. C. These exhibits include letters and
> e-mails that Caldwell and Rudnick ex-
> changed between July 18 and July 20, 2005
> which consistently refer to Dr. Jay's selling
> T-shirts with the Stop Snitching Graphic and
> do not reference other designs or the text
> logo. *Id.*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2109454 (S.D.N.Y.)
**(Cite as: 2006 WL 2109454 (S.D.N.Y.))**

FN3. The second graphic features a circular "DO NOT ENTER" sign except that the word "SNITCH" replaces the word "ENTER." *See* Compl., Ex. A ("T-shirt Sample # 2"). The third design features a rectangular "NO PARKING ANYTIME" sign with the word "SNITCHING" replacing the word "PARKING." *Id.* ("T-shirt Sample # 3").

To further drive home the not-so-subtle message conveyed in the graphics, a text "logo" for the Department of Hood Affairs is apparently placed on the back of the T-shirts sold by Spojax. *See* Compl., Ex. A. The text includes the following mission statement:

The Department of Hood Affairs is an urban shirt company established in 2005 for the purpose of citing and obstructing any potential communication violations in the inner cities of America. The Department of Hood Affairs was specifically designed to enforce the following rules of society:

1. DO NOT SNITCH

2. STOP SNITCHING

3. NO SNITCHING ANYTIME

These three violations consist of divulging unnecessary information willingly and are punishable by fines of up to $250,000 or greater. *See* Compl., Ex. A.

The dispute between the parties commenced on July 14, 2005, when Caldwell discovered that a Dr. Jay's clothing store located on 125th Street in New York City was selling T-shirts that featured an "exact replica" of the Stop Snitching Graphic. Compl. at ¶ 18, Ex. C. In the two or three week period following plaintiffs' discovery of the T-shirts at Dr. Jay's, plaintiffs met with the defendants in an effort to resolve the dispute. Although Rudnick agreed to remove the offending T-shirts from the Dr. Jay's store and to order 83 dozen "Stop Snitching" T-shirts from Spojax, plaintiffs ultimately filed this lawsuit on August 19, 2005. *See* Compl. at ¶¶ 22, 25, Ex. C.

DISCUSSION

As an initial matter, defendants contend that this Court lacks subject matter jurisdiction because plaintiffs did not have a registered copyright for the Stop Snitching Graphic when they filed the complaint. *See* Defs. Mem. at 4-5. We note that "[w]hether a claimant has standing is the threshold question in every federal case, determining the power of the court to entertain the suit." *In re Gucci,* 126 F.3d 380, 387-88 (2d Cir.1997)(quoting *Warth v. Sedin,* 422 U.S. 490, 498 (1975)).

*Legal Standards*

*2 In resolving a Rule 12(b)(1) motion to dismiss, we must assume the truth of the facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff. *See Raila v. United States,* 355 F.3d 118, 119 (2d Cir.2004).[FN4] Courts are permitted to consider evidence outside the pleadings when evaluating the threshold issue of subject matter jurisdiction. *See, e.g., Tabachnik v. Dorsey,* 04 Civ. 9865(SAS), 2005 WL 1668542, at *2 (S.D.N.Y. July 15, 2005) (citing *Robinson v. Government of Malaysia,* 269 F.3d 133, 140-41 (2d Cir.2001)). Plaintiffs bear the burden of establishing subject matter jurisdiction. *See Makarova v. United States,* 201 F.3d 560, 562 (2d Cir.2000).

FN4. We are also mindful of the fact that "the complaint of a *pro se* litigant should be liberally construed in his favor." *Salahuddin v. Cuomo,* 861 F.2d 40, 42-43 (2d Cir.1988) (citation omitted).

The Copyright Act provides that, except under circumstances that are not relevant here, "no action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the work has been made in accordance with this title." *See* 17 U.S.C.A. § 411(a) (2005).[FN5] *See also Whimsicality, Inc. v. Rubie's Costume Co., Inc.,* 891 F.2d 452, 453 (2d Cir.1989)("[P]roper registration is a prerequisite to an action for infringement."); *Nat'l Ass'n of Freelance Photographers v. Associated Press,* No. 97 Civ. 2267(DLC), 1997 WL 759456, at *12 (S.D.N.Y. Dec. 10, 1997) ("[A]n action for copyright infringement cannot be asserted unless a certificate of registration has been issued; the mere filing of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2109454 (S.D.N.Y.)
**(Cite as: 2006 WL 2109454 (S.D.N.Y.))**

an application is simply insufficient to support such a claim"). Thus, a plaintiff's failure to register a copyright before bringing an infringement action requires dismissal on jurisdictional grounds. *See, e.g., Country Road Music, Inc. v. MP3.com, Inc., 279 F.Supp.2d 325, 332 (S.D.N.Y.2003); Noble v. Town Sports Int'l, Inc., No. 96 Civ. 4257(JFK), 1998 WL 43127 (S.D.N.Y. Feb. 2, 1998).*

> FN5. We note that § 411(a) was amended by the Artists' Rights and Theft Prevention Act of 2005, Pub.L. No. 109-9, 119 Stat. 218, which inserted the words "preregistration or" after "shall be instituted until." Preregistration is separate from the registration process and is only available for unpublished motion pictures, sound recordings, musical compositions, literary works prepared for publication in book form, computer programs, advertising or marketing photographs. *See generally* 37 C.F.R. § 202.16.

*Analysis*

In the complaint, plaintiffs concede that their registration application was still "pending" at the time the complaint was filed. Compl. at ¶¶ 14-15. Moreover, in the registration form attached to the complaint, the spaces below the headings for "effective date of registration" and "registration number" as well as the spaces used to designate the dates when the application and required deposits are received by the Copyright Office are conspicuously blank. *See* Compl., Ex. A. Based on plaintiffs' failure to comply with the registration requirements of the statute, we dismiss the complaint without prejudice. <sup>FN6</sup>

> FN6. In some situations, it is appropriate to allow a plaintiff who has obtained a registration certificate after the initiation of a copyright action to simply amend the complaint. *See J. Racentstein & Co., Inc. v. Wallace, 96 Civ. 9222(TPG), 1997 WL 605107, at *1-2 (S.D.N.Y. Oct. 1, 1997)* (citing cases). However, in this case, we have concluded that such leave should not be granted. Postmotion submissions from both parties create numerous factual questions relevant to whether plaintiffs have, in fact, secured a registration certificate for the copyright at issue in this infringement action.

In a letter dated May 15, 2006, plaintiffs notified this Court that they had "officially received a copyright certificate of registrations for the design(s) in dispute" after filing the complaint and requested permission to amend the complaint to include the attached certificates of registration. *See* Pl. Ltr. dated May 15, 2006, Exs. A-B. However, plaintiffs attached two Certificates of Registration that differ in significant ways from the original application form attached to the complaint. Pl. Ltr. dated May 15, 2006, Exs. A-B. For example, in the application attached to the complaint, the nature of the work is described as "Graphics depicting a t-shirt idea" and is further described in the following way on the second page: "T-shirt samples number 1-4 are initial ideas of the Dept. of Hood Affairs merchandise. T-shirt # 4 is the actual mission statement of submitted for approval & it will also be used for the back of the T-shirt(s)." *See* Compl., Ex. A.

The Certificate of Registration attached as "Exhibit A" to the May 15th Letter appears to have an effective registration date of June 21, 2005 and a registration number. Unlike the original application, the nature of the work is identified as a "Technical drawing depicting a t-shirt" and the certificate contains the following description on the second page: "Technical drawings number 1,2,3,4 are part of a catalog for the Department of Hood Affairs. The text on the technical drawing number 4 is the statement used on the rear of the designs." Pl. Letter dated May 15, 2005, Ex. A. It seems possible that plaintiff Tawfiq submitted more than one registration application related to the DOHA apparel line to the Copyright Office.

Defense counsel has submitted a copy of what appears to be a letter from the Copyright Office to plaintiff Tawfiq that was allegedly produced by plaintiffs during the course of discovery. *See* Attachment to Defs. Letter dated May 1, 2006. We have

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2109454 (S.D.N.Y.)
(Cite as: 2006 WL 2109454 (S.D.N.Y.))

some concerns about the authenticity of this document since the first copy of the document submitted had been marked up by hand and a second "clean" copy appears to have been produced with the assistance of correction fluid. Consequently, we have not relied on this submission in resolving the pending motion. However, if the November 7, 2005 letter is genuine, it is evidence that an Examiner in the Copyright Office informed Tawfiq that while the DOHA text logo and the sketches of the T-shirts could be registered as "technical drawings," this would confer "no protection [for] the t-shirt designs themselves" and that "the designs on the shirts themselves are not copyrightable artwork." *See* Attachment to Defs. Letter dated May 1, 2006.

Having concluded that subject matter jurisdiction is lacking, it would be inappropriate to reach defendants' remaining arguments. However, this Court observes that there appear to be significant obstacles to plaintiffs prevailing on their copyright claim. First, plaintiff Caldwell does not appear to be the owner of any copyright related to the DOHA apparel line.[FN7] Second, it seems unlikely that successful registration of a "technical drawing" and "text" can support a claim of infringement based on the reproduction of the Stop Snitching Graphic on T-shirts. *See* Pl. Ltr dated May 15, 2006, Exs. A-B. [FN8] In the event that plaintiffs decide to file a new complaint reasserting their copyright claim, they should include as exhibits copies of all correspondence and documents that they have either sent to, or received from, the Copyright Office related to the graphics, technical drawings or text at issue in this case.

FN7. The complaint clearly states that Tawfiq is the "sole proprietor of all rights, title(s) and interests in the copyrights associated with the designs used for the [Department of Hood Affairs] apparel line." Compl. at ¶ 15. Tawfiq is also the only individual listed as the author, copyright claimant and "owner of exclusive rights" in both the registration application form attached to the complaint and the registration certificates subsequently submitted to this Court. *See* Compl., Ex. A; Pl. Ltr dated May 15, 2006,

Exs. A-B. Nothing in the complaint suggests that Caldwell has acquired any ownership rights from Tawfiq.

FN8. Moreover, we doubt that the Stop Snitching Graphic, which consists of one word added to a common street sign, can be copyrighted. *See* 37 C.F.R. § 202.1(a) (stating that "[w]ords and short phrases such as names, titles, and slogans; familiar symbols or designs; mere variations of typographic ornamentation, lettering or coloring" are not subject to copyright).

CONCLUSION

**\*3** Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) is granted without prejudice. The Clerk of Court is respectfully requested to close this case.

IT IS SO ORDERED.

S.D.N.Y.,2006.
Caldwell v. Rudnick
Not Reported in F.Supp.2d, 2006 WL 2109454 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 9

Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
**(Cite as: 2001 WL 1518264 (S.D.N.Y.))**

**H**Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
VIDEO-CINEMA FILMS, INC., Plaintiff,
v.
CABLE NEWS NETWORK, INC. d/b/a CNN, De-
fendant.
VIDEO-CINEMA FILMS, INC., Plaintiff,
v.
AMERICAN BROADCASTING COMPANIES,
INC., Defendant.
VIDEO-CINEMA FILMS, INC., Plaintiff,
v.
CBS CORPORATION, Defendant.
**No. 98 CIV. 7128IBSJ), 98 CIV. 7129(BSJ), 98
CIV. 7130(BSJ).**

Nov. 28, 2001.

AMENDED OPINION <u>FN1</u>

> <u>FN1.</u> The only change from the original
> Opinion appears on page 14, line 8, where
> the court has substituted the word "copy-
> righted" for the word "uncopyrighted."

JONES, District J.

### INTRODUCTION

**\*1** Plaintiff, Video-Cinema Films, Inc. ("Video-
Cinema") filed these actions against Defendants, Ca-
ble News Network, Inc. ("CNN"), American Broad-
casting Companies, Inc. ("ABC") and CBS Corpora-
tion ("CBS"), alleging copyright infringement in vio-
lation of 17 U.S.C. §§ 101 *et seq.,*<u>FN2</u> and common-
law unfair competition for their nationwide broad-
casts of excerpted footage from the motion picture
*The Story of G.I. Joe* ("*G.I.Joe* ") on their news pro-
grams after the death of actor Robert Mitchum
("Mitchum"). Defendants move for summary judg-
ment. For the reason set forth below, Defendants'
motions are granted.

> <u>FN2.</u> Plaintiff has withdrawn its Lanham
> Act claims against Defendants. Accordingly,
> this Court hereby dismisses Plaintiff's

Lanham Act claims.

### THE PARTIES

Plaintiff Video-Cinema, a New York Corporation
which licenses copyrighted motion pictures and their
excerpts, owns the copyright of *G.I. Joe.* Its President
and sole shareholder is Larry Stern ("Stern"). *See*
Plaintiff President's Affidavit in Opposition to
[ABC's motion for] Summary Judgment ("Stern
Aff.") ¶¶ 1; 4; Deposition of Larry Stern ("Stern
Dep.") at 11-13 (attached as Ex. 9 to ABC's State-
ment of Undisputed Material Facts).

Defendant CNN distributes news and information
programming by satellite and cable distribution sys-
tems. It is composed of several 24-hour cable news
networks, including CNN, CNN Headline News and
CNN International. *See* Declaration of Pilar G. Keagy
¶ 6.

Defendant ABC operates the ABC Television Net-
work, which among other things, distributes news
programming for the viewing public. ABC distributes
programming to its affiliates or approximately 190
independently-owned local television stations around
the country and to ten local stations that are indirectly
owned by ABC's parent, ABC, Inc.

ABC News is a division of ABC which produces a
variety of daily news programming including news
programming that principally is dedicated to brief
reports of the current news. ABC News' programs
include: *World News Tonight with Peter Jennings,*
typically broadcast weekdays in the early evening;
*World News Now,* a daily news program for late-
night viewers, broadcast weekdays between 2:00 a.m.
and 5:00 a.m.; and *World News This Morning,* broad-
cast weekdays between 5:00 a.m. and 6:00 a.m. In
addition, ABC News broadcasts *Good Morning
America* every weekday between 7:00 a.m. and 9:00
a.m. *Good Morning America* is a morning news and
entertainment show with a variety of programming,
including brief reports of the current news of the day,
interviews, commentary, and feature programming.
*See* Declaration of Griffith Foxley ¶¶ 3-4; Affidavit
of Eileen Murphy ¶¶ 3-4.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)**
**(Cite as: 2001 WL 1518264 (S.D.N.Y.))**

ABC News also operates NewsOne, a news video wire service. NewsOne distributes television news stories, including some news stories broadcast on ABC News programs, to subscriber news organizations.[FN2] Most NewsOne subscribers are ABC affiliates and the local stations indirectly owned by ABC's parent company. The subscribers may only use the NewsOne provided stories on their local news programs, and only within 40 hours and/or once within a week of its distribution by NewsOne. *See* Declaration of Don Dunphy, Jr. ¶¶ 3-6.

> FN3. NewsOne charges a weekly subscriber fee for all NewsOne news broadcasts distributed that week. The fee is not related to the content of the news stories.

*2 Defendant CBS, a television and radio broadcasting corporation, is the indirect parent of CBS Broadcasting, Inc. which operates the CBS Television Network. The CBS Television Network distributes programming to its affiliates and to 16 local television stations owned and operated by CBS. CBS News is a division of CBS Broadcasting Inc. which produces news programming for the CBS Television Network, including *CBS This Morning* (currently *The Early Show* ) and *Up to the Minute,* its overnight news program show. These shows principally are dedicated to stories that occurred within the previous 24 hours or "day-of-air" stories. CBS also operates *CBS NewsPath,* a satellite television news "wire" service that distributes breaking news programming to subscribers, most of whom are CBS affiliates or the local stations owned and operated by CBS Broadcasting Inc. *See* Declaration of Helen M. Gold ¶¶ 2-4; Deposition of Andrew M. Sturchio at 16-17; 19; 45-56; 48.

FACTS

The following facts are undisputed or taken in light most favorable to Plaintiff. *G.I. Joe* is a 108 minute long World War II motion picture about American infantry soldiers as seen through the eyes of Ernie Pyle, the famed World War II correspondent.[FN4] It starred Burgess Meredith as Ernie Pyle. Mitchum played a supporting role as Lieutenant Walker for which he received an Academy Award nomination for Best Supporting Actor.[FN5] *G.I. Joe* was released in 1945 in theaters across the United States. Since

then, it has been shown in its entirety on television on numerous occasions.[FN6]

> FN4. *G.I. Joe* was produced in 1945 by Lester Cowan. It was originally copyrighted on August 17, 1945 and filed in the Copyright Office at L-13455, with the renewal dated November 20, 1972 and filed with the Copyright Office at R 540453. Cowan passed the copyright by his the Last Will and Testament, dated September 28, 1991, to his wife Ann Ronell, who, in turn, bequeathed it to the University of Southern California ("USC") by her Last Will dated September 5, 1991. *See* Stern Aff. ¶¶ 7; 11.

> FN5. This was Mitchum's only Academy Award nomination.

> FN6. Although Stern is "familiar with every aspect of [*G.I. Joe's* ] history since its creation" and was the distributer of the television photoplays, he does not know "with factual certainty" the number of times *G.I. Joe* has been broadcasted on television. *See* Stern Aff. ¶¶ 9-10. Nonetheless, he testified that the movie probably had been shown on television over 50 times. *See* Stern Dep. at 33-34.

*Plaintiff's Purchase of G.I. Joe*

On July 1, 1997, Mitchum passed away. Prior to then, beginning in early 1997, Stern had begun negotiating with USC to purchase *G.I. Joe,* as well as two other films. As of July 1, 1997, the parties had exchanged various proposals, but no agreement had been reached. Nonetheless, Stern, anticipating that news organizations would air Mitchum obituaries containing clips from *G.I. Joe,* [FN7] spent approximately 10 hours in front of two television sets that evening and the next morning, flipping through news broadcasts and the morning shows of seven VHF television stations to determine what stations were showing clips from *G.I. Joe* in their obituaries. While doing so, he measured "the extent of the infringing uses of *G.I. Joe* " with a wrist watch and made notes of each time he saw a clip of *G.I. Joe* in a Mitchum obituary. He saw obituaries containing *G.I. Joe* clips on 6 out of the 7 stations he watched. *See* Stern Aff. ¶¶ 13-14; Stern Dep. at 53-59; 214-17; 237-41; 263-68; Con-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
**(Cite as: 2001 WL 1518264 (S.D.N.Y.))**

tinued Deposition of Larry Stern ("Stern Dep. II") at 5-9; 21-27 (attached as Ex. 10 to ABC's Statement of Undisputed Material Facts); Declaration of Nathan Seigel Ex. H.

> FN7. Stern believed that news organizations would run clips from *G . I. Joe* because it was the only movie for which Mitchum was nominated for an Academy Award. *See* Stern Dep. 216-17.

Thereafter, in September, 1997, Stern sent a revised draft contract proposal to USC-the first since he saw the obituaries. Apparently, this draft contained two new provisions granting Stern retroactive rights in the film to March, 1997, including the rights to bring any infringement claims available as of that date.[FN8] This Court notes that prior to July, 1997, none of the exchanged draft proposals had contained provisions providing for the purchase of any retroactive rights. *See* Stern Dep. at 50-57; 244-46; 250-52.

> FN8. Stern alleges that he informed USC that infringing clips of *G . I. Joe* had aired on news broadcasts, and "USC gave [his] corporation the express right to pursue these infringements ..." *See* Stern Aff. ¶ 15.

