# DONOVAN DECL.
# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
Roy Den Hollander,

                    Plaintiff on behalf of himself               Docket No. 07 CV 5873 (MGC)
                    and all others similarly situated,       ECF

          -against-                        **CLASS ACTION**
                                                **42 U.S.C. 1983 COMPLAINT**

Copacabana Nightclub,
China Club,
Guest House,
A.E.R. Nightclub,
Lotus,
Sol, [1] and
Jane Doe Promoters,

                    Defendants.
----------------------------------------------------------x


### Civil Rights, 14th Amendment - Equal Protection Class Action.

1. This is an action brought by the plaintiffs as a class for declaratory and injunctive relief and nominal damages against the defendant nightclubs for the deprivation, under the color of state law, of the plaintiffs' rights as guaranteed by the equal protection clause of the Fourteenth Amendment of the Constitution of the United States.

2. The class action is brought pursuant to 42 U.S.C. § 1983 over which this Court has jurisdiction in accordance with 28 U.S.C. § 1343(3) & (4).

3. The class action is maintainable under Fed. R. Civ. P. § 23(b)(2) because the defendants have acted on grounds generally applicable to the class, thereby making declaratory and injunctive relief and nominal damages appropriate to the class as a whole.

4. The defendants are nightclubs located in New York City, opened to the public, serve alcoholic and non-alcoholic beverages, their operations are entwined with the New York State Division of Alcoholic and Beverage Control and the New York City Consumer Affairs Department, and the nightclubs, along with New York State and the City, benefit from invidiously discriminating against the plaintiff class. The defendants' promoters act as agents for the nightclubs.

---

[1] The defendants are listed by their trade names or "doing business as" names. Their legal business names are Copacabana Nightclub: River Watch Restaurant, Inc.; China Club: Nightlife Enterprises L.P.; Guest House: presently unknown; A.E.R. Nightclub: AER Lounge LLC: Lotus: Lulu's LLC;, and Sol: Presently unknown.

5.  The plaintiff, individually and on behalf of all the others similarly situated, both past and future, challenges the practice and policy of the defendants that charges men more for admission than females or makes a man's admission more timely or economically burdensome than for females.

6.  As Exhibit A shows, the defendants allow females in free up to a certain time but charge men for admission until that same time, or allow ladies in free over a longer time span than men. Examples of the defendants' commonly practiced form of invidious discrimination against men by New York City nightclubs are: "Ladies free till Midnight, Gents $10", or "Free for ladies before 12AM, Guys are free before 11PM."

7.  The class represented by the named plaintiff in this action consists of all men who were admitted to these nightclubs within the passed three years and were charged more than females or their admissions made more burdensome than for females through arbitrarily imposed time restraints.

8.  The exact number of members of the class is not known, but it is estimated in the thousands; therefore, the class is so numerous that joinder of all members is impracticable.

9.  There are questions of law and fact presented in this action that are common to the entire class and that affect the rights of the class:

    a.  Were the members of the class invidiously discriminated against because of their sex by having to pay more money or navigate arbitrarily imposed time restraints in order to gain admission?
    b.  Were the defendants acting under color of state law when they discriminated against the class members?

10. The claims of the named plaintiff arise out of the same discriminatory practice and course of conduct by the defendants and are based on the same legal theories as for the entire class. The plaintiff has attended these nightclubs and was charged more than females or had less time for entering a nightclub free of charge or at a reduced price.

11. The named plaintiff is an attorney admitted to practice in New York State and the U.S. District Courts for both the Southern and the Eastern Districts of N.Y., a former litigation associate at Cravath, Swaine & Moore, and is able to conduct this litigation fairly and adequately to protect the interests of the class.

    WHEREFORE, the named plaintiff requests that judgment be entered in this action on behalf of himself and all other class members similarly situated as follows:

    1.  A declaratory judgment that the defendants practice of charging men more for admission than females or making it more timely or economically burdensome on men to gain admission violates the equal protection clause of the Fourteenth Amendment to the Constitution.

2

2. The defendants be enjoined from continuing their invidiously discriminatory practice against men.

3. Nominal damages to be decided by the Court.

4. And any other relief that is just and proper.

Dated: New York, NY
      June 12, 2007

                                        _____
                                        Roy Den Hollander (RDH 1957)
                                        Attorney for plaintiffs
                                        545 East 14 Street, 10D
                                        New York, NY 10009
                                        (917) 687 0652

# DONOVAN DECL.
# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
Roy Den Hollander,

                Plaintiff on behalf of himself
                and all others similarly situated,

        -against-

Copacabana Nightclub,
China Club,
A.E.R. Nightclub,
Lotus,
Sol, and
Jane Doe Promoters,

            Defendants.
-----------------------------------------------------------x

Docket No. 07 CV 5873 (MGC)
ECF

**NOTICE OF MOTION FOR**
**DISQUALIFICATION OF**
<u>**JUDGE CEDARBAUM**</u>

      PLEASE TAKE NOTICE, that upon this notice of motion, attached affirmation of Roy

Den Hollander, Esq. (the named plaintiff for the putative plaintiff class and tentative class

counsel in this civil rights, 42 U.S.C. § 1983, class action), and the accompanying

memorandum of law, the named plaintiff will move this Court on Thursday, November 1, 2007

at 9:30 PM before Judge Miriam G. Cedarbaum at the U.S. District Court, Southern District of

New York, U.S. Courthouse, Courtroom 14A, 500 Pearl Street, New York, N.Y. for an Order

disqualifying Judge Cedarbaum from this case for the appearance of sexual bias, sexual

prejudice, and partiality against the putative class of men on whose behalf this class action was

filed and the male named plaintiff.  Disqualification is requested under 28 U.S.C. §§ 455(a) &

(b)(1) and the Due Process Clauses of the Fifth and 14th Amendment to the U.S. Constitution.

Dated: New York, NY
       October 7, 2007

                             /S/
                         _____
                         Roy Den Hollander (RDH 1957)
                         545 East 14 Street, 10D
                         New York, NY 10009
                         (917) 687 0652

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
Roy Den Hollander,

                    Plaintiff on behalf of himself
                    and all others similarly situated,

        -against-

Copacabana Nightclub,
China Club,
A.E.R. Nightclub,
Lotus,
Sol, and
Jane Doe Promoters,

                Defendants.
----------------------------------------------------------x

Docket No. 07 CV 5873 (MGC)
ECF

**AFFIRMATION IN SUPPORT
OF DISQUALIFICATION OF
<u>JUDGE CEDARBAUM</u>**

     I, Roy Den Hollander, an attorney admitted to practice in the State of New York and the

U.S. Southern District Court of New York, affirm under the penalty of perjury in accordance

with 28 U.S.C. § 1746 the following:

     1.  I am the named plaintiff and attorney who filed this civil rights, 42 U.S.C. § 1983,

class action, Fed. R. Civ. P. 23(b)(2), for the violation of the 14th Amendment equal protection

rights of a class consisting solely of men, including myself, who were charged more for

admission than females by the defendant nightclubs or given less time than females to enter the

defendant clubs for free or at a reduced price.  This discriminatory practice is commonly referred

to as "Ladies' Nights."

     2.  Judge Cedarbaum directed counsel for all parties or the parties to attend a Case

Management and Scheduling Conference pursuant to Fed. R. Civ. P. 16  on October 16, 2007.

     3.  On Friday at 4:46 PM, September 28, 2007, defendant A.E.R. Lounge, LLC ("AER")

electronically served and filed with the Court a Rule 12(b)(6) motion to dismiss this civil rights,

1

class action. The return date for oral argument was October 25th, which, under Judge Cedarbaum's rules, gave the plaintiff-attorney acting on behalf of the putative class until noon on October 17th to provide the Court and defendants with opposition papers.

4. On Monday afternoon on October 1st, three days after receiving AER's motion to dismiss, Judge Cedarbaum's office contacted the plaintiff-attorney acting on behalf of the class of men to inform him that the Judge was moving up the Scheduling and Case Management Conference to October 9th. Various defendants could not make that date, and the Conference was finally set by Judge Cedarbaum's office for Wednesday at 10:30 AM, October 3rd.

5. At the October 3rd Conference, rather than focusing the discussion on Case Management and Scheduling matters, Judge Cedarbaum used most of the 40 minutes of the Conference to grill with unequivocal animosity the plaintiff-attorney acting on behalf of the class about the arguments and authorities presented in AER's motion to dismiss that was served just five days earlier.

6. The plaintiff-attorney had no notice that the subject matter of the October 3rd conference was going to focus on the arguments and authorities presented by defendant AER in its request for dismissal of this civil rights class action on behalf of men. According to Judge Cedarbaum's rules, the plaintiff-attorney had until October 17th to complete his legal research and write an opposition memorandum, and would then have until October 25th to prepare for an oral hearing on AER's motion to dismiss.

7. Judge Cedarbaum short circuited the time her own rules provided for the preparation of the class' opposition to AER's motion to dismiss.

8. The factual inference is that by requiring the plaintiff-attorney to argue AER's motion to dismiss without reasonable notice was fundamentally unfair, and created the appearance that

2

Judge Cedarbaum was motivated by sexual bias, sexual prejudice, and partiality toward the class of men on whose behalf the male named plaintiff brought this suit.

9. During the October 3rd Conference, Judge Cedarbaum refused to appoint the plaintiff-attorney acting on behalf of the class as interim class counsel, which, in the Judge's words, turned a putative class action into a *pro se* action.

10. Judge Cedarbaum communicated that since the plaintiff-attorney who filed the case on behalf of the class of men was now *pro se*, it was likely he would not have an opportunity to an oral hearing to argue against AER's or any other defendants' motion to dismiss because her Rules (3. Motions D.) do not allow oral argument on *pro se* maters. The plaintiff-attorney would still be able to submit opposition papers as a *pro se* plaintiff.

11. The factual inference is that Judge Cedarbaum considered the October 3rd Conference as the plaintiff-attorney and the class of men he was acting on behalf of as their only chance to orally argue against AER and any other defendant's motion to dismiss, even though the other defendants had not yet filed their motions to dismiss.

12. During the October 3rd Conference's argument over AER's motion to dismiss, Judge Cedarbaum repeatedly interrupted and cut off the plaintiff-attorney's responses to her questions in the manner reminiscent of the talk show host Chris Matthews, which further handicapped the plaintiff-attorney's efforts to fight for a suit aimed at eliminating a form of invidious discrimination against men and himself.

13. At one point during the overly antagonistic interrogation on AER's motion to dismiss, Judge Cedarbaum resorted to a personal and professional insult of the plaintiff-attorney acting on behalf of the class by calling into question in a mocking fashion whether the plaintiff

3

was an attorney at all.  At this point the plaintiff-attorney requested the Judge disqualify herself, which she denied to do.

14.  Unfortunately the Conference was not recorded, as is the general policy of Judge Cedarbaum, but the lack of proper notice, the uncalled personal and professional insult, the repeated cutting-off of answers, the disdainful disregard for the plaintiff-attorney's arguments, and the jockeying by the Court to reduce a class action on behalf of thousands of men to a *pro se* case brought by a lone, individual man creates the appearance that Judge Cedarbaum, whether true or not, is biased and prejudiced against men and creates a perception that she is not impartial in these proceedings.

15.  This affirmation has been made in good faith.

Dated: New York, NY                     /S/
        October 7, 2007
                                        _____
                                        Roy Den Hollander (RDH 1957)
                                        545 East 14 Street, 10D
                                        New York, NY 10009
                                        (917) 687 0652

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

Roy Den Hollander,

                  Plaintiff on behalf of himself
                  and all others similarly situated,

      -against-

Copacabana Nightclub,
China Club,
A.E.R. Nightclub,
Lotus,
Sol, and
Jane Doe Promoters,

            Defendants.