**\*3** Ultimately, Stern purchased *G.I. Joe,* with the retroactive rights, as well as the other two movies. According to Defendants, the day Stern received the executed contract from USC, he sent letters to approximately 12 different news organizations requesting payment (of $5,000 or 10,000 each) for use of *G.I. Joe* in their Mitchum obituaries. Some of these organizations had not even aired clips from *G.I. Joe.* All of the news organizations that had aired clips from the movie responded that the use of the clip was fair. *See* Stern Aff. ¶ 18; Stern Dep. at 87-88.

*Defendants' Obituaries*

CNN had prepared an obituary for Mitchum a few months prior to his death. The obituary lasted 2 minutes 50 seconds and detailed Mitchum's acting career as well as other newsworthy aspects from his life, including, among other things, his 57 year marriage to Dorothy Spence. The obituary used film clips from *G.I. Joe* and at least 8 other movies.[FN9]

> FN9. The clip from *G.I. Joe* was obtained from a Mitchum documentary entitled *Robert Mitchum: The Reluctant Star,* which the CNN journalist who prepared the obituary received from another reporter, who had purchased it from a video store.

During the middle of the obituary, a 17-second clip from *G.I. Joe* airs, without sound, as the correspondent states that "[i]n 1945 Mitchum earned an Academy Award nomination-his only one-for Best Supporting Actor in [*G.I. Joe* ]." The clip then shows Mitchum speaking one line from *G.I. Joe.* CNN aired its Mitchum obituary approximately 10 times on its 3 networks between the afternoon of July 1, 1997 and the morning of July 2, 1997.

Upon learning of the news of Mitchum's death, ABC News prepared three obituaries for its daily news broadcasts-all of which were aired within 24 hours of Mitchum's death. Each obituary contained clips from 7-10 Mitchum films, including *G.I. Joe.*[FN10] The *G .I. Joe* clips ranged from 9 to 20 seconds in length. The first obituary aired on *World News Tonight With Peter Jennings* at 6:30 p.m. EDT. It was 55 seconds long and contained a 9 second clip from one scene of *G.I. Joe* in which the camera focused exclusively on Mitchum. During the 9 second clip the movie's original sound was replaced by the anchor stating that "Mitchum was nominated for an Academy Award for his role in 'The Story of G.I. Joe,' which launched him into stardom in 1945."

> FN10. ABC's clip from *G.I. Joe* likewise was obtained from *Robert Mitchum: The Reluctant Star,* which ABC News had rented from a local video store. *See* Affidavit of Elizabeth Tribolet ¶ 8; Deposition of Kate O'Brian at 13-14.

ABC broadcast its second Mitchum obituary on July 2, 1997 at about 3:00 a.m. EDT on *World News Now,* and again at around 5:00 a.m. EDT. It lasted 1 minute 53 seconds and included an 18 second clip of Mitchum from *G.I. Joe.* The original sound was eliminated from 9 seconds of the clip while the correspondent explained that Mitchum "reached stardom in 1945 with *G.I. Joe* " for which "he was nominated for an Oscar as best supporting actor, but did not win ." The other 9 seconds of the clip had Mitchum speaking one line from the film.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
**(Cite as: 2001 WL 1518264 (S.D.N.Y.))**

ABC's last Mitchum obituary aired on *Good Morning America* shortly after 8:00 a.m. on July 2, 1997. It was 1 minute and 44 seconds in length including a 20 second clip from *G.I. Joe.* Ten of the 20 seconds of the original sound were inaudible as the correspondent explained that "[Mitchum] found the most success when cast as a rugged military man. His 1945 portrayal of an Army captain in 'The Story of GI Joe' earned him his only Oscar nomination." [FN11]

> FN11. Adding the length of the clips from the 3 different shows, Plaintiff states that the overall use of *G.I. Joe* by ABC was 47 seconds. Stern Aff. ¶ 12.

**\*4** On July 12, 1997, NewsOne distributed the ABC News Mitchum obituaries to its subscribers. It also distributed a Mitchum obituary that aired on KABC-TV, a NewsOne subscriber. [FN12] That obituary lasted 1 minute 40 seconds, including a 22 second clip of *G.I. Joe,* of which 11 seconds of the original sound was inaudible.

> FN12. KABC-TV is not a Defendant to this lawsuit.

CBS prepared separate Mitchum obituaries containing clips of *G.I. Joe* for *CBS This Morning* and for *Up To The Minute.* [FN13] CBS aired one of the Mitchum obituaries on *Up To The Minute* at 4:38 a.m. EDT on July 2, 1997. The obituary, which was 1 minute 59 seconds long, contained a 6 second clip of Mitchum's performance in *G.I. Joe.* During these 6 seconds, the sound from the original movie was replaced by the correspondent describing the significance of the film to Mitchum's career. Specifically, the clip airs in the middle of the obituary while the correspondent explained: "It was *G.I. Joe* that made him a star. His portrayal of Lieutenant Walker in the film earned him an Oscar nomination for best supporting actor." The obituary also explained other newsworthy aspects of Mitchum's life. It was re-broadcast at 7:38 a.m. EDT on July 2, 1997, for the benefit of CBS's West Coast affiliates, and was retransmitted on *CBS NewsPath.*

> FN13. In doing so, the news producers obtained footage from Mitchum's films from the CBS News archives. Included in the archives was a tape of the *49th Annual Golden Globe Awards* show, which contained a tribute to Mitchum for receiving the Cecil B. DeMille Award for outstanding contribution to the entertainment field. The Mitchum tribute contained an excerpt from *G.I. Joe,* among other films. CBS incorporated a portion of this excerpt into its Mitchum obituaries.

On July 2, 1997 at 7:48 a.m. EDT, *CBS This Morning* broadcast its Mitchum obituary. The obituary lasted for 1 minute 53 seconds and included a 14 second clip from *G.I. Joe.* During the first 9.5 seconds of the clip, the original sound was muted while the correspondent noted that: "Mitchum's powerful performance as a rough but weary lieutenant in [*G.I. Joe* ] earned him his only academy award nomination." The rest of the clip has Mitchum speaking one line from the movie.

Two shorter versions of the *CBS This Morning* obituary ran on the show at 7:01 a.m. and 7:11 a.m EDT. These obituaries, which were 16 seconds and 26 seconds long respectively, each contained an identical clip of less than 6 seconds from *G.I. Joe,* and did not use the audio from the original movie. The *CBS This Morning* obituaries were not rebroadcast by CBS or retransmitted by *CBS NewsPath.*

*The Instant Motion*

As previously noted, Stern sent letters to different news organizations, including Defendants, requesting payment for the use of *G.I. Joe* in their Mitchum obituaries. [FN14] All of the news organizations that actually had used clips of *G.I. Joe* in their obituaries responded that their use was fair. Thereafter, Plaintiff commenced this action for copyright infringement and unfair competition. Defendants now move for summary judgment on the grounds that the use of the clips from *G.I. Joe* was a fair use under 17 U.S.C. § 107.

> FN14. This Court notes that no one who owned any copyright interests in any of the Mitchum clips from other films used in any of Defendants' obituaries ever objected to their use. The only complaint that Defendants ever received about the Mitchum obituaries came approximately 9 months later, in March, 1998, when Stern wrote let-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
**(Cite as: 2001 WL 1518264 (S.D.N.Y.))**

ters to Defendants requesting a fee.

### DISCUSSION [FN15]

FN15. Plaintiff asserts that Defendants' ar-
guments for their motions are based on
unsworn documents containing allegations
by counsel. Since under Rule 56(e) of the
Federal Rules of Civil Procedure, summary
judgment motions must be supported by the
personal knowledge of a declarant or affiant,
and not by statements from counsel, Plaintiff
argues that Defendants motion should be
denied. Plaintiff's argument is without merit.
It is clear from reading the declarations and
affidavits that they are made from the per-
sonal knowledge of the declarant or affiant.
Indeed, all of these sworn statements state
that the undersigned is familiar with the
facts of this action. To the extent that Plain-
tiff's argument is that Defendants' sworn
documents must contain the words "personal
knowledge," it is unavailing. *See Texaco
A/S, S.A. v. Commercial Ins. Co. of Newark,
1995 WL 628997 at *2 (S.D.N.Y.1995),
rev'd on other grounds, 160 F.3d 124 (2d
Cir.1998).* Furthermore, this Court notes that
Defendants' attorneys' declarations do not
contain allegations in support of their mo-
tions, but simply attach exhibits in support
of their statements of facts and memoranda
of law.

*The Copyright Claims*

For purposes of this motion alone, Defendants do not
contest the validity of Plaintiff's copyright in *G.I. Joe.*
Accordingly, this Court will assume that Plaintiff's
copyright is valid.

**\*5** The Copyright Act grants copyright owners cer-
tain exclusive rights, including the right "to repro-
duce the copyrighted work in copies." 17 U.S.C. §
106. Notwithstanding this, "the fair use of a copy-
righted work ... for purposes such as criticism, com-
ment, news reporting, teaching (including multiple
copies for classroom use), scholarship, or research, is
not an infringement of copyright." 17 U.S.C. § 107.
Thus, the fair use doctrine permits the reasonable use
of copyrighted materials, without the permission of
the copyright owner, as long as it is for one of the

purposes enumerated in § 107. *Maxtone-Graham v.
Burthchell,* 803 F.2d 1253, 1255 (2d Cir.1986); *see
Leibovitz v. Paramount Pictures,* 137 F.3d 109, 112
(2d Cir.1998).

"Fair use is a mixed question of law and fact." *Wright
v. Warner Books, Inc.,* 953 F.2d 731, 735 (2d
Cir.1991) (citing *Harper & Row, Pub., Inc. v. Nation
Enterprises Inc.,* 471 U.S. 539, 560 (1985)). None-
theless, courts can resolve fair use determinations on
summary judgment motions. *Id.* " '[T]he mere fact
that a determination of the fair use question requires
an examination of the specific facts of each case does
not necessarily mean that in each case involving fair
use there are factual issues *to be tried.*" ' *Id.* (cita-
tions omitted).

Whether use of the copyrighted material is fair re-
quires a case-by-case determination "within the con-
text of the four non-exclusive factors enumerated in
section 107." *Wright,* 953 F .2d at 735 (citing *Harper
& Row,* 471 U.S. at 549). These factors are:

(1) the purpose and character of the use, including
whether such use is of a commercial nature or is
for nonprofit educational purposes; (2) the nature
of the copyrighted work; (3) the amount and sub-
stantiality of the portion used in relation to the
copyrighted work as a whole; and (4) the effect
of the use upon the potential market for or value of
the copyrighted work.

17 U.S.C. § 107. While, Defendants have the burden
of proving that their potentially infringing use was
fair, *see Infinity Broadcast Corp. v. Kirkwood,* 150
F.3d 104, 107 (2d Cir.1998), Defendants need not
establish that all of the factors favor them. *See
Wright,* 935 F.2d at 740. In addition, none of the
above factors is dispositive to this Court's analysis.

Before analyzing the fair use factors, however, this
Court first addresses Plaintiff's assertion that, under
*Roy Export* and *Harper & Row,* any use of copy-
righted material must be essential or an actual neces-
sity to qualify as fair use. Specifically, Plaintiff ar-
gues that because Defendants could have obtained
still photos of Mitchum from the public domain and
used them for their obituaries, Defendants' fair use
defense must fail. This Court disagrees. As correctly
noted by Defendants, neither *Roy Export* nor *Harper
& Row* stand for that proposition. *See Roy Export*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
**(Cite as: 2001 WL 1518264 (S.D.N.Y.))**

*Company Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting System, Inc.,* 672 F.2d 1095, 1099-1100 (2d Cir.1982); *Harper & Row,* 471 U.S. at 555-560. In fact, the portion of the opinions on which Plaintiff relies do not address the fair use doctrine. *See id.* Instead, they are concerned with whether there exists a First Amendment privilege to use copyrighted material beyond what is permitted by the fair use doctrine, which for the purpose of this Court's analysis is irrelevant. *See Roy Export,* 672 F.2d at 1099-1100; *Harper & Row,* 471 U.S. at 555-560.

*Purpose and Character of Use*

**\*6** The first fair use factor is the purpose and character of Defendants allegedly infringing use. To determine the purpose and character of the use, this Court must consider whether the material was used for one of the purposes set forth in § 107, and whether it was used for a meaningfully different or "transformative" purpose than the original. *Campbell v. Acuff-Rose Music,* 510 U.S. 569, 579 (1994). In addition, although far from dispositive, this Court should consider whether Defendants are for-profit or not-for-profit entities. *Id.*

First, Defendants clips of *G.I. Joe* were used in connection with news reports of the death of Mitchum. Thus, they were used for one of the purposes set forth in § 107. It is well settled that where the Defendants' use is for one of the purposes set forth in the statute, there is a strong presumption this factor favors the alleged infringer. *Arica Institute, Inc. v. Palmer,* 970 F.2d 1067, 1077 (2d Cir.1992) (citing *Wright,* 953 F.2d at 737). Indeed, the Second Circuit has stated that " "[i]f a [work] falls into one of these categories ... assessment of the first fair use factor should be at an end." " *Wright,* 953 F.2d at 736 (citations omitted).

Second, in order to determine whether a work is transformative, this Court looks to whether the new work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell,* 510 U.S. at 579 (citations omitted). This Court finds that the obituaries are transformative works as they do not intend to supersede *G.I. Joe,* but rather to create a new work. *See Hofheinz v. AMC Productions* 2001 LEXIS 1591 at *25 (E.D.N.Y.2001). Simply stated, Defendants' use of the clips from *G.I. Joe* was for an

entirely new purpose and character than the original film. While Plaintiff's copyrighted work intended to entertain its audience, as well as to inform them of the reality that American infantrymen faced in World War II, Defendants' obituaries aimed to inform the viewing public of Mitchum's death and educate them regarding his impact on the arts. *See id.; Hofheinz v. A & E Television Networks,* 146 F.Supp.2d 442, 446-47 (S.D.N.Y.2001). Moreover, defendants' clips were used because of their relevance to Mitchum and not to convey a synopsis of the original film. [FN16] Just as parody must mimic the original work to make its point, and biographers are permitted to quote their subjects, so too should obituaries about actors be allowed to show reasonable clips of their work. *Hofheinz,* 2001 LEXIS 1591 at *26 (citing *Campbell,* 510 U.S. at 580-81; *New Era Publications, Int'l v. Carol Pub. Group,* 904 F.2d 152, 156 (2d Cir.1990) ( "*New Era II*")).

> [FN16.] For Instance, CNN's clip of *G.I. Joe* has Mitchum telling a soldier to dig a latrine.

Finally, this Court should consider the fact that Defendants are for-profit entities. Plaintiff argues that this fact weighs against a finding of fair use. This Court disagrees. As previously noted, the commercial nature of Defendants is not dispositive for finding against fair use. *See Campbell,* 510 U.S. at 584. Courts should look to see whether the new work will be used for a purpose favored by the statute rather than Defendants' status as a for-profit entity. *Id.* (if "commercially carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107 ... since these activities 'are generally conducted for profit' "). This is true especially where, as here, the new work is transformative in nature. *Id.* at 579 (noting that the more transformative a new work, the less significant will be the other factors, such as commercialism, that may weigh against a finding of fair use); *see also Arica* 970 F.2d at 1078; *Infinity Broadcast Corp.,* 150 F.3d at 108. Otherwise, as correctly noted by Defendants, the fair use doctrine would be limited to not-for-profit entities. *Arica* 970 F.2d at 1078.

**\*7** In sum, based upon the above, this Court finds that the purpose and character of the obituaries favors a finding of fair use.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
**(Cite as: 2001 WL 1518264 (S.D.N.Y.))**

*Nature of Copyrighted Work*

When analyzing the second factor, courts look to whether the original work previously had been published and whether it is fictional. Creative works are entitled to greater copyright protection than factual works. Here, it is undisputed that *G.I. Joe* is a fictional work. Although this weighs against a finding of fair use, it is not dispositive. *See e.g. Leibovitz,* 137 F.3d at 115 (finding fair use although the original work was creative).

*G.I. Joe* was published through both the release of the film to the public and its appearance on television numerous times.[FN17] *See Shoptalk, Ltd. v. Concorde-New Horizons Corp.,* 168 F.3d 586, 591 (2d Cir.1999); *Hofheinz,* 2001 LEXIS 1591 at *27. Since Defendants did not usurp the first publication rights in *G.I. Joe,* they enjoy a slightly wider degree of latitude in making their fair use claim. *See Hofheinz,* 2001 LEXIS 1591 at *27 (citing *Campbell,* 510 U.S. at 586); *see also Harper & Row,* 471 U.S. at 564 (noting that unpublished works are entitled to greater protection than published works); *New Era Publications Int'l v. Henry Holt & Co.,* 873 F.2d 576, 583 (2d Cir.1989). Indeed, the Second Circuit has found that where the plaintiff's work has already been published, this fact alone supports a finding of fair use under the second statutory factor. *See Arica,* 970 F.2d at 1078. Based upon the above reasoning, this court finds that the second factor is neutral or, at best, slightly favors a finding against fair use.

> FN17. Plaintiff argues that under the 1909 Copyright Act (which, according to Plaintiff, governs), *G.I. Joe* was not "generally published," but rather only had a "limited publication." That distinction is irrelevant to the fair use doctrine, which is concerned only with whether the work has been published at all. *See Harper & Row,* 471 U.S. at 555. By contrast, the distinction between "general" and "limited" publication concerns whether a work that existed prior to the 1976 Act was published in a manner which divested it of any form of copyright protection, or published in a manner whereby it still enjoyed common law copyright protection. *See Estate of Martin Luther King v. CBS Inc.,* 194 F.3d 1211, 1214 (11th

Cir.1999).

*Amount and Substantiality of Portion Used*

The third factor looks to "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This factor has both a "quantitative and a qualitative" aspect to it. *Wright,* 953 F.2d at 738 (internal citations omitted). Thus, this Court must consider whether the clips formed a significant percentage of the original film, as well as whether the clips were essentially the heart of the film. *See id.* at 738; *New Era II,* 904 F.2d at 158. Courts also have considered "whether the quantity of the material used was 'reasonable in relation to the purpose of the copying.'" ' *American Geophysical Union v. Texaco, Inc.,* 60 F.3d 913, 926 (2d Cir.1994) (citing *Campbell,* 510 U.S. at 586).

The length of the clips used by Defendants were far from substantial, especially in comparison to the overall length of the film.[FN18] Indeed, the clips ranged from 6 to 22 seconds, or less than 1 percent, of the 108 minute long film. Such *de minimus* amounts of a full-length feature film favor a finding of fair use.[FN19] *See Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.,* 166 F.3d 65, 71 (2d Cir.1999) (stating that a "[d]e minimis infringement of a copyrighted work is not actionable"); *Hofheinz v. A & E Television Networks,* 146 F.Supp.2d at 448.

> FN18. As previously noted, Plaintiff states that this court should consider the aggregate length of the clips used by the individual Defendants. *See supra* at 9 n. 9. For instance, according to Plaintiff, ABC's total use was 47 seconds. This Court has considered the total use of the clips and finds that it does not change the result.

> FN19. The Second Circuit consistently has found fair use in cases where only a small portion of the original work was used. *See Leibovitz,* 137 F.3d 109; *Arica,* 970 F.2d at 1079; *Wright,* 953 F.2d at 740; *New Era II,* 904 F.2d at 59; *Maxtone-Graham,* 803 F.2d at 1263.