----------------------------------------------------------x

Docket No. 07 CV 5873 (MGC)
ECF

## MEMORANDUM OF LAW IN SUPPORT OF NAMED PLAINTIFF'S MOTION FOR DISQUALIFICATION OF JUDGE CEDARBAUM

Dated: October 7, 2007

Roy Den Hollander (RDH 1957)
545 East 14 Street, 10D
New York, NY 10009
(917) 687 0652

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ ii

ARGUMENT ............................................................................................... 1

  Introduction ........................................................................................ 1

  Legal Bases for Disqualification ............................................................ 1

  28 U.S.C. § 455(a) Lack of Impartiality .................................................. 3

  28 U.S.C. § 455(b)(1) Personal Bias and Prejudice ................................. 5

  No Fair Notice ..................................................................................... 6

CONCLUSION ........................................................................................... 10

## TABLE OF AUTHORITIES

**United States Constitution**

Fifth and 14th Amendments ............................................................... 2, 6

**Statutes**

28 U.S.C. § 144 ........................................................................................ 2

28 U.S.C. § 455 ............................................................................... 2, 3, 4, 5

Fed. R. Civ. P. 16 ..................................................................................... 3

**Cases**

Alger v. Hayes, 452 F.2d 841(8th Cir. 1972) ............................................. 1

Berger v. United States, 255 U.S. 22, 41 S. Ct. 230, 65 L. Ed. 481 (1921) ................. 5 n.1

Bolling v. Sharpe, 347 U.S. 497, 74 S. Ct. 693, 98 L. Ed. 884 (1954) ...................... 6 n.2

Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856,
6 L.Ed.2d 45 (1961) ............................................................................... 4, 9

Craig v. Boren, 429 U.S. 190, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976) ...................... 9

In re Murchison, 349 U.S. 133, 75 S. Ct. 623, 99 L. Ed. 942 (1955) ……………….…....…… 2

Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 108 S. Ct. 2194,
100 L. Ed. 2d 855 (1988) ……………………………………………………………..……….. 3

Liteky v. United States, 510 U.S. 540, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994) .. 1, 2, 3, 4, 5

Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S. Ct. 1965, 32 L. Ed. 2d 627 (1965) .. 4, 8, 9

Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 70 S. Ct. 652,
94 L. Ed. 865 (1950) ……………………………………………………………..……..… 7

Nichols v. Alley, 71 F.3d 347 (10th Cir. 1995) ……………………………………..….... 2, 10 n. 3

Offutt v. United States, 348 U.S. 11, 75 S. Ct. 11, 99 L. Ed. 11 (1954) …………………...…… 2

Seidenberg v. McSorleys' Old Ale House, Inc., 308 F. Supp. 1253 (1969) …..……..…. 4, 9, 10

Seidenberg v. McSorleys' Old Ale House, Inc., 317 F. Supp. 593 (1970) ………..….. 4, 9, 10

United States v. Brinkworth, 68 F.3d 633 (2d Cir. 1995) …………………………..………… 2

United States v. Jordan, 49 F.3d 152 (5th Cir. 1995) ……………………………..………… 2, 3

Ward v. Monroeville, 409 U.S. 57, 93 S. Ct. 80, 34 L. Ed. 2d 267 (1972) ……….…………... 1

**Treatises**

Rotunda & Nowak, Treatise on Constitutional Law, 3rd edition ………………………..………… 6

**Other**

Thode, Reporter's Notes to Code of Judicial Conduct, pp. 60-61 (1973) ………….………… 5

Webster's New World, Roget's A-Z Thesaurus, 1999 edition ………………………..………… 1

**ARGUMENT**

Introduction

Although the plaintiff-attorney acting on behalf of the class of men made an oral request

at the October 3rd Conference that Judge Cedarbaum disqualify herself, which was denied during

the Conference, the request did not meet the requirement that oral motions must be officially

recorded.  Alger v. Hayes, 452 F.2d 841, 843 (8th Cir. 1972)(citations omitted).  Since the request

never rose to the status of a motion, this is the initial motion by the plaintiff-attorney acting on

behalf of the class for disqualification of Judge Cedarbaum on the grounds of the appearance of

sexual bias, sexual prejudice, and partiality against the class of men, including the named

plaintiff.

The term "bias" implies a mental leaning in favor of or against someone or some persons

that interferes with impartial judgment.  Webster's New World, Roget's A-Z Thesaurus, 1999

edition.

The term "prejudice", similar to bias but stronger, implies preconceived and unreasonable

judgment or opinion marked by suspicion, fear or hatred.  Id.

The term "partiality" also includes bias and prejudice but is broader and also includes

"intolerance".  Id.; cf. Liteky v. United States, 510 U.S. 540, 552, 114 S. Ct. 1147, 1156, 127 L.

Ed. 2d 474, 489 (1994)(Scalia, J. wrote the majority opinion).


Legal Bases for Disqualification

All parties to a case have a constitutional right to a neutral and detached judge.  Ward v.

Monroeville, 409 U.S. 57, 62, 93 S. Ct. 80, 84, 34 L. Ed. 2d 267, 272 (1972).

> A fair [hearing] in a fair tribunal is a basic requirement of due process. Fairness of course
> requires an absence of actual bias in the [hearing] of cases. But our system of law has
> always endeavored to prevent even the probability of unfairness. ... [so] to perform [the

1

courts'] high function in the best way "justice must satisfy the appearance of justice." In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 625, 99 L. Ed. 942, 946 (1955)(words in quotation marks from Offutt v. United States, 348 U.S. 11, 14, 75 S. Ct. 11, 13, 99 L. Ed. 11, 14 (1954)(Frankfurter, J.)).

The federal statutes used for protecting a class of men and an individual male from an unfair tribunal are 28 U.S.C. § 144 and 28 U.S.C. § 455. The purpose behind §§ 144 and 455 is to promote public confidence in the judicial process; therefore, the question is not whether a judge is actually biased, prejudiced, or partial toward a party, but whether her actions make it appear so. Liteky v. United States, 510 U.S. 540, 548, 114 S. Ct. 1147, 1154, 127 L. Ed. 2d 474, 486 (1994); United States v. Brinkworth, 68 F.3d 633, 637 (2d Cir. 1995)(citing H.R. Rep. No. 1453, 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 6351, 6355). The courts consider outward manifestations and the reasonable inferences drawn from them in deciding whether there exists an appearance sufficient for disqualification. Nichols v. Alley, 71 F.3d 347, 351 (10th Cir. 1995). Procedurally, § 144 requires an affidavit or affirmation, but it's substantive elements are encompassed by § 455.

This motion to disqualify Judge Cedarbaum for the appearance of sexual bias, sexual prejudice, and partiality toward the named plaintiff and the putative class of men relies on 28 U.S.C. §§ 455(a) & (b)(1). To disqualify her for violating their due process rights that every litigant have fair notice of a court's proceedings, the motion relies on the fundamental fairness doctrine of the due process clauses in the Fifth and 14th Amendments to the U.S. Constitution.

These type of motions are fact driven and must not be determined by comparisons to other cases. United States v. Jordan, 49 F.3d 152, 157 (5th Cir. 1995)("each ... case is extremely fact intensive and fact bound, and must be judged on its unique facts and circumstances more than by comparison to situations considered in prior jurisprudence.").

2

28 U.S.C. § 455(a) Lack of Impartiality

§ 455(a) requires a judge to disqualify herself "in any proceeding in which [her] impartiality might reasonably be questioned." § 455(a) expands the protection of § 455(b) but also duplicates some of its protection as well, such as with regard to bias and prejudice. Liteky, 510 U.S. at 552, 114 S. Ct. at 1156, 127 L. Ed. 2d at 489. Subsection (a) requires recusal in some circumstance where subsection (b) does not because it covers all aspects of partiality and not merely those specifically addressed in subsection (b). Liteky, 510 U.S. at 553 n. 2.

In determining whether to disqualify, the courts look to see whether a reasonable person given all the facts would question whether the judge was impartial. Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 861, 108 S. Ct. 2194, 2203, 100 L. Ed. 2d 855, 873 (1988)(citing with approval the 5th Circuit decision appealed from). Or, stated differently, how the events appear to an objective observer, and "an observer of our judicial system is less likely to credit judges' impartiality than the judiciary." Jordan, 49 F.3d at 157.

This motion requests Judge Cedarbaum's disqualification under § 455(a) for her appearance of intolerance toward the named plaintiff and the putative class on whose behalf this action was brought. During the October 3rd Case Management and Scheduling Conference pursuant to Fed. R. Civ. P. 16, Judge Cedarbaum repeatedly and with animosity prevented the named plaintiff from completing his answers to her questions by constantly interrupting him. (Affirmation ¶ 12). The plaintiff was not running off at the mouth with long-winded and circular answers but trying to explain the factual allegations and the law on which the case was based.

For example, in trying to answer the Judge's question as to what legal authority existed for state action in regulating facilities that sold alcohol for consumption on the premises, the named plaintiff, amid numerous antagonistic interruptions, tried to recount two decisions

3

factually similar to this action that Judge Cedarbaum was apparently unaware of: <u>Seidenberg v.</u>
<u>McSorleys' Old Ale House, Inc.</u>, 317 F. Supp. 593 (1970)(Mansfield, J. found state action in
granting plaintiff's motion for summary judgment); <u>Seidenberg v. McSorleys' Old Ale House,</u>
<u>Inc.</u>, 308 F. Supp. 1253 (1969)(Tenney, J. found state action in denying defendant's motion for a
Rule 12(b)(6) dismissal). In the <u>McSorleys'</u> case, two females from N.O.W. were refused
service at McSorleys' Old Ale House because of their sex. In the process of explaining these
two decisions, Judge Cedarbaum kept interrupting that <u>Moose Lodge No. 107 v. Irvis</u>, 407 U.S.
163, 92 S. Ct. 1965, 32 L. Ed. 2d 627 (1965), was dispositive, which is not so because the
Supreme Court factually distinguished <u>Moose Lodge</u> from <u>Burton v. Wilmington Parking</u>
<u>Authority</u>, 365 U.S. 715, 81 S. Ct. 856, 6 L.Ed.2d 45 (1961), which was the case relied on in the
<u>McSorleys'</u> decisions. This would have been made clear had the plaintiff been allowed to finish
his answers.

     Throughout the 40 minute conference, Judge Cedarbaum persistently and inimically
interrupted the named plaintiff acting on behalf of the class which demonstrated an appearance
of intolerance for a lawsuit aimed at eliminating a form of invidious discrimination against men.

     § 455(a) requires that the judge's lack of impartiality derive from judicial predispositions
that go beyond what is normal and acceptable. <u>Liteky</u>, 510 U.S. at 552, 114 S. Ct. at 1155-56,
127 L. Ed. 2d at 489. Judicial conduct during the course of a hearing that is critical or
disapproving of, or even hostile to, counsel, the parties, or their case, may support a partiality
challenge if it reveals an opinion that derives from an extrajudicial source and reveals such a
high degree of antagonism as to make fair judgment impossible. *See* <u>id.</u> 510 U.S. at 555, 114 S.
Ct. at 1157, 127 L. Ed. 2d at 491.

4

The October 3rd Conference was the very first before Judge Cedarbaum, and the plaintiff-attorney had never appeared in any prior proceeding before her. The source of Judge Cedarbaum's predisposition for her apparent intolerance toward the plaintiffs' could only have come from outside the court—most likely the result of the past 40 years of feminism turning man into the new post-modern devil.[1] Further, Judge Cedarbaum kept referring to the type of discrimination alleged as defendant nightclubs charging males more for drinks than females, but that accusation does not appear anywhere in the papers filed with the Court. It is, however, the common perception among the public as to what occurs on Ladies Nights, indicating that Judge Cedarbaum's apparent intolerance was formed outside of judicial proceedings.

## 28 U. S. C. § 455(b)(1) Personal Bias and Prejudice

Disqualification under § 455(b)(1) also requires an objective basis. What matters is not the reality of bias or prejudice but its appearance. Liteky, 510 U.S. at 548, 114 S. Ct. at 1154, 127 L. Ed. 2d at 486. Even if the judge does not have any personal bias or prejudice toward a party or group, the appearance of such that reasonably leads one to question the judge's impartiality calls for disqualification. Thode, Reporter's Notes to Code of Judicial Conduct, pp. 60-61 (1973).

In addition to the continuing interruptions by Judge Cedarbaum (Affirmation ¶ 12), her Honor also verbally disparage the plaintiff-attorney, and presumably the class of men on whose behalf this civil rights suit was brought, with a vituperative invective communicating that it was questionable whether the man standing before her was an attorney at all. (Affirmation ¶ 13). This remark evinces a bias and prejudice against guys fighting for their rights when their success will end up reducing the preferential treatment given to females. When males pay more for the

---

[1] Prejudice towards a class inferred prejudice toward individual members of that class. See Berger v. United States, 255 U.S. 22, 27-29 41 S. Ct. 230, 231, 65 L. Ed. 481, 483-84 (1921)

same admission, the economics permit the defendant clubs to charge females less. Judge Cedarbaum's appearance of bias and prejudice in her denigrating remark most likely has its source in the continuing culture wars of America.

The normality of television talk shows with their catchy sound bites of personal destruction is not the normality in a court of law that's interested in the whole story, not just a sliver that serves a predisposition. Nor is it an acceptable belief in court, as with talk shows, that civility in allowing someone to finish their answer is a sign of weakness. Taken as a whole, the 40 minute conference could only be viewed by a reasonable man in post-modern America as raising serious questions of an appearance that Judge Cedarbaum has a preconceived and unreasonable opinion marked by suspicion, or at least a mental leaning against the named plaintiff and the putative class of men in this civil rights action.

No Fair Notice

The Due Process clauses of the Fifth and 14th Amendments guarantee a fundamentally fair governmental procedure when citizens' rights are at stake.[2] Rotunda & Nowak, Treatise on Constitutional Law, Vol. 3 § 17.8, 3rd edition. Fundamental fairness includes providing the persons whose interests are in jeopardy from court action or inaction with a form of notice reasonably designed to apprise the party of the nature of a proceeding. See id. at "Notice". "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information,

---

[2] The right raised in this case is equal protection under the law, which is a right guaranteed by both the 14th Amendment and the "due process clause" of the Fifth Amendment. Bolling v. Sharpe, 347 U.S. 497, 498-99, 74 S. Ct. 693, 694, 98 L. Ed. 884, 886 (1954).