**\*8** Nor do the clips constitute the "heart" of the film. Taking the heart of a work means taking the key informational or creative component that serves as a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
**(Cite as: 2001 WL 1518264 (S.D.N.Y.))**

substitute for the original. See *Harper & Row,* 471 U.S. at 564-65. This is not the case here. Plaintiff argues that the scene from which ABC and CBS took their clips was the essence of *G.I. Joe* because it was an important scene in which Mitchum's character is in a dugout talking to Burgess Meredith's character, Ernie Pyle about sending death notices to soldier's mothers. However, the information that Plaintiff claims makes this scene important was not conveyed by the small fraction of the scene used by ABC and CBS. The clips gave no indication that Mitchum was discussing writing letters to dead soldiers' mothers, or even that the film had anything to do with Ernie Pyle. Nor can CNN's clip-a scene in which Mitchum tells a soldier to dig a latrine-be described as the heart of *G.I. Joe.*

Finally, Defendants' use was reasonable in relation to the purpose of the copying. Defendants' obituaries sought to effectively detail Mitchum's career-a task which required some exhibition of actual movie clips. See *Hofheinz,* 2001 LEXIS 1591 at *31. The clips used by Defendants related solely to Mitchum's performance and did not distill or reflect the entire movie. In addition, the original sound was completely inaudible for some of the clips and partly eliminated in the others. Based on the above, this Court finds that Defendants' use was reasonable to produce their obituaries. Accordingly, the amount and substantiality of clips in the obituaries favors a finding of fair use.[FN20]

> FN20. Plaintiff contends that "the overall aggregate broadcasts must be considered" when analyzing this factor. This Court disagrees. This factor measures the extent of Defendants' use "in relation to the copyright work," 17 U.S.C. § 107(3), not whether it was widely distributed. See *Wright,* 953 F.2d 731; *Mathieson v. Associated Press,* 1992 WL 164447 (S.D.N.Y.1992).

*Effect of Use upon Potential Market*

The fourth factor focuses on the effect Defendants' use will have upon the potential market for or value of the copyrighted work. 17 U .S.C. § 107(4). This factor asks whether the challenged use competes with, by providing a substitute for, either the original copyrighted work, or derivative works that a copyright owner would traditionally expect to create or

commission. *New Era II,* 904 F.2d at 159-60. In analyzing this factor, this Court must consider whether "widespread conduct of this sort would have a substantial impact on the market for the original." *Campbell,* 510 U.S. at 590; see also *Harper & Row,* 471 U.S. at 566-67 (" 'Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." ') (citations omitted); *Infinity Broadcast Corp.,* 150 F.3d at 110 (noting that this factor is concerned with the possible usurpation of a "market that properly belongs to the copyright-holder"). If the allegedly infringing use "is not in competition with the copyrighted use," the fair use defense is ordinarily sustained. *Italian Books Corp. v. American Broadcasting Cos., Inc.,* 458 F.Supp. 65, 70 (S.D.N.Y.1978).

Here, there is nothing before this Court that suggests that Defendants' obituaries competed with or reduced the market for Plaintiff's film. In fact, Stern himself acknowledged that the obituaries did not have an impact on the market for the entire original film. See Stern Dep. II at 40; 47-49; 63. This Court therefore finds that the alleged infringing clips "are too few, too short, and too small in relation to the whole" to undercut the market for the film.[FN21] *Monster Communications, Inc. v. Turner Broadcasting Systems, Inc.,* 935 F.Supp. 490, 495 (S.D.N.Y.1996). Where, as here, Defendants have produced a transformative work that would otherwise qualify for fair use, and Defendant's work does not interfere with the market for the original, the fourth factor favors the defendant as a matter of law. See *Leibovitz,* 137 F.3d at 116-17.

> FN21. Indeed, it is possible that the obituaries could have increased market demand for the film.

*9 Plaintiff claims that it will be deprived of a licensing fee for the use of its film if Defendants' use is deemed fair. This argument, however, fails to establish market impairment under this factor. A copyright plaintiff "is not entitled to a licensing fee for a[use] that otherwise qualifies for the fair use defense." *Leibovitz,* 137 F.3d at 117; see *Ringgold v. Black Entertainment Television, Inc.,* 126 F.3d 70, 81 (2d Cir.1997). In addition, since every copyright infringer who seeks to avail herself of the fair use doctrine potentially could have sought a license from the owner of the infringed work, Plaintiff's argument, if

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1518264 (S.D.N.Y.)
**(Cite as: 2001 WL 1518264 (S.D.N.Y.))**

taken to its logical conclusion, would render this fac-
tor obsolete because it would favor the copyright
owner in every case. *See Ringgold,* 126 F.3d at 81.
The point of the fair use doctrine is that, in certain
circumstance, such as the one before this Court, the
law will not require an infringer of a copyrighted
work to obtain such a license. *See Rosemont Enter-
prises, Inc. v. Random House, Inc.,* 366 F.2d 303, 306
(2d Cir.1966).

Moreover, even for non-transformative uses of entire
works, consideration of licensing revenues is not
permitted absent evidence that a regular traditional
market exists for the specific use at issue. *See
Ringgold,* 126 F.3d at 79. This Court finds that there
is not a regular traditional market for obituaries. Ac-
cording to Defendants, between the three of them,
only once in the last five years have they paid for a
licensing fee for use of a film clip in obituaries. In
addition, Defendants note that in Stern's 38 years in
the industry, he has received only 3 other small set-
tlement payments from other stations (to avoid litiga-
tion) for use of his clips in obituaries.

In sum, this court finds that the public would be hin-
dered by denying Defendants' fair use defense. De-
fendants created obituaries that detail Mitchum's life
and his impact on the arts. The obituaries contain
information which, if the general public does not find
interesting, at the very least, movie aficionados
across the country will find informative. *See
Campbell,* 510 U.S. at 578 n. 10. Accordingly, the
fourth factor also favors a finding of fair use.

Having considered the four factors set forth in the 17
U.S.C. § 107, this Court holds that the balance of
factors favors a finding of fair use. *See Wright,* 953
F.2d at 740 (district court correctly granted defen-
dants summary judgment where three of the four fac-
tors clearly favored the defendants); *Leibovitz,* 137
F.3d 109; *Arica* 970 F.2d 1067. Accordingly, Defen-
dants' motions for summary judgment on Plaintiff's
copyright claims are granted.

*The Unfair Competition Claims*

Defendants' summary judgment motions for Plain-
tiff's unfair competition claims are granted as well.
Plaintiff's unfair competition claims are based on the
same conduct as its copyright claims, and thus are
preempted by federal law. *See Oboler v. Goldin,* 714

F.2d 211, 213 (2d Cir.1983); *see also Richard Feiner
& Co.,* 10 F.Supp.2d 310, 316 (S.D.N.Y.1998) ("Sec-
tion 301 of the Copyright Act provides for preemp-
tion of all state claims that are tantamount to those
falling within the scope and subject matter of copy-
right").

CONCLUSION

*10 For the reasons set forth above, Plaintiff's
Lanham Act claims are DISMISSED. Defendants'
motions for summary judgment are GRANTED. The
Clerk of the Court is ORDERED to close these cases.

SO ORDERED:

S.D.N.Y.,2001.
Video-Cinema Films, Inc. v. Cable News Network,
Inc.
Not Reported in F.Supp.2d, 2001 WL 1518264
(S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 10

Westlaw

Not Reported in F.Supp.2d, 2007 WL 324592 (D.Colo.)
**(Cite as: 2007 WL 324592 (D.Colo.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
D. Colorado.
Suzanne SHELL, Plaintiff,
v.
Jolene DEVRIES, Anna Hall Owen, and Unknown
Defendant Doe, Defendants.
**No. Civ. 06-CV-00318-REB.**

Jan. 31, 2007.

Suzanne Shell, Elbert, CO, pro se.

Daniel Bernard Slater, Law Offices of Dan Slater,
Canon City, CO, for Defendants.

ORDER ADOPTING RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

BLACKBURN, J.

**\*1** This matter is before me on: 1) the defendants'
Motion to Dismiss Pursuant to F.R.C.P. Rule
12(b)(6) and for Attorneys' Fees and Costs Pursuant
to 17 U.S.C. § 505; and 2) the Recommendation of
the United States Magistrate Judge [# 19], filed De-
cember 15, 2006. The Magistrate Judge recommends
that the motion to dismiss be granted. The plaintiff
filed an objection to the recommendation [# 21] on
December 28, 2006, and the defendants filed a re-
sponse to the plaintiff's objection [# 22] on January 8,
2006. I have reviewed each of these filings, as well as
the balance of the record in this case.

As required by 28 U.S.C. § 636(b), I have reviewed
*de novo* all portions of the recommendation to which
objections have been filed, and have considered care-
fully the recommendation, the objection, and the ap-
plicable case law. In addition, because the plaintiff is
proceeding *pro se,* I have construed her pleadings
more liberally and held them to a less stringent stan-
dard than formal pleadings drafted by lawyers. *See
Hall v. Belmon,* 935 F.2d 1106, 1110 (10th Cir.1991).
Plaintiff's objection is without merit. The recommen-
dation is detailed and well-reasoned. Therefore, I find
and conclude that the arguments advanced, the au-

thorities cited, and the findings of fact, conclusions of
law and recommendation proposed by the Magistrate
Judge should be approved and adopted.

THEREFORE, IT IS ORDERED as follows:

1. That the recommendation of Magistrate Judge
Boland [# 19], filed December 15, 2006, is AP-
PROVED AND ADOPTED as an order of this court;

2. That the defendants Motion to Dismiss Pursuant to
F.R.C.P. Rule 12(b)(6) and for Attorneys' Fees and
Costs Pursuant to 17 U.S.C. § 505; is GRANTED;

3. That the plaintiff's first claim for relief is DIS-
MISSED under FED. R. CIV. P. 12(b)(6) for failure
to state a claim on which relief can be granted;

4. That under 28 U.S.C. § 1367(c)(3), the court DE-
CLINES to exercise supplemental jurisdiction over
the plaintiff's second and third claims for relief, both
of which are claims under state law; and

5. That this case is DISMISSED.

Dated January 30, 2007, at Denver, Colorado.

RECOMMENDATION OF UNITED STATES
MAGISTRATE JUDGE

BOLAND, Magistrate J.

This matter is before me on the Motion to Dismiss
Pursuant to F.R .C.P. Rule 12(B)(6) and for Attor-
neys' Fees and Costs Pursuant to 17 U.S.C. § 505
[Doc. # 5, filed 3/17/06] (the "Motion"). I respect-
fully RECOMMEND that the Motion be GRANTED
insofar as its seeks dismissal of this case and DE-
NIED to the extent it seeks an award of attorneys'
fees.

I. STANDARD OF REVIEW

The plaintiff is proceeding *pro se.* I must liberally
construe the pleadings of a *pro se* plaintiff. *Haines v.
Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 324592 (D.Colo.)
**(Cite as: 2007 WL 324592 (D.Colo.))**

L.Ed.2d 652 (1972). Nevertheless, I cannot act as advocate for a *pro se* litigant, who must comply with the fundamental requirements of the Federal Rules of Civil Procedure. *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991).

**\*2** In ruling on a motion to dismiss, the court must accept the plaintiff's well-pleaded allegations as true, and must construe all reasonable inferences in favor of the plaintiff. *City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 493, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986); *Mitchell v. King,* 537 F.2d 385, 386 (10th Cir.1976). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), overruled on other grounds by *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). A claim should be dismissed only where, without a doubt, the plaintiff could prove no set of facts in support of his claims that would entitle him to relief. *Id.*

## II. BACKGROUND

The plaintiff filed her First Amended Complaint (the "Complaint") on March 6, 2006 [Doc. # 4]. The Complaint contains the following allegations:

1. The plaintiff is the author and copyright owner of an internet website entitled *www.profane-justice.org. Complaint,* ¶ 1, 31.

2. On or about February 24, 2004, the defendants obtained a copy of ten pages of the plaintiff's website, and "transmitted that copy to their computer or computers, without seeking or obtaining [the plaintiff's] permission and without paying license fees and without negotiating a license fee reduction or waiver." *Id.* at ¶¶ 23, 31-32.

3. "The purpose and character of the defendants' use was to seek an order from the court against Shell in the form of an award of Owen's attorney fees and costs." *Id.* at ¶ 36e-f. The defendants attached the material as an exhibit to a motion for attorney fees and costs in Case No. 03-cv-00743-REB-MJW [Doc. # 95, filed February 26, 2004], filed by the plaintiff in this Court on April 25, 2003. *Id.* at ¶¶ 2-4, 36e-f.

The Complaint alleges three causes of action: (1) copyright infringement in violation of 17 U.S.C. §§ 101 et seq.; (2) "civil theft"; and (3) breach of contract. *Id.* at pp. 8-18. The plaintiff seeks monetary and injunctive relief. *Id.* at pp. 18-20.

## III. ANALYSIS

### A. Claim One: Copyright Act

The defendants assert that the use of copyrighted material in judicial proceedings is inherently "fair use" as a matter of law and, therefore, Claim One does not state a claim for infringement of the Copyright Act. *Motion,* pp. 4-6.

The Copyright Act grants a copyright owner exclusive rights in the copyrighted works. 17 U.S.C. § 106. However, the Act contains a "fair use" privilege which allows others to use the copyrighted material in a reasonable manner despite the lack of the owners' consent:

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include-

**\*3** (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. Fair use is a statutory defense to copyright liability. *Id.*

The defendants assert that "[t]he use of copywritten

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 324592 (D.Colo.)
(Cite as: 2007 WL 324592 (D.Colo.))

[sic] material in judicial proceedings is inherently 'fair use' as a matter of law" based on "the plain language of the legislative history surrounding the adoption of the Fair Use' provision." While it is true that both the United States Senate and the United States House of Representatives have recognized that judicial use of copyrighted materials may constitute fair use, S.Rep.No. 94-473, pp. 61-62 (1975); H.R.Rep. No. 94-1476, p. 65 (1976), the United States Supreme Court has clearly stated that fair use must be determined on a case-by-case basis. *Campbell*, 510 U.S. at 577. Thus, the use of copyrighted material in judicial proceedings is not *inherently* fair use. Indeed, the use of copyrighted material in judicial proceedings has been found in some cases *not* to constitute fair use.

In *Images Audio Visual Productions v. Perini Bldg. Co.*, 91 F.Supp.2d 1075 (E.D.Mich.2000), the plaintiff held copyrights for photographs of a construction site. The photographs were intended to serve, among other purposes, as an evidentiary record of progress in the event a dispute occurred during or after construction. When a dispute arose and the parties entered into arbitration proceedings, the construction company made photocopies of the plaintiff's photographs instead of paying the plaintiff for the copies. When sued by the plaintiff for copyright infringement, the construction company argued that its reproduction of the photographs for use in the arbitration proceedings constituted fair use. In determining that the construction company did not make fair use of the photographs, the court distinguished "between copyrighted works that happen to capture information that proves relevant to subsequent litigation, and works that are intended to capture such information, specifically for the purpose of litigation." *Id.* at 1086. The court held that where judicial proceedings are one of the intended markets of the copyrighted work, "the copyright holder is entitled to exercise control over the use of his works within this market; the fair use doctrine does not require the wholesale abandonment of copyright protection at the courthouse door." *Id.*

In contrast, where use of the copyrighted material as evidence in a judicial proceeding does not put the material to its intrinsic use, courts have found fair use of the material. *Religious Technology Center v. Wollersheim*, 971 F.2d 364, 367 (9th Cir.1992) (finding fair use where defendants copied and distributed

religious scriptures from former members of the Scientology Church and gave them to expert witnesses for the purpose of preparing testimony in a state tort litigation); *Jartech v. Clancy*, 666 F.2d 403, 406-07 (9th Cir.1982) (finding fair use where defendants made abbreviated copies of adult movies for use as evidence in a nuisance abatement proceeding).

1. Purpose and Character of the Use

*4 The first factor I must examine is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).

The central purpose of this investigation is to see ... whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative." Although such transformative use is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (internal quotations and citations omitted). Use of the material for the intrinsic purpose for which it was prepared balances the weight of the first factor against fair use.

The Complaint alleges that the content of the website "is intended to generate income" and that "the nature of the infringed work was an exclusive publication containing creative analysis and commentary about events occurring related to the lawsuit." *Complaint*, ¶¶ 21, 36i. The Complaint does not contain any allegations to support a reasonable inference that the defendants used the material for the intrinsic purpose for which it was prepared, *i.e.* that they used the "creative analysis and commentary about events" to generate income. Nor are there any allegations to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 324592 (D.Colo.)
(Cite as: 2007 WL 324592 (D.Colo.))

support a reasonable inference that the defendants'
use of the material was commercial in nature. To the
contrary, the Complaint alleges that the defendants
used the copyrighted portion of the plaintiff's website
as an exhibit to a motion for attorneys' fees. There
are no allegations that the defendants used the materials
for any other purpose. Thus, the first factor weighs
heavily in favor of fair use.

2. The Nature of the Copyrighted Work

The second factor to consider is the "nature of the
copyrighted work." 17 U.S.C. § 107(2). "In general,
fair use is more likely to be found in factual works
than in fictional works." *Stewart v. Abend,* 495 U.S.
207, 237, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990).
"The law generally recognizes a greater need to dis-
seminate factual works than works of fiction or fan-
tasy." *Harper & Row, Publishers, Inc. v. Nation
Enterprises,* 471 U.S. 539, 563, 105 S.Ct. 2218, 85
L.Ed.2d 588 (1985).

The materials are entitled "Lawsuit in United States
District Court for the District of Colorado Civil Ac-
tion No. 03-RB-1743(MJW)." *Complaint,* second
consecutive attachment, p. 1. The materials provide a
time-line of events leading up to the lawsuit as well
as a time-line of events that occurred during the law-
suit. Because the materials are primarily a chronol-
ogy of events, the materials are more factual in nature
than creative.[FN1] Thus, the second factor also weighs
in favor of fair use.

> FN1. The plaintiff alleges in the Complaint
> that the materials are "singularly creative,
> containing insightfully unique results of her
> research which is not available from any
> other source, as well as containing editorial
> commentary, discussion, analysis, and legal
> documents which are not generally available
> anywhere else." *Complaint,* ¶ 36h. The
> plaintiff attaches the materials to the Com-
> plaint. The materials are simply a chronol-
> ogy of the plaintiff's version of the events
> surrounding her lawsuit.

3. Amount and Substantiality of the Portion Used

*5 The third factor I must examine is "the amount
and substantiality of the portion used in relation to
the copyrighted work as a whole." 17 U.S.C. §

107(3). The Complaint alleges that the defendants
"obtained a copy of a significant chapter of Shell's
website, specifically 10 pages dealing with Shell's
civil rights lawsuit against Owen...." *Complaint,* ¶ 23.
The Complaint further alleges that "[t]he amount and
substantiality of the work infringed consisted of the
entire content involving Fremont County and Shell's
competitors in Fremont County. This content was
meant to stand alone as a complete representation of
the concept explored." *Id.* at ¶ 36j. It is unclear from
the allegations of the Complaint exactly how much of
the website was used, and how substantial the used
portion is in relation to the entire website.