6

and it must afford a reasonable time for those interested to make their appearance." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S. Ct. 652, 657, 94 L. Ed. 865, 873 (1950)(citations omitted).  This right to be heard has little reality or worth unless one is informed that a particular matter will be addressed.  See id.

Judge Cedarbaum denied the due process rights of the named plaintiff and the putative class of men by holding a hearing on AER's motion to dismiss without providing proper notice to the plaintiffs.  She also made the finality of that hearing a *fait accompli* by indicating there would be no other subsequent oral hearing on motions to dismiss even though the four other defendants had not yet filed their motions.  She accomplished this by refusing to appoint the plaintiff-attorney as interim class counsel which allowed her to treat the case as a *pro se* matter. *Pro se* matters under her rules are not allowed a hearing.

The October 3rd Case Management and Scheduling Conference, at which the beginning stages of a case's tentative schedule are normally set, was turned into a hearing on the named plaintiff and the putative class of men's opposition to defendant AER's motion to dismiss.  The problem was that the plaintiff class' opposition wasn't due until October 17th with a hearing set for October 25th.  The original date for the Case Management and Scheduling Conference was October 16th.  Had the Court kept to that date, the plaintiff-attorney would have already conducted the necessary legal research and written an opposition, so by using the original date of October 16th as a hearing on the plaintiff class' opposition to dismissal would not have jeopardize the equal protection rights of the named plaintiff and the putative class of men.  But the Court chose not to do that.  Instead, after receiving on Friday at 4:46 PM, September 28th, AER's motion to dismiss, the Court, three days later, began on Monday afternoon, October 1st, to move up the Case Management and Scheduling Conference to an earlier date.  By Tuesday

morning, October 2nd, the Conference's new date was set for the very next day, Wednesday, at 10:30 AM on October 3rd. Even had the plaintiff class been notified, which it wasn't, to come prepared to counter AER's motion to dismiss, it would have been impossible to complete the necessary research and organize it into a cogent argument in opposition. It may be that the changing of the original Conference to an earlier date was pursued, perhaps with some fortuity, perhaps not, to maximize the chances that the plaintiff-attorney would not be in a position to counter Judge Cedarbaum's arguments for dismissing the case.

The substance of Judge Cedarbaum's arguments for dismissal were similar to those in AER's motion to dismiss papers. Her Honor apparently adopted AER's key argument that there is no state action involved in the defendants discriminating against men. The Judge and AER argued that licensing alone by the State of New York or New York City is not state action and no federal court has held such, which is correct. But that's not the test for state action. The entire nature of the relationship between New York's Division of Alcoholic and Beverage Control and the New York City Department of Consumer Affairs with the defendant nightclubs must be examined. Normally that's done in discovery—not a Scheduling Conference. The Judge and AER also relied on the U.S. Supreme Court decision: Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S. Ct. 1965, 32 L. Ed. 2d 627 (1965), as holding that a liquor license did not infer state action. But neither the Judge nor AER pointed out that this case was distinguishable from Moose Lodge. Moose Lodge No. 107 was a private club; the defendants here are all public accommodations. When appraised of that fact by the plaintiff-attorney, her Honor stated she doubted whether the phrase "public accommodation" even appeared in the Moose Lodge case. It does—five times. The Judge and AER, in their arguments for dismissal, also failed to mention two decisions, by two different judges, in the very same court that Judge Cedarbaum sits and

8

where this action was brought.  Those decisions in the <u>McSorleys'</u> case found state action when

McSorleys' Tavern, regulated by the New York State Division of Alcoholic and Beverage

Control, discriminated against two females from N.O.W. by refusing to serve them because of

their sex.  <u>Seidenberg v. McSorleys' Old Ale House, Inc.</u>, 317 F. Supp. 593 (1970)(Mansfield, J.

found state action in granting plaintiff's motion for summary judgment); <u>Seidenberg v.</u>

<u>McSorleys' Old Ale House, Inc.</u>, 308 F. Supp. 1253 (1969)(Tenney, J. found state action in

denying defendant's motion for a Rule 12(b)(6) dismissal).  Both of the <u>McSorleys'</u> decisions

relied on <u>Burton v. Wilmington Parking Authority</u>, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45

(1961), for finding state action.  When the U.S. Supreme Court decided <u>Moose Lodge</u>, that Court

distinguished <u>Moose Lodge</u> from <u>Burton</u>, in part, by stating, "Unlike <u>Burton</u>, the Moose Lodge

building is located on land owned by it, not by any public authority. Far from apparently holding

itself out as a place of public accommodation, Moose Lodge quite ostentatiously proclaims the

fact that it is not open to the public at large.  Nor is it located and operated in such surroundings

that although private in name, it discharges a function or performs a service that would otherwise

in all likelihood be performed by the State.  In short, while [in <u>Burton</u> there] was a public

restaurant in a public building, Moose Lodge is a private social club in a private building."

While <u>Burton</u> isn't completely similar to this case, <u>Moose Lodge</u> is clearly distinguishable.  But

both Judge Cedarbaum and AER ignored that.

   They also ignored that the U.S. Supreme Court cited with approval to the 1970

<u>McSorleys'</u> decision on state action when it stated, "both federal and state courts uniformly have

declared the unconstitutionality of gender lines that restrain the activities of customers of state-

regulated liquor establishments...." <u>Craig v. Boren</u>, 429 U.S. 190, 208, 97 S. Ct. 451, 462, 50 L.

Ed. 2d 397, 413 (1976)(This is dicta, although persuasive dicta.)


9

In addition to the deprivation of the due process rights of the plaintiff class by failing to provide adequate and timely notice, Judge Cedarbaum has succeeded in reducing a civil rights class action, on behalf of thousands of men, into a *pro se* action by a lone, individual male. Reality would seem to imply that it is more publicly palatable to dismiss a case against one, lone man than thousands, although in this day and age in America, it is becoming increasing commonplace to ignore the rights of all men.

A dismissal without certifying the class, likely assures that no other man will bring another individual or class suit for the same or similar invidious discrimination because of the expense, judicial hostility, and the barrage of social opprobrium engendered by his audacity to fight for the rights of a man or men. The end result will be that questionable procedural decisions will enshrine invidious discrimination against males while in virtually identical situations, such as the McSorleys' case, females rights will remain protected.

## CONCLUSION

Judge Cedarbaum's conduct during the 40 minute conference revealed a high degree of favoritism to the beneficiaries of the defendant nightclubs' discrimination—females. Every extra dollar a guy pays is a dollar a female doesn't pay for admission. The Conference also revealed a high degree of antagonism to the named plaintiff and the class of men on whose behalf he was acting. Both the favoritism and antagonism make a fair judgment in this civil rights case near impossible.[3]

If there is any doubt about Judge Cedarbaum's appearance of sexual bias, sexual prejudice, and partiality, just switch the sexes. Consider how the named plaintiff would have

---

[3] Where the question is a close one, then the judge should disqualify herself. Nichols, 71 F.3d at 352.

10

been treated had an accident of nature made him a female, and she was suing on behalf of

thousands of other females because the defendant nightclubs charged ladies more for admission

than guys on "Men's Nights".


Dated: New York, NY
      October 7, 2007

/S/
_____
Roy Den Hollander (RDH 1957)
545 East 14 Street, 10D
New York, NY 10009
(917) 687 0652

11

# DONOVAN DECL.
# EXHIBIT 3

**PAUL W. STEINBERG**

ATTORNEY AT LAW

14 EAST FOURTH STREET

NEW YORK, NY 10012-1141

(212) 529-5400

PAULSTEINBERG@NYSBAR.COM

## CONFIDENTIAL PRIVILEGED LEGAL MATTER

Deborah Swindells Donovan
Gordon & Rees LLP
90 Broad Street FL 23
New York NY 10004-2270

Vanessa Reeve Elliott
Beattie Padovano LLC
50 Chestnut Road STE 208
Montvale NJ 07645-1830

Robert Scott Grossman
585 Stewart Avenue STE 300
Garden City NY 11530-4783

October 19, 2007

RE:     Roy Den Hollander matter

Dear Counsel:

Since January 2006, I have been counsel to Mr. Den Hollander's upstairs neighbor. As such, I have read some of the media reports on your case in federal court. You should know that although Mr. Den Hollander may be regarded by the public as a harmless joke, the files of MetLife (the previous owner of Stuyvesant Town) indicate that several of his neighbors expressed concern about Mr. Den Hollander's mental stability and temper tantrums going back to the mid 1990s. Those documents are a matter of public record in the NY Supreme Court files (116711/03).

Today, following an appearance to adjourn a Motion (NY Civil Court 021283 /06), Mr. Den Hollander ran after me down the court hallway and initiated a physical altercation. If you have not yet had much interaction with Mr. Den Hollander, this may sound odd, but what appeared to cause the behavior was that Motions were heard by an attractive blond female judge who ruled against Mr. Den Hollander. Mr. Den Hollander tends to have strong responses to what he feels is gender-atypical behavior, which appears to spring from his own gender identity insecurities (in NY Supreme pleadings, Den Hollander complained that my client was not wearing tight-fitting shirts, that my client was hiding his muscles, and asked the court to direct my client to pay for Den Hollander's bedding, etc.).

*--continued on reverse--*

The reason I bring up these matters to you is that while people may laugh about him, Mr. Den Hollander is someone who has potential for violence and you may wish to act accordingly. He also calls himself an "investigator" and claims that he worked for Kroll. He has made a point of indicating to me that he knows where I live, and has named me as a defendant in Civil Court, claiming that the pleadings I submitted in Supreme Court were defamatory. My client informs me that at one point some years ago, Mr. Den Hollander threatened him, and recently Mr. Den Hollander got into a "karate" stance and blocked my client from exiting the apartment elevator.

For some while, Mr. Den Hollander had a website on "Been-Scammed" and although he took the web site down shortly before commencing his "Ladies Night" media campaign, I did save some pages from the site while it was on the web. Since he has apparently been successful in scrubbing archives such as WayBack Machine, I have not been able to get the full site. However, you may wish to read the attached, and bear in mind that these were writings which he made publicly available. Currently, the attached has not been submitted in court, but I intend to file as an Exhibit to a submission on November 14.

Please feel free to contact me if you have any questions.

Regards,

Paul Steinberg
Attorney for William Fasano

Saturday, September 02, 2006 11:56 AM
**Fear Corrupts**
© Roy Den Hollander 2006
The purpose of the Feminist Movement is not equality, justice or freedom, but power—power over men.
Virtually every female lives with a never-ending fear that just about any man has the physical power to do
with her as he wishes. He can beat her up, rape or kill her with his bare hands, providing no one else is
present to prevent it. She does, however, have recourse to the courts, and if she is dead, the prosecutor
will try to avenge her, but when a female faces a man in a situation of imminent physical violence,
she's powerless.
This lack of power to protect their own beings has driven many females to an uncontrollable fury and
madness that has spawned a slithering, insidious, malicious obsession to control men totally by gutting
their freedom of thought and speech and relegating them to the non-human status of beasts.
Feminists, or more appropriately Feminazis, use well-proven totalitarian tricks to reach this end. They
propagandize their goal as liberation of all females, but in reality they aim to warp society's institutions
into a big sister that relentlessly attacks, humiliates and demoralizes men.
The Feminazis profess their aim is to raise the consciousness of men and females, but they are actually
carrying out a campaign of indoctrination and social pressure by assuming the role of scolding mothers or
shrews. Their true goal is to domesticate men into sheepish little boys who will blindly obey their self-
righteous, hypocritical and bigoted whims.
Having tasted social power, the Feminazis will not stop until they reshape America and eventually the
world into an intolerant hell complete with thought-control, inquisitions, intimidation, enslavement and,
as one Feminazi priestess advocated, a reduction in the male population to 10%. Perhaps the reduced
male population will be kept in protective hamlets surrounded by armed guards and barbed wire where
females can safely pick out their pleasure for the night and where females' fears remain entombed.


posted by admin with 0 Comments
Saturday, August 12, 2006 12:43 PM
**Two Sides**
© Roy Den Hollander, 2006

When I worked for Metromedia TV News, now Fox News, there was only one way out of the newsroom
and above that door was a sign: "Each story has two sides—make sure you get both." That maxim is no
longer followed by the effete, eastern intellectual, white trash, elitist media.

Today, the fifth estate kowtows to the current, political-correctionalist propaganda of depicting females as
victims and men as oppressors. The news media and Hollywood portray the role of wife as dreadful and
that of the husband as enviable. As with other superficially, politically naive analyses, the Feminazi
infested media often fails to look beyond its members own biased beliefs to the reality of being a husband
in feminarchy America

Everyday the husband leaves the house and children to trade 8, 10 or 12 hours of his life for the means to
provide for his wife and offspring. Beyond food and housing, he must satiate her voracious appetite for
material goods in her Sisyphean effort to keep up with Mrs. Jones; assuage her relentless vanity with
expensive jewelry, perfumes, clothes and cosmetics; appease with social status her vindictive, vitriolic
ranting as age lines her face; satisfy junior's whining for a new toy, bicycle or car; and fulfill his
daughter's limitless greed for MTV hyped products.