Even if I assume that the entire website was used,
"the fact that an entire work was copied does not ...
preclude a finding of fair use." *Sega Enterprises Ltd.
v. Accolade, Inc.,* 977 F.2d 1510, 1526 (9th Cir.1992).
Where the use of the work was limited, as it was
here, the third factor carries very little weight. *See id.*
at 526-27.

4. Effect on the Market

The fourth factor focuses on "the effect of the use
upon the potential market for or value of the copy-
righted work." "This last factor is undoubtedly the
single most important element of fair use." *Harper &
Row,* 471 U.S. at 566. "Fair use, when properly ap-
plied, is limited to copying by others which does not
materially impair the marketability of the work which
is copied." *Id.* at 566-67.

The Complaint alleges only that the defendant's use
of the materials deprived the plaintiff of the income
from defendants for the license fees. *Complaint,* ¶
36k. The Complaint does not allege that the market-
ability of her work is impaired. Indeed, it is impossi-
ble to imagine how the defendants' use of the materi-
als as an exhibit to a motion for attorneys' fees could
in any way impact the marketability of the materials.

My analysis of the fair use factors weighs heavily in
favor of the defendants. Accepting all well-pleaded
allegations as true and construing all reasonable in-
ferences in favor of the plaintiff, the Complaint al-
leges a fair use of the copyrighted materials. There-
fore, the Complaint fails to state a claim for copyright
infringement. I RECOMMEND that Claim One be
dismissed for failure to state a claim upon which re-
lief can be granted.

Not Reported in F.Supp.2d, 2007 WL 324592 (D.Colo.)
**(Cite as: 2007 WL 324592 (D.Colo.))**

### B. State Law Claims

Claims Two and Three assert causes of action for civil theft and breach of contract, respectively. I construe these claims solely as state-law-based claims. This Court may decline to exercise supplemental jurisdiction over the plaintiff's state law claims when it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Because I have recommended dismissal of the plaintiff's copyright claim for failure to state a claim upon which relief can be granted, I respectfully RECOMMEND that the Court decline to exercise supplemental jurisdiction over the remaining state law claims.

### C. Attorneys' Fees

*6 The defendants seek attorneys' fees pursuant to the Copyright Act, 17 U.S.C. § 505. Section 505 provides:

In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

The Supreme Court has stated that, in determining whether attorneys' fees should be awarded, courts may consider "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence ... as long as such factors are faithful to the purposes of the Copyright Act...." *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 535 n. 19, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).

The plaintiff's claims required an analysis and an application of the facts to the law. Although I have recommended that the claims be dismissed, I find that the action was not wholly frivolous. I respectfully RECOMMEND that the Motion be DENIED insofar as it seeks attorneys' fees.

### IV. CONCLUSION

I respectfully RECOMMEND that the Motion be GRANTED to the extent it seeks dismissal of this case.

I further RECOMMEND that the Motion be DENIED insofar as it seeks an award of attorneys' fees to the defendants.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have 10 days after service of this recommendation to serve and file specific, written objections. A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed.R.Civ.P. 72(b); *Thomas v. Arn,* 474 U.S. 140, 147-48, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), and also waives appellate review of both factual and legal questions. *In re Key Energy Resources Inc.,* 230 F.3d 1197, 1199-1200 (10th Cir.2000). A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review. *United States v. One Parcel of Real Property,* 73 F.3d 1057, 1060 (10th Cir.1996).

D.Colo.,2007.
Shell v. Devries
Not Reported in F.Supp.2d, 2007 WL 324592 (D.Colo.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 11

Westlaw

Not Reported in F.Supp.2d, 2007 WL 1701715 (D.Colo.)
**(Cite as: 2007 WL 1701715 (D.Colo.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
D. Colorado.
Suzanne SHELL, Plaintiff,
v.
Jolene DEVRIES, Anna Hall Owen, and Unknown
Defendant Doe, Defendants.
**Civil Case No. 06-cv-00318-REB-BNB.**

June 11, 2007.

Suzanne Shell, Elbert, CO, pro se.

Daniel Bernard Slater, Law Offices of Dan Slater, Canon City, CO, for Defendants.

### ORDER DENYING PLAINTIFFS' MOTION TO RECONSIDER

BLACKBURN, J.

**\*1** This matter is before me on **Plaintiff Shell's Verified Motion To Reconsider** [# 26], filed February 16, 2007. The defendants have filed a response [# 27] and the plaintiff has filed a reply [# 34]. I deny the motion.

On January 31, 2007, I entered an order [# 23] adopting the recommendation of the magistrate judge, and granting the defendants' motion to dismiss. Judgment [# 24] was entered on February 5, 2007. In her motion, the plaintiff asks that my order adopting the recommendation of the magistrate judge, and granting the defendants' motion to dismiss, be vacated. She asks also that both Magistrate Judge Boland and I be recused from this case.

Though captioned as a motion to reconsider, the plaintiff's motion properly is considered as a motion to alter or amend judgment under Fed.R.Civ.P. 59(e), or as a motion for relief from judgment under FED.R.CIV.P. 60. The essence of the relief sought by the plaintiff is that I vacate the court's judgment in this case. FED.R.CIV.P. 59 provides that a party may move "to alter or amend a judgment" in a motion filed within ten days of the judgment. Viewed as a motion under rule 59, the plaintiff's motion is timely. Rule 59 permits a court to "open the judgment if one has been entered, ... make new findings and conclusions, and direct the entry of a new judgment. The primary bases for a motion under Rule 59(e) are:

(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir.2000) (citations omitted). Rule 60 provides that a court may relieve a party from a final judgment based on various reasons, including mistake, inadvertence, newly discovered evidence, and "any other reason justifying relief from the operation of the judgment." FED.R.CIV.P. 60(b).

None of these circumstances pertains here. The plaintiff details in her motion her disagreement with my legal conclusions. She does not demonstrate an intervening change in the law, the existence of new evidence, a mistake, or the need to correct clear error or to prevent manifest injustice. Rather, the plaintiff continues to argue that the legal conclusions of this court are incorrect. I disagree. Accordingly, whether considered under Rule 59 or 60, the plaintiff's motion for reconsideration must be denied.

The plaintiff asks also that Magistrate Judge Boland and I be recused from this case. As a general rule, recusal is required when "a reasonable person armed with the relevant facts would harbor doubts about the judge's impartiality." Maez v. Mountain States Tel. & Tel., Inc., 54 F.3d 1488, 1508 (10th Cir.1995). 28 U.S.C. § 455 requires recusal when such circumstances arise. Hinman v. Rogers, 831 F.2d 937, 939-40 (10th Cir.1987). Stated differently, § 455 requires a judge to recuse himself from a case when his participation in the case creates an appearance of impropriety. U . S. v. Pearson, 203 F.3d 1243, 1264 (10th Cir.2000) (citation omitted). However, a "judge should not recuse himself on unsupported, irrational, or highly tenuous speculation." Hinman, 831 F.2d at 939-40 (citation omitted).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1701715 (D.Colo.)
**(Cite as: 2007 WL 1701715 (D.Colo.))**

**\*2** In this case, the plaintiff claims that Magistrate Judge Boland and I have exhibited bias and prejudice against her because we disagree with her reading of the applicable law, and have entered a ruling against her on that basis. This does not constitute a basis on which a reasonable person armed with the relevant facts would harbor doubts about my impartiality or the impartiality of Magistrate Judge Boland. The plaintiff's motion to recuse is denied.

**THEREFORE, IT IS ORDERED that Plaintiff Shell's Verified Motion to Reconsider** [# 26], filed February 16, 2007, is **DENIED.**

D.Colo.,2007.
Shell v. Devries
Not Reported in F.Supp.2d, 2007 WL 1701715 (D.Colo.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 12

Westlaw

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
CREDITSIGHTS, INC., Plaintiff-Counterclaim Defendant,
v.
Paul CIASULLO, Defendant-Counterclaim Plaintiff,
v.
Glenn Reynolds and Peter Petas, Additional Counterclaim-Defendants.
**No. 05 CV 9345(DAB).**

Sept. 5, 2008.

MEMORANDUM & ORDER

<u>DEBORAH A. BATTS</u>, District Judge.

*1 Defendant-Counterclaim Plaintiff Paul Ciasullo (hereinafter Counterclaim Plaintiff) brings counterclaims against Plaintiff CreditSights, Inc., as well as additional Counterclaim Defendants Reynolds and Peta (hereinafter collectively referred to as "Counterclaim Defendants"). Counterclaim Plaintiff alleges that Counterclaim Defendants conspired to divest him of his shares and control within the company.

Now before the Court are four different motions. The first is Plaintiff's Motion for Default Judgment against Counterclaim Plaintiff. The second is Counterclaim Defendants' Motion to Dismiss Counterclaim Plaintiff's counterclaims under <u>Federal Rule of Civil Procedure 12(b)(6)</u>. The third is Counterclaim Defendants' Motion for Sanctions under <u>Fed.R.Civ.P. 11</u>. The fourth motion pending before the Court is Counterclaim Defendants' Motion to Strike certain allegations made by the Defendant. Also before the Court are Counterclaim Plaintiff's requests to re-plead and for sanctions against Counterclaim Defendants.

Counterclaim Plaintiff brings ten counter causes of action: (1) breach of contract; (2) unjust enrichment; (3) fraud; (4) declaratory judgment stating that Counterclaim Defendants have no continuing right, title, or interest to any of shares of CreditSlghts and such

shares rightfully belong to Defendant; (5) breach of fiduciary duties; (6) tortious interference with business relations; (7) prima facie tort; (8) civil conspiracy to commit prima facie tort; (9) civil conspiracy to tortiously interfere with business relations; and (10) damage to business reputation. Counterclaim Plaintiff seeks damages based on his first, second, third, fifth, sixth, seventh, eight, ninth, and tenth causes of action.

For the reasons contained herein, Counterclaim Defendants' Motion for Default Judgment is DENIED. Counterclaim Defendants' Motion to Dismiss Counterclaim Plaintiff's first, second, third, fourth, fifth, sixth, seventh, eight, ninth, and tenth causes of action is GRANTED in part and DENIED in part. Counterclaim Defendants' Motion for <u>Rule 11</u> Sanctions is DENIED. Counterclaim Defendants' Motion to Strike certain allegations is GRANTED. Counterclaim Plaintiff's request to re-plead is DENIED. Counterclaim Plaintiff's request for sanctions is DENIED.

I. MOTION FOR DEFAULT JUDGMENT

*A. BACKGROUND*

This action originally commenced on November 3, 2005, and was duly served upon the Defendant, Paul Clasullo. On December 1, 2005, Counterclaim Plaintiff Clasullo submitted a request for an extension of time to Answer or respond to the Complaint, which was due merely one day later on December 2, 2005. That request was granted and Counterclaim Plaintiff's deadline was extended to December 23, 2005. On December 27, 2005, four days after Counterclaim Plaintiff's Answer or response was due, the Court received Counterclaim Plaintiff's second request for an extension of time to file a Motion to Dismiss. This second request was granted, and a December 30, 2005 deadline was set. On December 30, 2005, Counterclaim Plaintiff filed his Motion to Dismiss. On March 1, 2006, after the filing of an Amended Complaint and the institution of a new briefing schedule for Motion to Dismiss submissions, the Court granted a Plaintiff's first request for an extension, extending by one week the deadlines for the Parties' respective submissions. On March 27, 2006, the due date for Counterclaim Plaintiff's reply sub-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
(Cite as: 2008 WL 4185737 (S.D.N.Y.))

mission in further support of his Motion to Dismiss, the Court received Counterclaim Plaintiff's third request for an extension; this request was granted and Counterclaim Plaintiff's time to file reply papers was set for April 10, 2006. These papers were filed timely.

**\*2** On May 10, 2006, this Court stayed discovery in this action pending resolution of Counterclaim Plaintiff's Motion to Dismiss. On March 26, 2007, Counterclaim Plaintiff's Motion to Dismiss was denied and Counterclaim Plaintiff was ordered to Answer Plaintiff's Amended Complaint within 30 days. On May 2, 2007, the Court granted Plaintiff's request to file a Second Amended Complaint, in order to add claims against Counterclaim Plaintiff based on newly discovered conduct. Plaintiffs were given 60 days to file the Second Amended Complaint. Plaintiffs filed the Second Amended Complaint on May 18, 2007.

On June 13, 2007, the Court received Counterclaim Plaintiff's request for yet another extension of time; the request proposed extending Counterclaim Plaintiff's time to Answer Plaintiff's Second Amended Complaint until June 25, 2007. Plaintiff consented to this request upon the express condition that Counterclaim Plaintiff make no further extension requests, and Counterclaim Plaintiff consented to this condition. The Court granted this extension request on June 13, 2007. The next day, on June 14, 2007, the Court received a letter from counsel for Defendant, requesting to be relieved as counsel. On June 21, 2007, the Court ordered that defense counsel be relieved. This Order gave Counterclaim Plaintiff Ciasullo a deadline of June 25, 2007 to have new counsel file an appearance, and an extended deadline of July 31, 2007 to move against or Answer Plaintiff's Second Amended Complaint.

On June 25, 2007, the deadline date for having new counsel file a Notice of Appearance, the Court received a telephone call from Mr. Ciasullo. He indicated that the new counsel he planned to retain was on trial and would be unable to finalize paperwork with counsel until the end of the week. The Court directed Mr. Ciasullo to communicate through the Pro Se Office. On June 28, 2007, the Court received a written request for an extension of time for new counsel to file a Notice of Appearance. The Court granted this request and extended the deadline for the filing of a Notice of Appearance to July 13, 2007.

On July 16, 2007, three days after the Court Ordered deadline for filing a Notice of Appearance, Counterclaim Plaintiff Ciasullo filed a Notice of Pro Se appearance in this action. On August 1, 2007, one day after the response to Plaintiff's Second Amended Complaint was due, the Court received a letter request from Plaintiff for an extension of time until September 28, 2007 to file that response. The Court denied that request.

On September 6, 2007, Plaintiff moved for default judgment against Defendant. The very next day, on September 7, 2008, Ms. Marianne Murray, Esq. filed a Notice of Appearance on Counterclaim Plaintiff's behalf. On September 11, 2007 Counsel for Counterclaim Plaintiff filed submissions in opposition to the Motion for Default Judgment. Plaintiff replied to the opposing papers on September 17, 2007. Finally, on September 21, 2007, Counsel for Counterclaim Plaintiff also filed an Answer, Third Party Complaint and Counterclaims in response to Plaintiff's Second Amended Complaint.

## B. *THE DEFAULT JUDGEMENT LEGAL STANDARD*

**\*3** "The dispositions of motions or entries of defaults and default judgments ... are left to the sound discretion of a district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties." *Shah v. New York State Dept. of Civil Serv.,* 168 F.3d 610, 615 (2d Cir.1999) (*quoting Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 95 (2d Cir.1993)). District courts generally consider three factors when deciding whether to vacate a default judgment motion: (1) the willfulness of the default; (2) whether defendant has demonstrated a meritorious defense and (3) whether, and to what extent, granting default will cause prejudice to the non-defaulting party. *Gonzalez v. City of New York,* 104 F.Supp.2d 193, 195 (S.D.N.Y.2000); *Nationsbank of Florida v. Banco Exterior de España,* 867 P. Supp. 167, 175 (S.D.N.Y.1994). The Second Circuit has held that, where default judgment is entered, " 'excusable neglect' is to be construed generously in the context of an attempt to vacate a default judgment." *American Alliance Ins. Co., Ltd. v. Eagle Ins. Co.,* 92 F.3d 57, 58 (2d Cir.1996)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
(Cite as: 2008 WL 4185737 (S.D.N.Y.))

C. *DISCUSSION*

In this case, the Court finds that Counterclaim Plaintiff's default was willful and intentional. Counterclaim Plaintiff repeatedly flouted this Court's Orders and deadlines and proceeded on his own schedule; Counterclaim Plaintiff acted in bad faith and in blatant disregard for the Court's generosity and leniency. However, while the Court finds most of Counterclaim Plaintiff's Answer, Third party Complaint and Counterclaims frivolous (see Motion to Dismiss discussion, *infra* ), at this stage of the litigation, the Court cannot find with certainty that Counterclaim Plaintiff has no meritorious defense to any of the claims that have been levied against him. Most significantly, Counterclaim Plaintiff filed a response to Plaintiff's Second Amended Complaint within a month after Plaintiff moved for default judgment; in this case, the Court cannot find that Plaintiff would be unduly prejudiced by having to prosecute its claim after a delay of such a relatively short period. In light of the fact that a Motion to Vacate a default judgment here would, accordingly, be successful, the Court declines to exercise its discretion to grant Plaintiff's Motion in the first place. In the interests of judicial economy, Plaintiff's Motion for Default Judgment is hereby DENIED.

## II. COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS COUNTERCLAIM PLAINTIFF'S COUNTERCLAIMS

A. *BACKGROUND*

The Court presumes the Parties' familiarity with the facts set forth in the March 26, 2007 Memorandum & Order, which addressed Counterclaim Plaintiff Ciasullo's Motion to Dismiss the Complaint.[FN1]

> FN1. In its Complaint, Plaintiff alleges that Counterclaim Plaintiff pledged his Credit-Sights stock in violation of various Stockholder and Stock Grant Agreements, that Counterclaim Plaintiff resigned after he sexually harassed a colleague and signed an agreement giving that resignation all effects of a termination for cause, and that Counterclaim Plaintiff's pledges created a basis to divest him of his shares, and that Counterclaim Plaintiff improperly disclosed confidential information to certain persons.

In his counterclaims, Counterclaim Plaintiff claims that Counterclaim Defendants Reynolds and Petas engaged in a plan and scheme to use Counterclaim Plaintiff's expertise in the financial industry to create and build CreditSights, all the while concealing their intent to divest Counterclaim Plaintiff of any control or decision making in the operation of CreditSights, and ultimately to divest him of ownership. (Counterclaim Plaintiff's Answer to Second Amended Complaint and Counterclaims "CCP. Ans. & Count." ¶ 64).

*4 In December 1999, Counterclaim Defendant Petas approached Counterclaim Plaintiff about starting an online financial research firm focused on the debt market. (*Id.* ¶ 66). At that time, Counterclaim Defendant Petas allegedly did not mention that he wanted Counterclaim Defendant Reynolds to be a participant in the business plan. (*Id.* ¶ 66). In January 2000, Counterclaim Plaintiff alone wrote a business plan for what ultimately became a model for CreditSights; the plan was sent to various potential investors. (*Id.* ¶ 67). Over the next two months, Counterclaim Plaintiff became aware of Counterclaim Defendant Reynolds' intention to participate in the planned business. Counterclaim Plaintiff assented, based on representations that the founding three would each support one another and each act as a team. (*Id.* ¶ 68). At this point, "it was agreed that Ciasullo, Petas and Reynolds would together start an online independent financial research business focused on debt research ..." (*Id.*)

From January through March 2000, Counterclaim Plaintiff built the CreditSights business, engaging in massive efforts to obtain financing for the Company. (*Id.* ¶ 69). Ultimately, according to Defendant, CreditSights was formed in or about November 2000.[FN2] (*Id.* ¶ 71.) Counterclaim Defendants Reynolds and Petas both made personal capital contributions to facilitate the formation of CreditSights; Counterclaim Plaintiff raised contributions from two business acquaintances. (*Id.*)

> FN2. The Court notes that this date differs from the date provided in Plaintiffs Complaint.