At work, the husband must win out over others or jeopardize the means of satisfying his insatiable
dependents. Job stress is an ever-present companion that contributes to the seven years shorter life span
men have as compared to dames. Many husbands, however, do not have to worry about stress, because

their assigned role as serfs to princesses lands them in jobs that kill before stress has a chance to even raise their blood pressure. In the ten most hazardous jobs in America, over 90 percent of the workers are men. Every year industrial accidents kill twelve times more men than girls.

When an unfriendly nation decides to invade a husband's homeland, he, not his wife, will be drafted. The husband will go fight in order to protect his family and their way of life. In the twentieth century, 99 percent of the soldiers killed in wars were men. (Perhaps death is the easy way for men to survive a war. Of the over two million young American men who served in Vietnam, approximately 800,000 suffer from post-traumatic stress syndrome. I wonder if any of these guys would have traded washing dishes for the hell they went through and are still suffering from.

In an emergency situation, females, including wives, and children are rescued first while men, including husbands, wait, hoping the grim reaper's scythe swings slowly enough for them to escape.

When the bottom of the economy falls out, the main provider of a family, usually the husband loses his job, which requires the family to seek government assistance. Some welfare programs require the husband to leave his home before the wife and children can receive support. As a result, the wife still has her children and a roof over her head while the husband walks the indifferent streets alone. Approximately 90 percent of America's three million homeless are menâ€"not a few because of lost jobs stolen by broads. [1]

At the other end of the economic scale where both husband and wife have well paying jobs, government and private support groups' discrimination against men has virtually no effect. But a form of male discrimination still exists. When the wife has a child, she often has the option to leave work to raise the child, to work part-time or return to work full-time. The husband also has three options: to continue working, to continue working and to continue working.

Finally, the burdens foisted on husbands and all men by this wo - man's nation cause men to commit suicide five times more often than females. For example, the Vietnam War killed around 58,000 young men; since that war's end, over 58,000 men who served in Vietnam have committed suicide.

When the Feminazis ask, â€œMy God, who would want to be a wife?â€    Given the alternativeâ€"many.
posted by admin with 1 Comments
Saturday, August 12, 2006 12:25 PM
**An Invisible Weapon**
Â© Roy Den Hollander, 2006

Physical violence mainly injures the body while emotional distress sears the mind. Contemporary feminazi groups and the political-correctionalist media and politicians incessantly depict husbands and boyfriends as brutal batters of their innocent, defenseless wives and concubines. Trendy beliefs claim that a large percentage of America's 50% divorce rate results from the genetically programmed physical violence of men against females. The media, populace and politicians, however, ignore the incapacitating genetically programmed violence of emotional distress that wives and girls batter their beaus with day after day, year after year, which ends in a divorce, early grave for the husband or lawsuit against the man. Females intentionally or recklessly inflict emotional pain on a man with words, intonation of voice, facial demeanor and acts or patterns of behavior, often over a long period of time. For example, every time a guy leaves the refrigerator door open for more than some arbitrarily time limit set by his girl, the domineering paragon of everything correct barks "shut the door!" Over time, opening the refrigerator can become an unpleasant taskâ€"not unlike touching a live wire. Or the reckless, maybe intentional keeping of letters from the wifeâ€™s lover in a place for the husband to find them in order to shatter the world of a faithful husband, especially if her sexual escapades occurred in the year prior to the birth of a child. As

the genetically evil female well knows, a nauseating doubt will plague the husband until the day he dies that his child may not be his. What redress for the pain she caused would the husband have in feminarchy Americaâ€"none! In Russia, he could find some justice by slapping her around a bit, and if she called the cops, theyâ€™d help him out.

Girls have the advantage in America because physical violence is easy to prove: it leaves physical marks that a camera can record. Emotional violence, however, stalks the invisible world of the mind, which makes it a near perfect weapon. Husbands and boyfriends canâ€™t take pictures of the pain broads intentionally and recklessly cause them. Big Sister America is using that fact to tie menâ€™s hands, so they can no longer defend themselves against their girlfriends or wives twisting the blade of emotional pain through their hearts.

When will we see advertisements paid for by taxpayer dollars giving men a number to call to get some ragging, nagging, malicious broad to shut her yap? Not until science invents a technique for measuring emotional distress. Until then, a man has no choice but to follow Mother Nature, regardless of the cost, and slap the broad across the chops to stop the barrage of emotional bullets spewing from her tongue, which, of course, has always been a girlâ€™s gun.

posted by admin with 0 Comments
Wednesday, July 05, 2006 4:43 PM
### A Different Time
A propeller driven plane drones somewhere overhead far out of sight. Its low monotone humming envelops a warm, spring Sunday afternoon somewhere in the 1950s. I sit on my 24 inch, black, single-gear Schwinn bicycle, keeping my balance by holding onto the door handle of an old, blue, four-door 1947 Dodge.

My consciousness pauses at the moment, feeling vaguely sad for no discernible reason. The weekâ€™s events ended with this gift of nothing to do: no homework, no television shows, no new housing developments to explore or classmates able to come out and play.

The dead-end street needs a new asphalt topping. Where I am balance on the side, the asphalt has broken up into small gravel-like stones with an isolated weed sprouting up here and there. It is still early spring, the lawns are just beginning to turn green and the tulips and dogwood buds remain closed, waiting for a few consecutive days of warm weather. The air smells fresh, warmed slightly by a gentle breeze.

The droning airplane fills the vacuum of silence on this street with modest middle-class houses in this small suburban town, whose claim to fame will not come until the end of the next decade. Of all the towns in America, this town will have the second highest number of persons per capita to die in Vietnamâ€"all of them men, of course, and all of them guys I knew.

posted by admin with 0 Comments
Friday, May 12, 2006 3:21 PM
### Do Men Cause the Wars?
By Roy Den Hollander

During a trip to the evil empireâ€"formerly the Soviet Union but still as evil as everâ€"a budding middle-aged Feminazi translator sternly ended her exposition about a battle depicted in a World War II museum outside Moscow with â€œMen cause the wars!â€   The American academicians and others along on the tour, including the males who were no longer men, nodded approvingly. Not me, my juvenile delinquent attitude, which Iâ€™ve never been able or wanted to outgrow, made me speak upâ€"â€œTell that to the guys pushing up daises in the Falklands!â€   That shut the broadâ€™s duplicitous mouth.

The Falklands, however, was just one war in which a female, Margaret Thatcher, helped kill 252 British and 655 Argentine soldiers, sailors, and airmen while doing in only three British females. What about all the other wars? Men certainly die in them in greater numbers than girls: the first Iraq war totaled about 22,000 men on both sides to 11 American female combat deaths and in Vietnam 58,185 American men to 8â€"thatâ€™s rightâ€"8 American females. But are guys the sole cause of that which destroys so many more men than broads? The National Organization of Witches (N.O.W.) and other

modern-day matriarchic tyrants would have us believe so because it infers that if men cause the wars, than they get what they deserve in war.

Letâ€™s look at the first Iraq war and April Glassby, the American ambassador to Iraq in 1990. She met Saddam Hussein just before he invaded Kuwait. At that time, there was rising tension between Iraq and Kuwait, Iraq was mobilizing and there were reports that Saddam might move across the border. So what did April tell Saddam at their meeting: the United States had no obligation to defend Kuwait. How dumb can you get! For dames it has no limits, especially in situations suited for men. Maybe April didnâ€™t want to offend Saddamâ€™s sensitivities by popping his illusion as the modern day Saladin. Whatever the reason for her stupidity, after April tells Saddam â€œgreen light,â€  he naturally invadesâ€"as would any guy when a girl gives him the go-aheadâ€"even though April probably meant â€œred light.â€    What was Saddam suppose to doâ€"read the bimboâ€™s mind?  So he invades, figuring the U.S. wonâ€™t intervene because thatâ€™s what its ambassador said, and if the U.S. wonâ€™t than no one will.

As for Viet Nam, lots of contributing factors went into bringing us that war, including the 1.8 million more votes Lyndon Johnson received from females than men in 1964. Of course, those bimbos didnâ€™t swing the election and Barry Goldwater might have dragged us into the same quagmire, but just looking at history as it played-out shows that more girls than guys were responsible for re-electing LBJ who turned Viet Nam into a male meat grinder.

How about the big killer of menâ€"World War II?  The war that prompted the bimbat Russian translator to blame only men. This requires a little historyâ€"something the Feminazis are excellent at ignoring or re-writing.

The treaty ending the First World War set up the League of Nations. In order for the League, like the United Nations today, to have any power required America as a member. The League ended up including most of Europe, including Germany, as well as Japan and Chinaâ€"but no U.S. Hereâ€™s why: President Woodrow Wilson and the leader of the Senate, Henry Cabot Lodge, had some disagreements over the League. Since the Senate would have to approve the treaty that called for U.S. membership, a compromise was crucial and likely because both men were politicians. But when Wilson suffered a stroke, his wife, in effect, took over as Presidentâ€"that doomed any chance of an agreement. When was the last time you tried to reach a compromise with a female? Itâ€™s not possible!  To broads â€œcompromiseâ€   means only one thing:  Do it their way! Without the U.S., the League ultimately proved incapable of preventing aggression by the Axis Powers in the 1930s, which culminated in World War II.

Another Mistress of War includes Queen Victoria with her campaigns of imperialism in Africa: the Anglo-Zulu War and the two Boer Wars. The Queen used 250,000 troops to conduct a scorched earth policy against the Boers and throw Africans and Boers into concentration camps: 27,927 Boers (of whom 22,074 were children under 16) and about 20,000 Africans died of starvation, disease and exposure. In all, about 25% of the Boer inmates and 17% of the African ones died. Concentration camps werenâ€™t new in 1900, but under the British matriarch Victoria, they wreaked an unprecedented toll of human misery. The Second Boer War alone cost around 75,000 lives â€" 22,000 British soldiers, 6,000-7,000 Boer soldiers, 20,000-28,000 Boer civilians and perhaps 25,000 Africans. The population of the world back then was 26% of what it is now, so multiply these figures by four to understand the scope of feminine barbarity.

Then thereâ€™s one of the all time Hoing champs: Catherine the Great of Russia. Ho Catherine started or instigated a number of wars in order to expand her domain to the South and East into the Ottoman Empire and bite off pieces of Poland in the West. Her eminence killed plenty men in order to add some 200,000 square miles to Russian territory, and when finished, she had bankrupted the county. The current German chancellor Angela Merkel has a picture of Catherine the Great in her office because, as Angela says, â€œCatherine was a strong woman,â€   which in Feminaziese means an unabashed Ho and destroyer of men.

There are plenty of other female tyrants throughout history who have unleashed the irrational fury of their twisted emotions when slighted, given vent to their insatiable greed and blown mindlessly passed

the chance of a compromise to kill plenty of men and others. The Feminazis conveniently ignored history hoping us guys will do the same and buy into their con of the empathetic female leader. Donâ€™t be fooled; broads are only empathetic so long as theyâ€™re looking in the mirror. The fighting and dying in wars will always fall on the shoulders of men, so it seems wise that to avoid unnecessary wars, men should keep bimbos out of the political decision making process.

posted by admin with 2 Comments
Friday, March 24, 2006 11:54 PM
**Some Differences: Men v. Girls**

Â© Roy Den Hollander, 2006

Feminazi propaganda claims that except for a few mounds of flesh and "gender" organs, there's basically no difference between men and girls. They say broads can do virtually anything men canâ€"perhaps, but can they do the tasks evolutionarily suited for men as well as men? Not in the real world they can't.

Would you waste time and money watching a bunch of broads trying to play basketball when you can catch a higher quality of ball played by men in college or the NBA? I don't think so. Of course, if the girls play in their tongs and halter tops, that's different. If you need someone to do your taxes, you'd be a fool to use a bimbo. Studies at Vanderbilt University show that thirteen times more boys than girls score above 700 on the math part of the SAT. Why risk going to jail because some feminazi ditz can't add? Or what about investing the money for which you had to put up with so much grief to earn in an economy where over 50% of the jobs are held by dames? Are you going to hand it over to some vain Feminazi such as the former CEO of Hewlett Packard who spent lots of company resources and time aggrandizing herself while the stock dropped 55%? On the other hand, when it comes to prostitution ringsâ€"invest with the sluts. Los Angeles recently busted the largest call girl operation in its history that had raked in five to eight million in just 22 months. It was run by broads: a 42 year-old Russian whore and her 22 year-old harlot daughter who is still on the lam. Money for sex-any broads natural calling.