At the inception of CreditSights, Counterclaim Plaintiff and Counterclaim Defendants Reynolds and Petas

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
(Cite as: 2008 WL 4185737 (S.D.N.Y.))

were each issued 2000 shares of stock. (*Id.* ¶ 72.) The Board of Directors included Counterclaim Defendants Reynolds and Petas, as well as Defendant. (*Id.*) Counterclaim Defendant Reynolds was named CEO and Counterclaim Plaintiff was named President. (*Id.*) Counterclaim Defendant Petas did not wish to be an officer (*Id.* ¶ 68.)

Approximately two years after the Company was formed, Counterclaim Plaintiff came to learn that Counterclaim Defendants Petas and Reynolds were actually both initially involved with the idea to create a company. (*Id.* ¶ 73.) Counterclaim Plaintiff had been led to believe by Counterclaim Defendant Petas that only Counterclaim Defendant Petas and Counterclaim Plaintiff would be founders.[FN3] (*Id.* ¶ 73.) This information was withheld from Counterclaim Plaintiff in order to induce him to provide his expertise, without which the Company could not be formed. (*Id.*) Counterclaim Plaintiff would not have provided his expertise had he known that Counterclaim Defendants Reynolds and Petas were planning to deny him an equal partnership. (*Id.*)

> FN3. The Court notes that this allegation is directly contradictory to Counterclaim Plaintiff's previous allegations that, prior to the formation of the Company, "it was agreed that Ciasullo, Petas and Reynolds would together start an online independent financial research business focused on debt research ...," and that each were issued equal portions of founding shares in the Company. (CCP.Ans. & Count.¶¶ 68, 72.)

Based on the promises of an equitable team environment, Counterclaim Plaintiff devoted all of his time to building the necessary components of the CreditSights business. (*Id.* ¶ 74.)

In the beginning of 2001, Counterclaim Defendants Reynolds and Petas recapitalized the Company with additional funds of their own, funds of their friends and family, but not funds of Defendant, who did not at that time have sufficient resources. (*Id.* ¶ 77.) Counterclaim Plaintiff later learned that Counterclaim Defendants Petas and Reynolds intentionally exploited the facts that, as alleged by Defendant, the Company needed a cash infusion at that time, and the fact that Counterclaim Plaintiff lacked resources to contribute personally to the recapitalization of the

Company, to try to dilute his stake in the Company and reduce his control. (*Id.*) However, Counterclaim Plaintiff raised $1 million in capital to help keep the Company afloat, thereby thwarting the efforts of Counterclaim Defendants Petas and Reynolds to dilute his stake and reduce his control. (*Id.* ¶ 78.)

*5 In August 2001, Counterclaim Defendants Reynolds and Petas, among others, voted in favor of removing Counterclaim Plaintiff as President of CreditSights. (*Id.* ¶ 79). At that point, Counterclaim Defendant Reynolds told Counterclaim Plaintiff he was removed because Counterclaim Defendant Reynolds did not want to leave his wife's and children's fortunes in Counterclaim Plaintiff's hands, as certain succession rules governing the officers of the Company would otherwise require. (*Id.* ¶ 79). Counterclaim Plaintiff alleges that this reason was merely pretextual, provided to conceal Counterclaim Defendants Reynolds and Petas' true intent to divest him of his control and ultimately ownership in the Company. (*Id.*)

In April 2004, another financing effort was undertaken; new outside investors infused the Company with an additional $7 million dollars of capital. (*Id.* ¶ 81.) As part of the 2004 financing, lead investors were given the right to appoint a member to the Board of Directors, increasing the size of the Board from four to five, and creating the possibility that it could grow to a size of six or seven. (*Id.*) The new outside investors required that additional financial controls be implemented, including set caps on compensation levels and bonus pools. (*Id.* ¶ 82.)

Given these caps, Counterclaim Defendant Reynolds requested that Counterclaim Plaintiff sell shares to generate cash in lieu of taking a bonus at the level they determined they should be able to take, stating he would do the same. (*Id.*) Counterclaim Plaintiff did so, even though he preferred to be paid a bonus and not dilute his equity. (*Id.*) Unbeknownst to Defendant, the shares sold by Counterclaim Defendant Reynolds did not belong to him but were in his wife's name. (*Id.*) As a result, Counterclaim Plaintiff was left with fewer shares than either Counterclaim Defendants Petas or Reynolds. (*Id.*)

In August of 2004, Counterclaim Plaintiff developed a life threatening condition, requiring surgery and "some weeks of absence" from the CreditSights of-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

fices. (*Id.* ¶ 83.) During this absence, Counterclaim Defendants Reynolds and Petas hired new salesmen without formal approval, without justification and without consulting Defendant, who was Head of Sales and Counterclaim Defendants Reynolds' equal. (*Id.*) Two days after Counterclaim Plaintiff's surgery, Counterclaim Defendant Reynolds held meetings with each sales person, falsely telling them he was doing so at the behest of Defendant. (*Id.* ¶ 84.) As a result of these meetings, there was a referendum on Counterclaim Plaintiff's management of the sales force; several sales staff members notified him of Counterclaim Defendant Petas' conduct and expressed their view that his authority was being undermined. (*Id.*)

On November 29, 2004, without warning or provocation, Counterclaim Defendant Reynolds requested that Counterclaim Plaintiff immediately meet with him and David Good, who was then the Company's General Counsel.[FN4] (*Id.* ¶ 86.) Prior to the meeting Counterclaim Plaintiff was planning to resign because he desired to pursue other expected professional opportunities. (*Id.* ¶ 89.) Counterclaim Plaintiff entered the meeting with a mindset to resign. (*Id.*)

> FN4. The Court notes that this allegation directly contradicts Counterclaim Plaintiff's claim that, just prior to the meeting, Counterclaim Plaintiff suspected that Counterclaim Defendants may have become aware of the fact that Counterclaim Plaintiff was involved in a relationship with a CreditSights employee, Ms. Tara Pierce. (*Id.* ¶ 88.)

*6 At the meeting, Counterclaim Defendant Reynolds told Defendant, " 'we believe that we could fire you for cause, but we're offering you the opportunity to resign according to the letter I'm placing in front of you." (*Id.* ¶ 87.) Counterclaim Plaintiff was also told he had been voted off the Board of Directors. (*Id.* ¶ 87.) Counterclaim Plaintiff was not given notice or the opportunity to participate in the Board meeting. (*Id.*) The allegedly pretextual basis for Counterclaim Defendant Reynolds' request for his resignation was the relationship with Ms. Pierce. (*Id.* ¶ 90.) Counterclaim Plaintiff claims that, in deciding whether to resign under the stated conditions of the prepared letter, or face being fired for cause, he was "well aware of the specious and disingenuous pretext upon which Reynolds sought to use to cloak his real mo-

tives." (*Id.* ¶ 91.)

While the prepared resignation letter states quite plainly that, "For purposes of my employment agreement, this resignation will be deemed to have the same economic consequence to me as a termination for cause under the employment agreement," (Second Am. Compl. Exh. G), at the meeting, Counterclaim Plaintiff understood the only "economic consequence" of signing the letter was a waiver of the right to six-month severance. (*Id.* ¶ 92.) Provisions of the employment agreement and the agreements incorporated therein notwithstanding, Counterclaim Plaintiff further understood that by resigning under the terms of the prepared letter, his founder's share of CreditSights stock would be preserved. (*Id.*) On November 29, 2004, the same day as the meeting, Counterclaim Plaintiff tendered his resignation. (*Id.*)

In 2005, Counterclaim Plaintiff began working at Soleil Securities Group, Inc. ("Soleil") which provides independent equities research services. (*Id.* ¶ 94.) It does not provide the same financial research services as Plaintiff CreditSights. (*Id.*) Counterclaim Plaintiff attempted to assure Counterclaim Defendant Reynolds that his new employment would not violate the non-compete clause in his employment agreement, but Counterclaim Defendant Reynolds refused to meet with him. (*Id.* ¶ 95.)

In March 2006, CreditSights employee Tara Pierce informed Counterclaim Plaintiff that Counterclaim Defendants were paying her to file a sexual harassment criminal complaint. (*Id.* ¶ 104.)

After learning about Counterclaim Plaintiff's employment at Soleil, Counterclaim Defendants Reynolds and Petas baselessly accused Counterclaim Plaintiff of violating his non-compete agreement. (*Id.* ¶ 96.) Subsequently, Counterclaim Defendants went to the authorities around or before June, 2006 accusing Counterclaim Plaintiff of stealing confidential and proprietary information from CreditSights, though in an email exchange between the parties a year earlier, Counterclaim Defendants assented to this activity. (*Id.* ¶ 97.) A criminal investigation was conducted at the location of Counterclaim Plaintiff's Soleil employment on June 6, 2006. (*Id.* ¶ 98.) No criminal charges were ever filed. (*Id.* ¶ 99.)

*7 Allegedly because of this criminal investigation,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

Soleil placed Counterclaim Plaintiff on leave and launched its own independent investigation of him. (*Id.*) Upon Counterclaim Plaintiff's return to Soleil, he was stripped of his management responsibilities and closely monitored. (*Id.*) Although the Counterclaim Defendants allegedly went to the authorities around or before June 2006, Counterclaim Plaintiff alleges that their accusation, and the attendant investigation, caused Soleil, in April of 2007, to ask him to leave his position with them. (*Id.* ¶ 99.)

Counterclaim Plaintiff filed these counterclaims on September 2007, after the Court's March 26, 2007 Order denying Counterclaim Plaintiff's Motion to Dismiss, and in response to Counterclaim Defendants' Hay 2007 Second Amended Complaint.

B. *DISCUSSION*

1. *Legal Standard*

For a complaint to survive dismissal under Rule 12(b)(6), the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1974 (2007). In other words, a plaintiff must satisfy "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 127 S.Ct. at 1964-65 (internal quotation marks omitted). Further, in deciding a motion to dismiss, the court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v. Jennings,* 489 F.3d 499, 510 (2d Cir.2007) (citation omitted). However, "general, conclusory allegations need not be credited ... when they are belied by more specific allegations of the complaint." *Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany,* No. 05 Civ. 10669, 2007 WL 2822214, at *7 (S.D.N.Y. Sept. 27, 2007).

In ruling on a 12(b)(6) motion, a court may consider the complaint as well as any additional documents incorporated into or appended to the complaint. *See Tarshis v. Riese Org.,* 211 F.3d 30, 39 (2d. Cir.2000). It is also well-established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes." *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d Cir.1988). *See also Dayton Monetary Associates v. Donaldson, Lufkin, & Jenrette Securities,* 1992 WL 204374, at *3 (S.D.N.Y.2002) (public court filings considered on 12(b)(6) motion to dismiss).

2. *Counterclaim Plaintiff's Release of Claims*

Counterclaim Defendants argue that all counterclaims based on Counterclaim Plaintiff's employment and resignation with CreditSights are subject of a valid release and waiver executed by Counterclaim Plaintiff on December 17, 2004. (Plaintiff and Counterclaim Defendants' Memorandum of Law in Support of Motion to Dismiss Counterclaims, "Count. Defs.' Mem. Law," at 1.) Counterclaim Defendants assert that, given this release, Count Three, (a Fraud claim), is barred entirely; and Counts One (Breach of Contract), Five (Breach of Fiduciary Duties), Seven (Prima Facie Tort), Eight and Nine (Civil Conspiracy claims) are each barred to the extent they rely on conduct relating to and predating his termination from the Company. (*Id.* at 8.)

*8 Counterclaim Plaintiff counters that the release and waiver he signed is subject to interpretation. (Counterclaim Plaintiff's Memorandum of Law in Opposition of Motion to Dismiss Counterclaims, "CCP Opp. Mem. Law," at 4.) He also argues that the release is unenforceable because he was fraudulently induced into signing the Separation Agreement, and/or unenforceable under affirmative defenses in equity. (*Id.* at 6.) Counterclaim Plaintiff further asserts that the language of the executed release does not discharge Counterclaim Defendants as Directors. (*Id.* at 7.) Finally, Counterclaim Plaintiff argues rescission of the contract for Counterclaim Defendant's failure to provide consideration for Counterclaim Plaintiff's assent to the release. (*Id.* at 9.)

Generally, a release is governed by the principles of contract law. *Golden Pacific Bancorp v. Fed. Deposit Ins. Corp.,* 273 F.3d 509, 515 (2d Cir.2001). It is well settled that "the threshold question in a dispute over the meaning of a contract is whether the contract

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

terms are ambiguous." *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59, 66 (2d Cir.2000). A contract is unambiguous when it has a "definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Hunt Ltd. v. Lifschultz Fast Freight,* 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Breed v. Insurance Co. of North America,* 413 N.Y.S.2d 352, 385 (1978)). When interpreting an unambiguous contract, "words and phrases are given their plain meaning." *Painewebber v. Bybyk,* 81 F.3d 1193, 1199 (2d Cir.1996). Under New York law, a court must enforce that plain meaning, "rather than rewrite an unambiguous agreement." *American Express Bank Ltd. v. Uniroyal,* 164 A.D.2d 275, 277, 562 N.Y.S.2d 631 (1st Dept.1990). A release may be invalidated if it is a "product of fraud, duress or undue influence." *Skluth v. United Merchants and Mfrs.,* 599 N.Y.S.2d 280, 282 (1st Dept.1990). However, it is well-settled that, in New York, a written release cannot be invalidated for lack of consideration. N.Y. GEN. OBLIG. § 15-303 (McKinney 2005).

In this case, Counterclaim Plaintiff's arguments in support of his contention that the release is unenforceable are unavailing. The release provision in Section 8 of the Separation Agreement reads unambiguously:

"[Y]ou release CreditSights, Inc. and its shareholders, officers, employees, agents, and affiliates from any and all causes of action, claims, rights of recovery or setoff, demands, damages, costs, losses and expenses of any kind or nature whatsoever, at law or in equity, which you may have had, now have, claim to have, or may claim to have in the future, whether known or unknown/ including but not limited to all claims on account of, or in any way arising or alleged to arise out of, your employment by or other association or other relationship with CreditSights, Inc., or your termination and resignation from such employment ... You represent that you have withdrawn any charges or complaints that you may have filed against the Company or its affiliates, or its or their officers, directors, shareholders, employees and agents, and you further agree not to file any charges or complaints arising out of or relating to your employment with the Company or termination thereof, against the Company, its affiliates or its or their officers, directors, shareholders, employees, and agents."

**\*9** (Second Amend. Compl., Exh. H § 8.)

The release provision does in fact bar claims against Counterclaim Defendants Petas and Reynolds as Directors. Clear on its face, this provision provides no ambiguity and no other reasonable interpretation exists.

In this case, Counterclaim Plaintiff fails to allege any specific statements made by either Counterclaim Defendant when soliciting the Separation and Proxy Agreements that were fraudulent. In his Memorandum of Law in Opposition to Motion to Dismiss Counterclaims, Counterclaim Plaintiff explicitly cites paragraphs 114(c) and 116 in support of his argument that his Counterclaim properly alleges fraudulent inducement. (CCP. Opp. Mem. Law at 6.) These paragraphs merely allege that Counterclaim Defendants' failed to disclose that they never intended to honor their obligations under those Agreements. (CCP. Ans. & Count. ¶¶ 114(c), 116). Counterclaim Plaintiff erroneously conflates a breach of contract claim with a claim for fraudulent inducement. "[A]s a general matter, a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract. Thus, general allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support [a fraud] claim." *Fierro v. Gallucci,* No. 06-CV-5189, 2008 WL 2039545, \*4 (E.D.N.Y. May 12, 2008) (citing, *Wall v. CSX Transp., Inc.,* 471 F.3d 410, 416 (2d Cir.2006), and *N.Y. Univ. v. Cont'l Ins. Co.,* 87 N.Y.2d 308, 318 (1995), internal quotations omitted.) Accordingly, these allegations cannot support Counterclaim Plaintiff's claim that the release is invalid on grounds of fraudulent inducement.

Nor does a more searching review of Counterclaim Plaintiff's allegations reveal any other specific misrepresentations made by Counterclaim Defendants which fraudulently induced him to enter the Separation Agreement. Rule 9(b) requires that in all allegations of fraud, the circumstances constituting the fraud must be stated with particularity. *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127-28 (2d Cir.1994). The pleading must be particular enough to satisfy the three goals of Rule 9(b): (1) to provide a defendant with fair notice of the claims against it; (2) to protect a defendant from harm to its reputation or

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). "[C]onclusory allegations that defendant's conduct was fraudulent or deceptive are not enough." *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 114 (2d Cir.1982). "Despite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge," however, "[w]here pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990) (citations omitted). In this case, Counterclaim Plaintiff has not identified a single misrepresentation which fraudulently induced him into entering the Separation Agreement. Nor do any of Counterclaim Plaintiff's allegations give rise to a "strong inference of fraud."

**\*10** Counterclaim Plaintiff's argument for rescission of contract due to failure of consideration likewise fails. In this case, not only was consideration provided to Defendant, specifically the consulting fee of $75,000 (Second Amend. Coxnpl., Exh. H.), but the provision in question is a release term in the Separation Agreement. Under New York Gen. Oblig. § 15-303 (McKinney 2005), there is no question that consideration is not required to support a term of release; any purported lack or insufficiency of consideration in this case does not render Counterclaim Plaintiff's release invalid.

Counterclaim Plaintiff's arguments that he was fraudulently induced to enter into the release fail. Accordingly, the executed release is valid. It bars Count Three, Counterclaim Plaintiff's claim for fraud, as well as those portions of Count One (Breach of Contract), Count Five (Breach of Fiduciary Duties), Count Seven (Prima Facie Tort), Counts Eight and Nine (Conspiracy) and Count Ten (Damage to Business Reputation) which relate to Counterclaim Plaintiff's employment with, and termination from, the Company, and any conduct occurring prior to the date when the release was entered into, December 17, 2004.[FN5]

FN5. This conduct includes any breach of contract claim with respect to the Proxy and

Voting Agreement; although the Proxy and Voting Agreement was entered into subsequent to the Separation Agreement, it was clearly contemplated by the Separation Agreement. (Second Amend. Compl.,, Exh. H, § 4.) Thus any such claim arises out of Counterclaim Plaintiff's termination and resignation from his employment with the Company. "It is well settled that releases are contracts that, unless their language is ambiguous, must be interpreted to give effect to the intent of the parties as indicated by the language employed [and] ... that releases bar suits on causes of action arising on or prior to the date of their execution but will not bar subsequent claims *unless they are specifically embraced within the release or fall within the fair import of its terms." Murray-Gardner Mgt. v. Iroquois Gas Transmission Sys.*, 646 N.Y.S.2d 418, 419 (3rd Dept.1996) (citation omitted; emphasis added).