But when it comes to the work Mother Nature made men for, girls don't cut it. So the next time some Feminazi gives you that blank, serious lookâ€"like the one your mother did when trying to tell you something that made no senseâ€"and says, "I'm a strong and independent woman," meaning she's as good and tough as a guy, ask her to step outside. "Excuse me!" She'll indignantly respond in a tone meant to intimidate. Reply with "I'm challenging you to a duel. Let's see how strong, independent and tough you really are. You can even choose the weapons, so long as they're not T and As or duplicity." That'll shut her yap.

Feminazi proselytizing even demands us to believe that girls are better suited for certain male activities-only the high paying and powerful ones of course-because broads are more compassionate and caring. Nobody wants a compassionate general, but let's see whether bimbos really are "compassionate." Take a husband and wife who both work. While driving, the wife slams into another car-not surprising since she's running her mouth on a cell phone and between breaths and gibberish, she's sucking down a coffee latte. She ends up in the hospital-good-for weeks. The family income is cut, but the husband's main concern is that she's okay and gets well. He knows they'll make it through the financial crunch. Reverse the situation. The husband is broadsided by some bimbo yakking on her cell phone and sipping a coffee latte. The accident, more like recklessness, sends him to the hospital for weeks. The wife's only concern is the impact on her of the loss of income and sex. Sex, unless she's an adulteress, which most wives are until men no longer find them attractive. While this example shows females as being less compassionate than men, it does show them as equals in one sense: both are primarily concerned about the wife.

Although girls are not as competent as men at many tasks; they aren't powerless. Mother Nature gave them the ability to use sex, sexual favors and sympathy to win what they want. But feminarchy America now allows them to habitually get away with conduct they never could have before. Feminazis believe the universe exempted them from civilized conduct by making them female even though that was just an accident.

Some examples: Has a girl ever summarily pushed you out of the way in a crowded night club or in a stampede to squeeze her fat ass into a bus or subway spot that could fit only one of her cheeks? What

about cutting in line or mouthing off in such a vitriolic manner that if it came from a man he'd end up with a knuckle sandwich? Then there's murdering her children without getting fried, killing her husband and not even going to jail or butchering incipient human beings on demand because she wants the choice to act irresponsibly in satisfying her sexual whim of the moment?

Feminarchy America allows broads to get away with more than Mother Nature intended, not because girls are superior but because females are now making the rules. We have forgotten six million years of hominid evolution: dames aren't here to soothe the "savage beast"; the "savage beast" is here to limit broads' infinite capacity for evil. And the most virulent feminine evil is the Feminazis.

So what's to be done with a Feminazi? Strap her to a missile and drop her it on the Middle East . They'll know how to deal with her.

posted by admin with 0 Comments

# DONOVAN DECL.
# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

Roy Den Hollander,

                Plaintiff on behalf of himself
                and all others similarly situated,        Civil Action No. 07 CV 5873 (MGC)

    -against-

Copacabana Nightclub,
China Club,
Guest House,
A.E.R. Nightclub,
Lotus,
Sol, and
Jane Doe Promoters,

                Defendants .
-------------------------------------------------------------x

### DECLARATION OF DEBORAH SWINDELLS DONOVAN
### IN OPPOSITION TO PLAINTIFFS MOTION TO
### DISQUALIFY JUDGE CEDARBAUM

Deborah Swindells Donovan, an attorney duly admitted to practice in theState of New

York, hereby affirms the following under the penalty of perjury:

1.     I am a partner with the law firm of Gordon & Rees, L.L.P., counsel for Defendant

Lotus, one of the nightclubs named in the within action. As counsel for Lotus, I am fully familiar

with the facts set forth herein. This Declaration is submitted in opposition to the frivolous Motion

To Disqualify Judge Cedarbaum, filed by Plaintiff Roy Den Hollander on or about October 7,

2007. I attended the October 3, 2007 Initial Pretrial Conference (the "Conference") that Plaintiff

unsuccessfully submits provides a basis for his motion to disqualify Judge Cedarbaum.

2.     In my twenty-four years as a practicing attorney, who appears primarily in federal

court, Plaintiff's contention that he "had no notice that the subject matter of the [Conference] was

going to focus on" the Motion To Dismiss filed by Defendant AER (Plaintiff ¶ 4),1 is at best disingenuous. At such initial conferences, many judges discuss the merits of a case and ask the parties to justify the positions they are taking. An attorney appearing at such conferences is expected to be able to answer substantive questions about the case. There certainly is no authority to support the novel suggestion made by Plaintiff that such a conference is limited to discussion only of case management and scheduling orders. Plaintiff ¶ 5.

3.      Judge Cedarbaum, consistent with this practice, merely pointed out that there was a jurisdictional question as to whether Title 42, United States Code, Section 1983 authorizes Plaintiff to file this lawsuit, alleging that private nightclubs which hold "Ladies' Nights as a promotion to encourage higher attendance, constitutes gender discrimination.  In general, plaintiffs may not challenge private action by means of Section 1983. There must be state action, which on the face of the Complaint, appears to be absent in this case.  Judge Cedarbaum simply asked questions of Plaintiff concerning jurisdiction.

4.      There is absolutely nothing but conjecture to support Plaintiff's suggestion that the change to an earlier conference date was a conspiracy on the part of the Court to catch him unprepared to address the merits of his case or respond to AER's jurisdictional motion. Plaintiff ¶¶ 4-8. In any event, Plaintiff was not unprepared; he argued his position at length and Judge Cedarbaum permitted him to speak for a substantial period of time.

5.      Plaintiff's assertion that the Court somehow improperly "reduce[d] a class action on behalf of thousands of men to a *pro se* case brought by a lone, individual man" is entirely unwarranted. Plaintiff ¶ 14. As a matter of law, Plaintiff is representing himself in this case; thus he is *pro se*. Further, no class has been certified. Thus, this is not yet a class action. The Court's comments on the status of the case accurately reflect its current procedural posture.

---

1 "Plaintiff ¶ ___" refers to the Affirmation of Roy Den Hollander, dated October 7, 2007 and submitted in support of his motion to disqualify Judge Cedarbaum.

They do not reflect Judge Cedarbaum's views on the merits of the case, despite Plaintiff's baseless assumption that these comments somehow demean the lawsuit. Plaintiff¶¶ 9,14.

6. Judge Cedarbaum's denial of Plaintiff's application to serve as interim class counsel was simply a judicial ruling. Plaintiff futilely tries to convert this judicial ruling into a sinister effort to rob Plaintiff of his opportunity to present oral argument in opposition to the defense motions to dismiss. Plaintiff ¶¶ 9-11. This convoluted argument rests on the Judge's individual rules, which do not provide for oral argument of motions in *pro se* cases. But the Court did not definitively state she would not hold oral argument in this case, where Plaintiff is *pro se* but also is a lawyer admitted to practice in this State. Before appointing class counsel, interim or otherwise, the question of jurisdiction must be resolved to determine whether the case will continue or be dismissed. There is nothing but Plaintiff's imagination to support the assertion that she had ulterior motives in denying his application to serve as interim class counsel.

7. During the conference, The Court set a return date of November 29, 2007 for all the jurisdictional defense motions. According to Judge Cedarbaum's individual practice rules for motions, therefore, the motions must be filed by November 7, 2007. Plaintiff then will have an opportunity to oppose all defense motions at once, by November 21, 2007, rather than submitting one opposition to the motion already filed by AER (the opposition deadline for that motion would have been October 16, 2007) and then file additional piecemeal oppositions to the other defense motions expected to be filed. Judge Cedarbaum did not "short circuit" Plaintiff's time to oppose AER's motion, despite Plaintiff's assertion otherwise. Plaintiff ¶ 7. Instead, she actually provided him with more time to submit written papers than he otherwise would have had.

8. The oral exchange between Judge Cedarbaum and Plaintiff on a fundamental question of law, namely the Court's jurisdiction, absolutely did not exhibit any animus,

3

antagonism or disdain on the Judge's part toward men. Plaintiff ¶¶ 5, 13, 14. Rather, the exchange reflected the Court's concern that it might lack jurisdiction, and she questioned Plaintiff extensively concerning this potential issue. When Plaintiff identified two lower court decisions in support of his position, Judge Cedarbaum invited him to send her those cases, thereby demonstrating her receptiveness to legal authority that supported Plaintiff's premise that the extensive regulation by the State is sufficient to constitute the necessary state action to confer Section 1983 jurisdiction.

9.      Plaintiff's characterization of the Judge as "repeatedly interrupt[ing] him and cut[ting him] off" is inaccurate. Plaintiff ¶ 12. Rather, it was my observation that Plaintiff repeatedly interrupted Judge Cedarbaum, raising his voice in an effort to keep the Judge from finishing her remarks.

10.     Plaintiff's accusation that Judge Cedarbaum "was motivated by sexual bias, sexual prejudice, and partiality toward the class of men on whose behalf the male named plaintiff brought this suit" is fantasy. Nothing was said by the Court that possibly could be construed as reflecting discriminatory animus against men. The conference focused solely on the jurisdictional question, not the substance of whether "Ladies Nights" discriminate against men. The accusation that the Judge is sexually biased or prejudiced against men is merely self-serving speculation.

11.     This speculation stands in stark contrast to Plaintiff's unrelenting bias against females. Perhaps Plaintiff would prefer a male judge, given his negative stereotypes of women on the Internet, frequently referring to them as "feminazi." The attached Exhibit A includes examples of Plaintiff's invective against women. It is my understanding these "articles" appeared on the Internet. I personally have read diatribes by Plaintiff on the Internet which are entirely consistent with many of the views expressed in this exhibit. Unfortunately, I did not save them because Plaintiff's opinion of women is not at issue in the lawsuit he has brought. Had I

4

known he would level a baseless charge of gender discrimination against Judge Cedarbaum personally, I certainly would have retained them as they unequivocally reflect his misogyny. The articles suggest Plaintiff is challenging Judge Cedarbaum's impartiality simply because she is female, not biased. Plaintiff is the one who is sexually biased, not Judge Cedarbaum.

Dated:      New York, New York
            October 23, 2007

                                              Deborah Swindells Donovan (DD 3421)

EXHIBIT "A"

Saturday, September 02, 2006 11:56 AM
**Fear Corrupts**
Â© Roy Den Hollander 2006
The purpose of the Feminist Movement is not equality, justice or freedom, but powerâ€"power over men.
Virtually every female lives with a never-ending fear that just about any man has the physical power to do
with her as he wishes.  He can beat her up, rape or kill her with his bare hands, providing no one else is
present to prevent it.  She does, however, have recourse to the courts, and if she is dead, the prosecutor
will try to avenge her, but when a female faces a man in a situation of imminent physical violence,
sheâ€™s powerless.
This lack of power to protect their own beings has driven many females to an uncontrollable fury and
madness that has spawned a slithering, insidious, malicious obsession to control men totally by gutting
their freedom of thought and speech and relegating them to the non-human status of beasts.
Feminists, or more appropriately Feminazis, use well-proven totalitarian tricks to reach this end.  They
propagandize their goal as liberation of all females, but in reality they aim to warp society's institutions
into a big sister that relentlessly attacks, humiliates and demoralizes men.
The Feminazis profess their aim is to raise the consciousness of men and females, but they are actually
carrying out a campaign of indoctrination and social pressure by assuming the role of scolding mothers or
shrews.  Their true goal is to domesticate men into sheepish little boys who will blindly obey their self-
righteous, hypocritical and bigoted whims.
Having tasted social power, the Feminazis will not stop until they reshape America and eventually the
world into an intolerant hell complete with thought-control, inquisitions, intimidation, enslavement and,
as one Feminazi priestess advocated, a reduction in the male population to 10%.  Perhaps the reduced
male population will be kept in protective hamlets surrounded by armed guards and barbed wire where
females can safely pick out their pleasure for the night and where females' fears remain entombed.


posted by admin with 0 Comments
Saturday, August 12, 2006 12:43 PM
**Two Sides**
Â© Roy Den Hollander, 2006

When I worked for Metromedia TV News, now Fox News, there was only one way out of the newsroom
and above that door was a sign: "Each story has two sidesâ€"make sure you get both."  That maxim is no
longer followed by the effete, eastern intellectual, white trash, elitist media.

Today, the fifth estate kowtows to the current, political-correctionalist propaganda of depicting females as
victims and men as oppressors.  The news media and Hollywood portray the role of wife as dreadful and
that of the husband as enviable.  As with other superficially, politically naive analyses, the Feminazi
infested media often fails to look beyond its members own biased beliefs to the reality of being a husband
in feminarchy America

Everyday the husband leaves the house and children to trade 8, 10 or 12 hours of his life for the means to
provide for his wife and offspring.  Beyond food and housing, he must satiate her voracious appetite for
material goods in her Sisyphean effort to keep up with Mrs. Jones; assuage her relentless vanity with
expensive jewelry, perfumes, clothes and cosmetics; appease with social status her vindictive, vitriolic
ranting as age lines her face; satisfy junior's whining for a new toy, bicycle or car; and fulfill his
daughter's limitless greed for MTV hyped products.