### 3. *Count One: The Breach of Contract Counterclaim*

Counterclaim Defendants argue that, to the extent that portions of Counterclaim Plaintiff's Breach of Contract Counterclaim are not barred by the release provision of the Separation Agreement, Counterclaim Plaintiff still fails to state adequately a claim for relief. Counterclaim Defendants maintain that Counterclaim Plaintiff's allegations regarding his breach of contract counterclaim are insufficient because he fails to identify which specific contractual provisions Counterclaim Defendants breached. (CCDs.' Mem. Law at 8-9.) Counterclaim Defendants further argue that this Count is contradicted by the agreements themselves, and that Counterclaim Plaintiff's allegations fall to satisfy the elements of a claim for breach of contract. (*Id.*)

In New York, a claim for breach of contract must allege: (1) existence of a contract; (2) the claimant has performed his or her obligations under the contract; (3) the defendant failed to perform his or her obligations there under; and (4) damages resulted to the plaintiff. *W.B. David & Co., Inc. v. DWA Communications, Inc.*, 2004 WL 369147 at *2 (S.D.N.Y.2004); *Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, 1999 WL 544708, at *18 (S.D.N.Y.1999). "In pleading these elements, a plain-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
(Cite as: 2008 WL 4185737 (S.D.N.Y.))

tiff must identify what provisions of the contract were breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.,* 171 F.Supp.2d 354, 358 (citing *Levy v. Bessemer Trust Co., N.A.,* 1997 WL 431079, at *5 (S.D.N.Y.1997)).

Counterclaim Defendants assert that Counterclaim Plaintiff's Breach of Contract claim must be dismissed because Counterclaim Plaintiff failed to set forth the specific contractual provisions that Counterclaim Defendants allegedly breached. (CCDs.' Mem. Law at 8-9.) Counterclaim Plaintiff counters that he has identified the breach of specific agreements and that he provided Counterclaim Defendants with adequate notice of the claimed breaches by incorporating various contractual provisions in the pleading, specifically provisions regarding the wrongful divesting of Counterclaim Plaintiff's shares. (CCP. Opp. Mem. Law at 10.)

*11 The Court finds Counterclaim Defendants' argument compelling. New York law is eminently clear that a proper breach of contract claim must identify specifically breached contract terms. None are so alleged in the counterclaims.

Moreover, in this case, amendment would be futile. Counterclaim Plaintiff failed to allege facts which satisfy sufficiently all the elements required for a breach of contract claim. Specifically, he fails to allege sufficiently that he adequately performed his own obligations under the relevant agreements. Counterclaim Plaintiff admits the existence of certain executed documents, including the 2001 Convertible Loan Agreement with third party Klausner and the 2005 Stock Pledge Agreement with Klausner. (Opposition to Counterclaim Defendant's Motion for Rule 11 Sanctions, "CCP. Opp. To Rule 11 Mot.," ¶¶ 29-34.) [FN6] The existence of these documents is in violation of the unambiguously stated terms of the 2000 Restricted Stock Grant Agreement, which prohibit the offering, transfer, pledge, or encumbrance of any unvested stock without written consent, and of any vested stock without the Company exercising the right of first refusal.[FN7] This conduct was engaged in prior to any divestment of Counterclaim Plaintiff's CreditSights shares by the Counterclaim Defendants.

FN6. These documents are considered by this Court even on a Rule 12(b)(6) motion since they are documents integral to the complaint. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808-09 (2d Cir.1996); *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773-74 (2d Cir.1991).

FN7. Counterclaim Plaintiff does not argue that these documents are fabricated, or that they have been erroneously attributed to him; instead, he relies on the specious argument that they do not constitute "pledges" within the meaning of an "enforceable security interest" as defined by the Uniform Commercial Code, Articles 8 and 9. (CCP. Opp. Mem. Law Rule 11 Mot. at 7.) It is a basic principle of contract law that, where the language of an agreement is clear and unambiguous, the intent of the parties lies therein and the agreement must be enforced by the plain meaning of its terms. *Klos v. Lotnicze,* 133 F.3d 164, 168 (1997) (noting that where the contractual terms are clear, "[t]he secret or subjective intent of the parties is irrelevant.") Since the plain language of the Restricted Stock Agreement prohibits even the offering of shares, not to mention any encumbrance of shares, Counterclaim Plaintiff's sophistry fails. (Second Amend. Compl. Exh. B ¶ 5.)

Counterclaim Plaintiff argues that when he agreed in his resignation letter to have the same economic consequences as a termination for cause under the 2004 Employment Agreement, it was understood that this only meant the Counterclaim Plaintiff giving up his six-month severance, not his rights to CreditSights shares. (CCP. Ans. & Count. ¶ 92).

This alleged "understanding" is nowhere reflected in any of the relevant contractual terms, which are facially clear. Counterclaim Plaintiff fails to allege he had the written consent of the Counterclaim Defendants to disclose proprietary business information to third parties such as Klausner, as required in the 2000 Restricted Stock Grant Agreement, Section 6(a).

Therefore, even accepting all the factual allegations in the counterclaim as true and making all reasonable inferences in the claimant's favor, Counterclaim Plaintiff cannot make out a claim for breach of contract because Counterclaim Plaintiff does not allege

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

adequately that he performed his obligations under the referenced contracts, particularly the 2000 Restricted Stock Grant Agreement. Because Counterclaim Plaintiff cannot allege that he had prior written consent to release proprietary information as required under Section 6(a) of the 2000 Restricted Stock Grant Agreement, the second element of his breach of contract counterclaim requiring the claimant to have performed his obligations under the contract is not satisfied. The counterclaim for breach of contract is therefore DISMISSED.

### 4. Count Two: The Unjust Enrichment Counterclaim

Counterclaim Defendants maintain that Counterclaim Plaintiff's unjust enrichment counterclaim must be dismissed because it is duplicative of the breach of contract counterclaim. (CCDs.' Mem. Law at 10-11.) Counterclaim Plaintiff asserts the unjust enrichment counterclaim is properly alleged because he was wrongfully deprived of the value to which he is entitled, the full market value, of his CreditSights shares. (CCP. Ans. & Count. ¶ 111.)

*12 "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." _Kaye v. Grossman_, 202 F.3d 611, 616 (2d Cir.2000) (internal quotation marks and citation omitted). However, before inquiring into these elements, a court must make the threshold consideration of whether or not the matter is controlled by a valid contract. "The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." _Goldman v. Metropolitan Life Ins. Co._, 807 N.Y.S.2d 583, 588 (2005) (citation omitted). As the New York Court of Appeals has explained:

A 'quasi contract' only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment.... Briefly stated, a quasi-contractual obligation is one imposed by law _where there has been no agreement or expression of assent, by word or act, on the part of either party involved._

_Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,_ 70 NY.2d 382, 388-389 (1987) (citations and internal

quotations omitted) (emphasis in original).

Here, Counterclaim Plaintiff conclusorily argues that, "the pleading alleges that CreditSights was unjustly enriched by the true value of Ciasullo's CreditSights stock based on conduct that goes beyond and is separate from that which is the subject of any of the agreements between CreditSights and Ciasullo." (CCP. Opp. Mem. Law Mot. to Dismiss at 16.) However, Counterclaim Plaintiff fails to point out exactly, or even suggest, what conduct was "beyond and separate from" the scope of matters controlled by contract in this case.

Moreover, the Court sees no grounds for allowing the counterclaim to proceed as a pleading in the alternative. "[C]ourts generally dismiss claims for quantum meruit on the pleadings only when it is clear from the face of the complaint that there exists an express contract that clearly controls." _Knudsen v. Quebecor Printing (U .S.A.), Inc.,_ 792 F.Supp. 234, 237 (S.D.N.Y.1992). In this case, Counterclaim Plaintiff has made no factual allegations which make plausible a claim that the relevant contracts are either invalid or unenforceable. The deprivation of the value of Counterclaim Plaintiff's CreditSights shares is an issue clearly controlled by valid and enforceable contracts between the Counterclaim Defendants and Defendant, including the Separation Agreement, the 2004 Executive Employment Agreement, and the 2000 Restricted Stock Grant Agreement.

Because the Counterclaim Defendants' and Counterclaim Plaintiff's rights and obligations with respect to Counterclaim Plaintiff's shares is a matter controlled by valid and enforceable agreements, the counterclaim for unjust enrichment is hereby DISMISSED.

### 5. Count Three: The Fraud Counterclaim

*13 As discussed supra, the Court holds that Counterclaim Plaintiff's counterclaim for Fraud is barred by the release provisions of the Separation Agreement, Section 8. Even if that release was not valid, not enforceable, or did not contemplate all of the fraudulent misconduct alleged by Defendant, this counterclaim would still fail, as a matter of law.

Counterclaim Defendants contend that Counterclaim Plaintiff's Count for Fraud is impermissibly duplicative of his Breach of Contract counterclaim. (CCDs.'

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

Mem. Law at 12.) Counterclaim Defendants further contend that the fraud claim must fail because Counterclaim Plaintiff does not identify specific representation upon which he relies, as required under Fed.R.Civ.P. 9(b). (*Id*. at 13, FN 4.)

Counterclaim Plaintiff alleges that his relationship with Counterclaim Defendants exceeded that of a mere contractual relationship, suggesting that, though CreditSights was in fact a corporation, because his relationship with Counterclaim Defendants was "mora akin to a partnership," distinct duties were owed to him. (CCP. Mem. Law at 14.) Counterclaim Plaintiff further alleges that the misrepresentations made by Reynolds and Fetas go beyond intent to perform and that, because the alleged misrepresentations and omissions concern "the very heart of the issue of trust among Petas, Reynolds and Ciasullo," they are beyond the scope of his counterclaim for breach of contract. (*Id.* at 14.)

In New York, the elements of common law fraud are "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970-71 (2d Cir.1987). The elements of actual fraud in New York are false representation, scienter, materiality, expectation of reliance, justifiable reliance, and damage." *Congress Fin. Corp. v. John Morrell & Co.,* 790 F.Supp. 459, 469 (S.D.N.Y.1992) (citation omitted). A successfully pleaded count for fraud that is independent of a breach of contract count must either (1) demonstrate a legal duty that is distinct from a legal duty to perform under the contract; or, (2) allege a misrepresentation that is collateral or extraneous from the contract; or, (3) seek special damages caused by a misrepresentation and unrecoverable as contract damages. *Bridgeston/Firestone Inc. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir.1996). As "an essential element of a cause of action for fraud ... justifiable reliance must be pleaded with particularity pursuant to Fed.R.Civ.P 9(b)." *Lutin v. New Jersey Steel Corp.,* 1996 WL 636037, at *7 (S.D.N.Y.1996) (citation omitted); *see also Manning v. Utilities Mutual Ins. Co.,* 254 F.3d 387, 400-01 (2d Cir.2001) (affirming District Court's dismissal of New York fraud claim for failure to plead reasonable reliance with sufficient particularity as required by Rule 9(b)).

In this case, Counterclaim Plaintiff tries to support his fraud counterclaim on four factual bases. (CCP. Ans. & Count. ¶ 114(a)-(d).) Three of these allegations concern an allegedly fraudulent scheme to usurp Counterclaim Plaintiff's control in and, ultimately oust him from, the Company; the last concerns Counterclaim Defendants' intent to perform under the agreements.

*1. The Scheme to Oust Counterclaim Plaintiff From the Company*

**\*14** Counterclaim Plaintiff alleges the Counterclaim Defendants intended to induce his reliance and subsequent actions in helping to create and build the Company, specifically misrepresenting that Counterclaim Plaintiff and Counterclaim Defendants would always be equal in the Company, failing to disclose their real motive in removing Counterclaim Plaintiff as President of the Company was to divest Counterclaim Plaintiff of his control and ownership of CreditSights, and representing to Counterclaim Plaintiff that he should continue to work at CreditSights without disclosing their plan to oust Counterclaim Plaintiff from the company and divest Counterclaim Plaintiff of his shares. (CCP. Ans. & Count. ¶¶ 82, 114, 116.) Counterclaim Plaintiff alleges that Counterclaim Defendant Reynolds induced Counterclaim Plaintiff to sell his shares to generate cash for the company by falsely representing to Counterclaim Plaintiff that Reynolds sold his own shares when, in actuality, he sold shares under his wife's name, with the intent of diluting Counterclaim Plaintiff's equity. (CCP. Ans. & Count. ¶ 82.) Counterclaim Plaintiff asserts that these allegations demonstrate fraudulent misrepresentations collateral to the contracts and are not duplicative of the breach of contract counterclaim. (CCP. Opp. Mem. Law at 14.)

The Court finds Counterclaim Plaintiff's efforts to create a fraud counterclaim predicated on such allegations unavailing. First, Counterclaim Plaintiff fails to demonstrate how these allegations, which fundamentally concern his capacity and control as an employee of CreditSights, are outside the scope of the agreements relevant in this case, including valid and enforceable employment contracts. Second, Counterclaim Plaintiff has not pleaded any legal duty, nor can the Court ascertain one, outside a duty to perform under the contract, upon which he justifiably relied. While Counterclaim Plaintiff claims Counterclaim

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
(Cite as: 2008 WL 4185737 (S.D.N.Y.))

Defendants breached fiduciary duties he was owed as a partner, the structure of the Company was a corporation, not a partnership. Finally, even assuming the misrepresentations to be collateral to the contracts and/or that there exists a separate fiduciary duty upon which Counterclaim Plaintiff could justifiably rely, these allegations are merely conclusory. Counterclaim Plaintiff has not pleaded justifiable reliance with the requisite particularity. Moreover, the Counterclaim Plaintiff has failed to "allege facts that give rise to a strong inference of fraudulent intent." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 812 (2d Cir.1996).*

On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain, 478 U.S. 265, 286 (1986).* "Factual allegations must be enough to raise a right to relief above a speculative level." *Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007).*[FN8]

> FN8. Counterclaim Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss Counterclaims erroneously relies on the pre-*Twombly* standard of pleading on a motion to dismiss.

In short, Counterclaim Plaintiff has offered up no facts which would raise his conclusory allegations to a level of plausibility, and a fraud counterclaim based on an alleged scheme to oust him from the Company fails.

2. *Counterclaim Defendants Never Intended to Honor their Obligations Under Specific Agreements*

*15 Second, Counterclaim Plaintiff tries to base his fraud counterclaim on the allegation that Counterclaim Defendants failed to disclose to Counterclaim Plaintiff when soliciting the Separation and Proxy Agreements that they never intended to have Credit-Sights honor its obligations under those agreements. (CCP. Ans. & Count. ¶ 114.) Essentially Counterclaim Plaintiff's allegation challenges the Counterclaim Defendants' intent to perform under the multiple contracts. It is hornbook law that such allegations cannot support a claim of fraud in New York. *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 19 (2d Cir.1996)* (citing *McKernin v. Fanny Farmer Candy Shops, Inc., 574*

N.Y.S.2d 58, 59 (2d Dept 1991)* (where a fraud claim "is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie"); *Metropolitan Transp. Auth. v. Triumph Advertising Productions, 497 N.Y.S.2d 673, 675 (1st Dept 1986)* (dismissing fraud claim where claim "allege[d] only a breach of the representation of performance implicit in making the bid and a subsequent assurance of performance" by the defendant)). *See also Papa's-June Music, Inc. v. McLean, 921 F.Supp. 1154, 1162 (S.D.N.Y.1996)* (dismissing fraud claim where "[t]he complaint does not allege a fraud claim that is sufficiently distinct from the breach of contract claim" but "merely appends allegations about [defendant's] state of mind to the claim for breach of contract").

Counterclaim Plaintiff's counterclaim for fraud is not adequately alleged. Accordingly, the Counterclaim Plaintiff's counterclaim for fraud is hereby DISMISSED.

6. *Count Four: The Declaratory Relief Counterclaim*

Counterclaim Defendants move to dismiss Counterclaim Plaintiff's counterclaim for declaratory relief on the grounds that it is duplicative of his breach of contract claim. (CCDs.' Mem. Law at 14 .) Counterclaim Plaintiff seeks a declaratory judgment that "Credit-Sights has no continuing right, title or interest to any of Ciasullo's shares of CreditSights and such shares rightfully belong to Ciasullo." (CCP. Ans. & Count. ¶ 120.)

In this case, none of Counterclaim Plaintiff's allegations adequately support a claim under which the declaratory relief he seeks could be granted. Accordingly, the counterclaim for Declaratory relief is hereby DISMISSED.

7. *Count Five; The Breach of Fiduciary Duty Counterclaim*

Counterclaim Defendants ask the Court to dismiss Counterclaim Plaintiff's breach of fiduciary duty counterclaim against Counterclaim Defendants Fetas and Reynolds, arguing that Counterclaim Plaintiff can not allege facts which satisfy the elements of a breach of fiduciary duty claim. (CCDs.' Mem. Law at

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

12 .)

Counterclaim Plaintiff alleges that, as officers and directors of CreditSights, Counterclaim Defendants violated fiduciary duties owed to fellow directors and shareholders, including Defendant. (CCP. Ans. & Count. ¶¶ 123-124.) Counterclaim Plaintiff further alleges that Counterclaim Defendants' morally reprehensible and reckless conduct warrants punitive damages. (*Id.* at ¶ 125.) Counterclaim Plaintiff seeks to recover damages, including the restoration of his CreditSights shares, loss of earnings from future employment at CreditSights, and loss of earnings from employment subsequent to his tenure at CreditSights, based on the alleged violation of fiduciary duties. (*Id.* at ¶ 125-126.)

*16 In New York, a claim for breach of fiduciary duty must allege: (1) breach by a fiduciary of a duty owed to the plaintiff; (2) defendant's knowing participation in the breach; and (3) damages. *SCS Communications, Inc. v. Herrick Co., Inc.,* 360 F.3d 329, 342 (2d Cir.2004). Generally under New York law, there is no fiduciary relationship between employers and employees. *Ellis v. Provident Life & Accident Ins. Co.,* 3 P.Supp.2d 399, 411 (S.D.N.Y.1998) (citation omitted).

At the outset, the Court notes that, in this case, the loss of earnings damages sought by Counterclaim Plaintiff arises from his status as an employee, not as a shareholder. Because no duty is owed to the Counterclaim Plaintiff as an employee, Counterclaim Plaintiff can neither make out a claim for damages arising from loss of earnings from future employment at CreditSights, nor from future employment subsequent to his employment at CreditSights, based on any alleged violation of fiduciary duties.

In stating his counterclaim for breach of fiduciary duties, Counterclaim Plaintiff seeks to rely on the duties Counterclaim Defendants Reynolds and Petas owed as officers and directors of the Company. However, as discussed infra, pages 18-24, the executed release in the Separation Agreement bars any and all causes of action against Counterclaim Defendants Petas and Reynolds as officers and directors. Moreover, even if the release did not bar this claim, it would still fail. The facts as alleged by Counterclaim Plaintiff do not support a counterclaim that Counterclaim Defendants Reynolds and Petas cancelled his

shares. In fact, Counterclaim Plaintiff alleges that the Company divested him of his shares. (CCP. Ans. & Count. ¶¶ 102-103.)

Accordingly, the Counterclaim Plaintiff's Count for Breach of Fiduciary Duty is hereby DISMISSED.

8. *Count Six: The Tortious Interference with Business Relations Counterclaim*

Counterclaim Defendants argue that Counterclaim Plaintiff has not alleged facts sufficient to satisfy the elements of a tortious interference with business relations claim. (Pl. Mem. Law at 15-16.)

Counterclaim Plaintiff alleges two distinct grounds for his tortious interference with business relations Count. First, Counterclaim Plaintiff contends that Counterclaim Defendants were aware of Counterclaim Plaintiff's employment with Soleil and contacted Soleil regarding his non-compete obligations to CreditSights with either the sole purpose of harming Counterclaim Plaintiff and/or through means that were unlawful and improper. (CCP. Ans. & Count. ¶¶ 95-99, 128.) Second, Counterclaim Plaintiff alleges that Counterclaim Defendants conspired to make a baseless criminal complaint to the New York City Police Department, falsely accusing Counterclaim Plaintiff of stealing confidential and proprietary information from CreditSights. (*Id.* ¶ 97.)