At work, the husband must win out over others or jeopardize the means of satisfying his insatiable
dependents.  Job stress is an ever-present companion that contributes to the seven years shorter life span
men have as compared to dames.  Many husbands, however, do not have to worry about stress, because

their assigned role as serfs to princesses lands them in jobs that kill before stress has a chance to even raise their blood pressure. In the ten most hazardous jobs in America, over 90 percent of the workers are men. Every year industrial accidents kill twelve times more men than girls.

When an unfriendly nation decides to invade a husband's homeland, he, not his wife, will be drafted. The husband will go fight in order to protect his family and their way of life. In the twentieth century, 99 percent of the soldiers killed in wars were men. Perhaps death is the easy way for men to survive a war. Of the over two million young American men who served in Vietnam, approximately 800,000 suffer from post-traumatic stress syndrome. I wonder if any of these guys would have traded washing dishes for the hell they went through and are still suffering from.

In an emergency situation, females, including wives, and children are rescued first while men, including husbands, wait, hoping the grim reaper's scythe swings slowly enough for them to escape.

When the bottom of the economy falls out, the main provider of a family, usually the husband loses his job, which requires the family to seek government assistance. Some welfare programs require the husband to leave his home before the wife and children can receive support. As a result, the wife still has her children and a roof over her head while the husband walks the indifferent streets alone. Approximately 90 percent of America's three million homeless are menâ€"not a few because of lost jobs stolen by broads.

At the other end of the economic scale where both husband and wife have well paying jobs, government and private support groups' discrimination against men has virtually no effect. But a form of male discrimination still exists. When the wife has a child, she often has the option to leave work to raise the child, to work part-time or return to work full-time. The husband also has three options: to continue working, to continue working and to continue working.

Finally, the burdens foisted on husbands and all men by this wo - man's nation cause men to commit suicide five times more often than females. For example, the Vietnam War killed around 58,000 young men; since that war's end, over 58,000 men who served in Vietnam have committed suicide.

When the Feminazis ask, â€œMy God, who would want to be a wife?â€   Given the alternativeâ€"many.
posted by admin with 1 Comments
Saturday, August 12, 2006 12:25 PM
An Invisible Weapon
Â© Roy Den Hollander, 2006

Physical violence mainly injures the body while emotional distress sears the mind. Contemporary feminazi groups and the political-correctionalist media and politicians incessantly depict husbands and boyfriends as brutal batters of their innocent, defenseless wives and concubines. Trendy beliefs claim that a large percentage of America's 50% divorce rate results from the genetically programmed physical violence of men against females. The media, populace and politicians, however, ignore the incapacitating genetically programmed violence of emotional distress that wives and girls batter their beaus with day after day, year after year, which ends in a divorce, early grave for the husband or lawsuit against the man. Females intentionally or recklessly inflict emotional pain on a man with words, intonation of voice, facial demeanor and acts or patterns of behavior, often over a long period of time. For example, every time a guy leaves the refrigerator door open for more than some arbitrarily time limit set by his girl, the domineering paragon of everything correct barks "shut the door!" Over time, opening the refrigerator can become an unpleasant taskâ€"not unlike touching a live wire. Or the reckless, maybe intentional keeping of letters from the wifeâ€™s lover in a place for the husband to find them in order to shatter the world of a faithful husband, especially if her sexual escapades occurred in the year prior to the birth of a child. As

the genetically evil female well knows, a nauseating doubt will plague the husband until the day he dies that his child may not be his. What redress for the pain she caused would the husband have in feminarchy Americaâ€"none! In Russia, he could find some justice by slapping her around a bit, and if she called the cops, theyâ€™d help him out.

Girls have the advantage in America because physical violence is easy to prove: it leaves physical marks that a camera can record. Emotional violence, however, stalks the invisible world of the mind, which makes it a near perfect weapon. Husbands and boyfriends canâ€™t take pictures of the pain broads intentionally and recklessly cause them. Big Sister America is using that fact to tie menâ€™s hands, so they can no longer defend themselves against their girlfriends or wives twisting the blade of emotional pain through their hearts.

When will we see advertisements paid for by taxpayer dollars giving men a number to call to get some ragging, nagging, malicious broad to shut her yap? Not until science invents a technique for measuring emotional distress. Until then, a man has no choice but to follow Mother Nature, regardless of the cost, and slap the broad across the chops to stop the barrage of emotional bullets spewing from her tongue, which, of course, has always been a girlâ€™s gun.

posted by admin with 0 Comments
Wednesday, July 05, 2006 4:43 PM
### A Different Time
A propeller driven plane drones somewhere overhead far out of sight. Its low monotone humming envelops a warm, spring Sunday afternoon somewhere in the 1950s. I sit on my 24 inch, black, single-gear Schwinn bicycle, keeping my balance by holding onto the door handle of an old, blue, four-door 1947 Dodge.

My consciousness pauses at the moment, feeling vaguely sad for no discernible reason. The weekâ€™s events ended with this gift of nothing to do: no homework, no television shows, no new housing developments to explore or classmates able to come out and play.

The dead-end street needs a new asphalt topping. Where I am balance on the side, the asphalt has broken up into small gravel-like stones with an isolated weed sprouting up here and there. It is still early spring, the lawns are just beginning to turn green and the tulips and dogwood buds remain closed, waiting for a few consecutive days of warm weather. The air smells fresh, warmed slightly by a gentle breeze.

The droning airplane fills the vacuum of silence on this street with modest middle-class houses in this small suburban town, whose claim to fame will not come until the end of the next decade. Of all the towns in America, this town will have the second highest number of persons per capita to die in Vietnamâ€"all of them men, of course, and all of them guys I knew.

posted by admin with 0 Comments
Friday, May 12, 2006 3:21 PM
### Do Men Cause the Wars?
By Roy Den Hollander

During a trip to the evil empireâ€"formerly the Soviet Union but still as evil as everâ€"a budding middle-aged Feminazi translator sternly ended her exposition about a battle depicted in a World War II museum outside Moscow with â€œMen cause the wars!â€  The American academicians and others along on the tour, including the males who were no longer men, nodded approvingly. Not me, my juvenile delinquent attitude, which Iâ€™ve never been able or wanted to outgrow, made me speak upâ€"â€œTell it to the guys pushing up daises in the Falklands!â€  That shut the broadâ€™s duplicitous mouth.

The Falklands, however, was just one war in which a female, Margaret Thatcher, helped kill 252 British and 655 Argentine soldiers, sailors, and airmen while doing in only three British females. What about all the other wars? Men certainly die in them in greater numbers than girls: the first Iraq war totaled about 22,000 men on both sides to 11 American female combat deaths and in Vietnam 58,185 American men to 8â€"thatâ€™s rightâ€"8 American females. But are guys the sole cause of that which destroys so many more men than broads? The National Organization of Witches (N.O.W.) and other

modern-day matriarchic tyrants would have us believe so because it infers that if men cause the wars, than they get what they deserve in war.

Let's look at the first Iraq war and April Glassby, the American ambassador to Iraq in 1990. She met Saddam Hussein just before he invaded Kuwait. At that time, there was rising tension between Iraq and Kuwait, Iraq was mobilizing and there were reports that Saddam might move across the border. So what did April tell Saddam at their meeting: the United States had no obligation to defend Kuwait. How dumb can you get! For dames it has no limits, especially in situations suited for men. Maybe April didn't want to offend Saddam's sensitivities by popping his illusion as the modern day Saladin. Whatever the reason for her stupidity, after April tells Saddam "green light," he naturally invades"as would any guy when a girl gives him the go-ahead"even though April probably meant "red light." What was Saddam suppose to do"read the bimbo's mind? So he invades, figuring the U.S. won't intervene because that's what its ambassador said, and if the U.S. won't than no one will.

As for Viet Nam, lots of contributing factors went into bringing us that war, including the 1.8 million more votes Lyndon Johnson received from females than men in 1964. Of course, those bimbos didn't swing the election and Barry Goldwater might have dragged us into the same quagmire, but just looking at history as it played-out shows that more girls than guys were responsible for re-electing LBJ who turned Viet Nam into a male meat grinder.

How about the big killer of men"World War II? The war that prompted the bimbat Russian translator to blame only men. This requires a little history"something the Feminazis are excellent at ignoring or re-writing.

The treaty ending the First World War set up the League of Nations. In order for the League, like the United Nations today, to have any power required America as a member. The League ended up including most of Europe, including Germany, as well as Japan and China"but no U.S. Here's why: President Woodrow Wilson and the leader of the Senate, Henry Cabot Lodge, had some disagreements over the League. Since the Senate would have to approve the treaty that called for U.S. membership, a compromise was crucial and likely because both men were politicians. But when Wilson suffered a stroke, his wife, in effect, took over as President"that doomed any chance of an agreement. When was the last time you tried to reach a compromise with a female? It's not possible! To broads "compromise" means only one thing: Do it their way! Without the U.S., the League ultimately proved incapable of preventing aggression by the Axis Powers in the 1930s, which culminated in World War II.

Another Mistress of War includes Queen Victoria with her campaigns of imperialism in Africa: the Anglo-Zulu War and the two Boer Wars. The Queen used 250,000 troops to conduct a scorched earth policy against the Boers and throw Africans and Boers into concentration camps: 27,927 Boers (of whom 22,074 were children under 16) and about 20,000 Africans died of starvation, disease and exposure. In all, about 25% of the Boer inmates and 17% of the African ones died. Concentration camps weren't new in 1900, but under the British matriarch Victoria, they wreaked an unprecedented toll of human misery. The Second Boer War alone cost around 75,000 lives â€" 22,000 British soldiers, 6,000-7,000 Boer soldiers, 20,000-28,000 Boer civilians and perhaps 25,000 Africans. The population of the world back then was 26% of what it is now, so multiply these figures by four to understand the scope of feminine barbarity.

Then there's one of the all time Hoing champs: Catherine the Great of Russia. Ho Catherine started or instigated a number of wars in order to expand her domain to the South and East into the Ottoman Empire and bite off pieces of Poland in the West. Her eminence killed plenty men in order to add some 200,000 square miles to Russian territory, and when finished, she had bankrupted the county. The current German chancellor Angela Merkel has a picture of Catherine the Great in her office because, as Angela says, "Catherine was a strong woman," which in Feminaziese means an unabashed Ho and destroyer of men.

There are plenty of other female tyrants throughout history who have unleashed the irrational fury of their twisted emotions when slighted, given vent to their insatiable greed and blown mindlessly passed

the chance of a compromise to kill plenty of men and others. The Feminazis conveniently ignored history hoping us guys will do the same and buy into their con of the empathetic female leader. Donâ€™t be fooled; broads are only empathetic so long as theyâ€™re looking in the mirror. The fighting and dying in wars will always fall on the shoulders of men, so it seems wise that to avoid unnecessary wars, men should keep bimbos out of the political decision making process.
posted by admin with 2 Comments
Friday, March 24, 2006 11:54 PM
**Some Differences: Men v. Girls**

Â© **Roy Den Hollander, 2006**
Feminazi propaganda claims that except for a few mounds of flesh and "gender" organs, there's basically no difference between men and girls. They say broads can do virtually anything men canâ€"perhaps, but can they do the tasks evolutionarily suited for men as well as men? Not in the real world they can't.
Would you waste time and money watching a bunch of broads trying to play basketball when you can catch a higher quality of ball played by men in college or the NBA? I don't think so. Of course, if the girls play in their tongs and halter tops, that's different. If you need someone to do your taxes, you'd be a fool to use a bimbo. Studies at Vanderbilt University show that thirteen times more boys than girls score above 700 on the math part of the SAT. Why girls going to jail because some feminazi ditz can't add? Or what about investing the money for which you had to put up with so much grief to earn in an economy where over 50% of the jobs are held by dames? Are you going to hand it over to some vain Feminazi such as the former CEO of Hewlett Packard who spent lots of company resources and time aggrandizing herself while the stock dropped 55%? On the other hand, when it comes to prostitution ringsâ€"invest with the sluts. Los Angeles recently busted the largest call girl operation in its history that had raked in five to eight million in just 22 months. It was run by broads: a 42 year-old Russian whore and her 22 year-old harlot daughter who is still on the lam. Money for sex-any broads natural calling.
But when it comes to the work Mother Nature made men for, girls don't cut it. So the next time some Feminazi gives you that stern, serious lookâ€"like the one your mother did when trying to tell you something that made no senseâ€"and says, "I'm a strong and independent woman," meaning she's as good and tough as a guy, ask her to step outside. "Excuse me!" She'll indignantly respond in a tone meant to intimidate. Reply with "I'm challenging you to a duel. Let's see how strong, independent and tough you really are. You can even choose the weapons, so long as they're not T and As or duplicity." That'll shut her yap.
Feminazi proselytizing even demands us to believe that girls are better suited for certain male activities-only the high paying and powerful ones of course-because broads are more compassionate and caring. Nobody wants a compassionate general, but let's see whether bimbos really are "compassionate." Take a husband and wife who both work. While driving, the wife slams into another car-not surprising since she's running her mouth on a cell phone and between breaths and gibberish, she's sucking down a coffee latte. She ends up in the hospital-good-for weeks. The family income is cut, but the husband's main concern is that she's okay and gets well. He knows they'll make it through the financial crunch. Reverse the situation. The husband is broadsided by some bimbo yakking on her cell phone and sipping a coffee latte. The accident, more like recklessness, sends him to the hospital for weeks. The wife's only concern is the impact on her for the loss of income and sex, unless she's an adulteress, which most wives are until men no longer find them attractive. While this example shows females as being less compassionate than men, it does show them as equals in one sense: both primarily concerned about the wife.
Although girls are not as competent as men at many tasks; they aren't powerless. Mother Nature gave them the ability to use sex, sexual favors and sympathy to win what they want. But feminarchy America now allows them to habitually get away with conduct they never could have before. Feminazis believe the universe exempted them from civilized conduct by making them female even though that was just an accident.
Some examples: Has a girl ever summarily pushed you out of the way in a crowded night club or in a stampede to squeeze her fat ass into a bus or subway spot that could fit only one of her cheeks? What

about cutting in line or mouthing off in such a vitriolic manner that if it came from a man he'd end up with a knuckle sandwich? Then there's murdering her children without getting fried, killing her husband and not even going to jail or butchering incipient human beings on demand because she wants the choice to act irresponsibly in satisfying her sexual whim of the moment?