In New York, a claim for tortious interference with business relations must allege: (1) business relations between the plaintiff and third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship. *Nadel v. Play-by-Play Toys & Novelties, Inc.,* 208 F.3d 368, 382 (2d Cir.2000).

a. *The Non-Compete Clause*

*17 Counterclaim Plaintiff alleges that Counterclaim Defendants' sole purpose in contacting Soleil about the non-compete clause in Counterclaim Plaintiff's Employment Agreement was to cause him harm. (CCP. Ans. & Count. ¶ 128.) Counterclaim Plaintiff also alleges that within days of rebuffing Counterclaim Plaintiff's efforts to discuss his employment

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
(Cite as: 2008 WL 4185737 (S.D.N.Y.))

with Soleil, Counterclaim Defendants wrote to Soleil accusing Counterclaim Plaintiff of violating the non-compete clause. (*Id.* ¶¶ 95, 96.)

With respect to CreditSights' conduct in contacting Soleil to discuss his non-compete clause, Counterclaim Plaintiff's counterclaim fails. Counterclaim Plaintiff's allegation that Counterclaim Defendants' sole purpose in contacting Soleil was to cause harm to the Counterclaim Plaintiff is not only conclusory, it is also belied by many of the Counterclaim Plaintiff's other factual allegations. Counterclaim Plaintiff concedes that his 2004 Executive Employment Agreement includes a one year non-compete clause; Section 9(b) of this Agreement makes untenable Counterclaim Plaintiff's conclusion that Counterclaim Defendants' only motivation was to bring him harm. Indeed, Section 9(b) makes it clear that the facts, as pleaded by Defendant, show that Counterclaim Defendants had an alternative purpose for contacting Soleil: the enforcement of the non-compete clause and protection of their business interests.

b. *The Criminal Investigation*

Additionally, Counterclaim Plaintiff alleges that Counterclaim Defendants' complaint to authorities and the criminal investigation which followed were a tortious interference with his business relations with Soleil. (CCP. Opp. Mem. Law at 18-19.) Counterclaim Plaintiff alleges an email exchange indicating Counterclaim Defendants' assent to the investigated activity make it improper for Counterclaim Defendants to bring a complaint to the authorities. (CCP. Ans. & Count. ¶ 97.)

Here, the Counterclaim Plaintiff has alleged at least one fact which, if true, makes plausible a claim for tortious interference with business relations. Namely, Counterclaim Defendants' complaint to the authorities may amount to tortious interference with Counterclaim Plaintiff's Soleil business relationship, assuming the truthfulness of his claim that in an email exchange, Counterclaim Defendants assented to Counterclaim Plaintiff's activity. This counterclaim is not precluded by the contractual release between the parties, as the Counterclaim Defendants' allegedly went to the police after the execution of the contractual release.

Accordingly Counterclaim Defendants' Motion to Dismiss Count Six, for tortious interference with business relations is GRANTED in part, on the non-compete clause claim, and DENIED in part, on the tortious interference claim.

9. *Count Seven: The Prima Facie Tort Counterclaim*

Counterclaim Defendants challenge Counterclaim Plaintiff's prima facie tort counterclaim because, in violation of the law in this Circuit, it does not allege facts that are unique from those alleged in other tort claims. (CCDs.' Mem. Law at 18.)

**\*18** Counterclaim Plaintiff argues that Counterclaim Defendants, separately and conspiring with each other, intended to cause and did cause Counterclaim Plaintiff to suffer the intentional infliction of economic damages without excuse or justification for their actions, solely motivated by greed and/or malevolent reasons. (CCP. Ans. & Count. ¶ 131.)

A prima facie tort includes four elements: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, and (4) by an act or series of acts that would otherwise be lawful. *Curiano v. Suozzi,* 63 N.Y.2d 113, 117 (1984). However, "[a] set of facts giving rise to a common-law tort is fatal to a prima facie tort claim". *Chen v. United States,* 854 F.2d 622, 628 (2d Cir.1988). "[T]here is no recovery in prima facie tort unless malevolence is the sole motive for defendant's otherwise lawful act." *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 333 (1983); *see also, Fallon v. McKeon,* 230 A.D.2d 629, 630 (1st Dep't 1996).

Here, Counterclaim Plaintiff alleges that Counterclaim Defendants' conduct was motivated solely by greed and/or malevolent reasons. (CCP. Ans. & Count. ¶ 131.) Notwithstanding Counterclaim Plaintiff's conclusory language, Counterclaim Plaintiff fails to support adequately his claim that Counterclaim Defendants' actions were motivated solely by the intent to injure him. Indeed, Counterclaim Plaintiff's own allegations identify several other legitimate motives for Counterclaim Defendants' conduct, including the enforcement of legal, binding contractual agreements. Counterclaim Plaintiff, for example, states that Counterclaim Defendants sought to take advantage of his absence for the purpose of economic gain. (CCP. Ans. & Count. ¶¶ 79, 85.) *See e.g.,*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

*Discover Group, Inc. v. Lexmark Int'l., Inc.,* 333
F.Supp.2d 78, 87 (E.D.N.Y.2004) (dismissing a
prima facie tort claim where the complaint alleged
that defendant "was acting, at least in part, to further
its own economic interests.").

Clearly, as acknowledged by Counterclaim
Plaintiff, Counterclaim Defendants alleged conduct was not
motivated solely by disinterested malevolence. Ac-
cordingly, Counterclaim Plaintiff's counterclaim for
prima facie tort is DISMISSED.

10. *Counts Eight and Nine: The Civil Conspiracy to
Commit a Prima Facie Tort, and Civil Conspiracy to
Interfere Tortiously with Business Relations, Coun-
terclaims*

Counterclaim Defendants move to dismiss Counter-
claim Plaintiff's Civil Conspiracy to commit a prima
facie tort and civil conspiracy to tortiously interfere
with business relations counterclaims because inde-
pendent claims for civil conspiracy are barred under
New York law. (CCDs.' Mem. Law at 20-21.)

New York does not recognize an independent tort of
conspiracy. *See, Alexander & Alexander of New
York, Inc. v. Fritzen,* 68 N.Y .2d 968, 969, 503
N.E.2d 102, 102, 510 N.Y.S.2d 546, 547 (1986)
("[A]s we long held, a mere conspiracy to commit a
tort is never of itself a cause of action.") Therefore, if
the claimant fails to state a cause of action for either
of the torts underlying the alleged conspiracy, it nec-
essarily fails to state an actionable claim for civil
conspiracy. *Kirch v. Liberty Media Corp.,* 449 F .3d
388, 401 (2d Cir.2006).

*19 Here, Counterclaim Plaintiff fails to state a coun-
terclaim for prima facie tort. Consequently, the coun-
terclaim of civil conspiracy to commit a prima facie
tort must be dismissed. However, because Counter-
claim Plaintiff provides sufficient facts to state a
claim for tortious interference with business relations
with respect to the Counterclaim Defendants' com-
plaint to the authorities, his civil conspiracy to inter-
fere tortiously with business relations counterclaim
cannot be dismissed.

Consequently, Counterclaim Defendants' Motion to
Dismiss Count Eight is GRANTED, however Coun-
terclaim Defendants' Motion to Dismiss Count Nine
is DENIED.

11. *Count Ten: The Damage to Business Reputation
Counterclaim*

Counterclaim Defendants move to dismiss Counter-
claim Plaintiff's damage to business reputation coun-
terclaim on two grounds. First, to the extent that the
counterclaim is based on statements allegedly made
one year prior to the filing of Counterclaim Plaintiff's
Answer to Amended Complaint and Counterclaims,
Counterclaim Defendants contend it is barred by the
statute of limitations. (CCDs.' Mem. Law at 22-23.)
Second, Counterclaim Defendants maintain that, to
the extent that the counterclaim is based on state-
ments made in litigation, the alleged statements are
protected by absolute privilege. (*Id.* at 21-23.)

Counterclaim Plaintiff argues that Counterclaim De-
fendants falsely and publicly accused Counterclaim
Plaintiff of; (1) sexual harassment; (2) purportedly
breaching the non-compete clause in the 2004 Execu-
tive Employment Agreement; and, (3) disclosing
confidential and proprietary business information
with knowledge or reckless disregard as to the inac-
curacy of the statements. In Counterclaim Plaintiff's
view, these statements caused damage to Counter-
claim Plaintiff's business reputation. (CCP. Ans. &
Count. ¶¶ 140-141.)

a. *Public Actions Not Identified and the One Year
Statute of Limitations*

Counterclaim Plaintiff's counterclaim for damage to
business reputation is, in New York, a defamation
claim. *See Pasqualini v. MortgageIT, Inc.,* 498
F.Supp.2d 659, 670 (S.D.N.Y.2007) (Where the
plaintiff's claim is based entirely on defendant's dis-
semination of negative statements about her, the re-
sulting harm to plaintiff's professional reputation, "is
thus, in essence, a defamation claim, and is subject to
the applicable one year statute of limitations.")
Defamation claims are subject to a one year statute of
limitations under New York C.P.L.R. § 215(3)
(McKinney 2007).

In this case, outside of the instant litigation, Counter-
claim Plaintiff's defamation claim is based on state-
ments made prior to June 2006 (CCP. Ans. & Count.
¶ 140.) Consequently, these statements are barred by
the one-year statute of limitations, as they were made
more than one year before the September 2007 filing

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

of this counterclaim.

Counterclaim Plaintiff fails to allege that any of the allegedly harmful accusations, including the alleged public accusations of sexual harassment, accusations that he violated the non-complete clause in his employment agreement, or accusations that he wrongfully disseminated confidential and proprietary business information occurred within one year prior to the filing of his Answer and Counterclaims.[FN9] Accordingly, Counterclaim Plaintiff's counterclaim for damage to business reputation is DISMISSED because of the one-year statute of limitations.

> FN9. Regarding Counterclaim Plaintiff's allegation that, after he began employment at Soleil, Counterclaim Defendants baselessly made public accusations mat Counterclaim Plaintiff violated the Section 9(b) non-compete clause in the 2004 Executive Employment Agreement, the Court notes that Counterclaim Plaintiff cannot rely on statements made during the instant litigation proceedings. Public statements made in connection with court proceedings are absolutely privileged and not actionable. See *Levy v. State,* 58 N.Y.2d 733 (1982) (holding that there is absolute immunity from civil suits on statements and affirmations made in the course of a judicial proceeding).

## III. COUNTERCLAIM DEFENDANTS' MOTION FOR RULE 11 SANCTIONS

### A. *BACKGROUND*

**\*20** Counterclaim Defendants move pursuant to Federal Rule of Civil Procedure 11, on the grounds that Defendants asserted blatant factual errors and statements not relevant to their counterclaims solely for the purpose of smearing the Counterclaim Defendants. (Counterclaim Defendant's Memorandum of Law in Support of Motion for Sanctions for Rule 11 of the FRCP, "CCDs.' Mem. Law Rule 11 Mot .," at 2.) Counterclaim Defendants allege that Counterclaim Plaintiff's Answer to Amended Complaint and Counterclaims contains erroneous information which should be stricken and merit sanctions. (*Id.*) According to Counterclaim Defendants, the blatant factual inaccuracies alleged by Counterclaim Plaintiff include: (1) Counterclaim Plaintiff's denial that he

pledged his CreditSights stock; and (2), Counterclaim Plaintiff's awareness that Counterclaim Defendant Reynolds would be involved with running the Company from the start. (*Id.*) Counterclaim Defendants argue that sanctions should be imposed to deter Counterclaim Plaintiff from engaging in similarly frivolous litigation tactics in the future. (*Id.*)

### B. *THE FED. R. Civ. P. 11 LEGAL STANDARD*

Rule 11 states in part: "The signature of an attorney or party constitutes a certificate by the signer that ... to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact.... If a pleading, motion, or other paper is signed in violation of this rule, the court ... shall impose upon the person who signed it ... an appropriate sanction." The purpose of Rule 11 is to afford a trial court judge a mechanism "to enforce ethical standards upon attorneys appearing before them, while being careful not to rein in zealous advocacy." *Pannonia Farms, Inc. v. USA Cable,* 426 F.3d 650, 652 (2d Cir.2005). Federal Rules of Civil Procedure are to be given their plain meaning. *Pavelic & Le-Flore v. Marvel Entertainment Group,* 493 U.S. 120, 123 (1989). The plain meaning of Rule 11 is well-settled: any signatory of a document submitted to the court must conduct a "reasonable inquiry" or face sanctions. *Business Guides, Inc. v. Chromatic Commc'ns Enter., Inc.,* 498 U.S. 533, 541 (1991). Though decision of whether or not to impose sanctions is completely within the discretion of the district court, "any such decision [must be] made with restraint and discretion." *Schlaifer Nance & Co., Inc. v. Estate of Warhol,* 194 F.3d 323, 334 (2d Cir.1999) (citation omitted). "[T]he standard for triggering the award of fees under Rule 11 is objective unreasonableness." *Margo v. Weiss,* 213 F.3d 55, 65 (2d Cir.2000).

### C. *DISCUSSION*

Counsel for Counterclaim Plaintiff argues that sanctions are inappropriate in this case. Defense Counsel represents that Counterclaim Plaintiff was extensively interviewed regarding the pledges of his CreditSights stock to third parties, and that Counsel assured themselves of the truthfulness of Counterclaim Plaintiff's denial of stock pledges by contacting the third parties and confirming that those third parties would sign affidavits attesting to this assertion. (Joint

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
(Cite as: 2008 WL 4185737 (S.D.N.Y.))

Declaration of Murray, Esq. and O'Rourke, Esq. In Opposition to Counterclaim Defendant's Motion for Rule 11, "CCP. Joint Decl. Opp. Rule 11 Mot." (¶¶ 18-19.) Counterclaim Plaintiff and his Counsel jointly and separately reviewed the Counterclaim Plaintiff's Answer/Counterclaims several times for factual accuracy. (*Id.* ¶ 17.) Counsel repeatedly asked Counterclaim Plaintiff whether they had all relevant documentation and requested that Counterclaim Plaintiff search his files for supporting documentation. (*Id.* ¶ 28.) Counterclaim Plaintiff continuously assured Counsel that he provided them all the requisite information. (*Id.* ¶¶ 23, 28-30.)

**\*21** When Counterclaim Plaintiff finally disclosed the existence of a 2005 Stock Pledge Agreement with third party Klausner, Counsel conducted extensive research, questioning Counterclaim Plaintiff about why he had not come forth with this information earlier. (*Id.* ¶ 34.) They also called Klausner to verify the existence of any agreement. (*Id.*) In the course of this inquiry into the 2005 Stock Pledge Agreement, Counsel became aware of an executed 2001 Convertible Loan Agreement with Klausner. (*Id* . ¶¶ 29-31.) Upon discovering this, Counsel immediately advised Counterclaim Defendants that the Answer and Counterclaims would be withdrawn and revised. (*Id.* ¶ 33.)

Counterclaim Defendants' maintain Counterclaim Plaintiff's allegation that he was unaware of the extent of Counterclaim Defendant Reynolds involvement with the Company was also a blatant factual inaccuracy. Defense Counsel argues it cannot be known whether this is a blatant inaccuracy until further discovery is conducted, and therefore not a basis for Rule 11 sanctions.

Counterclaim Defendants have raised a compelling claim that at least with respect to Counterclaim Plaintiff's denial that he pledged CreditSights stock, Rule 11 sanctions may be warranted in this case. This is particularly true given that Counsel for Counterclaim Plaintiff has yet to withdraw and revise the Answer and Counterclaims in this case, which clearly contain erroneous representations. However, the Court, in an exercise of leniency and restraint, exercises its discretion and hereby declines to impose monetary sanctions at this time on Counterclaim Plaintiff's counsel. The Court expects, however, that Counterclaim Plaintiff's counsel, now with knowledge of their cli-

ent's unreliability, will require more information and corroboration from their client and/or others before filing sanctionable papers with the Court. Counterclaim Plaintiff shall withdraw and revise the Answer and Counterclaims within 30 days of the date of this Order.

D. *CONCLUSION*

In accordance with the foregoing, Counterclaim Defendants' motion for Rule 11 sanctions against the Counterclaim Plaintiff is DENIED at this time.

IV. COUNTERCLAIM DEFENDANTS' MOTION TO STRIKE CERTAIN ALLEGATIONS IN THE COUNTERCLAIM

A. *BACKGROUND*

Counterclaim Defendants move to strike certain allegations in the Counterclaim Plaintiff's Answer to Second Amended Complaint and Counterclaims pursuant to Fed.R.Civ.P. 12(f). In particular, Counterclaim Defendants assert that allegations made pertaining to (1) adulterous relationships between members of the Company's Board of Directors and employees at prior places of employment; and, (2) Counterclaim Defendant Reynolds' mental health and alcohol use, are unsupported by evidence, unsupportable and irrelevant to any claim or defense which may be raised by Defendant. (CCDs.' Mem. Law Rule 11 Mot. at 12.)

B. *MOTION TO STRIKE LEGAL STANDARD*

Fed.R.Civ.P. states in pertinent part: "[T]he court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." It is well settled that a Rule 12(f) motion will be denied, "unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United Corp.* 551 F.2d 887, 893 (2d Cir.1976).

C. DISCUSSION and CONCLUSION

**\*22** In this case, evidence regarding the adulterous relationships that members of the Company's Board of Directors engaged in prior to working at the Company would be inadmissible. As Counterclaim De-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)
**(Cite as: 2008 WL 4185737 (S.D.N.Y.))**

fendants explain, "what allegedly occurred at previous places of employment by Board Members has no bearing on, and is no defense to, Ciasullo's own non-compliance with CreditSights' policies against sexual harassment or the unanimous decision of the Board of Directors to remove him from the Board for harassing a subordinate." (CCDs.' Mem. Law Rule 11 Mot. at 12.)

Likewise, the Court cannot find that there are any circumstances under which evidence pertaining to Counterclaim Defendant Reynolds' mental health and alcohol use would be admissible in this case. Counterclaim Plaintiff has alleged no causal relation between such facts and his claims.

Accordingly, Counterclaim Defendants' Motion to Strike is GRANTED.

## V. COUNTERCLAIM PLAINTIFF'S REQUESTS TO REPLEAD AND FOR SANCTIONS

Counterclaim Plaintiff requests leave to replead. (CCP. Opp. Mem. Law at 24.) Federal Rule of Civil Procedure 15 states, in relevant part: "A party may amend its pleading by leave of the court ... and leave shall be freely given when justice requires." If amendment to the complaint would not be futile, requests for leave to re-plead should be granted. *Nemo Tile Company v. Shamut Nat'l. Corp.,* 1995 WL 1682315 (E.D.N.Y.1995).

Here, amendments to the counterclaims would be futile. Thus, Counterclaim Plaintiff's request for leave to re-plead counterclaims is DENIED. All counterclaims dismissed herein are accordingly DISMISSED, WITH PREJUDICE.

Counterclaim Plaintiff also requests that the Court impose sanctions on Plaintiff and its Counsel for filing their Motion for Sanctions. (CCP. Mem. Law Opp. Rule 11 Mot. at 11.) This request is patently frivolous, in that Counterclaim Plaintiff barely escaped monetary sanctions at this stage of the proceedings. Moreover, the request is made in obvious contravention of Rule 11, which requires that a motion for sanctions be made separately from any other motion, describe the alleged conduct which violates Rule 11(b) and be served in accordance with Rule 5 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 11(c)(2). Counterclaim Plaintiff's request is accord-

ingly DENIED.