Feminarchy America allows broads to get away with more than Mother Nature intended, not because girls are superior but because females are now making the rules. We have forgotten six million years of hominid evolution: dames aren't here to soothe the "savage beast"; the "savage beast" is here to limit broads' infinite capacity for evil. And the most virulent feminine evil is the Feminazis.

So what's to be done with a Feminazi? Strap her to a missile and drop her it on the Middle East . They'll know how to deal with her.

posted by <u>admin</u> with <u>0 Comments</u>

# DONOVAN DECL.
# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
Roy Den Hollander,

                Plaintiff on behalf of himself
                and all others similarly situated,

      -against-

Copacabana Nightclub,
China Club,
A.E.R. Nightclub,
Lotus,
Sol, and
Jane Doe Promoters,

             Defendants.
-----------------------------------------------------------x

Docket No. 07 CV 5873 (MGC)
ECF

**REPLY AFFIRMATION IN
SUPPORT OF MOTION TO
DISQUALIFY
<u>JUDGE CEDARBAUM</u>**

     I, Roy Den Hollander, an attorney admitted to practice in the State of New York and the

U.S. Southern District Court of New York, affirm under the penalty of perjury in accordance

with 28 U.S.C. § 1746 the following:

     1.  I am the named plaintiff and attorney who filed this civil rights, 42 U.S.C. § 1983,

class action, Fed. R. Civ. P. 23(b)(2), for the violation of the 14th Amendment equal protection

rights of a class of thousands of men, which includes me.  This affirmation is filed in reply to the

attorney for Lotus, Deborah Swindells Donovan, opposition to the motion to disqualify Judge

Cedarbaum for the appearance of sexual bias, sexual prejudice and partiality against the putative

class of men.

     2.  Attorney Donovan resorts to a tactic often used by self-righteous feminists[1] and their

sycophants over the past forty years in this country:  attack a man for daring to exercise his

---

[1] Russ Limbaugh is often credited with inventing the term "feminazi" in 1992. I disagree, since I've been using the term since 1991, not in court of course.  At the very least, I should be credited as a co-author.  The on-line version of

2

freedom of speech in an effort to silence what they don't like and win something they don't

deserve—in this case a denial of my motion for recusal. (Donovan Declaration ¶ 11).  It doesn't

matter to attorney Donovan and those of like intolerance that "[t]he proponents of the First

Amendment ... were determined that every American should possess an unrestrained freedom to

express his views, however odious they might be to vested interests whose power they might

challenge."  Feldman v. United States, 322 U.S. 487, 501, 64 S. Ct. 1082, 1089, 88 L. Ed. 1480,

1419 (Black, J. dissenting)(1944).  It also doesn't matter to her how well reasoned and factually

based the essays she published in her Exhibit A are.  Clearly attorney Donovan wouldn't object

had the sexes in the essays been trans-gendered, since, as with all conformists, popular

acceptance by others of what they say is most important.

3. The issue raised by attorney Donovan in the essays in her Exhibit A is not a matter of

popularity over who can genuflect the most before feminist dogma; it's the cornerstone of this

allegedly free nation—the First Amendment right to enter the market place of ideas no matter

what group may be agitated.  Attorney Donovan is asking a Federal Court to deny a motion

based on a plaintiff's exercise of this freedom outside the courthouse and having nothing to do

with the legal issues in this case.  Attorney Donovan just doesn't appreciate anyone challenging

the power of feminist zealots in this country, especially when the challenge, as in this case, is to

the deprivation of the rights of men.  She, therefore, uses essays critical of the feminist special

interest group to stereotype me as biased against all females. (Donovan Declaration ¶ 11,

Donovan Memorandum pp. 8, 9).

---

the Merriam-Webster dictionary defines feminazi as "an extreme or militant feminist."  That's probably the
equivalent of feminist zealot or self-righteous feminist.

3

4.  Attorney Donovan does not challenge the accuracy of the essays, only that they offend her personally[2] and the overly subjective sensitivities of self-righteous feminists.  The law, theoretically at least, does not make decisions based on the subjective standards of members of powerful special interest groups.  Subjective sensitivities that cry offensiveness do not trump the First Amendment right to free speech.  Attorney Donovan's, and millions like her, unwillingness to tolerated speech they find offensive is not a compelling interest that allows for the punishment of the exercise of free speech by having a court deny that speaker's motion.

5.  Attorney Donovan cites to six essays, all of which except for one, are not available to the public, although I'd be willing to publish them if any publisher makes me an offer.[3]  Since the essays are not available to the public, but exist only on a couple of computers, the only way attorney Donovan could have obtained access is by hacking into those computers.  That's a violation of 18 U.S.C. § 1030(a)(2)—a federal felony, which is punishable by a fine or imprisonment of not more than ten years.  Attorney Donovan indicates that the computer she hacked into, or some third person hacked into on her behalf, was connected to the internet.  (Donovan Declaration ¶ 11).  She doesn't, however, give the computer's address, perhaps in an effort to disguise her apparent violation of the law.

6.  Attorney Donovan argues based on the essays that my motion to have Judge Cedarbaum dismissed for the appearance of sexual bias against the plaintiff class of men should be denied because the plaintiff is a "misogynist."  Personally, I disagree with the characterization:  one can't hate that which one lusts after.  For example, I doubt attorney Donovan hates chocolate, although she might not like what it does to her.

---

[2] And no, the personal is not politically—it's private; but attacking the personal often gets results in America these days.
[3] The only one of the six essays to which the public has access and of which I am particularly proud is attached as Exhibit A.

3

4

7. Also based on the illegally obtained essays, attorney Donovan argues that I have an "unrelenting bias against females". (Donovan Declaration ¶ 11). The essays criticize feminist zealots—a sect to which all ladies do not belong, much to the annoyance of the sect. The essays are punchy, hard-hitting, intentionally provocative, well-written, well-reasoned, and factually based. Just because they stroke someone's fur the wrong way is too bad—this isn't Russia[4], and, in fact, they're meant to agitate. Apparently they've been successful even though, until now, not legally available to the public. By putting the essays in her Declaration, attorney Donovan has published them without the author's permission.

8. The *sine qua non* of bias is "unreasoned" of which the essays in Donovan's Exhibit A are not. I'll match their reasoning against any feminist, irrational proselytism that attorney Donovan cares to roll out. More importantly, however, is that the issue in this motion to disqualify a judge is not how bias one of parties may be, but whether the Judge has exhibited an appearance of not acting fairly towards that party. The essays are as irrelevant as attorney Donovan's client, Lulu's LLC or Lotus, repeated failure to pay its New York State taxes. Exhibit B.

9. The above seven paragraphs illustrate the result of the tried and true tactic of self-righteous feminists and their sycophants to distract from the merits of an argument by engaging in *ad hominem* attacks of calling their opponents "biased" or "misogynist" or some other opprobrium. It's always easier to make a dissembling, damaging allegation than to refute it, which is why the political correctionalists in America seem incapable of sticking to the issues when someone dare oppose their world view. Whenever dissent rears up to threaten the

---

[4] Russia hasn't changed as much as the New York Times pretends. Today, vocal opposition to a powerful group no longer ends in the Gulag; it's a straight trip to the grave.

5

unanimity of belief among the chosen, it is crushed with a choir of vituperation against the person who raises alternative ideas.

10. Now to the merits of the recusal motion. Attorney Donovan is correct when she says, "[a]t initial conferences, many judges discuss the merits of a case ...." (Donovan Declaration ¶ 2). But they don't argue on behalf of a defendant's motion to dismiss when that motion isn't scheduled for oral argument until three weeks later. By the Judge extensively questioning me on the arguments and authorities in A.E.R. Lounge's ("AER") motion to dismiss just five days after the filing of that motion, the Judge violated her own time frame for allowing preparation for oral opposition to a motion. Attorney Donovan pulls a neat trick in her Declaration at ¶ 7 by claiming I now have more time to "submit written papers." One of many factors creating an appearance of partiality wasn't the time to submit written papers, but that the Judge, in effect, held oral argument on the dismissal motion just five days after its filing at a conference arranged by the Court for which I had one day's notice.

11. AER's motion to dismiss left out two key decisions from the Southern District Court of New York that held "state action" did exist for a tavern regulated by the New York State Division of Alcoholic and Beverage Control ("ABC"). During Judge Cedarbaum's antagonistic grilling of me on the "state action" issue, she didn't know about those two decisions until I raised them. A reasonable inference is that the Judge didn't know about the two decisions because AER's motion left them out.

12. Attorney Donovan creates a false impression with the best of them in her Declaration at ¶ 3. She claims Judge Cedarbaum "simply asked questions" of me about "state action". Not so, the judge consistently interrupted my answers with manifest animosity the likes of which I had never witness in any court before.

6

13.  Attorney Donovan down plays the importance of Judge Cedarbaum's decisions at the

October 3rd Scheduling Conference. (Donovan Declaration ¶¶ 5, 6).  When the Complaint was

filed, the status of the case was a putative class action in which I, as an attorney, could file

motions and take other actions on behalf of the class, which is the law.  Now, however, as the

result of Judge Cedarbaum's refusal to appoint me interim counsel for the class and her refusal to

make a decision on class certification, the case is as the Judge said, *"pro se"*.  The Judge can

later make a decision on class certification, but that's assuming there is a "later".  Judge

Cedarbaum repeatedly questioned the defendants as to why they hadn't moved earlier to dismiss

the action and remarked she couldn't understand their delay.  A clear indication as to where this

case and the rights of thousands of men are going—under the stiletto heel of preferential

treatment for females.

14.  The crucial part of the Judge's decisions is their impact.  Had Judge Cedarbaum

decided to first make a decision on class certification, as I requested, a decision for certification

would have put pressure on the defendants to settle by halting their invidious discrimination

against men.  Any settlement would not have required the defendants to pay money to the class

of men, nor any attorney's fees to me.  A settlement would simply have put a stop to guys

economically subsidizing feminine desires to party at certain night clubs.  The ladies would then

have to pay as much as men do to enter a club—sounds fair to me.  On the other hand, had the

Judge decided against certification, it would not have gone down well with the public because it

would have ruled against thousands of men whose civil rights were being violated.  It would also

have given me a chance, not a certainty, just a chance, to have the U.S. Court of Appeals for the

Second Circuit review her denial of class certification.  By putting off any decision on class

certification, the Judge reduced the case to one lone individual male fighting for his rights.  A

7

dismissal against one guy is not going to cause any ripples in this society. More importantly, it will send a message, along with Donovan's efforts to chill the free speech of men, that anyone wanting to bring a similar class action should forget it. Even if he has the time and energy, he'll be castigated for exercising his rights under the U.S. Constitution only to end in the street with the courthouse doors slammed in his face.

15. In the majority of civil rights cases, the class certification decision is made before any decision on motions to dismiss. The Second Circuit has urged the district courts to make the class certification "as soon as practicable after the *commencement* of [the] action." Henry v. Gross, 803 F.2d 757, 769 (1986)(Court's emphasis). And the Seventh Circuit discourages pre-certification motions to dismiss. Koch v. Stanard, 962 F.2d 605, 607 (1992).

16. Attorney Donovan keeps raising state action as a jurisdictional requirement that must be decided first—it is not. (Donovan Declaration ¶¶ 3, 6, 8, 10). Personal jurisdiction exists because the parties live or do business in New York State, and subject matter jurisdiction exists because the question to be resolved is a federal question. The Judge's questioning did not focus on these jurisdictional issues but the 14th Amendment's Equal Protection clause, which has two requirements: "state action" and invidious discrimination. Those are substantive questions not jurisdictional. Attorney Donovan initially defends the Judge's grilling me on these issues at the conference on the grounds that they were substantive. She considers the issues substantive in ¶ 2 of her Declaration because it serves the argument she makes there, but in later paragraphs, she claims the "state action" issue is procedural because it serves her arguments in those paragraphs. Apparently attorney Donovan believes she can have her way regardless of the inconsistency of her reasoning. I'll go with the reasoning of the U.S. Supreme Court that the 14th Amendment embodies and extends to all individuals substantive protections from "state action". Jett v.