## VI. CONCLUSION

For the foregoing reasons, Counterclaim Defendants' Motion for Default Judgment against Counterclaim Plaintiff is DENIED. Counterclaim Defendants' Motion to Dismiss Counterclaim Plaintiff's First, Second, Third, Fourth, Fifth, Seventh, Eighth, and Tenth causes of action is GRANTED. Counterclaim Defendants' Motion to Dismiss Counterclaim Plaintiff's Sixth and Ninth Cause of Action is GRANTED in part, and DENIED in part. Counterclaim Defendants' Motion for Rule 11 Sanctions against Counterclaim Plaintiff is DENIED, at this time, and Counterclaim Defendants' Motion to Strike certain allegations is GRANTED. Counterclaim Plaintiff's request to replead is DENIED. Counterclaim Plaintiff's request for sanctions is DENIED.

**\*23** SO ORDERED.

S.D.N.Y.,2008.
CreditSights, Inc. v. Ciasullo
Not Reported in F.Supp.2d, 2008 WL 4185737 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 13

Westlaw.

Not Reported in F.Supp.2d, 2007 WL 4292030 (S.D.N.Y.)
**(Cite as: 2007 WL 4292030 (S.D.N.Y.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Charlene MORISSEAU, Plaintiff,
v.
DLA PIPER, et al., Defendants.
**No. 06 Civ. 13255(LAK).**

Dec. 3, 2007.

**MEMORANDUM AND ORDER**

<u>LEWIS A. KAPLAN</u>, District Judge.

**\*1** Plaintiff, an African-American graduate of the Harvard Law School and, in her student days, an editor of the *Harvard Law Review,* here sues DLA Piper, a former employer, and a host of its personnel principally for employment discrimination. She alleges that (a) her work conditions and termination were discriminatory on the basis of her race, (b) her termination constituted retaliation for protected activity, (c) the firm engaged in post-termination retaliation in connection with her application for admission to the New York Bar, (d) she was subjected to a hostile work environment, and (e) the firm breached a contract by allegedly terminating her for complaining about what she asserted was an ethical violation. The matter is before the Court on defendants' motion for summary judgment.

*Prior Proceedings*

This controversy has had a long and turbulent history.

Plaintiff initially filed a complaint with the Equal Employment Opportunity Commission ("EEOC") which, on August 14, 2006, determined upon its investigation that it was unable to conclude that any violation of the civil rights laws had occurred and notified plaintifFof her right to sue. On November 16, 2006, plaintiff, then represented by the firm of Ballon Stoll Bader & Nadler, PC (the "Ballon Firm"), filed this action.

On February 16, 2007, the Court entered a Consent

Scheduling Order (DI 17) which called for the completion of discovery by May 25, 2007 and the filing of ajoint pretrial order by May 31, 2007.

Discovery did not proceed smoothly, to say the least. Some of the difficulties are captured by this excerpt from the Court's order of March 29, 2007:

"Defendants served their document requests on January 12, 2007. On February 16, 2007, the Court ordered plaintiff to respond to all outstanding document requests by March 8, 2007. Plaintiff then sought an extension of, among other things, the time for document production. By order endorsed on the application and dated March 15,2007, the Court directed that '[t]he documents shall be produced by plaintiff no later than March 20, 2007.'

"On March 20, 2007, plaintiff produced 340 pages of documents and a formal response to the document request that was filled with boilerplate objections. She furnished also a privilege log, as required by S.D.N. Y. Civ. R. 26.2., which asserted privileged as to only 7 documents.

"Upon review of the documents produced by plaintiff, defendants' counsel concluded that there were numerous categories of requested documents in which no responsive documents were furnished and in which it was most unlikely that plaintiff did not possession [*sic* ] responsive materials. Accordingly, they wrote to plaintiff's counsel making these points. Plaintiffs counsel did not respond.

"On March 26, 2007, plaintiff appeared for her deposition. At the outset, she admitted that she had numerous responsive documents that had not been produced including documents relating to her employment after leaving defendant DLA Piper, her litigation against a former employer, and her application to the New York Bar. She admitted also that she had two e-mail accounts that she had not reviewed for responsive documents.

**\*2** "When confronted with this testimony, plaintiff's counsel first sought to excused [*sic* ] the failure to produce these documents on the ground that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4292030 (S.D.N.Y.)
(Cite as: 2007 WL 4292030 (S.D.N.Y.))

a Confidentiality Stipulation only recently had been signed. This excuse, however, was undercut by the fact that defendants sent the confidentiality stipulation to plaintiff's counsel on March 14 and followed up on March 21 after failing to hear from plaintiffs counsel. In any case, the Confidentiality Stipulation was so-ordered on March 23, in advance of plaintiff's deposition. Plaintiff's counsel then changed course. Following a break at the deposition, he told defendants' counsel that the reason the documents had not been produced is that many were privileged. They did not, however, appear on the privilege log served on March 20, 2007." DI 28.

Accordingly, the Court held that all privilege claims with respect to documents that did not appear on the March 20, 2007 privilege log had been waived. It granted defendants' motion for sanctions to the extent that plaintiff was ordered to "pay defendants $5,000 to compensate them for part of the attorneys' fees incurred by defendants in making this application and in conducting the March 26 session of plaintiff's deposition without the benefit of the documents that the Court had ordered produced by March 20, in advance of the deposition." In addition, in light of the fact that "the documents withheld include materials going directly to plaintiff's economic damages as a result of her departure from DLA Piper," it precluded plaintiff "from offering evidence of economic damages as a result of that departure unless all documents sought by defendants' request are produced on or before April 2, 2007." [FN1] *Id.* This dispute was only a harbinger of things to come.

> FN1. Plaintiff ultimately did not comply. The economic damages aspect of her claim therefore was dismissed. DI 102.

Plaintiff's deposition was scheduled to resume on April 9, 2007. On that morning, however, plaintiff purportedly fired the Ballon Firm. Defendants by letter sought an order that the case proceed notwithstanding the purported termination of plaintiff's counsel. Moreover, on April 10, 2007, defendants moved for a Rule 35 examination of plaintiff by mental health professionals.

On April 10, 2007, the Court held a conference in consequence of defendants' request. At that time, it stayed the action, with certain exceptions, to and in-

cluding May 10, 2007 to permit plaintiff to seek other counsel. Tr., Apr. 10, 2007, at 12. It extended plaintiffs time to respond to the Rule 35 motion until May 24. *Id.* at 13. In addition, it permitted defendants to make any motion they saw fit with respect to events that already had occurred, with opposing papers on any such motion to be due on the later of May 24 or the fourteenth day after the date the motion was made. *See also* DI 37.

Two motions were filed while the case was stayed: (1) defendants' motion to compel and for sanctions (DI 40), and (2) the Ballon Firm's motion for leave to withdraw and to fix charging and retaining liens (DI 42).

*3 The stay expired on May 10, 2007. No counsel appeared on plaintiff s behalf. In addition, defendants noticed the continuation of her deposition for May 22. Plaintiff, however, simply failed to show up. DI 102, at 4.

May 24, 2007 came and went without any response by plaintiff to the pending motions. Accordingly, on May 29, 2007, the Court granted all three motions. DI 47.

The strife, if anything, subsequently increased. Plaintiff subsequently has engaged in repeated baseless efforts to relitigate the question whether she should be compelled to submit to a Rule 35 examination and, if so, on what terms as well as the privilege objections that were waived long ago. *See, e.g.,* DI 102, at 4-5. It would burden this memorandum unduly to recapitulate the details. They are apparent from the docket sheet as well as a number of orders of the Court. *E.g.,* DI 95, 97, 98, 102, 106, 111.

In short, plaintiff repeatedly has obstructed the progress of this action and has ignored deadlines and other obligations.

*The Pending Motion*

Defendants' motion for summary judgment dismissing the complaint was filed on October 22, 2007. Answering papers initially were due on or about November 5, 2007.

Plaintiff filed no answering papers on that date. She

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4292030 (S.D.N.Y.)
(Cite as: 2007 WL 4292030 (S.D.N.Y.))

did, however, file an affirmation in opposition to an-other motion by defendants.[FN2] The last paragraph of her affirmation asked that the motion for summary judgment be held in abeyance pending the disposition of the other motion. DI 117 ¶ 12(d). While the Court saw no reason to hold the summary judgment motion in abeyance, it *sua sponte* extended plaintiffs time in which to respond to the summary judgment motion to and including November 14, 2007. DI 120.

> FN2. That motion seeks dismissal for viola-tion of several Court orders. DI 115.

On November 11, 2007, plaintiff moved for an exten-sion of time until November 27, 2007 to respond to the motion for summary judgment. DI 121. That mo-tion was granted. DI 124. Nonetheless, plaintiff filed no answering papers by the due date.

On November 28, 2007, after the due date already had passed, plaintiff filed a request to submit her re-sponsive papers by mail, stating that she could not bring them to the Courthouse during business hours. DI 125. On the following day, me Court granted permission but with the proviso that it did not thereby extend the time within which papers had to be filed, DI 127, which already had expired.

On December 3, 2007, the Court received in cham-bers a package from plaintiff delivered by Federal Express. The package contained three volumes of purported exhibits to plaintiffs declaration authenti-cating documents in opposition to defendant's motion for summary judgment.[FN3] No such declaration was filed. Nor has plaintiff filed a Rule 56.1 statement, a memorandum of law, or any properly authenticated, admissible evidence in opposition to the motion.

> FN3. The three volumes together are roughly 3 inches thick. The contents are not authenticated. There are no exhibit tabs or other labels, and there is no table of con-tents. Even if there were a basis for conclud-ing that these materials are admissible, as there must be in order to be considered here, *e.g.*, *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.1997), "( [j]udges are not like pigs, hunting for truffles buried' in the record." *Albrechtsen v. Bd. of Regents of the Univ. of Wisconsin Sys.*, 309 F.3d 433, 436 (7th Cir.2002), *cert. denied*, 539 U.S. 941 (2003)

(quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) (per curiam)). The Court therefore would decline to review them in any event.

The consequences of plaintiff's failure to respond are clear. Under S.D.N.Y. CIV. R. 56.1, all well sup-ported averments in defendants' Rule 56.1 Statement are deemed admitted. Moreover, as the Notice to Pro Se Litigants attached to the motion make clear, plain-tiff:

*4 "may NOT oppose summary judgment simply by relying upon the allegations in [her] complaint. Rather, [she] must submit evidence, such as wit-ness statements or documents, countering the facts asserted by the defendant and raising material is-sues of fact for trial ....

"If [she] do[es] not respond to the motion for summary judgment on time with affidavits or documentary evidence contradicting the material facts asserted by the defendant, the court may ac-cept defendant's factual assertions as true. Judg-ment may then be entered in defendant's favor without a trial."

As plaintiff has not controverted defendants' Rule 56.1 Statement, all of the well supported averments it contains are deemed admitted.

*Discussion*

In view of the procedural posture of the case, it is unnecessary to say a great deal about the evidence and the law. But the Court has reviewed defendants' submissions-which include voluminous excerpts from plaintiffs deposition-with care. A few brief words are in order.

Plaintiff applied for a job at Piper in early spring 2003. She was offered a job in its New York litiga-tion department by Heidi Levine, now one of the de-fendants. Plaintiff was actively recruited for the posi-tion after the offer was made by Peter Bynoe, an Af-rican American partner in the firm's Chicago office. Def. 56.1 St. ¶¶ 4-5.

Plaintiff had serious difficulties with several people in the New York office. It would serve little purpose

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4292030 (S.D.N.Y.)
**(Cite as: 2007 WL 4292030 (S.D.N.Y.))**

to recount the details here; they are spelled out in defendants' Rule 56.1 Statement and the papers there cited. *Id.* ¶¶ 5-146.

All of this led to Ms. Levine expressing the view, in late March 2004, that plaintiff's conduct needed to be addressed. *Id.* ¶ 147. After a careful review, Piper partners Finnerty IE, Finnerty, Jr., and Inskeep concluded that plaintiff's behavior was unacceptable and that she would have to acknowledge the problems and correct her behavior or be terminated. *Id.* ¶¶ 164-65. They delivered this message to her at a meeting on April 8, 2004, saying in substance that there were two options-Option A being to acknowledge the problems and correct her behavior and Option B being to discuss severance alternatives. *Id.* ¶ 172-75.

Finnerty III, another partner named Kaback, and plaintiff met again on April 13, 2004. Plaintiff claimed that she lacked sufficient information to choose either Option A or Option B and declined to pick one. *Id.* ¶¶ 179-80. Finnerty III informed plaintiff on the following day that her employment was terminated. *Id.* ¶¶ 183-86. Finnerty III has sworn that the termination was based on plaintiff's insubordinate and inappropriate conduct and had nothing to do with race or retaliation. Finnerty III Decl. ¶¶ 41-42.

In order to withstand a motion for summary judgment, an employment discrimination plaintiff first must adduce evidence that would permit a reasonable trier of fact to find that (1) she was a member of a protected class, (2) her job performance was satisfactory, (3) an adverse employment action occurred, and (4) the action occurred in circumstances giving rise to an inference of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000). If such evidence is adduced, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for their actions. *See id.* at 142. Assuming that burden is carried, the evidence as a whole must be such as to justify a trier of fact's finding "that the defendant intentionally discriminated against the plaintiff." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993).

**\*5** In this case, plaintiff concededly was a member of a protected class. Her termination was an adverse employment action. The critical questions are whether her job performance was sufficiently satisfactory to make out a *prima facie* case and, if it was,

whether a trier of fact on this record reasonably could find discrimination on the basis of race. It quite plainly could not.

Historically there has been some tension in the Second Circuit authorities as to how demanding is the required showing of qualification of employment or continued employment at the *prima facie* case stage. On occasion, concern has been expressed lest the requirement of proof of a *prima facie* case fold into the ultimate determination on the merits. *See, e.g., Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 91 (2d Cir.2001); *Tavoloni v. Mount Sinai Med. Ctr.,* 26 F.Supp.2d 678, 681 (S.D.N .Y.1998) (citing cases); *Naftchi v. New York University,* 14 F.Supp.2d 473,480-81 (S.D.N.Y.1998) (same). But this uncertainty does not affect the analysis of this case.

Here, the uncontradicted evidence demonstrates that plaintiff did not perform in a manner satisfactory to Piper notwithstanding her academic credentials. She was a confrontational, stubborn, and insubordinate employee in an environment in which professional personal relations, flexibility and a willingness to accept supervision were essential. For that reason alone, she arguably cannot establish a *prima facie* case. But she would fail even if the Court were to assume the existence of a *prima facie* case. Defendants have articulated a legitimate, non-discriminatory reason for plaintiffs termination. There is no basis from which any reasonable jury could find that race played a factor in the decision to terminate plaintiff, as there is no evidence to support the notion that plaintiff's difficulties were race-related. Indeed, plaintiff had difficulties with more than one senior lawyer who was involved in hiring her not many months before. *Cf. Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997) (difficult to impute invidious motive inconsistent with decision to hire to person involved in hiring decision).

The Court has considered also plaintiff's hostile work environment and other claims. There is no evidence from which a reasonable trier of fact could find that plaintiff's workplace was "permeated with 'discriminatory intimidation, ridicule, and insult' " that was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment," *Harris v. Forklift Sys.,* 510 U.S. 17, 21 (1993) (citation omitted), let alone that any problems in the workplace were race related.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4292030 (S.D.N.Y.)
**(Cite as: 2007 WL 4292030 (S.D.N.Y.))**

The retaliation claims also fail. While plaintiff engaged in protected activity and suffered an adverse employment action when she was terminated, there is no evidence of any causal connection between the two. Nor is there any evidence either of any adverse post-termination action by defendants or, even if there were, of any causal connection between any such action and any protected activity.

*6 Finally, plaintiff's breach of contract claim fails. First, the Court already has dismissed her claim for economic damages (DI 50, 102), the sole relief available even if there were a breach of contract. In any case, the conduct alleged here does not come within the narrow exception articulated in *Wieder v. Skala,* 80 N .Y.2d 628 (1992), because the Piper firm never impeded or discouraged plaintiff from filing a complaint with the Disciplinary Committee.

*Conclusion*

The Court understands that plaintiffs belated submission of the three volumes of purported exhibits may evidence a desire to oppose this motion and that she is proceeding *pro se,* however, it has elected not to delay decision further against the possibility that further papers will arrive. Plaintiff is a member of the Bar, a graduate of the Harvard Law School, and a former editor of its law review. She is fully able to conduct this litigation properly. She repeatedly has failed to do so. Indeed, she has defied court orders, ignored schedules, failed to show up for or obstructed her deposition, and filed frivolous applications. She has no claim to any further indulgence.

Defendants' motion for summary judgment dismissing the complaint (DI 114) is granted in all respects.

SO ORDERED.

S.D.N.Y.,2007.
Morisseau v. DLA Piper
Not Reported in F.Supp.2d, 2007 WL 4292030 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# KREBS DECL.
# EXHIBIT 14

Westlaw

Slip Copy, 2009 WL 4432374 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2009 WL 4432374 (C.A.2 (N.Y.)))**

**H**
Only the Westlaw citation is currently available. This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,
Second Circuit.
Charlene MORISSEAU, Plaintiff-Appellant,
v.
DLA PIPER, formerly known as Piper Rudnick
LLP and formerly known as DLA Piper Rudnick
Gray Cary U.S. LLP, Robert Fink, Esq., Joseph
Finnerty, III, Esq., Joseph Finnerty, Jr., Esq., Leroy
Inskeep, Esq., Denise Kaback, Aaron Katz, Esq.,
Heidi Levine, Esq., Marrilla Ochis, Esq., Peter Pan-
taleo, Esq., Douglas Rappaport, Esq. and Amy
Schulman, Esq., Defendant-Appellees.
**No. 08-0697-cv.**

Dec. 4, 2009.

Appeal from the United States District Court for the
Southern District of New York (Kaplan, J.).
Charlene Morisseau, Harrison, NY, pro se.

Bettina B. Plevan (Edward A. Brill, of counsel),
Proskauer Rose LLP, New York, NY, for Defend-
ants-Appellees.

Present WILFRED FEINBERG, JOHN M. WALK-
ER, JR. and ROBERT A. KATZMANN, Circuit
Judges.

**SUMMARY ORDER**

**\*1 ON CONSIDERATION WHEREOF,** it is
hereby **ORDERED, ADJUDGED,** and **DE-
CREED** that the judgment of the district court
entered December 4, 2007, is **AFFIRMED.**

Plaintiff-Appellant Charlene Morisseau appeals
from a judgment of the United States District Court

for the Southern District of New York (Kaplan, J.),
entered December 4, 2007, granting defendants'
motion for summary judgment and dismissing the
complaint; a Memorandum Opinion entered Janu-
ary 23, 2008, denying Morisseau's motion to amend
the judgment; and an order entered February 7,
2008, denying Morisseau's motion for reconsidera-
tion. We assume the parties' familiarity with the
facts, procedural history, and specification of issues
on appeal.

We have considered all of Morisseau's arguments
on appeal and find them without merit. Therefore,
the judgment of the district court is **AFFIRMED.**

C.A.2 (N.Y.),2009.
Morisseau v. DLA Piper
Slip Copy, 2009 WL 4432374 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.