8

<u>Dallas Independent School District</u>, 491 U.S. 701, 731, 109 S. Ct. 2702, 2720, 105 L.Ed.2d 598, 624 (1989).

17.  Attorney Donovan prevaricates when she claims the conference focused solely on the "state action" issue.  (Donovan Declaration ¶ 10).  The judge brought up the invidious discrimination issue a number of times.  The Judge even focused on the details of exactly how much more guys were charged to enter a club than ladies and raised the unpopularity of the lawsuit in connection with discrimination.

18.  Attorney Donovan makes an intentionally false statement when she says that the accusation against the Judge is for being **"sexually biased or prejudiced against men ...."** (Donovan Declaration ¶ 10 (emphasis added)).  The allegations in the motion to disqualify are of the Judge's **"appearance** of sexual bias, sexual prejudice, and partiality against the class of men, including the named plaintiff," (Den Hollander Law Memorandum p. 1 (emphasis added)) and that the October 3rd conference "create[d] the **appearance** that Judge Cedarbaum, whether true or not, is biased and prejudiced against men and creates a perception that she is not impartial in these proceedings," (Den Hollander Initial Affirmation ¶ 14 (emphasis added)).

19.  Defense counsel Donovan claims that the disdainful disregard and animosity exhibited by the Judge towards me by consistently cutting off my answers, pointing out the unpopularity of the lawsuit, and at one point mockingly calling into questions my professional credentials demonstrated no "animus, antagonism or disdain" toward the class of men.  (Donovan Declaration ¶ 8).  Attorney Donovan conveniently forgets that I was standing there not just as a man but as the putative representative of thousands of men.  And, let's be frank, does anyone expect a defense lawyer not to spin what occurs in court or elsewhere.

9

20. Attorney Donovan blissfully ignores that this is a suit to vindicate the rights of men, that all the plaintiffs are men, and that I am standing in their stead. When the Court exhibits palpable antagonism toward me, it is doing the same toward the thousands of guys who continue to be charged more than females at night clubs in violation of the 14th Amendment. When the antagonism within the courtroom as shown by the Judge's repeated interruptions, the professional insult, the remark about the unpopularity of the case, the arguing on behalf of a defendant's motion that was filed five days earlier, the moving up of the originally scheduled conference to just five days after the filing to that defendant's motion, and the delaying, perhaps forever, a decision on class certification in a civil rights case are all combined with the reality beyond the courthouse walls that (1) this suit would cost females lots of money by ending the male subsidization of ladies to party in nightclubs and (2) the past 40 years of institutions in America giving females preferential treatment at the expense of the rights of men, it adds up to at least an appearance of sexual bias, sexual prejudice and partiality toward the male plaintiffs.

21. Defendant Sol also filed an answering declaration but it wasn't filed until 5:52 PM on the Wednesday before the return date of Thursday, November 1, 2007. According to Judge Cedarbaum's rule, 3. Motions C., the declaration should have been filed by 12 noon. Since the declaration was not timely filed, I have not addressed it in this affirmation.

Dated: New York, NY
     October 28, 2007

/S/
_____
Roy Den Hollander (RDH 1957)
545 East 14 Street, 10D
New York, NY 10009
(917) 687 0652

9

### A Different Time

A propeller driven plane drones somewhere overhead far out of sight. Its low monotone humming envelops a warm, spring Sunday afternoon somewhere in the 1950s. I sit on my 24 inch, black, single-gear Schwinn bicycle, keeping my balance by holding onto the door handle of an old, blue, four-door 1947 Dodge.

My consciousness pauses at the moment, feeling vaguely sad for no discernible reason. The week's events ended with this gift of nothing to do: no homework, no television shows, no new housing developments to explore or classmates able to come out and play.

The dead-end street needs a new asphalt topping. Where I am balance on the side, the asphalt has broken up into small gravel-like stones with an isolated weed sprouting up here and there. It is still early spring, the lawns are just beginning to turn green and the tulips and dogwood buds remain closed, waiting for a few consecutive days of warm weather. The air smells fresh, warmed slightly by a gentle breeze.

The droning airplane fills the vacuum of silence on this street with modest middle-class houses in this small suburban town, whose claim to fame will not come until the end of the next decade. Of all the towns in America, this town will have the second highest number of persons per capita to die in Vietnam—all of them men, of course, and all of them guys I knew.

New York State Department of State

http://appsext8.dos.state.ny.us/stwarrants_public/stw_warrants?p_nam...

# New York State Department of State
## State Tax Warrant Notice System
Taxpayer Names

Please note that this record report has been generated by an independent searcher, using the Department of State's, State Tax Warrant Notice On-Line Database. The information contained in this report is NOT an official record of the Department of State.

| Taxpayer Name(s) Selected: | City specified in warrant address record of Taxpayer Searched: | County in which warrant is filed of Taxpayer Searched: |
| --- | --- | --- |
| LULU'S, LLC | Not Applicable | Not Applicable |

Your name selection(s) has returned 3 State Tax Lien Notice histories.
Back Button
Back

### Warrant ID# : E-022837098-W001-4

| Recorded Taxpayer Name(s) | | | | Address | | |
| --- | --- | --- | --- | --- | --- | --- |
| LULU'S, LLC T/A LOTUS | | | | 409 W 14TH ST NEW YORK, NY 10014-1003 | | |

| Docket Date | County | Docket Amount | Dos File Date | Satisfied Date | Vacate Date | Amend Date |
| --- | --- | --- | --- | --- | --- | --- |
| July 20, 2004 | NEW YORK | $48,613.73 | July 20, 2004 | | | |

| Recorded Taxpayer Name(s) | | | | Address | | |
| --- | --- | --- | --- | --- | --- | --- |
| LULU'S, LLC T/A LOTUS | | | | 409 W 14TH ST NEW YORK, NY 10014-1003 | | |

| Docket Date | County | Docket Amount | Dos File Date | Satisfied Date | Vacate Date | Amend Date |
| --- | --- | --- | --- | --- | --- | --- |
| July 20, 2004 | NEW YORK | $48,613.73 | September 19, 2007 | September 10, 2007 | | |

### Warrant ID# : E-010958639-W001-5

| Recorded Taxpayer Name(s) | Address |
| --- | --- |
| | |

New York State Department of State

http://appsext8.dos.state.ny.us/stwarrants_public/stw_warrants?p_nam...

| WILL REGAN INDIVIDUALLY AND AS RESPONSIBLE PERSON OF LULU'S, LLC | | | | 136 W 16TH ST APT 1RW NEW YORK, NY 10011-6200 | | |
|---|---|---|---|---|---|---|
| **Docket Date** | **County** | **Docket Amount** | **Dos File Date** | **Satisfied Date** | **Vacate Date** | **Amend Date** |
| July 21, 2004 | NEW YORK | $46,590.70 | July 21, 2004 | | | |

| Recorded Taxpayer Name(s) | | | | Address | | |
|---|---|---|---|---|---|---|
| WILL REGAN INDIVIDUALLY AND AS RESPONSIBLE PERSON OF LULU'S, LLC | | | | 136 W 16TH ST APT 1RW NEW YORK, NY 10011-6200 | | |
| **Docket Date** | **County** | **Docket Amount** | **Dos File Date** | **Satisfied Date** | **Vacate Date** | **Amend Date** |
| July 21, 2004 | NEW YORK | $46,590.70 | May 26, 2005 | | May 19, 2005 | |

| Warrant ID# : E-022837098-W003-3 | | | | | | |
|---|---|---|---|---|---|---|
| Recorded Taxpayer Name(s) | | | | Address | | |
| LULU'S, LLC T/A LOTUS | | | | 409 W 14TH ST NEW YORK, NY 10014-1003 | | |
| **Docket Date** | **County** | **Docket Amount** | **Dos File Date** | **Satisfied Date** | **Vacate Date** | **Amend Date** |
| November 03, 2006 | NEW YORK | $81,817.56 | November 03, 2006 | | | |

Back Button

* Filed with Department of State on or prior to implementation of electronic filing system, January 8, 2004. Dates for filings made prior to January 8, 2004 must be derived from paper filings and should be obtained from the Department of Taxation and Finance.

Back

[ Division of Corporations, State Records and UCC Home Page ] [ NYS Department of State Home Page ]

10/28/2007 12:36 PM

# DONOVAN DECL.
# EXHIBIT 6

## Joshua Hurwit

**From:**  Samona Butler [SButler@gordonrees.com]
**Sent:**  Thursday, October 25, 2007 10:16 AM
**To:**  LULU-1046630.LEGAL@worksite.gordonrees.com
**Subject:**  FW: Hollander v. Copacabana

**From:** Deborah Swindells Donovan
**Sent:** Wednesday, October 24, 2007 6:17 PM
**To:** Samona Butler
**Subject:** FW: Hollander v. Copacabana

please file

**From:** Deborah Swindells Donovan
**Sent:** Wednesday, October 24, 2007 6:15 PM
**To:** 'Roy Den Hollander'
**Subject:** RE: Hollander v. Copacabana

Roy,

You are entitled to take any action you deem appropriate.  However, I did not obtain those articles by "hacking."  If you read my declaration carefully, you will see that I stated only that it was my understanding that the "articles" had been published on the internet.  The articles were given to me by a third party.

I notice you are not denying that you wrote the offensive articles or that they appeared on the internet at one time.

I am not the least bit concerned with your retaliatory action.  Nor will it intimidate or prevent me from representing my client to the best of my ability.

Deborah

**GORDON & REES LLP**

**Deborah Swindells Donovan**
*Partner*

90 Broad Street, 23rd Floor       Main Phone:   (212) 269-5500
New York, NY 10004                Fax:          (212) 269-5505
email: ddonovan@gordonrees.com
info:  my Bio

San Francisco·San Diego·Los Angeles·Sacramento·Newport Beach·Las Vegas
Portland·Houston·Phoenix·Dallas·New York·Long Island·Newark·Denver
http://www.gordonrees.com

**From:** Roy Den Hollander [mailto:roy17den@gmail.com]
**Sent:** Wednesday, October 24, 2007 6:08 PM

12/17/2009

**To:** Deborah Swindells Donovan
**Subject:** Hollander v. Copacabana

Dear Deborah,

Just to keep you informed, I've filed a complaint with the Internet Computer Crime Center, a partnership of the FBI and National White Collar Crime Center, for your "hacking," they call it computer intrusion, into computer(s) to obtain the articles you published today around noon time.  FYI, the cite for the crime is 18 U.S.C. § 1030(a)(2).

Thanks for the battle.

Best

Roy


--
Roy Den Hollander
Attorney at Law
New York, N.Y.
rdhhh@yahoo.com
(917) 687-0652

San Francisco * San Diego * Los Angeles * Sacramento * Orange County * Las Vegas * Portland * Houston *
Phoenix * Dallas * New York * Long Island * Newark * Denver

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.
IRS CIRCULAR 230 DISCLOSURE
To ensure compliance with requirements by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**GORDON & REES LLP**
**http://www.gordonrees.com**

12/17/2009

# DONOVAN DECL.
# EXHIBIT 7

DEBORAH SWINDELLS DONOVAN
DDONOVAN@GORDONREES.COM

ATTORNEYS AT LAW
90 BROAD STREET
23RD FLOOR
NEW YORK, NY 10004
PHONE: (212) 269-5500
FAX: (212) 269-5505
WWW.GORDONREES.COM

November 1, 2007

**BY REGULAR MAIL**
Honorable Miriam Goldman Cedarbaum
United States District Court
Southern District of New York
500 Pearl Street, Room 1330
New York, New York   10007

      Re:    <u>Hollander v. Copacabana Nightclub, et al.</u>
              Docket No. 07 Civ. 5873 (MGC)

Dear Judge Cedarbaum:

      We represent Defendant Lotus in this case.   We have just received a letter from Plaintiff, Roy Den Hollander, dated October 29, 2007, which cavalierly accuses me personally of committing a crime and copyright violations.  We apologize to the Court for having to respond but we cannot leave such baseless accusations unaddressed.

      Mr. Hollander's outrageous accusations are entirely speculative and merely reflect an effort to deflect attention from the weakness of his case.   The letter is completely irrelevant to any existing issue in the case and should be ignored.  It is a waste of both the Court's time and that of Lotus.

      Should the Court wish me to provide any additional information, I would be happy to do so.

Honorable Miriam Goldman Cedarbaum
November 1, 2007
Page 2

Thank you for your consideration.

Respectfully submitted,

GORDON & REES, L.L.P.

Deborah Swindells Donovan